IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VARIANT HOLDING COMPANY, LLC, | Case No. 14-12021-BLS |
| Debtor. | Hearing Date: September 30, 2014 at 1:30 p.m. (ET) <br> Objection Deadline: September 19, 2014 at 4:00 p.m. (ET) |

## MOTION OF THE BEACH POINT FUNDS FOR AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

BPC VHI, L.P., Beach Point Total Return Master Fund, L.P., and Beach Point Distressed Master Fund, L.P. (collectively, the "Beach Point Funds") respectfully submit this motion (the "Motion") seeking an order directing the appointment of a chapter 11 trustee.[1]  In support hereof, the Beach Point Funds respectfully state as follows:

### I.

### PRELIMINARY STATEMENT

1.     The Beach Point Funds are the holders of over $73 million in secured claims against Variant Holding Company, LLC, the debtor and debtor in possession in the above-captioned bankruptcy case (the "Debtor").  The Beach Point Funds are not just creditors, but are also the victims of a complex fraudulent scheme orchestrated by the Debtor and its management, which, in less than a year after the Beach Point Funds' loan, have siphoned off millions of dollars of corporate assets to insiders, harming the Debtor's creditors and business as a whole.  The Beach Point Funds have obtained evidence of this fraud through discovery in a California state court action (the "State Court Litigation") that they commenced to collect the amounts owed by the Debtor and certain affiliates.  During the State Court Litigation, the rampant fraud

---

[1] A proposed form of order directing the appointment of a chapter 11 trustee is attached hereto as Exhibit "A".

perpetrated by the Debtor and its management has been attested to by several former high-level employees, including the Debtor's former Chief Financial Officer ("CFO") and the Debtor's former Managing Director.[2]

2.       The Debtor and its management perpetrated their fraud through two related schemes, both of which depended on the use of either shell entities, kick-back arrangements, or forged documents.  First, the Debtor and its management absconded with loan proceeds intended to be used for capital expenditures on multifamily apartment complexes owned by the Debtor's direct and indirect subsidiaries (the "Subsidiaries").  Second, they also skimmed proceeds from the sale of certain of the Subsidiaries' properties.  Both schemes resulted in substantial loss to the Debtor's creditors and the value of its estate.

3.       The most costly of the Debtor's fraudulent schemes involved the wrongful diversion of millions of dollars of purported capital expenditure draws through the use of shell entities controlled by the Debtor's Chief Executive Officer ("CEO"), Courtland Gettel, or his family or acquaintances.  This fraud was not an isolated act.  Lisa Jack, the Debtor's former CFO, testified that multiple shell companies were created by Mr. Gettel to fraudulently invoice lenders for services never performed and never intended to be performed.  As a result, rather than using loaned funds for needed capital expenditure work, such funds in large measure were fraudulently diverted to Mr. Gettel.  Indeed, several employees were paid minimum wage only to receive their true salary as a cut of the fraudulent expenses while also avoiding paying taxes on such income.

4.       The Debtor, under the direction of Mr. Gettel and several other senior executives

---

[2] The Beach Point Funds, on information and belief, believe that several key employees responsible for managing the properties of the Subsidiaries have recently resigned.  If this is true, then this is further reason for granting the relief requested herein.  The Beach Point Funds reserve the right to supplement the evidence offered in support of this Motion prior to the hearing date.

who were enriched by the fraud, further structured fraudulent transactions with shell entities to

defraud the Beach Point Funds out of proceeds of sales of the Subsidiaries' properties, which

proceeds the Beach Points Funds were entitled to under their loan agreement. Rather than pay

these proceeds to the Beach Point Funds, thereby reducing the amount owed under their loan,

Mr. Gettel personally enriched himself, and his family and acquaintances, by funneling sale

proceeds to shell entities that then kicked the funds back to Mr. Gettel and other senior

executives of the debtor. After the Beach Point Funds became suspicious of the Debtor, Mr.

Gettel and his attorney went on to forge documents and create fictitious bank accounts to

convince the Beach Point Funds that $6 million of sale proceeds owed to the Beach Point Funds

were being held in escrow when in fact the proceeds had already been taken by Mr. Gettel.

5.      To be clear, these are not simply allegations from a complaint. These facts come

from the sworn testimony[3] of former senior executives of the Debtor as well as the escrow agent

whose signature was forged.[4] Concerns about fraud by the Debtor indeed caused three different

accountants working for the Debtor to recently resign and tell their story to the FBI. As a result

of these whistleblowers, the Department of Justice is actively investigating the Debtor and Mr.

Gettel.[5]

6.      These facts not only expose the Debtor's principals to potential criminal liability.

They also demonstrate that the Debtor cannot be trusted to act in the best interests of the estate.

The Debtor is a holding company, whose only assets of value are its controlling equity interests

---

[3] These facts come from only three depositions that have occurred as discovery is still in its infancy. It should be
noted that none of these witnesses have any interest in the outcome of the suit. Several other depositions of former
employees of the Debtor have been scheduled but have been canceled due to a calculated pattern of obstruction by
the Debtor from witness intimidation, scheduling gamesmanship and the assertion of spurious objections.
[4] Excerpts of transcripts supporting the facts recited herein are attached to the "Declaration of Evan T. Mayor in
Support of Motion of the Beach Point Funds For an Order Directing the Appointment of a Chapter 11 Trustee"
("Mayor Declaration"), as Exhibits A through C. The Mayor Declaration is attached hereto as Exhibit "B".
[5] "Declaration of James M. Pearl in Support of Motion of the Beach Point Funds For an Order Directing the
Appointment of a Chapter 11 Trustee," ("Pearl Declaration") ¶ 3. The Pearl Declaration is attached hereto as
Exhibit "C".

in the Subsidiaries. The Subsidiaries are other holding companies or special purpose entities that

own real property throughout the country. Accordingly, the only real value in the Debtor's estate

is derived from the value of the Subsidiaries' properties and the ability to realize maximum sale

proceeds from the same. However, the Debtor and its management have proved themselves

incapable of managing assets without diverting value to insiders. By funneling cash otherwise

intended to fund capital expenditure work for the subject properties, the Debtor has allowed

many of the properties to fall into a state of complete disrepair. As explained in detail below,

certain of the properties have lost their certificates of occupancy. Others suffer from raw sewage

flowing through the units, citations for Housing Code violations, structural defects, and failed

equipment requiring hundreds of thousands of dollars of repair work. The properties are in such

a poor state from the failure of the Debtor to use loan proceeds for their permitted purposes

rather than the enrichment of the Debtor's management, that the current manager for many of the

properties, CFLane, LLC ("CFLane"), has threatened to walk away from the assets for fear of

reputational as well as financial harm flowing from its management of properties in such poor

condition. Should this occur, the estate's ability to realize value from the properties would be

severely undermined, as CFLane is responsible for collecting current rent. CFLane will also

likely be instrumental in the marketing of the Subsidiaries' properties given its first-hand

knowledge of the assets, which will likely be valuable to any interested buyer.

