# **<u>Exhibit B</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VARIANT HOLDING COMPANY, LLC, | Case No. 14-12021-BLS |
| Debtor. | |

## DECLARATION OF EVAN T. MAYOR IN SUPPORT OF MOTION OF THE BEACH POINT FUNDS FOR AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

I, Evan T. Mayor, declare as follows:

1.      I am admitted to practice law in the State of California and am an attorney with the law firm O'Melveny & Myers LLP, attorneys of record for BPC VHI, L.P., Beach Point Total Return Master Fund, L.P., and Beach Point Distressed Master Fund, L.P. (the "Beach Point Funds"). I have been actively involved in the lawsuit commenced by the Beach Point Funds in the Superior Court of the State of California, County of Los Angeles, titled *BPC VHI, L.P. v. Variant Holding Company, LLC*, pending under case number BC546153 (the "State Court Litigation"). I have personal knowledge of the matters stated herein unless otherwise noted and, if called upon to do so, could and would competently testify to them under oath.

2.      I am duly authorized to make this declaration (the "Declaration") on behalf of the Beach Point Funds, and submit this Declaration in support of the *Motion of Beach Point Funds for an Order Directing the Appointment of a Chapter 11 Trustee* (the "Motion"),[1] filed by the Beach Point Funds.

3.      On August 7, 2014, the Beach Point Funds took the deposition of the former Chief Financial Officer of Variant Commercial Real Estate ("Variant") and/or Conix, Inc., Lisa

---

[1] Capitalized terms not otherwise defined herein shall have the meanings afforded to them in the Motion.

Jack, in the State Court Litigation.[2]  A true and correct copy of excerpts from Jack's deposition transcript are attached hereto as **Exhibit A.**

4.      On July 14, 2014, the Beach Point Funds took the deposition of the former Managing Director of Variant and/or Conix, Inc., Dan Wesson, in the State Court Litigation. A true and correct copy of excerpts from Wesson's deposition transcript are attached hereto as **Exhibit B.**

5.      Following Wesson's deposition, I emailed the listing agreements to Wesson that are referenced in the paragraph 29 of the Himot Declaration, filed concurrently herewith. I asked Wesson whether the listing agreements accurately reflected agreements between The Waterfall Group, LLC and the Debtor's Subsidiaries. Wesson told me that the listing agreements were fabricated and that he did not sign those agreements. He said he did not act as a broker on sales referenced in the listing agreements, as the agreements indicate. Wesson told me that he would sign a declaration to that effect.

6.      On August 18, 2014, the Beach Point Funds took the deposition of Leverage Exchange Group, LLC Vice President, Brigitte Echave, in the State Court Litigation. A true and correct copy of excerpts from Echave's deposition transcript are attached hereto as **Exhibit C.**

7.      Beach Point Funds served a deposition subpoena on the registered agent of Apartment Consulting & Renovations in the State Court Action setting the deposition for September 4, 2014 at 9 a.m. in Dover, Delaware. The entity uses Harvard Business Services, Inc., a registered agent service, as its registered agent. On September 2, 2014, I emailed counsel for Debtor in the State Court Action, Howard Steinberg of Greenberg Traurig LLP, requesting that he provide a contact at Apartment Consulting & Renovations based on the fact that his client, the Debtor, paid the entity several million dollars. On September 3, 2014, the day before the scheduled deposition, my colleague James M. Pearl and I spoke by telephone with Mr. Steinberg, who informed us that he did not anticipate Apartment Consulting & Renovations

---

[2] On information and belief, Variant Holding Company, LLC, the Debtor, is doing business as Variant Commercial Real Estate. Conix, Inc. is a subsidiary of the Debtor.

would appear at the deposition.  Mr. Steinberg said as far as he knew there was no connection between Debtor and Apartment Consulting & Renovations and he believed it was not an active entity.  Apartment Consulting & Renovations failed to appear through a representative for its Court ordered deposition.  No representative of Apartment Consulting & Renovations ever responded to the subpoena.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of September, 2014 at Los Angeles, California.

Evan T. Mayor

OMM_US:72572114.1

# Exhibit A

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               FOR THE COUNTY OF LOS ANGELES

3

4    --------------------------------

5    BPC VHI, L.P., et al.,              )

6              Plaintiffs,               )   Case No.

7         vs.                            )   BC546153

8    VARIANT HOLDING COMPANY, LLC,       )

9    et al.,                             )

10             Defendants.               )

11   --------------------------------

12

13

14          VIDEOTAPED DEPOSITION OF LISA JACK

15               Dana Point, California

16              Thursday, August 7, 2014

17                    Volume I

18

19

20

21   Reported by:

22   GAIL E. KENNAMER, CSR 4583, CCRR

23   Job No. 1893520

24

25   PAGES 1 - 273

                                           Page 1

```
1    APPEARANCES:

2

3    For Plaintiffs:

4

5         O'MELVENY & MYERS LLP

6         BY: JAMES M. PEARL, ESQ.

7         and EVAN T. MAYOR, ESQ.

8         1999 Avenue of the Stars, Suite 700

9         Los Angeles, California 90067-6035

10        310.553.6700

11        jpearl@omm.com

12

13

14   For Defendants:

15

16        GREENBERG TRAURIG, LLP

17        BY: HOWARD J. STEINBERG, ESQ.

18        1840 Century Park East, Suite 1900

19        Los Angeles, California 90067

20        310.586.7700

21        steinbergh@gtlaw.com

22

23

24

25
```

Page 3

1    APPEARANCES (Continued):

2

3    For Deponent:

4

5         H. DEAN STEWARD, ESQ.

6         107 Avenida Miramar, Suite "C"

7         San Clemente, California 92672

8         949.481.4900

9         deansteward@fea.net

10

11

12    ALSO PRESENT:

13

14         Lawrence M. Goldman, Chief Administrative Officer

15         and General Counsel for Beach Point Capital

16         Cash Doye

17         Jennifer Williams, Videographer

18

19

20

21

22

23

24

25

                                                Page  4

| | | |
|---|---|---|
| 1 | LISA JACK, | 10:10 |
| 2 | a witness herein, having been administered an oath, was | |
| 3 | examined, and testified as follows: | |
| 4 | | |
| 5 | -EXAMINATION- | 10:10 |
| 6 | | |
| 7 | BY MR. PEARL: | |
| 8 | Q    Good morning, Ms. Jack. | |
| 9 | Have you ever had your deposition taken before? | |
| 10 | A    No. | 10:10 |
| 11 | Q    I'm going to explain to you briefly what a | |
| 12 | deposition is.  The court reporter here is going to be | |
| 13 | taking a transcript of what questions I ask and what | |
| 14 | answers you give.  It's very important that to get an | |
| 15 | accurate record, you let me complete my question before | 10:11 |
| 16 | you start answering, and I'll let you complete your answer | |
| 17 | hopefully before I start asking the next question.  It | |
| 18 | gets hard to record if we're talking over each other. | |
| 19 | You'll get a transcript of the deposition, and you'll | |
| 20 | have a certain amount of time to make any changes if the | 10:11 |
| 21 | transcript does not accurately reflect your testimony or | |
| 22 | you wish to change your testimony. | |
| 23 | If you do change your testimony, then the lawyers can | |
| 24 | comment on that at trial. | |
| 25 | I'll ask you questions, some of which require a "Yes" | 10:11 |

Page 12

1      Q     And Conix Enterprises is entered -- issued your    10:16

2  paycheck?

3      A     Yes.

4      Q     Are you a certified public accountant in the

5  state of Arizona?                                            10:17

6      A     No.

7      Q     When you began work for Conix, who were your

8  direct supervisors?

9      A     Just Court Gettel.

10     Q     And your title was chief financial officer?        10:17

11     A     Yes.

12     Q     And how long did you work for Variant or for

13  Conix?

14     A     Two and a-half months.

15     Q     When did you officially resign from Conix?         10:17

16     A     January 30th, 2014.

17     Q     And why did you resign?

18     A     I --

19           MR. STEINBERG:  I want to object on the grounds

20  of accountant-client privilege if your answer is based     10:17

21  upon information that you received from either Christopher

22  Reynolds or Christopher Morgan with respect to any

23  accounting advice, accounting services, or information

24  that they provided to the company.

25           And I instruct you not to answer if that's the basis    10:18

                                                      Page 17

1    of your answer.                                    10:18

2            THE WITNESS:  It is not, to my knowledge.

3      BY MR. PEARL:

4        Q    Okay.

5        A    I -- One of the reasons why I was hired to work   10:18

6    for Conix/Variant was to perform a audit, not to perform

7    the audit, but to -- for them to go through an audit, and

8    lead that process with outside auditors.  And I didn't

9    believe at that time that I was going to be able to

10   successfully complete that audit.                  10:18

11       Q    Why not?

12       A    I was not going to be able to sign a management

13   representation letter at the end of the audit.

14       Q    What is a management representation letter?

15       A    Stating various things.  That the financial     10:18

16   statements are true and correct, that there are no control

17   issues within the company.  You state various things

18   related to signing off on financial statements that are in

19   a management representation letter.

20       Q    Okay.  Can you list those to the best of your    10:19

21   recollection of what's typically in a management

22   representation letter?

23       A    Management representation letter states that

24   you're unaware of any fraud that the company may be

25   involved in.                                        10:19

                                              Page 18

1        You are stating that the financial statements are          10:19

2    true and correct to the best of your knowledge.

3        You are stating that you haven't -- you know,

4    everything is complete.  There is no omissions from the

5    financial statements.                                          10:19

6        Things of that nature.

7        Q    And what were your specific concerns about your

8    ability to sign a management letter?

9        A    I believed that there were transactions that had

10   occurred that were not going to be presented correctly on      10:19

11   the financial statements, and that I would not be able to

12   sign off on specifically the fraud element of the

13   management representation letter and the accuracy of the

14   financial statements.

15       Q    So you were unable to -- You thought you were         10:20

16   going to be unable to sign a management letter that stated

17   there was no fraud at the company?

18       A    Correct.

19       Q    What were your concerns about fraud at Conix?

20            MR. STEINBERG:  I want to interpose an objection       10:20

21   on accountant-client privilege if your answer relies upon

22   accounting advice services or information provided to the

23   company by either Christopher Reynolds or Christopher

24   Morgan.

25            THE WITNESS:  Okay.  No.                               10:20

Page 19

| | | |
|---|---|---|
| 1 | informed me that the money was given to him, and that he | 10:23 |
| 2 | had given it to a related entity of Conix -- Well, | |
| 3 | actually of another employee of Conix. | |
| 4 | Q    Let's -- Let's walk through that. | |
| 5 | So there was an invoice to Premier Homes -- | 10:23 |
| 6 | A    Correct. | |
| 7 | Q    -- that you questioned? | |
| 8 | A    Correct. | |
| 9 | Q    And there was an employee of Conix who also was | |
| 10 | a principal of Premier Homes? | 10:23 |
| 11 | A    Correct. | |
| 12 | Q    Was that employee named Tom Wagner? | |
| 13 | A    Yes. | |
| 14 | Q    And was Tom Wagner also an employee of Conix? | |
| 15 | A    Yes. | 10:23 |
| 16 | Q    Was he an employee of Variant as well? | |
| 17 | A    We were all employees of Conix Enterprises. | |
| 18 | That was the entity that employed individuals. | |
| 19 | Q    And what specifically did he tell you in terms | |
| 20 | of the invoice and the money he received? | 10:24 |
| 21 | A    He told me that he created an invoice to submit | |
| 22 | to the bank; that he received the cash from the invoice; | |
| 23 | he was allowed to keep $100,000 of it; and that he sent | |
| 24 | the remaining funds to an entity called Helena, LLC. | |
| 25 | Q    And did you believe that to be a fraudulent | 10:24 |

Page 22

1    transaction?                                                    10:24

2        A    Yes.

3        Q    Why?

4        A    Because that was not the purpose of the invoice

5    submitted to the bank.                                          10:24

6        Q    What was the purpose of the invoice submitted to

7    the bank?

8        A    For various construction-related activities on

9    the apartments.

10       Q    And who -- who owned Helena, if you know?              10:24

11       A    Mike Bernstein.

12       Q    And was Mike Bernstein also an employee of

13   Conix?

14       A    Yes.

15       Q    Do you know if this relationship of related            10:25

16   parties was disclosed to Doral?

17       A    I don't know.  Not to my knowledge.

18       Q    And was Mr. Wagner concerned about the

19   arrangement?

20       A    I don't -- I don't think that's a question for         10:25

21   me.