      7.     The above examples of fraud, dishonesty, and gross mismanagement carried out

by the Debtor provide sufficient "cause" to make this the archetypal case requiring appointment

of a chapter 11 trustee under Bankruptcy Code section 1104(a). Not only has the Debtor and its

management depleted any trust that might be placed in a debtor in possession while under the

control of the bankruptcy court, the Debtor has already placed the estate at risk by unnecessarily

inflating the amount of its and its Subsidiaries' debt to enrich themselves at the expense of creditors, while taking actions that have substantially impaired the value of the properties that are critical to this bankruptcy case. Accordingly, the appointment of a trustee is in the best interests of creditors.

8.      Seemingly acknowledging the "cause" for appointment of a chapter 11 trustee, the Debtor is proposing to employ Development Specialists, Inc. ("DSI"), and to appoint Bradley D. Sharp as Chief Restructuring Officer ("CRO").[6] But this simply is not a case where a debtor should be permitted to absolve itself of its misconduct through the appointment of a CRO. Even with Mr. Sharp in place as the CRO, it is clear that the Debtor's management and ownership will retain a significant amount of control over the Debtor's assets and over the CRO (including the ability to terminate the CRO). And given the current management's clear willingness to deceive creditors, and their persistent intent to hide their fraud, there simply can be no confidence that this estate is being properly managed without the appointment of a chapter 11 trustee assuming full control.

## II.

## BACKGROUND INFORMATION

### A.    Petition Date and Jurisdiction.

9.      On August 28, 2014 (the "Petition Date"), the Debtor commenced the above-captioned bankruptcy case by filing a voluntary petition under chapter 11 of the Bankruptcy Code.

10.     This Court has jurisdiction over this matter under 28 U.S.C. § 1334(b). This is a core matter under 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district under 28 U.S.C.

---

[6] *See* Motion of Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and Restructuring-Related Services, *Nunc Pro Tunc* as of the Petition Date [D.I. 4] (the "CRO Motion").

§ 1408.[7]

**B.      The Debtor and its Business.**

11.      The Debtor is a holding company that, through its controlling interests in numerous limited liability companies (the "Subsidiaries"), indirectly owns numerous real estate parcels across the country.  The Debtor's interests and assets can be sorted into three categories, each of which are explained below:  (i) the "H14 Portfolio"; (ii) the "FX3 Portfolio"; and (iii) the "Other Properties Portfolio."[8]  On information and belief, the Debtor is the managing member of each Subsidiary it directly owns, and each Subsidiary is the managing member or general partner of each entity it directly owns.  As a result, the Debtor has ultimate-decision making authority as to the sale and operation of all of the Subsidiaries' properties, and the distribution of proceeds therefrom.  The Debtor's ultimate beneficial owners are a series of trusts associated with Mr. Gettel and his family.

**1.      The H14 Portfolio.**

12.      The Debtor, through certain Subsidiaries, owns fourteen multi-family residential developments in and around Houston and Dallas, Texas (the "H14 Properties").  The Debtor's interest in the H14 Properties is the result of the following series of affiliates.  The Debtor owns 100% of the membership interests in Laser Focus Holding Company, LLC ("Laser Holding"), which owns 100% of the membership interests in Laser Focus Commercial Investments, LLC ("Laser Commercial").  Laser Commercial is the indirect owner of fourteen special purpose entities (the "H14 SPEs"), which each own a separate H14 Property.

---

[7] Pursuant to Local Rule 9013-1(f), the Beach Point Funds hereby confirm their consent to the entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

[8] The Debtor has submitted an organizational chart reflecting its ownership and control of the Subsidiaries and their underlying assets as Exhibit "A" to the Declaration of Courtland Gettel Regarding Case Filing (the "Gettel Declaration") [D.I. 2].

13.     The H14 Properties are all encumbered by a loan between the H14 SPEs and Doral Bank (the "H14 Doral Loan"). The H14 Doral Loan consists of a $45 million initial advance, and a promise by Doral Bank to, upon satisfaction of certain conditions by the H14 SPEs, loan up to an additional $20 million to fund capital expenditures for the H14 Properties.

**2.     The FX3 Portfolio.**

14.     The Debtor, through more Subsidiaries, owns eleven multi-family residential developments in Texas, Maryland, Nevada, South Carolina, and Virginia (the "FX3 Properties"). The Debtor's interest in the FX3 Properties is the result of the following series of affiliates. The Debtor owns 100% of the membership interests in Numeric Commercial Investments, LLC ("Numeric Commercial"). Numeric Commercial indirectly owns and controls eleven special purpose entities (the "FX3 SPEs"), which each own a separate FX3 Property.[9]

**3.     Other Properties Portfolio.**

15.     The Debtor, through Numeric Commercial or other holding companies, owns a number of additional parcels of real property throughout Arizona, Texas, and Georgia (the "Other Properties"). Included among the entities that own such properties are Tucson Mall Suites, LLC ("Tucson Mall") and Spencer Highway Self Storage, LLC ("Spencer Highway"), both of which are wholly owned by Numeric Commercial.

**C.     The Beach Point Funds are Owed Over $73 Million by the Debtor.**

16.     As of the Petition Date, the Beach Point Funds are owed over $73 million by the Debtor pursuant to the terms of that Amended and Restated Loan Agreement dated as of October

---

[9] As explained in detail below, additional properties used to be indirectly owned by Numeric Commercial, but such properties have been sold as part of the fraud detailed herein.