22       Q    Okay.

23       A    I mean, I don't know the state of mind.

24       Q    Were there other transactions that you became

25   aware of that you were concerned about?                         10:25

                                                    Page 23

Lisa Jack, 8/7/2014

```
 1        A     Yes.                                          10:25

 2        Q     Can you tell me what those transactions were?

 3              MR. STEINBERG:  I want to again object on

 4    accountant-client privilege if the basis of your answer is

 5    based upon accounting advice, services, or information     10:25

 6    provided to you by either Messrs. Christopher Reynolds or

 7    Christopher Morgan.

 8              THE WITNESS:  There was an invoice to Apartment

 9    Consulting and Renovations LLC --

10    BY MR. PEARL:                                            10:26

11        Q     Okay.

12        A     -- that I questioned.  That's all.

13        Q     And you brought that invoice today?

14        A     I did.  I brought both of those invoices.

15        Q     Okay.  And where did you get those invoices?    10:26

16        A     From a drive on the -- on the system.

17        Q     Can you -- And are those documents in front of

18    you?

19        A     Yes.

20        Q     Can you hand those invoices to Mr. Steinberg so  10:26

21    he can review them.

22        Are they -- Are they from Mr. Reynolds or Mr. Morgan?

23        A     No.

24        Q     Can you hand them --

25              MR. PEARL:  Mr. Steinberg, will you let me know  10:26
```

Page 24

```
 1   if you are going to assert any claim of privilege over        10:26

 2   those documents?

 3           MR. STEINBERG:  No, I'm not.

 4           MR. PEARL:  We'll go ahead and make copies of

 5   those.                                                         10:27

 6      Q    Did you have concerns about the invoice to

 7   Apartment Consulting and Renovations?

 8      A    I did.

 9      Q    What was your concern?

10      A    When I was initially looking at the invoices, I       10:27

11   spoke to Graham Swanson, who is the head of asset

12   management, and he told me that as the head of asset

13   management, he didn't know anything about these vendors;

14   and that as far as he was concerned, the work was never

15   intended to be done.                                          10:27

16      Q    And would he have known if -- if there was

17   anticipated renovations to be done given his position?

18           MR. STEINBERG:  Objection.  Lacks foundation.

19           THE WITNESS:  The person in that position should

20   know.                                                         10:28

21    BY MR. PEARL:

22      Q    And was this a different set of funds than the

23   Premier Homes invoice or was this part of the same

24   transaction?

25      A    I don't recall if it was on the same draw to          10:28
```

                                                    Page 25

 1    Doral or if it was a separate draw on the construction.   I   10:28

 2    don't recall.

 3       Q    And you were concerned that this invoice for

 4    Apartment Consultants and Renovations was a fraudulent

 5    invoice?                                                    10:28

 6       A    I was concerned.

 7       Q    And you were concerned based on what Mr. Swanson

 8    told you, that he did not believe this work was ever

 9    intended to be done?

10       A    Correct.                                           10:29

11       Q    Were there other transactions that caused you to

12    be concerned that you would not be able to sign a

13    management representation letter?

14       A    Yes.

15       Q    Can you tell me what those transactions were?     10:29

16           MR. STEINBERG:  Again, I'd like to interpose --

17    impose an objection on the grounds of accountant-client

18    privilege if your answer is based upon accounting advice

19    services or information provided to you by Christopher

20    Reynolds or Christopher Morgan.                            10:29

21           THE WITNESS:  Okay.  It's not.

22       There was a closing of a apartment that was called

23    San Marin that was scheduled to occur the week that I left

24    at the end of January.

25    BY MR. PEARL:                                              10:29

                                                        Page 26

1    But it was more on the fact of what type of things    10:31

2    were on here than necessarily just the percentage of -- of

3    the cost.

4    For instance, I mean, a big one would be commissions.

5    Commissions usually, you know, don't exceed, you know,    10:31

6    maybe if there is two brokers on the deal, let's call it

7    maybe 6 percent, you know, usually something less than

8    that.

9    Q    I'm going to show you a document that's been

10    marked as Exhibit 28.    10:32

11    (Deposition Exhibit 28 was marked for identification

12    by the court reporter.)

13    THE WITNESS:  (Indicating.)

14    BY MR. PEARL:

15    Q    This is a closing statement for the San Marin?    10:32

16    A    (Indicating.)

17    Q    Ms. Jack, does this look like a closing

18    statement for the San Marin apartments?

19    A    Yes.  I have -- I have a different version with

20    buyer and seller side in front of me.  I don't know if the    10:32

21    numbers are the exact same, but this is the last version I

22    got.

23    Q    Okay.  Can you hand that document to

24    Mr. Steinberg.

25    A    Okay.    10:32

Page 28

1      Q     Did you receive that document from Mr. Morgan or     10:32

2   Mr. Reynolds?

3      A     No.

4            MR. PEARL:   Mr. Steinberg, are you going to be

5   asserting an accountant-client privilege for this           10:32

6   document?

7            MR. STEINBERG:   No, I'm not.

8     BY MR. PEARL:

9      Q     You can go ahead and put that back there.   We'll

10  copy it at the break.                                        10:33

11     A     (Indicating.)

12     Q     If you could just walk me through the charges on

13  this closing statement for San Marin.   Are there any of

14  these charges that appear unusual to you?

15     A     (Indicating.)                                       10:33

16     Let's see here.   There is a charge to Cajun Capital.

17  That entity is an entity of Court Gettel.

18     Q     Court -- Court runs Cajun Capital?

19     A     Yes, I believe so.   It was one of his personal

20  entities.                                                    10:34

21     Q     Okay.

22     A     Knox Insured is an entity run -- run by Court

23  Gettel's brother, Chad Gettel.

24     Q     Okay.

25     A     There is another charge to Cajun.                   10:34

                                                      Page 29

1      Helena, LLC is the entity that is owned by Mike          10:34

2  Bernstein.  He -- From my knowledge, I was told that

3  Helena, LLC is in Mike Bernstein's name but is run by

4  Mr. Court Gettel.

5      Q    Okay.  So both Helena, LLC and Cajun Capital      10:34

6  were run by Court Gettel according to --

7      A    That's what I was told.

8      Q    Who told you that?

9      A    Herb Weiss told me about Helena, LLC being run

10 by Court.                                                   10:35

11     Q    And who is Herb Weiss?

12     A    He is not related to the company.  He was

13 stepping in the last week of my -- of my employment to

14 help run the company when Court Gettel was absent.

15     Q    Where was Court?                                  10:35

16     A    Rehab.

17     Q    And Herb Weiss was -- was he a colleague of

18 Mr. Gettel?

19     A    I believe there -- they had some business

20 ventures together and a friend.                            10:35

21     Q    Are you aware of any services that Helena, LLC

22 or Cajun Capital, LLC performed in connection with the

23 sale of the San Marin apartments?

24     A    I'm not aware, no.

25     Q    Looking back at the invoice --                   10:36

                                                    Page 30

Lisa Jack, 8/7/2014

| | | | |
|---|---|---|---|
| 1 | A | Oh, I missed one. | 10:36 |

And Waterfall Group.

2

3       Q     What is your understanding of what the Waterfall

4   Group is?

5       A     I don't believe the gentleman's name, but it      10:36

6   is -- it was a gentleman in the Tucson office.  It was his

7   company.

8       Q     Is it Dan Wesson?

9       A     Yes.

10      Q     And was Dan Wesson also a managing director of    10:36

11  Variant?

12      A     I don't recall his title.

13      Q     But he was a senior employee at Variant?

14      A     Yes.

15      Q     And the Waterfall Group was his entity?          10:36

16      A     Yes.

17      Q     And --

18      A     I was told that Court had an interest in

19  Waterfall Group and Knox Insurance.

20      Q     The closing statement is issued by Landmark       10:36

21  Title Assurance Agency of Arizona.

22      Do you see that?

23      A     Yes.

24      Q     Do you know if Mr. Gettel had an interest in

25  Landmark Title Assurance?                                  10:37

Page 31

1     a legitimate entity?                                          10:38

2          A     I was concerned.

3          Q     Was the woman's name Kristina Quesada?

4          A     Yes.  That's what I was told.

5          Q     So upon seeing the San Marin closing statement,    10:38

6     you were concerned about payments to the Waterfall Group,

7     Sui Generis, Cajun Capital, Knox Insured, and Helena, LLC;

8     is that correct?

9          A     Uh-huh.

10         Q     And you were concerned that these were             10:39

11    fraudulent payments?

12         A     Yes.

13         Q     And you were concerned they were fraudulent

14    payments because you believe these were entities that were

15    either directly or indirectly providing the money back to    10:39

16    Mr. Gettel?

17         A     Yes.

18         Q     Who told you that Lynette prepared the Sui

19    Generis invoices and submitted them to Landmark Title?

20         A     I don't recall.                                    10:39

21         Q     Were there other transactions that you became

22    concerned about in the course of your employment at Conix?

23         A     After discovering or looking through this, I

24    went back to look at other transactions of other closing

25    statements, of which some concerned me; but at that point,   10:40

1    Gettel's wife?                                              10:54

2         A    I believe it was controlled by Court Gettel, but

3    I believe it was Court Gettel's wife's trust or entity.

4         And I believe that on some of the -- without looking

5    at the HUD statement, Mr. Greenberg was paid through the    10:54

6    closing statements.  I don't know of what nature, how

7    those invoices were submitted.

8         Q    Do you believe, sitting here today, that

9    Mr. Greenberg was aware of this fraud?

10              MR. STEINBERG:  I would object to the extent it   10:55

11   relies upon any communications with Mr. Greenberg or

12   anyone working for Mr. Greenberg on the grounds of

13   attorney-client privilege.  Instruct you not to answer.

14     BY MR. PEARL:

15         Q    If you can answer without relying on             10:55

16   attorney-client communications.

17              MR. STEINBERG:  I also object -- I also object

18   to the -- that it calls for a legal conclusion.

19     BY MR. PEARL:

20         Q    Go ahead.                                        10:55

21         A    Can I answer that?

22         Q    If you can answer without relying on an

23   attorney-client communication.

24         A    Can you repeat the question?

25         Q    Do you believe, sitting here today, that         10:55

                                             Page 40

```
 1   Mr. Greenberg was aware of these -- the fraudulent nature   10:55

 2   of these transactions?

 3             MR. STEINBERG:  Repeat the objections based on

 4   attorney-client privilege, and the fact that it calls for

 5   a legal conclusion.                                         10:55

 6             THE WITNESS:  Yes.

 7      BY MR. PEARL:

 8      Q    Now, at some point did you conduct an

 9   investigation into the related nature of these parties?

10      A    Yes.                                                10:56

11      Q    And when you discovered that these were, in

12   fact, parties related to Mr. Gettel, what did you do?

13      A    My first approach was I asked Mr. Gettel about

14   some of the invoices that I believed where the work was

15   not anticipated of being performed.                        10:56

16      Q    And what did he say?

17      A    He said that not only was it going to be

18   performed, but that it should be near completion, and that

19   he was going to Houston to check up on the work.

20      Q    And did you later discover that statement to be   10:56

21   false?

22      A    Yes.

23      Q    How did you discover it to be false?

24      A    My conversation with Tom Wagner was that he

25   created the invoice to submit to the bank and that that    10:57
```

                                              Page 41

Lisa Jack, 8/7/2014

```
 1    money he was paid -- he was being paid minimum wage, but      10:57

 2    that was his extra salary was to get money through the

 3    bank, and that the -- the balance was transferred to

 4    Helena, LLC and none of the things on his invoice were

 5    ordered or completed.  I believe there was refrigerators,     10:57

 6    some flooring.

 7        Q    I'm going to show you what's been marked as

 8    Exhibit 29.

 9        A    Okay.

10        (Deposition Exhibit 29 was marked for identification      10:57

11    by the court reporter.)

12            THE WITNESS:  (Indicating.)

13      BY MR. PEARL:

14        Q    Now, Ms. Jack, this is a document you brought

15    with you to the deposition today --                           10:58

16        A    Okay.

17        Q    -- is that right?

18        A    Yes.

19        Q    And is this the document that Mr. Wagner told

20    you he prepared?                                              10:58

21        A    Yes.

22        Q    And Mr. Wagner was paid a minimum wage by Conix?

23        A    Yes.

24        Q    And the rest of his salary was received through

25    payments that were run through the Premier Home               10:58
```

                                                    Page  42

| | | |
|---|---|---|
| 1 | Development Group? | 10:58 |
| 2 | A    Yes. | |
| 3 | Q    And he would receive a kickback on the contract | |
| 4 | and then refund the rest of the money to Mr. Gettel; is | |
| 5 | that how it worked? | 10:58 |
| 6 | MR. STEINBERG:  Objection.  Calls for a legal | |
| 7 | conclusion. | |
| 8 | THE WITNESS:  He told me that when he received | |
| 9 | the $4.8 million, he was allowed to keep $100,000, and the | |
| 10 | remaining amount was sent to Helena, LLC.  He also showed | 10:58 |
| 11 | me the wire to Helena, LLC. | |
| 12 | BY MR. PEARL: | |
| 13 | Q    So Mr. Wagner took $100,000 and wired the rest | |
| 14 | of the $4.781000 to Helena, LLC? | |
| 15 | A    Correct. | 10:59 |
| 16 | Q    And you believe Helena, LLC was controlled by | |
| 17 | Court Gettel? | |
| 18 | A    Yes.  That's what I was told. | |
| 19 | Q    And who told you that? | |
| 20 | A    Herb Weiss. | 10:59 |
| 21 | Q    And this invoice that you brought with you to | |
| 22 | the deposition today, this invoice was created by Tom | |
| 23 | Wagner? | |
| 24 | A    Yes. | |
| 25 | Q    And Tom Wagner, while affiliated with Premier | 10:59 |