11, 2013 (the "Loan Agreement").[10] The Beach Point Funds' mezzanine loan to the Debtor (the "Loan") was used by the Debtor to finance the acquisition of the H14 Properties, and to finance Numeric Commercial's purchase of the equity interests of a third party in the FX3 Portfolio. As a result of the Beach Point Funds' agreement to fund the Loan, the Debtor was able to acquire the H14 Portfolio and increase its equity position in the FX3 Portfolio with minimal equity investment. Despite the lack of an upfront equity investment by Mr. Gettel or the Debtor's other stakeholders, based on Mr. Gettel's $300 million valuation of all of the Debtor's and Subsidiaries properties,[11] and estimation of liabilities, Mr. Gettel will have benefited from the Beach Point Funds' Loan by obtaining approximately $70 million of net value for the Debtor's owners. As a result, there can be no denying that, based on the Debtor's estimation, the Beach Point Funds' Loan to the Debtor has been highly beneficial to the Debtor in enlarging its equity position. Far from a "loan to own"[12] financing arrangement as alleged by the Debtor, the Beach Point Funds' Loan was structured as standard mezzanine financing, allowing the Debtor to leverage its potential equity position, which according to the Debtor's valuations has grown substantially.

17.    The Loan is evidenced by two promissory notes in the aggregate face amount of $73.5 million. The Loan is secured by the Debtor's and certain of the Subsidiaries' interests in the H14 Portfolio, the FX3 Portfolio, and certain of the Other Properties Portfolio.[13] Specifically, with respect to the H14 Portfolio, the Loan is secured by, among other personal property rights, 100% of the membership interests in Laser Holdings,[14] Laser Holding's 100%

---

[10] A true and correct copy of the Loan Agreement is attached as Exhibit "1" to the "Declaration of Brian Himot in in Support of Motion of the Beach Point Funds For an Order Directing the Appointment of a Chapter 11 Trustee" ("Himot Declaration"). The Himot Declaration is attached hereto as Exhibit "D".

[11] Gettel Declaration, ¶ 8.

[12] *Id.* at ¶ 7.

[13] The Beach Point Funds' security interest in property of the Debtor and certain of the Subsidiaries are held through the Beach Point Funds' administrative agent, Cortland Capital Market Services LLC.

[14] The membership interests in Laser Holding are currently owned as follows: (i) the Debtor, 94%; (ii) Conix, Inc., 3%; and (iii) Courtland Gettel, 3%. Gettel Declaration, ¶ 15.

membership interest in Laser Commercial, and all proceeds thereof.[15]  With respect to the FX3

Portfolio, the Loan is secured by, at a minimum, all of the Debtor's economic interests in

Numeric Commercial, and proceeds thereof.[16]  As a result of these security interests, the Beach

Point Funds' loan is secured by, at a minimum, all distributions from Laser Holdings in the H14

Portfolio, and from Numeric Commercial on account of the FX3 Portfolio and the Other

Properties Portfolio.[17]  Finally, regarding the Other Properties Portfolio, the Loan is secured by a

pledge of Numeric Commercial's 100% membership interests in Tucson Mall and in Spencer

Highway.

18.     The Loan is guaranteed by certain affiliates of the Debtor.  Specifically, Numeric

Commercial and certain other entities have guaranteed the full amount of the Loan on an

unconditional basis (the "Full Guaranty").  Certain trusts and individuals, including Courtland

Gettel, the principal decision-maker and CEO for the Debtor,[18] entered into a limited guaranty of

Loan that became full recourse upon the Debtor's filing, if not before based on the fraud

perpetrated by the Debtor and its affiliates against the Beach Point Funds (the "Limited

Guaranty", and together with the Full Guaranty, the "Guaranties").

**D.      For Almost a Year, The Debtor Has Run a Fraudulent Enterprise of Entities Used
         Principally to Defraud Lenders of Millions of Dollars.**

**1.      The Debtor Used Fake Capital Expenditure Invoices to Defraud Lenders.**

19.     The costliest fraud committed by the Debtor to date (that has been discovered),

---

[15] *See* Loan Agreement, §§ 3.01(a)(i), (b)(i).

[16] Loan Agreement, §§ 3.01(b)(vi), (vii).  A copy of the financing statement perfecting this security interest is attached to the Himot Declaration as Exhibit "2".

[17] In the Gettel Declaration, the Debtor contends that "[t]he Debtor, through Numeric and other subsidiaries, owns an additional 13 apartment complexes that are unencumbered by Beach Point's and Cortland's asserted liens and claims."  Gettel Declaration, ¶ 13.  This statement appears to be in reference to the FX3 Properties and certain of the Other Properties.  The Beach Point Funds acknowledge that they do not hold deed of trusts with respect to these underlying properties.  However, the plain language of the Loan Agreement provides that the Beach Point Funds' liens do cover the Debtor's interests in the FX3 Portfolio and the Other Properties Portfolio.

[18] Gettel Declaration, ¶ 1.

was the Debtor's submission of fake invoices and spreadsheets to Doral Bank to justify the

release of $12 million in disbursements under the H14 Doral Loan to fund replacement and

alteration work on the H14 Properties ("CapEx Work"). The Beach Point Funds have discovered

that a large amount of the CapEx Work was never commenced and never intended to be

completed. Instead, the Debtor and its affiliates and principals diverted the money to related

entities controlled by Mr. Gettel or his family and acquaintances, substantially decreasing the

value of some of the Debtor's only meaningful assets. At least $4.8 million of the funds

disbursed by Doral Bank appear to have been borrowed by the H14 SPEs, only to be diverted to

related entities through a kick-back arrangement. Specifically, the Debtor represented through a

$4.8 million invoice to Doral Bank that an entity called Premier Home Development Group LLC

("Premier Home") was doing renovation work on the H14 Properties, which included the

purchase of 15,000 new appliances. Once Doral Bank funded the $4.8 million on account of this

invoice, the person in charge of Premier Home kept $100,000 for himself, and wired the rest to

Helena, LLC ("Helena"), an entity controlled by an individual named Mike Bernstein, an

employee of the Debtor.[19] This Premier Home kickback was obviously never disclosed to the

Beach Point Funds.