Page 43

| 1 | | Homes Group, was also an employee of Conix and Variant? | 10:59 |
| 2 | A | Conix Enterprises, yes. | |
| 3 | Q | He was an employee of Conix Enterprises? | |
| 4 | A | Yes. | |
| 5 | Q | Do you know what his title was? | 10:59 |
| 6 | A | I don't recall. | |
| 7 | Q | And what did he specifically tell you about this | |
| 8 | | invoice? | |
| 9 | A | That he created it to submit to the bank, and he | |
| 10 | | got a lot of money in his account, and he got to keep | 11:00 |
| 11 | | $100,000, and sent the rest of the money to another | |
| 12 | | entity. | |
| 13 | Q | So he never ordered these appliances? | |
| 14 | A | Not to my knowledge. | |
| 15 | Q | He never ordered the flooring material, the | 11:00 |
| 16 | | baseboard, or the appliances listed on here? | |
| 17 | A | No.  He said that the $100,000 could be | |
| 18 | | considered a restocking fee. | |
| 19 | Q | A what? | |
| 20 | A | Restocking fee. | 11:00 |
| 21 | Q | What is a restocking fee? | |
| 22 | A | I'm not sure. | |
| 23 | Q | So did you believe this to be a fraudulent | |
| 24 | | transaction? | |
| 25 | A | I did. | 11:00 |

Page 44

Lisa Jack, 8/7/2014

1       Q    Were you ever shown any proof that these        11:00

2    appliances, flooring material, and baseboard were actually

3    ever ordered?

4       A    No.

5       Q    And the date on this invoice is December 19,    11:01

6    2013.

7       When did your conversation with Mr. Wagner occur?

8       A    I believe early January.

9       Q    And the bank that these invoices were submitted

10   to was Doral; is that right?                            11:01

11      A    Correct.

12      Q    Now, Ms. Jack, you testified earlier that you

13   got documents off a drive at Conix or Variant.  Was there

14   a central server that housed these business documents and

15   invoices?                                               11:02

16      A    Yes.

17      Q    And where is that server located?

18      A    I believe in Tucson or possibly on the cloud.  I

19   don't recall.

20      Q    What was -- Who was the server for the cloud if  11:02

21   you remember?

22      A    I don't.

23      Q    Do you know if these -- this Premier Homes

24   invoice was provided to Beach Point?

25      A    I don't recall.                                 11:02

                                              Page 45

1      Q    Were there any other entities that Mr. Wagner        11:03

2   sent money to other than Helena, LLC?

3      A    Not to my knowledge.

4      Q    And did you speak with anyone at Helena, LLC

5   about these invoices?                                        11:03

6      A    No.

7      Q    Do you know if there is any employees of Helena,

8   LLC?

9      A    I do not.

10     Q    Did Mr. Wagner tell you what Helena, LLC was?        11:03

11     A    No.

12     Q    Did you understand at the time that he told you

13  this, that the money was being routed back to Mr. Gettel

14  through Helena, LLC?

15     A    No, not at the time.                                 11:03

16     Q    When did you discover that?

17     A    When I went over a list of entities with

18  Mr. Greenberg.

19          MR. STEINBERG:  I want to move to strike her

20  testimony on the grounds of attorney-client communication.  11:04

21     Instruct her not to answer any further.

22   BY MR. PEARL:

23     Q    Other than your conversation with Mr. Greenberg,

24  do you have any other independent knowledge of why you

25  believe these entities to be fraudulent?                     11:04

                                                    Page 46

Lisa Jack, 8/7/2014

```
 1        A     Through my conversations with Tom Wagner --      11:04
 2   Well, the invoice to be fraudulent.
 3        As far as the entity, I spoke with Herb Weiss as to
 4   the nature of these entities.
 5        Q     And Mr. Weiss told you that the entities were    11:04
 6   all related to Court?
 7        A     Yes.
 8        Q     Where did your conversation with Mr. Weiss
 9   occur?
10        A     On the telephone.                                11:05
11        Q     And where was Mr. Weiss at that point?
12        A     In Variant's office.
13        Q     In Tucson?
14        A     In San Diego.
15        Q     And do you know the date of that call?           11:05
16        A     Can I look at a calendar?
17        Q     Yeah.
18        A     (Indicating.)
19        It was the Monday of January 30th.  So hold on.
20   Let's see here.                                             11:05
21        (Indicating.)
22        It would be on January 27th, 2014.
23        Q     And where were you when you had that
24   conversation?
25        A     In my car.                                       11:05
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1      Q    And is it after that conversation that you      11:05
 2  decided that you were going to resign?
 3      A    No.
 4      Q    When did you decide you were going to resign?
 5      A    Subsequent to that conversation I went to      11:06
 6  Tucson.  I investigated a little bit further.
 7      And upon coming leaving Tucson, I -- I decided to
 8  resign.
 9      Q    And what did you do in your further
10  investigation in Tucson?                               11:06
11      A    I looked into the other entities, Apartment
12  Consulting, LLC, that apartment.
13      And there was actually one other invoice, and I
14  don't -- I don't have a copy of it, I don't believe, that
15  was a part of what I was looking at to -- there was      11:06
16  another entity, another --
17      Q    Was it Texas Rehab?
18      A    It was.
19      And I tried to Google the companies and find out more
20  about each of those companies and who might own them.   11:06
21      Q    And what did you discover about Apartment
22  Consulting and Renovations and Texas Rehab?
23      A    One of them was located at -- at an address that
24  had multiple companies located at that address, all with
25  bad business standings.                                 11:07
```

Page 48

1        And the other one was registered maybe to an          11:07

2   apartment building, like somebody's personal apartment.

3   So I just had a hard time verifying what these entities

4   and invoices and who owned them are.

5        Q    And did you ask?                                  11:07

6        A    I only had discussions with Chris Morgan and

7   Chris Reynolds regarding that.

8        Q    Were you seeking accounting advice from

9   Mr. Reynolds and Mr. Morgan?

10       A    No.                                               11:07

11       Q    You were asking them about a third-party entity

12   and its origin; is that right?

13       A    Correct.

14       Q    And what did they tell you?

15       A    They did not know what these entities were.      11:08

16       Q    And Mr. Morgan and Mr. Reynolds were accountants

17   at -- at Variant?

18       A    Yes.

19       Q    And what did you conclude about Apartment

20   Consulting and Renovations and Texas Rehab?              11:08

21       A    I -- Nothing conclusive other than Graham

22   Swanson told me that he didn't know of those invoices and

23   what work was ever planned to be done to those properties,

24   and I believe some of the properties listed on the

25   invoices were either sold or in the process of being sold.  11:08

Page  49

1    So I made the assumption that I wasn't comfortable.          11:08

2        Q    You didn't think you could sign a management

3    representation letter with respect to the Apartment

4    Consulting and Renovations invoices that these invoices

5    were not fraudulent?                                          11:09

6        A    Correct.

7        And they were listed as -- on the balance sheet as

8    construction in progress, which if the work had not

9    commenced, they weren't construction in progress, so the

10   financial statements would be inaccurate.                    11:09

11       Q    And Mr. Swanson, what was his title?

12       A    I believe he was the head of asset management.

13   I think he was a VP or SVP of asset management.

14       Q    To your understanding, what does the head of

15   asset management do?                                         11:09

16       A    He is in charge of managing the day-to-day of

17   the operations, the different asset managers on the ground

18   and various locations, managing the construction of these

19   apartments, what to do with these apartments to, you know,

20   lease them up, you know, rehab them, and ultimately sell     11:09

21   them.

22       Q    So if there was a $600,000 renovation going on

23   at San Marin, it's your conclusion that Mr. Swanson would

24   definitely know about it?

25           MR. STEINBERG:   Objection.   Calls for              11:10

                                                    Page 50

1    speculation and lack of foundation.                    11:10

2            THE WITNESS:  He -- From my understanding, he

3    traveled to the locations to our various apartment

4    buildings frequently.  He was out of the office on

5    business trips to visit apartment buildings.           11:10

6        So from that, I would conclude being at a property,

7    he would -- and he would probably visit a property with

8    significant renovations.

9      BY MR. PEARL:

10       Q    So he made -- he made site visits if there were   11:10

11   renovations going on, he was likely to know about them, in

12   your view?

13       A    Yes.

14       Q    And he was unaware of the renovations at

15   San Marin?                                              11:10

16       A    Correct.  Or any of the renovations on those.  I

17   wouldn't say San Marin.  On any of those invoices.

18       Q    And he didn't know what Apartment Consulting and

19   Renovations was?

20       A    No.                                            11:11

21       Q    As the head of asset management, he didn't know

22   who this vendor was that was purportedly conducting

23   renovations at the properties?

24       A    Correct.

25       Q    Does Mr. Swanson still work at Conix?          11:11

                                                    Page 51

```
 1   Cash to update on the status of completion.              11:18
 2        Q    Did Cash update you on the status of completion?
 3        A    We had a conversation about the invoices.
 4   However, it was very vague.
 5        Q    Can you tell me what you recall from the         11:18
 6   conversation?
 7        A    I asked Cash directly what was going on and if I
 8   should be concerned.
 9        And he said "No," to trust him.
10        Q    Turning to Exhibit 31, Pecan Crossing.           11:18
11        A    Uh-huh.
12        Q    Did you have a conversation with Mr. Swanson
13   about this invoice?
14        A    I had the conversation about all the invoices
15   related to Apartment Consulting, the Texas Rehab, and     11:19
16   Premier Homes at the same time.  It was one general
17   conversation as to all three vendors.
18        Q    And Mr. Swanson told you that he was unaware
19   of -- of any work done by the three vendors?
20        A    Correct.                                         11:19
21        Q    Did he tell you who he thought the vendors were?
22        A    No.
23        Q    Did he say --
24        A    He said I should ask Court.  They were Court's
25   vendors.                                                   11:19
```

Page 56

1        Q     So Mr. Swanson told you that Apartment          11:19

2    Consulting and Renovations, Premier Homes, and Texas Rehab

3    were Court's vendors?

4        A     Correct.

5        Q     Was Mr. Swanson aware of any renovations at     11:19

6    Pecan Crossing that he was able to verify for you?

7        A     We didn't speak to specific properties, just to

8    the three vendors and invoices, and he told me that none

9    of the work was done nor did he anticipate any of this

10   work being done by these vendors as the asset manager.    11:20

11       Q     So as the asset manager, he told you he did not

12   anticipate any of the work being done by Apartment

13   Consulting and Renovations, Texas Rehab, or Premier Homes?

14       A     Correct.

15       Q     And as the asset manager, Mr. Swanson told you   11:20

16   that he was unaware that any work had been done by

17   Apartment Consulting and Renovations, Texas Rehab, and

18   Premier Homes?

19       A     Correct.

20       Q     When he said these entities were Court's vendors 11:21

21   what did you understand that to mean?

22       A     At the time I believed that possibly Court was

23   directing construction without informing asset management.

24       Q     Did you ever discover any information that would

25   suggest that Mr. Gettel was actually directing these       11:21

Page 57

Lisa Jack, 8/7/2014

| 1 | renovations? | 11:21 |

    1    renovations?                                          11:21

    2        A    No.

    3        Q    Do you believe today that Mr. -- Mr. Gettel was,

    4    in fact, directing these renovations?

    5        A    No.                                           11:21

    6        Q    Do you believe that this money was being

    7    directly or indirectly funneled back to Mr. Gettel?

    8        A    Yes.

    9        Q    Why do you think that these renovations and

   10    purchases were not done?                              11:21

   11        A    I had a conversation with Cash Doye the day

   12    before I resigned, and I gave him my speculation as to why

   13    I thought this was occurring.

   14        And he didn't disagree or agree, and I took it to

   15    mean that he -- you know, the company had a cash flow    11:22

   16    issue, and the money was used to -- I mean, the apartments

   17    did not provide enough cash to pay for payroll or rent or

   18    any of the corporate expenses, and the money was being

   19    funneled back to Cash or to Court, and then put back into

   20    the company for other purposes.                       11:22

   21        Q    Where did that conversation occur?

   22        A    On the phone.

   23        Q    Where were you?

   24        A    I was at the Doubletree Hotel in Tucson,

   25    Arizona.                                              11:23

                                                         Page 58

1       Q      And do you remember the date of that            11:23

2   conversation?