20.     In addition to the blatant fraud involving the Premier Home transaction, there are

significant questions regarding certain of the invoices submitted by entities known as Apartment

Consulting & Renovations and Texas Rehab Specialist, which purportedly received $3.56

million and $2.9 million respectively from Doral Bank's loan proceeds. Ms. Jack, the former

CFO for the Debtor, has testified as to her concern that these too were illegitimate entities related

---

[19] Mayor Declaration, Ex. A at 43:3–45:4. The Debtor has represented that $1.56 million of these funds were
purportedly returned to Doral Bank, but the Beach Point Funds have not confirmed the source of these returned
funds.

to the Debtor and its affiliates, and also used as part of their scheme to defraud creditors.[20]
Indeed, litigation counsel for Debtor has admitted that Apartment Consulting & Renovations is
now a defunct entity for which his client has no contact information.[21]  When noticed for
deposition, this entity never responded, did not show for deposition, and its $3.56 million in
expenses cannot be verified in any way.[22]

> **2.    The Debtor's Failure to Complete CapEx Work as Represented Has Affected
> the Life and Safety of Individuals That Inhabit the H14 Properties.**

21.    The failure to use Doral Bank's loan proceeds to properly fund CapEx Work has
not only harmed the Debtor and its affiliates' creditors; it has also harmed the individuals that
inhabit the H14 Properties for which the CapEx Work should have been performed.  There is
significant concern regarding the condition of both the H14 Properties and FX3 Properties,
because the Debtor's principals and affiliates, while funneling millions of dollars into their own
pockets, have refused to pay vendors and fund critical repairs.  This neglect is well publicized.
Several newspapers and public records have documented raw sewage flowing through residences
of one of the FX3 Properties, an imminent danger to individuals' health and safety, and to the
value of the Debtor's estate.[23]  That apartment complex has been cited by the city of Pasadena,
Texas for operating without a certificate of occupancy confirming that the building complies
with local ordinances and state regulations.  Further, the Beach Point Funds have learned of
numerous complaints about the failure to pay vendors related to the H14 Properties and FX3
Properties, and CFLane, the property manager for these properties, has threatened to walk away.

22.    Moreover, on information and belief, there have been life and safety code
violations at the Pines of Westbury Apartments ("Pines of Westbury"), one of the H14

---

[20] *Id.* at 48:9–50:10, 57:1–58:8.
[21] Mayor Declaration, ¶ 7.
[22] *Id.*
[23] Himot Declaration, Ex. 17.

Properties, and the city of Houston had scheduled a visit to the complex to issue violations. These violations are based on, in part, structural defects in balconies that need to be repaired. The Beach Point Funds are informed and believe that $1 million is needed to fix the issues at Pines of Westbury. Further, on information and belief, another complex in the H14 Properties, the Park Texas Apartments, has had significant problems with the air conditioning unit that services the whole complex. The unit is purportedly leaking and $200,000 is needed to replace it. The unit had already been repaired twice after it stopped working, and there is concern that the unit would go out again, causing major problems for residents during the hot Texas summer.

23.    In addition, without obtaining the approval of Doral Bank as required in connection with the H14 Doral Loan, the Debtor and the Subsidiaries have destroyed three buildings located at complexes known as the Park Texas Apartments and the Ashton Oaks Apartments. This is a flagrant violation of a loan agreement between the Debtor's Subsidiaries and their lender and, given the lack of funds to replace the buildings, has resulted in a loss of hard assets of the Subsidiaries, thereby lessening the value of the Debtor's equity interests in those Subsidiaries. In sum, the Debtor and the Subsidiaries have proven themselves incapable (from both their fraudulent actions and incompetence) of preserving properties in a manner sufficient to ensure the safety of tenants or to preserve the Debtor's equity interests in the Subsidiaries, and cannot be trusted to adhere to policies or restrictions intended to provide creditor transparency.

### 3.    The Debtor Fraudulently Skimmed Millions in Bogus Closing Costs Provided to Shell Companies and Related Entities.

24.    Pursuant to the Loan Agreement, the Debtor and the Subsidiaries were entitled to sell the FX3 Properties, H14 Properties, and certain of the Other Properties only if the Beach Point Funds received any proceeds from the sales in excess of the amounts necessary to release

any claims secured by first-priority liens on the subject properties.[24]  The Debtor and its

principals orchestrated a complex scheme to siphon off sale proceeds from the sale of five

groups of the properties[25] using shell companies and fraudulent invoices.  This scheme, along

with the transactions used to divert capital expenditure loan proceeds, involved approximately

ten, and perhaps more, different employees of the Debtor or its affiliates, some of which were

paid minimum wage on the books but paid additional tax-free compensation through a series of

kick-back arrangements and fraudulent invoices.[26]

25.     Specifically, the Debtor represented to the Beach Point Funds that it used sales

proceeds to pay several entities millions of dollars for legitimate services performed in

connection with the sales.  Discovery in the State Court Litigation has revealed that these entities

received exorbitant fees for services that were not performed or could not be verified by Debtor's

accountants.  Most of the money was not retained by the entities but instead kicked back to Mr.

Gettel with the multiple participants sharing in the kickback scheme.  These arrangements were

designed to funnel millions of dollars of funds from the sales of the Subsidiaries' properties

away from the Beach Point Funds, in violation of the Loan Agreement, principally for the benefit

of Mr. Gettel.

26.     The statements provided to the Beach Point Funds represented that the Debtor

paid almost $2 million to an entity known as The Waterfall Group, LLC ("Waterfall") for alleged

supplemental brokerage services in connection with the sales of the properties.  Specifically,

---

[24] Loan Agreement, § 4.03.
[25] The five groups of properties are:  (a) a group of self-storage facilities located in North and South Carolina ("NC Storage"); (b) an apartment complex in Tampa, Florida ("San Marin"); (c) an apartment complex in Fort Worth, Texas ("Remington Oaks"); (d) an apartment complex in Commerce, Georgia ("Third Maryland"); and (e) an apartment complex in DeSoto, Texas ("Pecan Crossing").
[26] Ms. Jack, the Debtor's CFO, testified that Mr. Gettel's structuring of several different transactions to avoid tax liability initially sparked her suspicion of the Debtor's rampant fraud.  Mayor Declaration, Ex. A at 140:5–14, 85:10–87:7, 93:1–94:8, 157:8–23, 158:7–24, 188:22–189:2; Ex. B. at 25:18–21, 48:10–14, 67:9–12, 78:19–79:5, 85:11–86:8.