3       A      It would have been January 29th, I believe.

4       Q      And can you tell me how the -- all that you

5   remember from the conversation?                            11:23

6       A      The conversation was I believe I told him that I

7   thought they were all involved.  I didn't know who was

8   involved and who wasn't, but I was pretty sure, given all

9   the parties that were related to an employee, that it was

10  a significant amount of employees, and that -- you know, I  11:23

11  think I might have asked him why they hired me, and I

12  couldn't be a part of it.

13      Q      And what did Mr. -- Did Mr. Doye tell you that

14  your understanding was incorrect?

15      A      No.                                              11:23

16      Q      Did he say that your understanding of the facts

17  was wrong?

18      A      No.

19      Q      And you communicated to him that you believed

20  that all of these entities that we have discussed here      11:24

21  today were related to employees at Conix and Variant?

22      A      Yes.

23      Q      Do you recall specifically what Mr. Doye said?

24      A      No, I don't.

25      Q      Did you decide after that conversation that you   11:24

1    Point?                                                      11:25

2        A    Correct.

3        Q    And these fees that were paid to related parties

4    would otherwise have been provided to Doral and Beach

5    Point?                                                      11:26

6             MR. STEINBERG:  Objection.  Calls for a legal

7    conclusion.  Seeks expert testimony from someone not --

8    not qualified to testify.

9     BY MR. PEARL:

10       Q    Now, you have been an accountant for 17 years;     11:26

11   is that right?

12       A    Correct.

13       Q    So you have reviewed lending agreements before;

14   correct?

15       A    Correct.                                           11:26

16       Q    And you reviewed the lending agreements at issue

17   between Beach Point and Variant; is that right?

18       A    Correct.

19       Q    And you reviewed lending agreements between

20   Doral and --                                                11:26

21       A    Correct.

22       Q    -- Variant?

23       A    Yes.

24       Q    So it was your understanding that these fees

25   paid to The Waterfall Group, Sui Generis, Cajun Capital,    11:27

                                                    Page 61

1   Knox Insured, Helena, LLC were fees that otherwise would      11:27

2   have been owed to Doral and/or Beach Point?

3             MR. STEINBERG:  Objection.  Lacks foundation.

4   Calls for a legal conclusion.  Seeks expert testimony from

5   a person not qualified to provide.                           11:27

6     BY MR. PEARL:

7        Q    You can answer.

8        A    Yes.

9        Q    And why did you think that?

10             MR. STEINBERG:  Same objection.                    11:27

11             THE WITNESS:  Because in those agreements, from

12   what I recall, excess proceeds from closings went back to

13   the banks to pay down the loans.

14     BY MR. PEARL:

15        Q    And these fees would, to the extent they were      11:28

16   illegitimate, would have otherwise been paid back to the

17   lenders?

18        A    Correct.

19        Q    In your opinion as an accountant, did these

20   constitute fraudulent transactions?                          11:28

21             MR. STEINBERG:  Objection.  Calls for a legal

22   conclusion.

23             THE WITNESS:  Can I answer that?

24             MR. STEWARD:  Yes.

25             THE WITNESS:  Yes.                                  11:28

Page 62

1     Q     And is the reason that they resigned was because     13:10

2   they were concerned about fraud of the company?

3         Don't answer.  He can make his objection.

4             MR. STEINBERG:  All right.  I made the same --

5   I'm making the same objection based upon accountant-client     13:10

6   privilege.

7     BY MR. PEARL:

8     Q     How did you learn how they resigned?

9     A     I kept in contact with Chris Reynolds and Chris

10  Morgan.                                                        13:11

11    Q     So the -- the only way you know about this is

12  through a conversation with Mr. Reynolds or Mr. Morgan?

13    A     Yes.  And actually, Cash told me as well.

14    Q     What Did Cash tell you?

15    A     He sent me a text.                                     13:11

16    Q     Saying what?

17    A     Something to the effect of hypothetically, if

18  Chris and Chris are no longer -- something very vague, was

19  saying if they are no longer around, how would I outsource

20  the accounting?  Actually had a conversation with Cash        13:11

21  regarding outsourcing accounting subsequent.

22    Q     And in that conversation did he tell you why

23  they resigned?

24    A     No.  He tried to speculate as to why I resigned.

25    Q     And what did you tell them -- What did you tell        13:11

Page 84

```
 1    Cash was the reason for your resignation?           13:11

 2         A    It was a vague conversation other than I

 3    could -- could not be a part of what was going on, and

 4    that was pretty much the basis of my conversation.  I

 5    actually tried to give -- help him find somebody to     13:12

 6    outsource accounting to.

 7         Q    Did you become aware at some point that

 8    Mr. Wesson resigned?

 9         A    No.

10         Q    Did you become aware at some point that there  13:12

11    was an FBI investigation into the dealings of Variant and

12    Conix?

13         A    Yes.

14         Q    When did you become aware of that?

15         A    When I had left Tucson, I got a phone call from  13:13

16    Chris Reynolds, and he told me that Court was asking him

17    to move money.

18              MR. STEINBERG:  I'm going to object and

19    interrupt this answer and object on the grounds of

20    accountant-client privilege to the extent that he's      13:13

21    talking about it.

22              THE WITNESS:  I can give a version that doesn't

23    include talking or --

24      BY MR. PEARL:

25         Q    That's fine.                                   13:13
```

Page 85

1      A      Can I say what I instructed him to do?      13:13

2      Q      Yeah.

3      A      I instructed them to go home and turn off their

4    phones and not do anything they felt uncomfortable with,

5    and that we would talk when I got back to Orange County.      13:13

6         When I got back to Orange County, I received a call

7    that they had not gone home and turned off their phones.

8    They went to the FBI.

9      Q      Mr. Morgan and Mr. Reynolds went to the FBI?

10      A      Correct.      13:14

11      Q      And so did you learn about the FBI investigation

12    through them?

13      A      Yes.

14      Q      And was this after they resigned from the

15    company?      13:14

16      A      No.  Before.

17      Q      And do you know how much longer after they

18    learned about the FBI investigation they resigned?

19      A      Approximately a month.

20      Q      And you testified that Mr. Reynolds told you      13:14

21    that Court had instructed him to move money; is that

22    right?

23         MR. STEINBERG:  Objection.  Move to strike on

24    the grounds of accountant-client privilege.  Instruct the

25    witness not to answer.      13:14

                                                        Page 86

| | | |
|---|---|---|
| 1 | BY MR. PEARL: | 13:14 |
| 2 | Q   Are you going to observe his instruction? | |
| 3 | MR. STEWARD:  Just for the sake of getting | |
| 4 | through, Lisa, I advise you to go ahead and not testify in | |
| 5 | that area for now. | 13:15 |
| 6 | THE WITNESS:  Okay. | |
| 7 | MR. STEWARD:  Combination of counsel. | |
| 8 | BY MR. PEARL: | |
| 9 | Q   Did you ever receive any instruction from Cash | |
| 10 | or Court to move money or move assets? | 13:15 |
| 11 | A   I was not on any bank accounts. | |
| 12 | Q   Do you know why that was? | |
| 13 | A    In part, just the timing thing.  Most of the | |
| 14 | accounting was in Tucson, and I was in the process -- I | |
| 15 | actually, I apologize.  I was on new accounts that were | 13:15 |
| 16 | being set up with KeyBank for the new loan that was | |
| 17 | underway.  There was no real activity that was going on in | |
| 18 | those accounts.  I never wired any money or did anything. | |
| 19 | They were the property-level accounts. | |
| 20 | The money with Wells Fargo and those banks, I wasn't | 13:16 |
| 21 | involved with ever moving money or being instructed to do | |
| 22 | so. | |
| 23 | Q   Other than something Mr. Reynolds or Mr. Morgan | |
| 24 | told you, did you ever learn of instructions to | |
| 25 | individuals at Variant to move money? | 13:16 |

Page 87

```
 1        A     Other -- Other than possibly Lynette.          13:16

 2        Q     Did Lynette ever tell you --

 3        (Simultaneous speaking.)

 4              THE REPORTER:  Start again, please.  I need the

 5   full question and the objection.  You were talking         13:16

 6   simultaneously.

 7              MR. STEINBERG:  I'm going to object on the

 8   grounds of attorney-client communication.  If Lynette is

 9   the person who worked for Mr. Greenberg, I believe you

10   testified.                                                 13:16

11    BY MR. PEARL:

12        Q     What was Lynette's title at the company?

13        A     She was Court's assistant.  She was technically

14   in the Greenberg entity of where she got paid, but Conix

15   funded that payroll.  It was --                            13:17

16        Q     Conix funded Greenberg's payroll?

17        A     Yes.

18        It was all very one in the same company.  I think one

19   of my accountants technically worked for Greenberg.

20        Q     Who was that?                                   13:17

21        A     Kyle.  I forget his last name.

22        Q     Was Lynette an attorney or a paralegal?

23        A     No.

24        Q     And this is Lynette Johnson?

25        A     Maybe.  I thought her last name was something   13:17
```

Page 88

```
 1   else.                                                        13:17

 2        Q    I'm sorry.  Lynette Moreno?

 3        A    That was her.

 4        Q    Very different than Johnson.

 5        A    I'm like, I don't know.  Maybe.              13:18

 6        Q    It was Kyle Johnson; right?

 7        A    Yes.  Thank you.

 8        Q    So at some point you learned of an FBI

 9   investigation.  Do you recall what date that was?

10        A    That would have been on the 29th, I believe.  13:18

11        (Indicating.)

12        January 29th.

13        Q    And was it at that point that you decided to

14   resign?

15        A    I felt at that point whatever options could have  13:18

16   been on the table were no longer available.  There was no

17   question that I would resign after that.

18        Q    Did you ever receive any instructions by anyone

19   at Variant not to talk to the FBI?

20        A    No.                                           13:18

21             MR. STEINBERG:  I move -- All right.  Since the

22   answer is "No," I will save the objection.  Withdrawn.

23             THE WITNESS:  No.

24     BY MR. PEARL:

25        Q    Are you aware of any -- anyone at the company  13:19
```

Page 89

1    who met with the FBI?                                        13:19

2         A    Yes.

3         Q    Other than Mr. Morgan and Mr. Reynolds?

4         A    Yes.

5         Q    Who else met with the FBI?                         13:19

6         A    Lynette.

7         Q    How did you learn that?

8         A    Through Chris Reynolds.

9         Q    Did you submit a letter of resignation?

10        A    I sent an email.                                   13:19

11        Q    Who did you send the email to?

12        A    Several parties.  Court, of course.  I sent the

13   letter to several people within the Conix/Variant, you

14   know, entity.  Cash being one of them.  I sent a -- I sent

15   an email to Wells Fargo.  I sent an email to, I think,      13:20

16   Greenberg Traurig, just saying I'm not longer with the

17   company.

18        I just sent off a couple emails just to let everybody

19   know I was no longer with Variant.

20        Q    Did anyone reply to those emails?                  13:20

21        A    I got several phone calls.

22        Q    From?

23        A    Graham Swanson, Danny Barnes.  Several --

24   Several people called.

25        Q    What -- Tell me about your conversation with       13:20

                                                      Page 90

1    Mr. Swanson.                                              13:20

2         A    I didn't call anybody back.  I just left -- They

3    just left messages.

4         Court called.  I did have a subsequent conversation

5    with Court a week later since he wanted.                  13:21

6         Q    And what did Court say?

7         A    He -- He wanted closure, and he -- he said that

8    if there was something wrong with the accounting, that he

9    would hire somebody to figure it out because he didn't

10   want anything wrong with the accounting.                  13:21

11        Q    Did you ask him about the related-party

12   transactions?

13        A    Not at that point.  I already resigned.

14        Q    What did you learn about Lynette testifying to

15   the FBI?                                                  13:21

16        A    I understood that the FBI had Lynette, Chris,

17   and Chris operating within the company for a period of

18   time to gather information for them, and that they had

19   signed an agreement that they would not be prosecuted if

20   they cooperated.                                          13:22

21        Q    Did you have such an agreement with the FBI?

22        A    No.  I -- I resigned before I ever talked to the

23   FBI.

24        Q    And you don't believe you did anything wrong;

25   correct?                                                  13:22

                                             Page 91

1        A    Correct.  I called my Board of Ethics, both my        13:22

2    CPA license, and I hired an attorney.

3        Q    Did you receive any messages in advance of your

4    testimony today from anyone associated with Variant?

5        A    No.                                                   13:22

6        Q    Did you speak with Lynette about these

7    transactions?

8        A    Yes.

9        Q    And what did Lynette tell you?

10            MR. STEINBERG:  Objection.  Object on the            13:23

11    grounds of attorney-client privilege.