Waterfall was paid $1.176 million from the sale of NC Storage, $540,000 from the sale of San Marin, and $260,000 from the sale of Pecan Crossing. However, the funds paid to Waterfall from these sales were not for bona fide services, and, were in fact simply kicked back to Courtland Gettel. Specifically, according to the testimony of Dan Wesson,[27] who runs Waterfall and was also a Managing Director for the Debtor, these funds were deposited with Waterfall only so that they could then be wired at the direction of Courtland Gettel to Sui Generis WS, LLC ("Sui Generis"), a shell entity controlled by Gettel.[28] The Debtor, through its Senior Managing Director, explicitly instructed Mr. Wesson to not disclose this arrangement to the Beach Point Funds.[29] Moreover, Wesson testified that he was not even a licensed broker on at least one of these sales, so he could not accept any commissions with respect to the sale. Finally, Mr. Wesson has told counsel for the Beach Point Funds that the Debtor forged Wesson's name on two listing agreements the Debtor sent to the Beach Point Funds representing that Wesson was a broker on the NC Storage and San Marin sales.[30]

27.    In addition to testimony regarding an explicit kick-back arrangement among the Debtor, Waterfall, and Sui Generis, additional facts suggest that Mr. Gettel also used Sui Generis as a tool for fraudulently diverting cash from the Debtor in other ways. Sui Generis directly received approximately $600,000 on the San Marin sale, which closed on January 28, 2014. When the Beach Point Funds requested substantiation of this payment, the Debtor emailed the Beach Point Funds a consulting agreement between the Debtor and Sui Generis that was dated March 15, 2013.[31] The agreement provides that one of the services Sui Generis was to provide,

---

[27] Notably, just prior to his deposition, Mr. Wesson received a text message threatening him not to testify. Mr. Wesson testified that he knew this text was from Mr. Gettel. Mayor Declaration, Ex. B at 13:22–14:19, 138:5–141:19.
[28] *Id.* at B at 182:2–21, 9:20–12:25.
[29] *Id.* at 177:1–15.
[30] *Id.* at 90:6–91:1 & ¶ 5.
[31] A true and correct copy of this consulting agreement is attached to the Himot Declaration as Exhibit 9.

among others, was "advis[ing] as to public relations steps to be taken for marketing project post death on property." However, the death that the contract refers to at San Marin occurred on July 21, 2013, more than four months _after_ the date of the consulting agreement. It is clear the consulting agreement was created, albeit sloppily, by the Debtor to defraud the Beach Point Funds.

### 4. The Debtor's Principals and Agents Fabricated Documents, Forged Signatures, and Opened a Fake Bank Account to Misrepresent to the Beach Point Funds the Location Of $6.1 Million in NC Storage Proceeds.

28.    Perhaps the most pervasive example of the Debtor's willingness to cover up its fraud involves the sale of NC Storage. When NC Storage was sold, there was approximately $6.1 million in proceeds that were due to the Beach Point Funds under the Loan Agreement. Without the knowledge of the Beach Point Funds, NC Storage, LLC, the entity that owned NC Storage and a wholly owned indirect subsidiary of Numeric Commercial, deposited the $6.1 million with Leverage Exchange Group, LLC ("Leverage Exchange"), a 1031 exchange facilitator, in order to complete a 1031 exchange for NC Storage.[32] NC Storage, LLC did not acquire a replacement property within the required time period to complete a 1031 exchange, and on January 29, 2014, the $6.1 million was returned by Leverage Exchange to NC Storage, LLC.[33] The Beach Point Funds did not even become aware of the NC Storage sale or the $6.1 million in proceeds it was due from that sale until weeks after the sale's closing.

29.    Although the $6.1 million had already been returned to NC Storage, LLC in January due to the failed 1031 exchange, a representative of the Debtor blatantly misrepresented to the Beach Point Funds that the exchange was still active. The representative asked for the

---

[32] A 1031 exchange allows an investor to defer capital gains tax on the sale of real property by utilizing an exchange intermediary to hold the funds. The investor then identifies replacement property, and the exchange funds are used to purchase the replacement property. If the investor does not identify a replacement property within 45 days, then the cash must be returned to the investor.

[33] Mayor Declaration, Ex. C at 23:1–24:8, 29:9–12, 35:2–36:22, 76:9–12.

Beach Point Funds' permission to continue the exchange, and, in order to mislead the Beach Point Funds into believing it was active, even provided property tours of two potential 1031 replacement properties to a representative of the Beach Point Funds. The Beach Point Funds did not agree to permit the exchange, but agreed to consider it as long as the proceeds were held in escrow on the condition that they be sent to the Beach Point Funds if the Beach Point Funds did not approve the exchange by a specific date. On March 28, 2014, Cash Doye, the Debtor's Senior Managing Director,[34] emailed the Beach Point Funds with instructions incorporating the Beach Point Funds' request, purportedly executed by Brigitte Echave, an escrow agent at Leverage Exchange. When the Beach Point Funds became suspicious of the Debtor's fraud, it demanded the release of the $6.1 million from the escrow account. The escrow agent never responded to the Beach Point Funds' demand. On June 12, 2014, after the initiation of the State Court Litigation, the administrative agent for the Beach Point Funds received a wire for approximately $6.1 million. Although the Beach Point Funds were pleased to receive these funds, the facts elicited in discovery further evidence the Debtor's and its principals' fraudulent scheme and the desire to hide their theft.

30.     First, Ms. Echave has testified that she never saw the March 28 escrow instructions, and that the signature on these instructions, purporting to be hers, was forged.[35] Second, the account from which the Beach Point Funds were wired $6.1 million did not actually belong to Leverage Exchange. Rather, Jeff Greenberg, counsel for the Debtor, sent the wire.[36] However, Mr. Greenberg attempted to make it look like the wire came from Leverage Exchange, as he opened an account with USBank under the name of Leverage Exchange, and used that

---

[34] Cash Doye is advertised as the Senior Managing Director for Variant Commercial Real Estate, which, on information and belief, is a dba for the Debtor.

[35] *Id.* at Ex. C at 31:1–33:25.