12      BY MR. PEARL:

13        Q    Did Lynette --

14            MR. STEINBERG:  Instruct not to answer.

15      BY MR. PEARL:                                               13:23

16        Q    Was Lynette communicating legal advice to you?

17        A    No.

18        Q    Was Lynette acting as an agent for an attorney,

19    in your view?

20            MR. STEINBERG:  Objection.  Calls for a legal        13:23

21    conclusion.

22            MR. STEWARD:  You can go ahead and answer that,

23    Lisa.

24            THE WITNESS:  Not that I'm aware of.

25      BY MR. PEARL:                                               13:23

                                                    Page 92

1      Q     What did Lynette tell you?                          13:23

2            MR. STEINBERG:  Same objection.  Instruct the

3      witness not to answer to the extent that any information

4      was derived from communications that you may have had with

5      Mr. Greenberg.                                            13:23

6            MR. STEWARD:  You can answer that.

7            THE WITNESS:  Lynette showed me -- Lynette --

8      What was the conversation?  I'm trying to recall.  We

9      talked about a lot of things on the HUD statements and

10     what they were for, and mainly her response was Court just  13:23

11     told her what invoices to submit to the title company.

12     BY MR. PEARL:

13     Q     So Court directed her as to what documents to

14     submit?

15     A     Correct.                                            13:24

16     Q     And then Court directed her as to where to --

17     where and to whom to send the money?

18     A     Correct.

19     Q     Did Lynette create some of these invoices?

20     A     I believe so.  At Court's direction.               13:24

21     Q     Did she tell you she created the invoices?

22     A     It was more just at Court's direction was my

23     understanding, and that she did create the invoices.

24     Q     Do you recall what the date was of this

25     conversation with Lynette?                               13:24

                                                        Page 93

1    A    It would have been a Tuesday or Wednesday    13:24

2    morning.  It would have been either the 28th or the

3    morning of the 29th there was -- when I was in Tucson.

4    Q    Anything else you can remember about your

5    conversation with Lynette?    13:25

6    A    Other than she was genuinely concerned and

7    nervous and upset.

8    Q    Does Lynette still work at Variant?

9    A    I have no idea.

10    Q    I'm going to walk through the documents that you    13:25

11    brought to the deposition today.

12    A    Okay.

13    Q    And if you could just look at the document, tell

14    me what it is and, then we can give it to Mr. Greenberg

15    [sic] to review as to whether it's attorney-client    13:26

16    privilege/accountant-client privilege.  Mr. Steinberg.

17    I'm sorry.

18    A    Okay.  This is an AP aging that I had along the

19    way.  I believe it was the AP to the San -- San Marin

20    closing that was going to be paid.  It's just the first    13:26

21    page of one of eight.  I circled MVCA, Conix Residential,

22    Helena, LLC, and Forward Progress, all related entities.

23    Q    And where did you get this document?

24    A    Printed from the Yardi system.  So it would have

25    been printed from Yardi by one of my accountants.  I'm    13:26

Page 94

```
 1    pretty positive I didn't print it myself.              13:26

 2        Q    Yardi is an accounting software; correct?

 3        A    Correct.

 4        Q    And it's for property managers?

 5        A    Correct.                                       13:26

 6        Q    And so Variant had a account with Yardi wherein

 7    these accountant -- accounting documents were stored?

 8        A    Correct.

 9        Q    Is it the Voyager system?  Is that the

10    accounting software?                                   13:27

11        A    It's Yardi.  Yardi is an accounting, yeah, does

12    property management and accounting.

13        Q    Does that database contain -- also contain

14    communications or is it just accounting records?

15        A    Accounting, leasing records, you know, rent    13:27

16    rolls, things of that nature.

17        Q    Would it contain records relating to

18    renovations?

19        A    The construction in progress that was booked

20    would be kept there as well, yes.                      13:27

21        Q    So invoices for accounts payable would run

22    through the Yardi --

23        A    Yes.

24        Q    -- system?

25        A    Yes.                                           13:27
```

Page 95

1     Q    Is this a document you reviewed in connection     14:41

2  with your investigation of related-party transactions at

3  Variant?

4     A    Yes.

5     Q    There is an entity -- an entry circled here for     14:41

6  current payables to Pecan Crossing operating account.

7     Can you tell me why that is circled?

8     A    Because I wanted to look at the detail behind

9  the payables to determine what related parties were also

10  listed in the payables account.                          14:41

11     Q    And on this closing statement are there charges

12  that appear to you to be related-party transactions?

13     A    Yes.

14     Q    What are they?

15     A    JH Greenberg & Associates, Knox Insured, The     14:42

16  Waterfall Group, MW Consulting, MVCA.  That's all.

17     Q    Did you determine that these $938,000 for

18  current payables to Pecan Crossing also included

19  related-party transactions?

20     A    Yes.                                             14:42

21     Q    Sitting here today, do you consider these to be

22  fraudulent charges?

23     A    Yes.

24     Q    Do you recall what you -- what specifically you

25  were able to determine were related-party transactions     14:42

1  signed that?                                               14:49

2      A    That looks to be Shirley Welch.

3      Q    Who is Shirley Welch?

4      A    She is Greenberg's assistant, his paralegal of

5  sorts, assistant.  I don't know if she's an official    14:49

6  paralegal.

7      Q    Did Ms. Welch ever perform any services for Sui

8  Generis that you are aware of?

9      A    No.  Oh, not to my knowledge.  I don't know.

10     Q    Are you aware of any other entities that        14:50

11  Ms. Welch formed that you later suspected to be related?

12     A    I believe that would be privileged.

13     Q    You became aware of things, but it was through

14  an attorney?

15     A    Yeah.                                            14:50

16     Q    Did you ever review any contracts between

17  Variant or Variant entities and the related parties?

18     A    No.

19     Q    Did you ever ask for access to them?

20     A    Yes.                                             14:51

21     Q    Were you told you could not access them?

22          MR. STEINBERG:  Objection.  Attorney-client

23  privilege.

24    BY MR. PEARL:

25     Q    By someone other than an attorney?              14:51

                                              Page 138

1       A    Yes.                                                    14:51

2       Q    Who told you, you couldn't have access to them?

3       A    The IT person.

4       Q    So the IT person told you, you could not have

5    access to contracts that you wanted to review to -- to     14:51

6    research whether they were legitimate contracts?

7       A    I was actually looking for -- for tax-related

8    information so I could prepare adequate tax returns.

9       I told them everything that had a number in it should

10   be privileged by the CFO.  It was -- I -- I actually spent  14:51

11   weeks trying to get access to documents that I was not

12   allowed to have access to.

13      Q    And who was the IT person that told you, you

14   couldn't have access to them?

15      A    Not Rodney Mollen.  Another guy.  I don't           14:51

16   remember his name.

17      Q    Did you find it odd that as CFO, you couldn't

18   review underlying contracts to -- for purposes of creating

19   tax returns?

20      A    Very.                                                14:52

21      Q    That in and of itself is suspicious to you?

22      A    Yes.

23      Q    Did that make you think there may be fraud going

24   on at the company?

25      A    Yes.                                                 14:52

                                                    Page 139

1      Q    Is that unusual for any company you worked at      14:52

2   that you would be denied access to reviewing contracts?

3      A    I have always had full access to documents as

4   the CFO or controller.

5      Q    Sitting here today, who do you believe at the      14:52

6   company was aware of these related-party transactions and

7   their fraudulent nature?

8      A    I would say Graham Swanson, Dan Wesson,

9   Greenberg, Shirley Welch, Cash, Court, Mike Bernstein,

10  Lynette, Chris Morgan, Chris Reynolds.                     14:53

11     Q    Kristina Quesada?

12     A    Kristina Quesada.

13     Q    Tom Wagner?

14     A    Yes.

15     Q    Herb Weiss?                                        14:53

16     A    Only subsequently.  I don't think he knew

17  anything prior to me discussing it with him.

18     Q    Rodney Mollen?

19     A    I don't know him.  He wasn't there when I was

20  there.  I think he was the ex-CIO or COO, one of those.    14:53

21  He wasn't there when I was there.

22     Q    Anyone else in the accounting department?

23     A    I doubt it.  Maybe.  I don't know.  I don't

24  think Chris Morgan and Chris Reynolds knew until I told

25  them.                                                      14:54

Page 140

```
 1              MR. PEARL:  Let's take a quick break.          14:54

 2              THE WITNESS:  Okay.

 3              VIDEO OPERATOR:  Going off the record.  The time

 4    is 2:54.

 5        (A recess is taken.)                                 14:54

 6              VIDEO OPERATOR:  We are back on the record.  The

 7    time is 3:08.

 8      BY MR. PEARL:

 9        Q    Ms. Jack, I'm going to show you what's been

10    marked as Exhibit 42.                                    15:08

11        (Deposition Exhibit 42 was marked for identification

12      by the court reporter.)

13              THE WITNESS:  (Indicating.)

14      BY MR. PEARL:

15        Q    Ms. Jack, were you involved in Variant's request  15:08

16    to Doral for disbursements of the Doral loan?

17        A    No.

18        Q    Do you recognize the document I just put in

19    front of you?

20        A    No.                                             15:08

21        Q    I'll show you a document that's been marked as

22    Exhibit 43.

23        (Deposition Exhibit 43 was marked for identification

24      by the court reporter.)

25              THE WITNESS:  (Indicating.)                    15:09
```

Page 141

Lisa Jack, 8/7/2014

```
 1    Mercedes, and most of the employees were making minimum      15:34

 2    wage and buying nice cars and living in nice highrises in

 3    downtown and La Jolla and --

 4         Q    So it appeared unusual to you that these

 5    employees would be making minimum wage and living in        15:34

 6    highrise places in La Jolla and driving expensive cars?

 7         A    Correct.

 8         Q    Have you ever worked with a company where --

 9    that had this type of employment arrangement wherein

10    the -- the employees would receive minimum wage and get     15:34

11    their bulk of the income through other transactions?

12         A    No.  I mean, I've had several CEOs if cash was a

13    problem, they would take a minimum wage salary, but they

14    were doing that for the company, and they weren't taking

15    anything from the company.  They would do that in the       15:35

16    interim until the company was doing better.  They wouldn't

17    take their large salaries.

18         Q    Who are the individuals that were making minimum

19    wage and buying fancy cars?

20         A    Well, Court was on minimum wage.  Mike          15:35

21    Bernstein.  Cash.  Tom Wagner.  There might have been -- I

22    don't remember if Danny Barnes was on minimum wage or not.

23         Q    And were those -- and were those individuals

24    also living a lifestyle that was inconsistent with a

25    minimum wage salary?                                        15:36
```

                                                    Page 156

1    A    Yes.                                                      15:36

2    Q    And how did you -- How did you know that?

3    A    Cars in the parking lot.  Talking casually about

4  where people lived.

5    Q    Were these issues that raised red flags with        15:36

6  you?

7    A    Yes.

8    Q    Do you have any idea how much Mr. Bernstein was

9  making through payments other than his minimum wage

10  salary?                                                    15:36

11    A    I had a conversation with Court at one point,

12  and he told me that he had taken a million dollars of his

13  personal money and bonused the several individuals so that

14  they wouldn't have to pay taxes on it.  As a loan, he made

15  them personal loans, I guess, so that he could help them   15:37

16  avoid income tax.

17    Q    Do you recall when this conversation occurred?

18    A    I would say sometime in December.

19    Q    Did you ever see any loan documentation for

20  these individuals?                                         15:37

21    A    No.

22    Q    Did this strike you as an unusual arrangement?

23    A    Yes.

24    Q    This raised red flags with you about the

25  legitimacy of the entity?                                  15:37

Page 157

1      A    Yes.                                                    15:37

2      Q    How did that conversation come about?

3      A    I think socially.

4      Q    And he was telling you how he took care of his

5   employees?                                                     15:37

6      A    Yes.

7      Q    Do you recall anything else from that

8   conversation, the details?

9      A    He said that he was helping Cash because he was

10  getting a divorce and that would help him not have to pay      15:37

11  as much in his divorce by paying him on the side.

12     Q    So he was providing these payments as loans so

13  they could avoid payments in the divorce and payments in

14  taxes?

15     A    Yes.  And he made it sound because everybody        15:38

16  worked so hard out of -- you know, because he was very

17  generous.

18     Q    And what did you say?

19     A    What did I think or what did I say?

20     Q    Both.                                                  15:38

21     A    I didn't say much.  I thought it was one of many

22  red flags that added up much later.  One red flag at a

23  time, you know, took a few weeks to put the entire pieces

24  together, but there were several red flags.

25     Q    Did Court ever offer you the same deal of           15:39

                                                      Page 158

| | | |
|---|---|---|
| 1 | minimum wage and the percentage of various transactions? | 15:39 |

2    A    No.  But at one point they were trying to help

3   me buy a house down there or they were going to buy a

4   house for me to live in.