[36] Himot Declaration, Ex. 14.

account to wire the $6.1 million to the Beach Point Funds.[37]  When the attorney of the Debtor is

prepared to not only look the other way when the principals are committing fraud but also

actively participate, this mandates that neither the Debtor nor its principals or existing agents and

attorneys should be permitted to retain any control over the Debtor's or the Subsidiaries' assets.

**E.**    **The Debtor Commenced this Bankruptcy to Enjoin the State Court Litigation and the Beach Point Funds' Foreclosure Sales.**

31.    On December 31, 2013, the Debtor failed to make the first of several payments

due under the Loan Agreement when it failed to make a mandatory amortization payment under

one of the notes.  Shortly thereafter, the Beach Point Funds discovered that the sale of NC

Storage occurred without being reported to the Beach Point Funds.  In April, the Beach Point

Funds became suspicious of the Debtor when it learned of some discrepancies in construction

invoices submitted by the Debtor to Doral Bank, and of the resignation of the Debtor's CFO

(which occurred in January but was not discovered by the Beach Point Funds until April).  After

initial inquiries from representatives of the Beach Point Funds, the Debtor responded to the

Beach Point Funds' requests for information by further breaching its obligations under the Loan

Agreement through the failure to make mandatory interest payments due on May 1, 2014.  These

failures constituted an "Event of Default" under the Loan Agreement and the notes.  On May 7,

2014, the Beach Point Funds, through their administrative agent, served on the Debtor,

guarantors, and all other necessary parties under the Loan Agreement a notice of default stating

that the debt owing to the Beach Point Funds was in default, and demanding payment of the

same.  With the exception of the approximately $6.1 million wire sent in June to cover up the

fraudulent NC Storage transaction, which amount has been applied to the Debtor's outstanding

debt pursuant to the terms of the Loan Agreement, neither the Debtor nor the guarantors made

---

[37] Mayor Declaration, Ex. C at 69:10–71:19, 91:1–14.

any payment in response to the notice of default.

32.     On May 19, 2014, the Beach Point Funds commenced the State Court Litigation against the Debtor, certain affiliates that guarantied the Debtor's obligations under the Loan Agreement, and Cash Doye (the "Defendants"). In the State Court Litigation, the Beach Point Funds are seeking recovery of amounts owed under the Loan Agreement and Guaranties, and are also seeking punitive and other damages as a result of the Defendants' fraudulent scheme perpetrated against the Beach Point Funds. In this litigation, the Beach Point Funds have uncovered substantial evidence of fraud, highlighted by the facts discussed above.

33.     In addition to commencing the State Court Litigation, the Beach Point Funds, on July 3, 2014, through their administrative agent, served a "Notification of Disposition of Collateral" on the Debtor and the other owners of Laser Holding (which indirectly owns and controls the H14 Properties), notifying them that the Beach Point Funds intended to sell the membership interests in Laser Holding at a public auction on August 8, 2014 under UCC § 9-610 (the "Foreclosure Auction").[38] Even prior to commencing these bankruptcy cases to take advantage of the automatic stay, the Debtor and its principals seemed to have every intention of frustrating the completion of the Foreclosure Auction. During the marketing process, the Beach Point Funds learned that while it was marketing the LLC interests in Laser Holding, the Debtor and its affiliates had retained brokers and had started aggressively marketing the underlying parcels of real property, including the FX3 Properties and the H14 Properties. Not only did this action appear designed to frustrate the Beach Point Funds' marketing efforts, but, in light of the Debtor's pervasive history of fraudulent acts, it raises significant concern that the Debtor and its principals may again try to siphon off proceeds from property sales while leaving its creditors

---

[38] The Beach Point Funds also commenced foreclosure sales with respect to the membership interests in Tucson Mall and Spencer Highway, but voluntarily cancelled those sales.

without any meaningful recourse.

34.      By filing this bankruptcy case, the Debtor has temporarily stayed the State Court Litigation against the Debtor and the Foreclosure Auction.  The Court should appoint a chapter 11 trustee to ensure that while the Debtor is in bankruptcy, the Debtor's assets are not further diverted to insiders or to entities controlled by the Debtor's current management in exchange for no value.

**III.**

**BASIS FOR RELIEF REQUESTED**

A.      **The Court Should Appoint a Chapter 11 Trustee.**

      1.      **Appointment of a Trustee is Required Under Bankruptcy Code Section 1104(a)(1).**

35.      The Bankruptcy Code requires the Court to remove a debtor's management and appoint a chapter 11 trustee "for cause" where there is "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management . . . ."  11 U.S.C. § 1104(a)(1); *see also In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 473 (3d Cir. 1998).  The Bankruptcy Code's list of wrongs constituting fraud is not exclusive; other factors that mandate appointment of a trustee for cause include "conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence."  *In re Altman*, 230 B.R. 6, 16 (Bankr. D. Conn. 1999), *aff'd in part, vacated in part*, 254 B.R. 509 (D. Conn. 2000).  Once a party has proven "cause," appointment of a chapter 11 trustee is mandatory.  *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 318 (3d Cir. 2004).

a.    The Debtor's and Its Management's Gross Fraud and Dishonesty Mandate Appointment of a Chapter 11 Trustee.

36.    In this case, there should be no question that the Debtor's management is guilty of fraud and dishonesty.  Courts have regularly found that diversion of funds and misuse of corporate assets constitute fraud or dishonesty.  *See, e.g.*, *In re PRS Ins. Grp., Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001) (citing *In re Bibo, Inc.*, 76 F.3d 256, 257–58 (9th Cir. 1996) ("appointment of a trustee was mandated where management had siphoned funds from the debtor through kickbacks"); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 (3d Cir. 1989) ("systematic syphoning of debtor's assets to other companies under shareholder's common control constituted cause for appointment of trustee")).  Appointment of a chapter 11 trustee is particularly warranted where a debtor's principals complete transactions that deprive third parties of contractual rights, and seek to shield their actions through "secrecy and lack of candor . . . ."  *In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 111 (Bankr. S.D.N.Y. 2008).