5    Q    So they were going to buy a house for you in    15:39

6   La Jolla?

7    A    Yes.

8    Q    Did that strike you as unusual?

9    A    Yes.  I wasn't going to do that, by the way.

10    Q    You testified earlier that you said to Cash at    15:39

11   one point, "Why did you hire me?"  What did you mean by

12   that?

13    A    I think if you were doing these kinds of

14   transactions, why would you hire a CFO?  Why would you --

15   Why would you hire me?    15:39

16    Q    If you were engaged in fraud, why would you

17   bring in a CEO?

18    A    CFO, yes.

19    Q    CFO.  Sorry.

20   And what was his response?    15:39

21    A    They said they needed -- They wanted to take the

22   company to the next level.

23    Q    And to take it to the next level, they believed

24   they needed a CFO to give it financial legitimacy?

25    A    Yes.    15:40

Page 159

1          Do you see that?                                          16:28

2          A     Yeah.  There is two.  There is one for 693- and

3     one for 446-.

4          Q     Let's -- Let's talk about both of those.

5          A     Okay.                                               16:29

6          Q     Did you do any investigation to determine

7     whether those debits were bona fide?

8          A     Yes.

9          Q     What did you do?

10         A     They -- I -- Cajun Capital had loaned money to      16:29

11    all the entities, and he wanted it -- and Court wanted it

12    on San Marin as owing it, and the 1.7 was loaned so that

13    we could -- was loaned to all the properties so they could

14    pay their management fees so that we could have more cash

15    in the company.                                                16:29

16         And then he was paying himself back through this

17    closing.  San Marin did not owe the $1.7 million.  That

18    was spread out between all the properties for management

19    fees.

20         Q     Who told you that the $1.7 million was loaned to    16:30

21    all the properties?

22         A     Court.

23         Q     When did he tell you?

24         A     When it was loaned.

25         Q     When was -- When was it loaned?                     16:30

                                             Page 187

```
 1      A    It was loaned a week or two prior to that.      16:30

 2      Q    And the purpose of the loan that Mr. Gettel told

 3   you was to pay management fees?

 4      A    Yes.  He loaned the company -- company fees to

 5   pay himself back the management fees.  All those entities  16:30

 6   paid management fees.  He loaned it to San Marin so

 7   San Marin could owe the other properties so that he could

 8   get that money back.

 9      Q    Now, when you say he did, the loan was from

10   Cajun Capital, wasn't it?                                16:31

11      A    Correct.

12      Q    How do you know that Mr. Gettel has ownership

13   interest in Cajun Capital?

14      A    I believe it was him or his wife.

15      Q    What's the basis for your belief?               16:31

16      A    That's what he told me.  I believe he said it

17   was his wife.  It's his wife's trust.

18      Q    Did he say that it was owned by his wife's

19   father?

20      A    He did not say that.  He said his wife.  It     16:31

21   could be his wife's father, but he said his wife.

22      Q    Was Mr. Gettel still married to his wife at that

23   time?

24      A    I didn't know he was not married -- Oh,

25   actually, I did know he -- he was divorced for tax       16:31
```

Page 188

```
 1    purposes is what he told me.  So he lived with his wife,    16:31
 2    but he was technically divorced for tax purposes.
 3         Q    Was there a promissory note to evidence the
 4    loan?
 5         A    I don't know.  I believe that was through --    16:32
 6    Lynette handled his personal finances.  I believe there
 7    was supposed to be one.  I don't know if it ever was
 8    signed.
 9         Q    Do you know what entity the loan was booked to?
10         A    I believe that the entity -- it was loaned to    16:32
11    San Marin, and San Marin loaned it to the various
12    entities, the various companies.
13         Q    Do you know how much of the $1.7 million was
14    used to pay management fees owed for San Marin?
15         A    I don't, but a small portion of it.    16:32
16         Q    What leads you to say a small portion?
17         A    Because I remember the list, and it was for all
18    the properties.  It wasn't just San Marin.
19         Q    All right.  Approximately how much?
20         A    Let's -- I don't recall enough to give you --    16:33
21    let's say maybe 200- to 300,000.
22         Q    And when San Marin -- San Marin then loaned
23    portions of those moneys to other related entities?
24         A    Yes.
25         Q    And those related entities then used those    16:33
```

Page 189

```
 1    moneys to pay management fees?                          16:33

 2        A    Yes.

 3        Q    Were there agreements in place where management

 4    fees were properly -- were payable with respect to

 5    San Marin and the other LLCs?                           16:33

 6             MR. PEARL:  Objection.  Vague and ambiguous.

 7             MR. STEWARD:  If you know.

 8             THE WITNESS:  Yes.  The management fees were

 9    due.

10     BY MR. STEINBERG:                                      16:33

11        Q    Did you look at any documents that described the

12    fact that management fees would be owed?

13        A    Yes.  I did actually look at those agreements,

14    and I take that back.  Actually, we were booking -- they

15    were booking management fees in excess of the agreements  16:33

16    based on a verbal from Cash and Court.

17        Q    How much in excess?

18        A    I don't recall, but it wasn't -- they weren't

19    following the agreement.

20        Q    Well, can you give me an idea of the magnitude  16:34

21    of the discrepancy?

22        A    I don't recall.  It was a long time ago.

23        Q    But you do recall the management fees were owed?

24        A    I do recall what?

25        Q    Management fees were owed by the different      16:34
```

1              I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby,

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place therein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were placed under oath; that a

8     verbatim record of the proceedings was made by me

9     using machine shorthand which was thereafter

10    transcribed under my direction; further that the

11    foregoing is an accurate transcription thereof.

12         I further certify that I am neither financially

13    interested in the action nor a relative or employee

14    of any attorney or any of the parties.

15         IN WITNESS WHEREOF, I have this date subscribed

16    my name.

17    Dated: August 11, 2014

18

19

20

21

22

           Gail E. Kennamer, CSR 4583

23

24

25

Veritext National Deposition & Litigation Services
866 299-5127

# Exhibit B

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                      COUNTY OF LOS ANGELES
 3
 4
 5      BPC VHI, L.P., BEACH POINT   ) Case No. BC546153
 6      TOTAL RETURN MASTER FUND,    )
 7      L.P., BEACH POINT DISTRESSED )
 8      MASTER FUND, L.P.,           )
 9                                   )
10                  Plaintiffs,      )
                                     )
11      vs.                          )
                                     )
12      VARIANT HOLDING COMPANY,     )
        LLC; CONIX COMMERCIAL        )
13      INVESTMENTS, LLC;            )
        CONPARTMENTS, LLC; NUMERIC   )
14      COMMERCIAL INVESTMENTS, LLC; )
        CONIX COMMERCIAL, LLC;       )
15      COURTLAND GETTEL, as an      )
        individual and as Trustee of )
16      Gettel Children's Trust,     )
        Gettel Children's Trust 2,   )
17      Gettel Children's Trust 3,   )
        and Walker's Dream Trust;    )
18      KATHRYN ROSE GETTEL; CONIX,  )
        INC.; PETER CASH DOYE; and   )
19      DOES 1 through 100,          )
        inclusive,                   )
20                                   )
                    Defendants.      )
21      _____)
22              VIDEOTAPED DEPOSITION OF DAN WESSON
                        Tucson, Arizona
23                      July 14, 2014
                        10:09 a.m.
24      JEFFREY W. BARTELT, CR, RPR
25      Certificate No. 50363
```

                                                    Page 1