37.    In this case, the Debtor's principals and management have not merely diverted corporate funds by wiring such funds from a corporate account to a personal account.  Rather, they have cautiously orchestrated a complex scheme of shell companies controlled by insiders, false "consulting" agreements with such entities, and fictitious statements for services never rendered.  This fraudulent activity has not only become exposed through discovery in the State Court Litigation, but it has garnered the attention of federal law enforcement.  Further, the conduct of the Debtor's management, in addition to evidencing a desire to take corporate assets for their own benefit, demonstrates a willingness and ability (at least temporarily) to take any action necessary to shield their actions from creditors, including forgery and the commission of multiple state and federal crimes.  This sort of dishonesty, and the material misrepresentations the Debtor and its management have made to the Beach Point Funds to date, prove their inability

to serve as fiduciaries of the estate.  The appointment of a trustee here is thus mandatory.  *In Euro-American Lodging Corp.*, 365 B.R. 421, 432 (Bankr. S.D.N.Y. 2007) ("Dishonesty provides a reason to appoint a chapter 11 trustee under § 1104(a)(1)."); *Okla. Refining Co. v. Blaik (In re Okla. Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).

38.     Further, the Debtor's history of self-dealing mandates appointment of a trustee because it cannot be trusted to act as an honest broker.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'"); *In re William H. Vaughan & Co.*, 40 B.R. 524, 526 (Bankr. E.D. Pa. 1984) (holding that appointment of a trustee was necessary because the debtor could not be trusted to scrutinize dealings between debtor and debtor's president).  The Debtor has demonstrated that its only interest is diverting as much value to its principals and insiders as possible, an interest that is diametrically opposed to that of the Debtor's creditors in this case.  *See In re Marvel Entm't Grp., Inc.*, 140 F.3d at 472–73 (holding that acrimony among creditors, "when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor," may constitute cause for appointment of a trustee).

39.     Courts have found "cause" to appoint a chapter 11 trustee under much less flagrant circumstances.  For example, in *Euro-American Lodging*, a bankruptcy court appointed a trustee due to the debtor's "padding the creditors list," failing to pay taxes prepetition, and operating without necessary licensing.  *Euro-American Lodging Corp.*, 365 B.R. at 426–27.  The Beach Point Funds have not yet had the opportunity to conduct discovery regarding the Debtor's

creditor list, but the fraud warranting appointment of a trustee in this case far exceeds the "cause" found in *Euro-American Lodging*. In short, the Debtor conducted a fraudulent scheme whereby the Debtor siphoned off cash to principals of the Debtor through dummy entities and kick-back arrangements. Certain of these transactions were for the benefit of employees of the Debtor, apparently as a form of tax-free compensation. Further, due to the improper transfer of funds that should have been allocated to CapEx Work, the Debtor and its Subsidiaries have allowed the value of the properties to substantially deteriorate, in at least one circumstance resulting in the loss of necessary licensing. If cause existed for the appointment of a trustee in *Euro-American Lodging*, then it certainly exists in this case.

40.     In sum, the Debtor has for months been engaged in a series of self-dealing transactions designed to siphon off funds for its and certain insiders' benefit at the expense of its creditors. This conduct falls plainly within section 1104(a)(1)'s definition of "cause."

    b. <u>The Debtor's Gross Mismanagement of Corporate Assets Further Warrants Appointment of a Chapter 11 Trustee.</u>

41.     The diversion of corporate funds for the personal benefit of insiders, resulting in the deterioration of assets necessary to the value of the Debtor's estate, further evidences "gross mismanagement," and mandates appointment of a chapter 11 trustee. *E.g.*, *In re PRS Ins. Grp., Inc.*, 274 B.R. at 387 (citing *Intercat, Inc.*, 247 B.R. 911, 923 (Bankr. S.D. Ga. 2000)). In the absence of a debtor's ability to explain a legitimate reason for the diversion or transfer of assets to corporate insiders, gross mismanagement exists to appoint a chapter 11 trustee. *Id.*

42.     In the present case, even if the Court were to ignore the shocking evidence of the Debtor's insiders siphoning off sale proceeds that should have been properly paid to the Beach Point Funds, the gross mismanagement the Debtor has evidenced to date itself warrants appointment of a chapter 11 trustee. At its simplest form, had the Debtor not diverted funds to

insiders, such funds would have been used to pay down the Beach Point Funds' over $73 million secured debt, preserving value for the Debtor's unsecured creditors. Or, if the Debtor had spent proceeds it borrowed from Doral Bank for the purposes for which the loan was intended, the CapEx Work, instead of converting such funds for its and its management's benefit, the properties and hence the Subsidiaries would have more value for the benefit of the Debtor's estate.

43.    The Debtor's mismanagement of its assets is not only evidenced by the effect it has had on the Debtor's balance sheet. Evidence of the Debtor's gross mismanagement can be gleaned from the numerous examples of the Debtor's failure to adequately maintain the apartment complexes owned by the Debtor's Subsidiaries. One of the apartment complexes owned by the Subsidiaries has such faulty plumbing that tenants have endured sewage flowing through the units. That same complex has been cited for several other Housing Code violations, and the city within which it is located has refused to issue a certificate of occupancy for the property, which is intended to certify that a building complies with local and state ordinances and regulations. Further, the Subsidiaries' properties suffer from substantial structural defects, and one complex's air conditioning system requires hundreds of thousands of dollars of repair work. The Subsidiaries' properties, which are critical to the value of the Debtor's estate, are in such disrepair due to the malfeasance of the Debtor's and Subsidiaries' management that CFLane, the current property manager, has threatened to cease overseeing the properties.

44.    This is not merely a case of the Debtor's management blatantly stealing from its largest creditor. It is also a case of the Debtor and its management utterly disregarding what is best for the business, creditors, and tenants that must live every day with the effects of the Debtor's malfeasance. Such gross mismanagement independently provides cause for the

appointment of a chapter 11 trustee.

        c.      The Debtor's Retention of a CRO Does Not Negate the Need For a
Chapter 11 Trustee in This Case.

45.      The Debtor's attempt to cleanse its fraudulent acts and still preserve control over

its estate through the appointment of a CRO is unavailing.  While bankruptcy courts may take

into account changes in a debtor's management team in determining whether to order the

appointment of a chapter 11 trustee, last-minute management changes designed to fend off a

trustee appointment have been found to be insufficient.  *See In re Microwave Prods. of Am., Inc.*,

102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989); *In re Sharon Steel Corp.*, 871 F.2d at 1226.