```
 1                  DEPOSITION OF DAN WESSON
 2      commenced at 10:09 a.m. on July 14, 2014, at the
 3      offices of BARTELT REPORTING, LLC, 5151 East
 4      Broadway, Suite 1600, Tucson, Arizona, before
 5      JEFFREY W. BARTELT, a Certified Reporter, CR No.
 6      50363, for the State of Arizona.
 7
 8                          *  *  *
 9                    A P P E A R A N C E S
10
        For the Plaintiffs:
11
        O'MELVENY & MYERS, LLP
12      By:   James M. Pearl, Esq.
              Evan T. Mayor, Esq.
13            1999 Avenue of the Stars, 7th Floor
              Los Angeles, California  90067
14            jpearl@omm.com
              emayor@omm.com
15
16      For the Defendants:
17      GREENBERG TRAURIG, LLP
        By:   Howard J. Steinberg, Esq.
18            1840 Century Park East, Suite 1900
              Los Angeles, California  90067
19            steinbergh@gtlaw.com
20
        Also present:
21
              Jonathan Williams, CLVS
22
23
24
25
                                              Page  4
```

1      outcome in any way.

2              At this time will counsel please identify

3      themselves for the record.

4              MR. PEARL:  James Pearl, O'Melveny &

5      Myers, on behalf of the plaintiff.

6              MR. MAYOR:  Evan Mayor of O'Melveny on

7      behalf of the plaintiffs.

8              MR. STEINBERG:  Howard Steinberg of

9      Greenberg Traurig appearing on behalf of the

10     defendants.

11

12                          DAN WESSON,

13     called as a witness herein, having been duly

14     sworn, was examined and testified as follows:

15

16                            *  *  *

17

18                          EXAMINATION

19     BY MR. PEARL:

20         Q.  Mr. Wesson, can you identify for me who

21     else is in the room besides counsel of record?

22         A.  Court Gettel and Cash Doye.

23         Q.  Now, Mr. Wesson, were you an employee of

24     Variant, one of the Variant entities at some

25     point?

                                          Page  6

1        A.   Yes, I was.

2        Q.   Do you remember what entity that was?

3        A.   Variant Commercial Real Estate.

4        Q.   And at what point did you become an

5    employee of Variant?

6        A.   I'm not a hundred percent sure if this is

7    the exact date, but I believe it was on 3/10 of

8    2013.

9        Q.   What was your title at Variant?

10        A.   Managing director.

11        Q.   When you started at Variant, what was

12    your salary or arrangement for compensation?

13        A.   Well, originally my agreement was

14    $120,000 a year salary, and then I would get a

15    percentage of the acquisition fee.  You know, it

16    wasn't really nailed down, but it was somewhere

17    around three percent of the acquisition fee, and

18    then I would get some portion of the back end

19    when the property sold.  And, you know, again,

20    that wasn't really nailed down, either, but, you

21    know, it was in the ballpark of three percent.

22        Q.   And were you an employee of Variant only

23    for the purposes of obtaining healthcare?

24        A.   No.

25        Q.   What were your responsibilities for

Page 7

1    Variant?

2        A.   My responsibilities included running the

3    acquisition team, so I was responsible for, you

4    know, sourcing new deals, looking at new deals

5    as well as disposing of any properties that the

6    company wanted to sell.

7        Q.   In your role as managing director for

8    Variant, approximately how many transactions did

9    you perform these services for?

10       A.   So, I mean, we looked at a ton of deals,

11   but as far as deals completed, I worked on the

12   Houston 14 transaction, and then I worked on the

13   sale of Remmington Oaks, NC Storage, San Marin

14   Apartments and Pecan Crossing Apartments.  I

15   mean, I worked on a few other deals, but they

16   didn't make -- I worked on a potential

17   restaurant deal here in Tucson, but we didn't

18   complete that transaction.  I also worked on the

19   Embassy Suites transaction at Sunrise and

20   Campbell, which we did not complete.  I'm sure

21   there is others, but that's all that comes to

22   mind right now.

23       Q.   Can you describe for me how you're

24   supposed to be compensated on the H14

25   transaction?

Page  8

1          A.   Well, my agreement before I came over --

2     again, you know, it was not written in writing,

3     but based on the example that was given to me

4     had I been there during the FX3 transaction it

5     would have been somewhere 125 to $150,000.

6          Q.   And how were you ultimately paid on the

7     H14 transaction?

8          A.   I was paid $20,000.

9          Q.   Were there any other amounts allocated to

10    you or to Waterfall Group for the H14

11    transaction?

12         A.   No.

13         Q.   How much --

14         A.   Not that I recall.  I -- I don't think

15    so.  Other than my salary, I don't -- no.

16         Q.   Okay.  Did you see a closing statement

17    for the H14 transaction?

18         A.   I don't recall.  I don't think I did, but

19    I could have.

20         Q.   Are you aware of any monies that were

21    allocated on any of these transactions to the

22    Waterfall Group which were then refunded or

23    given back to a company called Sui Generis?

24         A.   Yes.

25         Q.   Can you tell me when that happened?

Page  9

1          A.   What transactions?

2          Q.   Yes.

3          A.   Yeah.  So like I said, that was NC

4     Storage, and that closed somewhere around

5     December 16th, 2013.  There was San Marin

6     Apartments that closed somewhere around January

7     31st, and then Pecan Crossing Apartments on

8     11/27/2013.

9          Q.  And just so the record is clear, these

10    were proceeds from the sale that were first

11    wired to the Waterfall Group and then a

12    percentage was wired back to Sui Generis?

13         A.   Correct.

14         Q.  And approximately how much of the fee

15    allocated to the Waterfall Group was then wired

16    back to Sui Generis?

17         A.   I believe -- so on NC Storage I think

18    approximately 90 -- I think approximately 95

19    percent was sent to that company.  San Marin, I

20    think, 90 percent.  Pecan Crossing, I believe it

21    was 90 percent.

22         Q.  So money was wired to Waterfall Group and

23    then 90 percent or 95 percent of that was then

24    wired back to Sui Generis?

25         A.   Correct.

1          Q.  And are you aware of any services that

2     Sui Generis played or participated in or

3     performed?

4          A.  Not that I know of.

5          Q.  Okay.  Are you aware of any services that

6     Sui Generis performed in the H14 transaction?

7          A.  I'm not aware of any.

8          Q.  Have you ever met an employee of Sui

9     Generis?

10         A.  No.

11         Q.  What do you think Sui Generis is?

12         A.  I have no idea.

13         Q.  Who did you think the money was going to

14    when you were wiring it back to Sui Generis?

15         A.  To Court Gettel.

16         Q.  For the Remmington Oaks transaction, are

17    you aware of any services performed by Sui

18    Generis?

19         A.  No.

20         Q.  Did you meet any employees of Sui Generis

21    in -- during the time of the transaction for

22    Remmington Oaks?

23         A.  No.

24         Q.  And who did you believe the money was

25    being wired back to when it was being wired to

1  Sui Generis?

2   A. The Waterfall was not paid -- Waterfall

3  Group wasn't paid anything on Remmington Oaks.

4   Q. On H14, who did you believe the money was

5  going to when you wired it back to Sui

6  Generis?

7   A. They weren't involved in the Houston

8  14.

9   Q. What services did they perform in H14?

10   A. None.

11   Q. In Pecan Crossing, was money sent to

12  Waterfall and then wired back to Sui Generis?

13   A. Yes.

14   Q. And who did you believe that money was

15  going to when you wired that money back to Sui

16  Generis?

17   A. To Court Gettel.

18   Q. And did Sui Generis perform any services

19  in the sale of the Pecan Crossing Apartments or

20  the purchase --

21   A. No.

22   Q. -- of the Pecan Crossing?

23   Who determined how much money would be

24  wired back to Sui Generis?

25   A. Court.

Page 12

1          Q.  For NC Storage, was money wired back to
2      Sui Generis out of the money that was allocated
3      to Waterfall?
4          A.  Yes.
5          Q.  Approximately how much?
6          A.  I don't have the exact number.  A
7      million-one-twenty-one.
8              MR. STEINBERG:  I'm going to object.  The
9      witness is consulting documents that we don't
10     know what they are.  They haven't been
11     introduced as an exhibit in this deposition, and
12     so I would ask that if there is anything that
13     he's consulting as a basis for his answer that
14     it being marked as an exhibit so that we know
15     what he's looking at.
16             MR. PEARL:  No objection.  We can go make
17     a copy of it.  I haven't seen it, either, so why
18     don't you go make a copy of that.
19             THE WITNESS:  You know, actually, I'm
20     going to be referring to all of these.  I mean,
21     you guys have all of these documents.
22         Q.  BY MR. PEARL:  Mr. Wesson, did you
23     receive a text message before this deposition
24     this morning?
25         A.  Yes, I did.

Page 13

1           Q.  And what did it say?

2           A.  I would have to -- I would have to turn

3       my phone on and read it.

4           Q.  Can you do that?

5           A.  Yeah.  It says:  I am blasting media

6       about you.  Good luck today.  You ruined my

7       life.  I will throw you in the cage for the rest

8       of your life.  You should watch who you talk to

9       as I will give you what you deserve.

10          Q.  Who is that from?

11          A.  I don't know.  The phone number is

12      520-441-6804.

13          Q.  Who do you believe that message is

14      from?

15              MR. STEINBERG:  Objection.  No

16      foundation.

17              MR. PEARL:  You can answer.

18              THE WITNESS:  Oh, I can answer?  It had

19      to either be Court, Cash, or Mike.

20          Q.  BY MR. PEARL:  Now --

21          A.  You're done with this?

22          Q.  Yeah, I'm done with it.

23              MR. PEARL:  Mr. Wesson sent a copy of

24      that text to us.  We will be producing it to the

25      other side.

Page 14

1          Q.  BY MR. PEARL:  Were you told at some

2     point, Mr. Wesson, that Variant had created fake

3     invoices that were being used for cap X

4     expenses?

5          A.  Yes.

6          Q.  And when were you told that?

7          A.  You know, it was -- I'm not sure of the

8     exact date.  It was the day before or the day of

9     Chris Reynolds leaving the company.

10          MR. STEINBERG:  Objection.  Move to

11     strike.  I object on the grounds of

12     accountant/client privilege and instruct the

13     witness not to make any further comments with

14     respect to that discussion.

15          MR. PEARL:  It is clear crime fraud

16     exception for fake invoices, but the objection

17     is noted.

18          Q.  BY MR. PEARL:  Mr. Wesson, how did you

19     feel when you were told this?

20          A.  Sick to my stomach.

21          Q.  Why?

22          A.  Because, as far as -- you know,

23     obviously, I'm not an attorney, but I know

24     that's not -- you know, it's not kosher to --

25     it's illegal.

                                        Page 15

1      distinct feeling that they didn't know who I

2      was, yet I had spent the entire day with him.

3      So obviously I just knew something wasn't right,

4      so I told him that I would talk to him later,

5      and then ended the call.

6           Q.  And did you tell Court about this call?

7           A.  Yes.

8           Q.  And what did Court tell you?

9           A.  He told me to call Cash.

10          Q.  And what did Cash say?

11          A.  Well, Cash got back to me, they were both

12     on the line, and told me not to tell them that I

13     paid any money back.

14          Q.  And when you say "paid any money back,"

15     you understood that to be referring to monies

16     paid back to Sui Generis?

17          A.  Right.

18          Q.  Now, what was Chris Reynolds title at

19     Variant?

20          A.  He was the CFO.

21          Q.  And did he resign at some point?

22          A.  Yes.

23          Q.  Do you know why --

24          A.  I'm assuming it was a resignation.  I

25     don't know if he quit or not.

Veritext National Deposition & Litigation Services
866 299-5127

1           I instruct the witness not to answer.

2           Q.  BY MR. PEARL:  Did your learning of fake

3    invoices contribute to your decision to leave

4    the company?

5           MR. STEINBERG:  Same objection.

6    Accountant/client privilege.

7           I instruct the witness not to answer.

8           Q.  BY MR. PEARL:  Did you believe the monies

9    that were wired back to Sui Generis were for

10   legitimate services?

11          A.  As far as the Waterfall Group is

12   concerned?

13          Q.  Yeah.

14          A.  Yeah, absolutely.  I -- yeah.

15          Q.  No.  The money that you then wired back

16   to Sui Generis, were you aware of any services

17   they performed to earn that money back?

18          A.  I mean, as far as I knew, Court owned

19   that company and he could do whatever he

20   wanted.

21          Q.  Now, who determined the amounts that were

22   paid to the Waterfall Group?

23          A.  Court.

24          Q.  And while this money was being paid to

25   the Waterfall Group, you at that time were a

1          managing director at Variant; is that right?

2               A.   Right.

3               Q.   Have you ever met an individual named

4          Mike Davies?

5               A.   No.

6               Q.   During the NC Storage transaction, was

7          there a charge that appeared on the closing

8          statement for a payment to Greenberg Traurig?

9               A.   On which transaction?

10              Q.   On any of the transactions.

11              A.   Oh.  Yeah, there was.  For NC Storage

12         there was.  I don't recall the others.

13              Q.   And on the NC Storage transaction, did

14         you work with Greenberg Traurig attorneys?

15              A.   Yes.

16              Q.   And were there also charges to Jeffrey

17         Greenberg?

18              A.   I believe so.

19              Q.   And did Jeffrey Greenberg do any services

20         on the transaction that you're aware of?

21              A.   Not that I'm aware of.

22              Q.   Did you find those charges to be odd?

23              A.   Well, when it came up I -- well, first of

24         all, I was confused on the whole thing, anyway,

25         because I had never worked with Greenberg

1              A.   No.

2              Q.   Were they created in the ordinary course

3      of business at Waterfall Group?

4              A.   Yes.

5              Q.   And at this time what was your position

6      within the Waterfall Group?

7              A.   I'm the -- whatever.  The managing

8      member.

9              Q.   Is there anyone else that is a member of

10     the Waterfall Group?

11             A.   I think my son is.

12             Q.   If you turn to the last page, the last

13     document.  We will go from back to front.  Can

14     you tell me what this is?

15             A.   It's a billing for consulting service

16     from the Waterfall Group to Variant.

17             Q.   And what's the date on it?

18             A.   November 21st, 2013.

19             Q.   And is this a document that you created

20     in the ordinary course of business at the

21     Waterfall Group?

22             A.   Yes.

23             Q.   And during that time at November 21,

24     2013, were you also a managing director at

25     Variant?

Veritext National Deposition & Litigation Services
866 299-5127

1          A.   Yes.

2          Q.   And the description here says real estate

3     consultation valuation and transaction

4     management.   Do you see that?

5          A.   Yes.

6          Q.   2.5 percent.  $260,000.  Do you see

7     that?

8          A.   Yes.

9          Q.   Was that fee paid out of the proceeds of

10    the transaction at the close of escrow?

11         A.   Yes.

12         Q.   And was that money wired in the first

13    instance to the Waterfall Group?

14         A.   Yes.

15         Q.   Was some percentage of that 260,000 then

16    wired back to Sui Generis?

17         A.   Yes.

18         Q.   And who instructed you to wire the money

19    back to Sui Generis?

20         A.   You know, I believe it was Lynette

21    Moreno.

22         Q.   And who did you understand to be

23    authorizing that?

24         A.   Court.

25         Q.   And when you say "Court," you mean Court

                                             Page 25

1      Gettel?

2             A.   Yeah, Court Gettel.

3             Q.   And who determined the $260,000 amount?

4             A.   Court Gettel.

5             Q.   And for the Pecan Crossing, what

6      consultation valuation and transaction services

7      did you perform?

8             A.   I -- you know, from the beginning of the

9      deal to the end of the deal, you know, I

10     consulted on all of it.  I mean, the valuation

11     of it, negotiating with the buyer, you know --

12     or, I'm sorry, with the broker.  Working the

13     deal.  Getting all the due diligence materials

14     together.  Getting it over to them.  Doing final

15     negotiations.  All that.

16            Q.  Did anyone from Sui Generis assist you in

17     that transaction?

18            A.   Well, I mean, if you're saying that Court

19     is Sui, then, yeah.  I mean, he -- so like I had

20     to talk to him, you know, is this -- can I do

21     this, can I do that.

22            Q.  So you understood Court to be the same as

23     Sui Generis?

24            A.   Yes.

25            Q.  Was there anyone else, any other

                                             Page 26

1          individual from Sui Generis that you worked

2          for?

3               A.  No.

4               Q.  Worked with?

5               A.  No.

6               Q.  And who determined the amount that would

7          be paid back from the Waterfall payment to Sui

8          Generis?

9               A.  Court Gettel.

10              Q.  And who is Lynette?

11              A.  Lynette Moreno.  I don't really know what

12         her job title is, but she works at Variant.

13         She's, for lack -- I don't know what her

14         description is, but she's worked for Court for

15         many years.

16                   So, you know, can I revise something

17         because it just dawned on me what I just said is

18         before when you were asking me questions about

19         did I work with anyone at Sui on those

20         transactions and I said no, but I guess really

21         the answer is, yeah, I worked with Court on all

22         those transactions.

23              Q.  Okay.  Can we go to the NC Storage, the

24         next page.  Now, is this a document you created

25         in the ordinary course of business in your

Veritext National Deposition & Litigation Services
866 299-5127

1        capacity for the Waterfall Group?

2             A.  Yes.

3             Q.  And this refers to a real estate

4        consultation valuation and transaction

5        management fee of 2.6 percent at 546,000.  Who

6        determined what that amount would be?

7             A.  Yeah, that's not -- that's not correct.

8             Q.  Okay.  What's not correct?

9             A.  This is for NC Storage.  The amount paid

10       isn't correct.  It was like a million-two.

11            Q.  Was it -- for the NC Storage transaction,

12       was there originally a $546,000 fee --

13            A.  Oh, yeah.

14            Q.  -- agreed to?

15            A.  Yeah.  Yeah.  Yeah.

16            Q.  And then was that fee revised upward?

17            A.  Yes.

18            Q.  Who revised it upward?

19            A.  Court.

20            Q.  Were there any additional services

21       performed that warranted that amount being

22       revised upward?  Did you request --

23            A.  Yeah.

24            Q.  -- it as a -- as a --

25                 MR. STEINBERG:  Objection.  Please let

Page 28

1     him answer the question.  He started to answer

2     and you interrupted his answer.

3               MR. PEARL:  Go ahead.

4               THE WITNESS:  Go ahead?

5          Q.  BY MR. PEARL:  Yeah.

6          A.  I mean, yeah.

7               MR. STEINBERG:  The question was, was

8     there additional service, and you said yes.

9               THE WITNESS:  Well, you know, in real

10    estate it's not -- it's not hours put in and

11    pay.  I mean, you -- you know, it's how -- you

12    know, kind of how well you do on the deal.  I

13    mean, at least from my recollection most brokers

14    were telling us that, you know, we were going to

15    probably get 18 million.  I mean, yeah, some of

16    them were saying, you know, you're going to get

17    up in the 20's or whatever, but, you know, we

18    all looked at that as broker bullshit, and so,

19    yeah.  I mean, I think that the Waterfall Group

20    definitely did create an increased value on that

21    deal.  I don't think had I not been involved in

22    the transaction there is no way that they would

23    have gotten 21 million.

24         Q.  Right, but did you as the principal of

25    the Waterfall Group request that the fee be

1          A.   Yeah.

2          Q.   Do you know why she changed titles?

3          A.   You know, I would only be speculating.

4          Q.   The next page of this document relates to

5     the San Marin Apartments.  Do you see that?

6               MR. STEINBERG:  You're on Exhibit 3 now?

7               MR. PEARL:  Yeah.

8               THE WITNESS:  Yes.

9          Q.   BY MR. PEARL:  Was the Waterfall Group

10    wired a sum of money, a portion of which was

11    then wired to Sui Generis?

12         A.   Yes.

13         Q.   Approximately how much -- well, how much

14    was wired to Waterfall Group in connection with

15    the San Marin Apartment transaction?

16         A.   $260,000.

17         Q.   And are you referring to Exhibit 2

18    here?

19         A.   I'm -- yes, I am.

20         Q.   And is it page -- the third page of that

21    exhibit?

22         A.   Yes.

23         Q.   Okay.  Now, this bank statement, this is

24    your personal bank account?

25         A.   No.  It's Waterfall Group.

Veritext National Deposition & Litigation Services
866 299-5127

1          Q.   Waterfall Group's bank account?

2          A.   Yes.

3          Q.   And it reflects a wire in on November 27,

4     2013, of $260,000; is that correct?

5          A.   Yes.

6          Q.   And on December 2nd 234,000 was wired to

7     Sui Generis?

8          A.   Yes.

9          Q.   And, again, was this done at the

10    authorization of Court Gettel?

11         A.   Yes.

12         Q.   And did this 234,000 come out of the

13    260,000 that Waterfall had been designated to

14    receive for the San Marin Apartment

15    transaction?

16         A.   Yes.

17         Q.   And other than Court Gettel, did you --

18    are you aware of any other services that were

19    performed by Sui Generis other than Court

20    Gettel --

21         A.   No.

22         Q.   -- in connection with the San Marin

23    Apartments?

24         A.   Correct.

25         Q.   I'm sorry.  This was in connection with

Page 41

1      the Waterfall Group along with the invoices that

2      Wesson sent to us.  Please review them and

3      confirm that they are okay.  Let me know if

4      you're handling these or if I should send them

5      to Wesson.

6              Did you receive this e-mail at some

7      point?

8          A.  Obviously, yeah, I must have because I

9      had it in my -- in my folder, yeah.

10         Q.  What did you understand Ms. Moreno to be

11     saying here?

12         A.  In her e-mail to Court?

13         Q.  Yeah.

14         A.  So it sounds like she is sending him the

15     invoices that were prepared from the Waterfall

16     Group as well as the -- the invoices from Sui to

17     the Waterfall Group.

18         Q.  And the top e-mail says -- is from

19     Ms. Moreno, and it doesn't have a to line.  It

20     says:  Pay up, old man.  I will have wiring

21     instructions -- wiring instructions no later

22     than tomorrow that I can send over to you so

23     that you can have them when we close.

24              Do you see that?

25         A.  Yes.

Veritext National Deposition & Litigation Services
866 299-5127

1          Q.  Do you recall receiving that e-mail?

2          A.  Yes.

3          Q.  And when she says pay up, old man, she's

4    referring to you?

5          A.  Yeah.

6          Q.  And did you receive this in the ordinary

7    course of business at -- as a principal member

8    of the Waterfall Group?

9          A.  Yes.

10         Q.  And was it Ms. Moreno who provided you

11   the wiring instructions to wire money back to

12   Sui Generis that was originally designated for

13   the Waterfall Group?

14         A.  Yes.

15         Q.  And you understood her to be giving you

16   those instructions at the direction of Court

17   Gettel?

18         A.  Yes.

19         Q.  And what is she asking you to pay up?

20         A.  The difference on the invoices.  The

21   amounts due to Sui.  I mean, I have to say that

22   none -- I mean, I don't think any of this is

23   correct.

24         Q.  You think those numbers were adjusted

25   later?

Page 48

1              A.   Yes.

2              Q.   I'm going to show you what's been marked

3       as Exhibit 4.

4                        (Deposition Exhibit No. 4 was marked

5                        for identification.)

6              Q.   BY MR. PEARL:   Mr. Wesson, do you

7       recognize this document?

8              A.   Yes.

9              Q.   And was this -- if you turn to the last

10      page of this document, it refers to a payment to

11      Sui Generis for NC Storage.   Do you see that?

12             A.   Yes.

13             Q.   Does that 1.121 million reflect the final

14      payment from the Waterfall Group to Sui Generis

15      in connection with the NC Storage transaction?

16             A.   Yes.

17             Q.   And if you look to Exhibit 2, your bank

18      records, do you have a bank statement that

19      reflects that payment?

20             A.   You know, I just have the screen shot.

21             Q.   Do you have a screen shot that reflects

22      that payment?

23             A.   Yes.

24             Q.   And what page of Exhibit 2 is that?

25             A.   It's the first page.

Veritext National Deposition & Litigation Services
866 299-5127

1        to do it under the law.

2            Q.  BY MR. PEARL:  You're not an accountant,

3        Mr. Wesson.  You have no duty to keep

4        confidential information that you learned about

5        criminal conduct at the company.

6                MR. STEINBERG:  All right.  And I'm going

7        to object to your characterization of criminal

8        conduct.  That has not been established and, you

9        know, your attempts to browbeat the witness when

10        he's already said that he prefers not to answer

11        that question, we will have the Court decide

12        this issue, and it's not the province of this

13        witness to make determinations about legal

14        issues.

15            Q.  BY MR. PEARL:  Do you choose to obey his

16        instruction?

17            A.  Honestly, I don't know what to do, man.

18        I'm kicking myself right now for not bringing an

19        attorney.

20            Q.  Okay.  Other than the accountants, did

21        other people at Variant know that money was

22        being kicked back to Sui Generis that was

23        provided to the Waterfall Group?

24                MR. STEINBERG:  Objection to the

25        characterization, the use of the word

Page 66