Although the Beach Point Funds do not doubt Mr. Sharp's or DSI's bona fides, there is no

evidence that they have appropriate experience in the complex world of managing or selling

multi-family apartment buildings.  Moreover, Mr. Sharp has only been involved in this case

since August.[39] As a result, it can only be assumed that Mr. Sharp is still largely dependent on

information or other supervision from the Debtor's current management.  Without a chapter 11

trustee, the Debtor's current management will undoubtedly remain involved in this case, and

there can be no real protection against further misconduct.

46.      As an example, the Debtor and its agent went so far in covering up their fraud in

connection with the NC Storage 1031 exchange that they forged an innocent third party's

signature, and attempted to set up a false bank account to shield the true source of transferred

funds.  If a chapter 11 trustee is not appointed, what will stop the Debtor's management from

doing this again in this bankruptcy case?  Even Mr. Sharp cannot prevent his signature from

being forged by the Debtor's management and principals.

47.      Simply put, the history of the Debtor's fraud runs too deep to cure by simply

---

[39] CRO Motion, ¶ 8.

retaining a CRO.  It is clear from a review of the engagement letter for DSI, attached to the CRO

Motion, that DSI will be submitting periodic reports to the Debtor's current management and

comply with the Debtor's corporate governance, suggesting that, even with the appointment of

Mr. Sharp as CRO, the Debtor's current management will continue to retain oversight and

decision-making authority.[40]  Further, the engagement agreement between DSI and the Debtor,

pursuant to which Mr. Sharp is to be retained as CRO, may be terminated by the Debtor "for any

reason."[41]  As an employee of the Debtor that can be terminated at will, there is an inherent level

of control that, in this case, prohibits any conclusion that a chapter 11 trustee is unnecessary

merely because of the appointment of a CRO.  As another court put it in ordering the

appointment of a chapter 11 trustee notwithstanding the debtor's engagement of a restructuring

officer: "the Debtor can fire whomever it hires." *In Euro-American Lodging Corp.*, 365 B.R. at

432.  This case is no different, except for the extreme gravity of "cause" in the present matter.

**B.    Appointment of a Trustee is in the Best Interests of Creditors Under Section 1104(a)(2).**

48.    Furthermore, appointment of a trustee is also appropriate here under Bankruptcy

Code section 1104(a)(2) because it would be in the best interests of the Debtor's creditors.  In

determining whether a trustee should be appointed "in the interests of creditors" under section

1104(a)(2), courts "look to the practical realities and necessities." *Euro-American*, 365 B.R. at

427.  Among the factors courts consider are "(i) the trustworthiness of the debtor; (ii) the debtor

in possession's past and present performance and prospects for the debtor's rehabilitation; (iii)

the confidence—or lack thereof—of the business community and of creditors in present

management; and (iv) the benefits derived by the appointment of a trustee, balanced against the

cost of the appointment." *Id.* (citations omitted).  Each of these four considerations warrant

---

[40] *See id.* at Ex. A, p. 2.
[41] *Id.* at p. 3.

appointment of a trustee here.

49.　　First, the Debtor's prepetition conduct has entirely eroded whatever trustworthiness it can claim to have. It has repeatedly used shell companies and bogus transactions to divert funds away from its creditors to line its insiders' pockets. In addition, the Debtor's management seemingly misled a bank into extending a "renovation" loan that was in fact used to pay itself through other shell companies. These actions have already garnered the attention of law enforcement, and should not go unnoticed by this Court. Thus, the first two factors—the Debtor's lack of trustworthiness and its past and present performance—weigh in favor of appointing a trustee.

50.　　Furthermore, the Debtor does not have the confidence of its creditor body. As described in greater detail above, the level of mistrust between the Debtor and the Beach Point Funds—the Debtor's largest secured creditors—is very high due to the Debtor's prepetition fraud and misconduct. Put simply, the Beach Point Funds do not believe that the Debtor, under this management, can effectively reorganize itself. Appointment of a chapter 11 trustee is the only remedy that will ensure that the Debtor is managed honestly and for the benefit of all of its stakeholders and relieve any suspicions of self-dealing and fraud. *See Marvel Entm't*, 140 F.3d at 474; 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3][d][ii] (16th ed. Rev. 2014).

51.　　Finally, there are substantial benefits to appointing an independent trustee here. The Debtor's Subsidiaries own numerous properties that, if managed properly, may provide meaningful value to the Beach Point Funds and other creditors. A fair and efficient sale process free from the stain of self-dealing that has marred the Debtor's prepetition sale efforts can yield significant value not just to the Beach Point Funds but to the Debtor's other creditors too. *See In re BLX Grp., Inc.*, 419 B.R. 457, 472 (Bankr. D. Mont. 2009) (concluding that appointment of

chapter 11 trustee to manage a sale process was in the best interests of creditors because it would "eliminate the insider circumstances and conflicts of interest" and would allow for a "professionally managed sale process").  Moreover, the costs to appointing a trustee here are minimal.  The Debtor is a holding company with minimal operations beyond managing the affairs of its Subsidiaries.  Even the Subsidiaries have minimal business operations, as they do not actually manage the day-to-day operations of the properties.  Thus, there is no reason to believe that a trustee with multi-family real estate experience would have a steep learning curve in getting up to speed.

## IV.

## CONCLUSION

52.     This Debtor has no place remaining in control of its business in bankruptcy.  Its history and propensity for fraud, dishonesty, and gross mismanagement plainly constitutes "cause" under the Bankruptcy Code, mandating the appointment of a trustee.  Moreover, a trustee is necessary to ensure that the Debtor's sale process is managed efficiently and appropriately, free from the taint of self-dealing and fraud that has marked the Debtor's business operations to date.  For the foregoing reasons, the Beach Point Funds request the Court place the Debtor and its estate under the control of a chapter 11 trustee, so that the Debtor's current management does not have any opportunity to continue abuse of creditor interests.

Dated:    September 5, 2014
          Wilmington, Delaware

_____
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

Daniel M. Petrocelli
James M. Pearl
Michael S. Neumeister
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone:  (310) 553-6700
Facsimile:  (310) 246-6779

Suzzanne S. Uhland
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Telephone:  (415) 984-8700
Facsimile:  (415) 984-8701

Attorneys for BPC VHI, L.P., Beach Point
Total Return Master Fund, L.P., and Beach
Point Distressed Master Fund, L.P.

Secured Creditors