```
 1    kickback.
 2              MR. PEARL:  Speaking objections.
 3              Go ahead.
 4              THE WITNESS:  I go ahead?
 5         Q.  BY MR. PEARL:  Yeah.
 6         A.  I mean, I don't really like the term -- I
 7    didn't perceive it as a kickback.  I was sharing
 8    fees.
 9         Q.  The money was being wired back to Sui
10    Generis.  Whom else knew about that?
11         A.  The only two people that knew about it
12    were Lynette Moreno and Jeff Greenberg.
13         Q.  Did Cash know about it?
14         A.  Well, yeah, obviously.  Yeah.  Yes.
15         Q.  Did Mike Burnstein know about it?
16         A.  I would not know that.  I would only be
17    guessing.
18         Q.  Did anyone other than Mr. Reynolds or
19    Mr. Morgan tell you things that had you
20    concerned -- that made you concerned about fraud
21    at Variant?
22         A.  Well, I never talked to Chris Reynolds
23    the entire time I worked there, so -- I'm sorry.
24    Say that again.
25         Q.  Was there anyone other than Chris
```

Page 67

1        Reynolds or Chris Morgan --

2              A.  No.

3              Q.  -- who told you things that made you

4        concerned about criminal conduct at Variant?

5              A.  Give me a minute.  Let me think.

6                  Not that comes to mind.

7              Q.  Did you ever have any conversations with

8        Lisa Jack about any cap X expenditures?

9              A.  I never talked to Lisa Jack the entire

10       time that she worked there.

11                  (Deposition Exhibit No. 7 was marked

12                   for identification.)

13             Q.  BY MR. PEARL:  Mr. Wesson, I'm showing

14       you a closing statement for the San Marin

15       Apartments.  Do you recognize this document?

16             A.  I mean, I wouldn't say I -- yeah.  I

17       mean, I know it's a closing statement.  I see

18       San Marin on here.

19             Q.  Okay.  Now, if you look down to the

20       additional charges, you'll see a payment to

21       invoice 13-12-103 to the Waterfall Group for

22       540,000.  Do you see that?

23             A.  Yes.

24             Q.  And was some portion of that money wired

25       back to Sui Generis?

1              A.  I have no clue what the hell that means,

2       but that's, you know, kind of typical.  You

3       know, it's -- well, the first one I know,

4       obviously.  I think what he's saying here is

5       he's wanting me to add in the procurement of the

6       buyer on my invoice.

7              Q.  Right.

8              A.  But I did not because I did not procure

9       the buyer.

10             Q.  Who procured the buyer?

11             A.  The broker did.

12             Q.  And who performed the brokerage services

13      on that transaction?

14             A.  Well, barely the broker did.

15             Q.  But it was -- was it Marcus &

16      Millichap?

17             A.  It was fucking horrible.  No, it was --

18      Oh, I'm sorry.  This is NC Storage.  Yeah, that

19      was Marcus & Millichap.  Yes, that was.  And he

20      actually did do a good job.  That was -- I'm

21      sorry.  I got it confused with Colliers.  But

22      the other two sentences, I have no idea what

23      that means.  In fact, if I recall when I got it,

24      I thought I have no idea what he's talking

25      about.  I don't know who his is.  I think,

Page 77

1     actually, this is the one where Lynette -- I

2     could be wrong, but I think it's the one where

3     Lynette responded Court's drunk because I don't

4     think she understood it, either.

5                    (Deposition Exhibit No. 10 was marked

6                    for identification.)

7          Q.   BY MR. PEARL:   I'd like to show you

8     what's been marked as Exhibit 10.   Do you

9     recognize this document?

10         A.   Yes.

11         Q.   Is this an invoice you received in the

12    ordinary course of business as the principal

13    member of the Waterfall Group?

14         A.   Yes.

15         Q.   And is this for payment that was to be

16    wired back to Sui Generis out of the payment

17    that was designated for the Waterfall Group?

18         A.   Yes.

19         Q.   And what is Ms. Moreno instructing you to

20    do at the top of this e-mail?

21         A.   She's telling me to wire back this money

22    after I get the wire from title.

23         Q.   And was it Ms. Moreno who sent you the

24    Sui Generis invoice?

25         A.   Yes.

                                        Page 78

1          Q.   Was that common?

2          A.   Yeah.

3          Q.   And Ms. Moreno you said at some point was

4     an assistant at Variant?

5          A.   Yes.

6          Q.   Were you ever informed that she had

7     changed jobs to work at JH Greenberg &

8     Associates?

9          A.   My understanding was that at some point,

10    and I believe it was the same time, where

11    several of the -- several of us went on minimum

12    wage, that we were trying to lower the expenses,

13    and the load that was on Variant, and that's

14    when she went over to Greenberg, but it wasn't

15    announced.  It was just on her e-mails.

16         Q.   Did her job function change at that point

17    in any way that you saw?

18         A.   Not that I -- I mean, I wouldn't know.  I

19    don't have that much contact with her, but as

20    far as I was -- you know, from me, no.

21         Q.   Why did several people go on minimum

22    wage?

23         A.   You know, I think that it was -- well,

24    what I was told was that, you know, it's super

25    tight on money and, you know, that we need to

Page 79

1    get over this hump and, you know, would you go

2    on minimum wage.  It wasn't dictated.  I mean,

3    it was our choice.  Not volunteer, but we were

4    asked to.

5        Q.  The understanding was always that you

6    would recoup your whole salary at the end of the

7    year?

8        A.  Yes.

9        Q.  You weren't waiving your entitlement to

10    that salary?

11        A.  No.

12        Q.  And during the whole term of your

13    employment at Variant, you understood that you

14    were a managing director of Variant entitled to

15    your salary that you had negotiated with

16    Mr. Gettel; is that right?

17        A.  That's correct.

18        Q.  You never had a discussion that, hey, I'm

19    working for Waterfall now?

20        A.  No.  Actually, we did, so when I started

21    there I made an agreement with Court that I

22    would still operate the Waterfall Group and

23    still do deals outside of Variant, so I kept

24    that going as well.  In fact, worked on a couple

25    of deals while I was at Variant, yeah.

Page 80