IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VARIANT HOLDING COMPANY, LLC,[1] | ) | Case No. 14-12021 (BLS) |
| | ) | |
| Debtor. | ) | **Related to Docket No. 20** |
| ——————————————————— | ) | |

**DEBTOR'S PRELIMINARY OBJECTION TO
MOTION OF THE BEACH POINT FUNDS FOR AN ORDER
DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE;
AND REQUEST FOR CONTINUANCE**

Variant Holding Company, LLC (the "Debtor"), the above-captioned debtor and debtor in possession, hereby submits this preliminary objection to the *Motion of the Beach Point Funds for an Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 20] (the "Trustee Motion"), filed by BPC VHII, L.P., Beach Point Total Return Master Fund, L.P., and Beach Point Distressed Master Fund, L.P. (collectively, the "Beach Point Funds").

The Debtor intends to conduct discovery in connection with the Trustee Motion. The Debtor will supplement this preliminary objection upon the completion of discovery. Pending the completion of discovery and the outcome of the Debtor's ongoing sale effort at its subsidiaries, the Debtor requests that the Court continue the hearing on the Trustee Motion currently set for September 30, 2014, by at least ninety (90) days.

In support hereof, the Debtor respectfully represents as follows:

---

[1]  The last four digits of the Debtor's federal tax identification number are (4044).  The Debtor's address is 1200 North El Dorado Pl., Ste. G-700, Tucson, AZ  85715.

## Preliminary Statement

1.      There is no need to appoint a trustee in this case because the Debtor has already taken proactive and irrevocable steps to ensure independent management of this estate. Bradley D. Sharp of Development Specialists, Inc. has been retained by the Debtor as Chief Restructuring Officer (the "CRO").  The CRO is charged with the task of controlling the Debtor's and its non-Debtor subsidiaries' assets, including the apartment and real estate portfolio held at subsidiary levels.  The Debtor, under the supervision of the CRO, is in the midst of a robust marketing process to sell the entire real estate portfolio held through its subsidiaries. Initial offers from prospective buyers are expected by the end of this month.  The CRO is firmly in control of this process and focused on maximizing the value of this estate.  The CRO brings a wealth of experience to the sale process and has devoted considerable time and resources getting up to speed on the Debtor and its subsidiaries.[2]

2.      The Debtor disputes the allegations of impropriety pertaining to its existing management, which have been raised to divert attention from the many wrongful acts engaged in by the Beach Point Funds.   In order to avoid a protracted and expensive dispute in this Court which could adversely impact both the timing and results of a sale of the real estate portfolios owned by subsidiaries, the Debtor is taking swift action to appoint independent managers to oversee the CRO's activities, and to amend its operating agreement to prevent existing equity holders and principals from having any management role with the Debtor.  Such governance controls will be irrevocable and will ensure independent and professional

---

[2]  Mr. Sharp has acted as chapter 11 trustee on numerous occasions in the past and has particular experience with liquidating real estate interests.

management of this estate, mooting any possible need for the appointment of a trustee. The Debtor expects that the new independent board of managers will be in place by next Friday, September 19, 2014.

3. The CRO is also taking immediate steps to address any critical maintenance issues at the real estate held through non-Debtor subsidiaries. Most importantly, any and all safety or health violations have been remedied or are being reviewed by the CRO and Doral Bank as the lender. There are no known sewage leaks or health violations that have not been addressed or are in process. To the extent that air conditioning repairs were required, temporary rental units have been placed into service to minimize impact on tenants in the summer months, and permanent repairs or replacements are in process with Doral Bank as the lender. The CRO is in direct contact with lender representatives at subsidiary levels in order to ensure continued funding to satisfy any urgent maintenance needs at the properties as they arise. The Debtor's subsidiaries are also working with an investment banker in an effort to refinance the existing indebtedness at the property level and to provide additional financing for repairs and upgrades at the properties.

4. The Beach Point Funds raise various allegations of *prepetition* fraud and misconduct on the part of the Debtor's principals and affiliates as the basis to appoint a chapter 11 trustee only two weeks following the filing of this case. The Debtor disputes these allegations and has asserted numerous cross-claims against the Beach Point Funds based on their own misconduct. Such cross-claims are detailed in the Debtor's and affiliated parties' *Cross-Complaint for: Breach of Contract; Fraud; Breach of the Implied Covenant of Good Faith and*

3

*Fair Dealing; Violation of the Commercial Code; Promissory Estoppel; Extortion; Violation of the Equal Credit Opportunity Act; Recoupment*, just filed in California state court (the "Cross-Complaint").  A true and correct copy of the Cross-Complaint is attached hereto as **Exhibit A**.

5.      As alleged in the Cross-Complaint, the Beach Point Funds are predatory lenders that have taken various concerted steps in order to effectuate a "loan to own" strategy with respect to the Debtor's subsidiary assets.  These acts and omissions have included, among other things: wrongfully demanding and receiving millions of dollars in proceeds from property sales to which the Beach Point Funds were not entitled; intentionally thwarting the Debtor from achieving certain financial benchmarks, which triggered multiple layers of multi-million dollar fees and charges under the Beach Point Funds' loan documents; inducing and encouraging the Debtor to incur significant expense in connection with a refinance transaction that the Beach Point Funds agreed to approve, only to renege on that promise two days before closing for the purpose of creating capital shortages and financial distress for the Debtor; and intentionally interfering with the Debtor's efforts to refinance, sell, or maintain its properties, which transactions would have generated proceeds more than sufficient to repay the Beach Point Funds' debt in full and allowed the Debtor to fund ordinary course maintenance and capital improvements.  The Beach Point Funds now attempt to use the cash crunch at subsidiary levels that they created through their own wrongful conduct as a basis to appoint a trustee.

6.      The Debtor's cross-claims against the Beach Point Funds are complex state law claims that will be decided in the state court litigation before a jury.  There is no need for this Court to render any ruling on such claims except to take notice that the Beach Point

Funds' allegations in the Trustee Motion are vigorously disputed.  In this regard, the Cross-Complaint addresses many of the key allegations of fraud leveled by the Beach Point Funds in the Trustee Motion.  Here are a few highlights:

- The Beach Point Funds make much of the allegation that the Debtor's principals forged documents and created fictitious accounts to convince the Beach Point Funds that $6.1 million of proceeds from a subsidiary's asset sale (NC Storage) were held in escrow.  But the Beach Point Funds fail to point out that they were not entitled to this money under their own loan documents.  Notwithstanding this critical fact, in order to placate the Beach Point Funds, the Debtor paid $6.1 million to the Beach Point Funds on account of the NC Storage proceeds in June 2014.  Hence, the Beach Point Funds have suffered no damages from this alleged fraud.

- The Beach Point Funds allege that the Debtor's principals implemented a kick-back scheme with various affiliated entities and improperly disbursed sale proceeds that should have gone to Beach Point (San Marin is an example).  In fact, the Beach Point Funds' loan documents permit transactions with affiliates so long as the terms are intrinsically fair.  As to San Marin, approximately $1 million had been paid from closing to Cajun Capital, an affiliated entity, in order to repay an outstanding loan.  The Beach Point Funds demanded all of this money and they got it.  The Beach Point Funds have been paid over $2.5 million in the aggregate on account of debts, closing costs, and expenses that had been paid from sales proceeds that the Beach Point Funds labeled as excessive or improper.

- The Beach Point Funds assert that they have been defrauded and shorted by the Debtor.  Yet, the Beach Point Funds have been paid approximately $18 million by the Debtor to date on account of the original $73.5 million loan balance.  Notwithstanding such pay-down, the Beach Point Funds claim that they are still somehow owed "over" $73 million.

7. The bottom line is that the Beach Point Funds have unclean hands when it comes to their relationship with the Debtor.  Nearly from the inception the loan, the Beach Point Funds have attempted to exert control over the Debtor with the ultimate goal of claiming

DOCS_SF:86119.5 89703-002

ownership to the Debtor's valuable subsidiary assets.  The Beach Point Funds continue with this game plan through the filing of the Trustee Motion.[3]

8.      Yet, the Beach Point Funds can point to no reason why Mr. Sharp is not completely independent or well qualified to handle the role of CRO, except for the fact that he was not chosen by the Beach Point Funds.  The Debtor even offered to meet with the Beach Point Funds in order to discuss additional safeguards and sale protocols on a going forward basis. Suffice it to say, no meeting occurred.

9.      The Beach Point Funds point to the possibility that the CRO could fall victim to new fraudulent acts to be perpetrated by the Debtor's principals.  This argument begs the question:  Would not an independent trustee face the same problem?  The key point is that the CRO has taken charge of the Debtor's and its subsidiary's assets so that no one, through fraud or otherwise, can intervene, impede, or participate in the Debtor's subsidiaries' sale process or the disposition of the proceeds therefrom.  The CRO has also devoted considerable time and resources getting up to speed and addressing property issues, and if a trustee is appointed, there would be an expensive and unnecessary learning curve that would delay and impede the sale of subsidiary assets.  Any such delay could cause the loss of potential existing

---

[3] The Beach Point Funds have gone one step further through the filing of the *Motion of the Beach Point Funds and Cortland Capital Market Services LLC for an Order (I) Compelling the Debtor or Chapter 11 Trustee to Seek Bankruptcy Court Approval for All Sales of Property Owned by Non-Debtor Subsidiaries, III) Granting the Beach Point Funds and Cortland Capital Market Services LLC Adequate Protection for the Use of Their Collateral, and (III) Granting Related Relief* [Docket No. 34], filed on September 9, 2014 (the "Motion to Compel").  Through the Motion to Compel, the Beach Point Funds seek to impose additional controls and reporting obligations on the Debtor as to its non-Debtor subsidiaries, presumably in the event that the Trustee Motion is not granted on September 30, 2014.  As addressed further below, the Debtor is willing to seek Court approval prior to causing any of its subsidiaries to execute asset sales and to segregate the proceeds received by the Debtor therefrom pending further Court order.  The Debtor offered as much to the Beach Point Funds in an effort to avoid unnecessary litigation, but no resolution was reached.  The Beach Point Funds chose to file the Motion to Compel instead.

buyers for the properties, expose the Debtor to unknown risks affecting the markets generally, and potentially cause a substantial reduction in the proceeds of sale.

10.     Under these circumstances, there is no basis to appoint a trustee.

### Request for Continuance

11.     As noted above, the Debtor has implemented management changes and brought in a CRO who is beyond reproach in terms of his integrity and qualifications.  The CRO is managing the Debtors' subsidiaries' ongoing effort to sell their assets for the highest possible price and thereby maximize the value of this estate.  In their Motion to Compel, even the Beach Point Funds admit that "given the lack of any real operations by the Debtor, seeking the sale of the Subsidiaries' properties may be the only path toward providing any real value to the Debtor's creditors."  *See* Motion to Compel at pp. 33-34.  The Debtor agrees that the sale effort is the key driver to realizing value in this case, and therefore requests a continuance of the hearing on the Trustee Motion by at least ninety (90) days in order allow the sale effort to be concluded.  In the meantime, it makes little sense for the Debtor and the Beach Point Funds to incur hundreds of thousands of dollars in professional fees, and to waste this Court's time, litigating a Trustee Motion that is likely to be mooted by the outcome of the sales effort.  Moreover, a hotly contested trustee battle could create confusion in the marketplace and disrupt the sale process, which everyone agrees is the best available alternative for maximizing asset value.

12.     Even putting aside the ongoing sale effort, a continuance of at least ninety (90) days is warranted to allow the Debtor to prepare for trial.  The Debtor intends to present evidence that will establish that independent management, through the CRO, is firmly in place

7

and that the Debtor's principals will no longer have any say over the bankruptcy process, subsidiary sales, or anything else when it comes to the Debtor.  Further, the Debtor intends to present valuation evidence, in the form of expert testimony and/or actual offers as and when they are received, to show that there is ample equity value in this estate that the Beach Point Funds are attempting to seize for their own benefit and at the expense of other constituents.  Finally, the Debtor intends to establish that health and safety concerns raised in the Trustee Motion either have been addressed or are in the process of being addressed by the CRO.

13.     Based on the foregoing, the Debtor anticipates that a multi-day trial will be required in order for all of the evidence and arguments in connection with the Trustee Motion to be presented to the Court.  In an effort to reach agreement regarding scheduling, the Debtor's counsel has reached out to counsel for the Beach Point Funds, but no agreement has been reached.  In order for the Debtor to adequately present its defense of the Trustee Motion, the Debtor must have access to all documents and witnesses on which the Beach Point Funds intend to rely at trial, including an opportunity to conduct discovery.  The Debtor also requires adequate time to retain a valuation expert or experts and for such expert(s) to issue a report.  On this basis, and given the pending sale effort at subsidiary levels, the Debtor requests that the continue the hearing on the Trustee Motion currently set for September 30, 2014 by at least ninety (90) days.

14.     In the interim, there will be no prejudice to the Beach Point Funds or the Debtor's estate.  The CRO is in control of the Debtor.  Whatever alleged misconduct may have occurred prepetition, there is no more risk of it occurring again postpetition than a Court-appointed trustee would face.  Indeed, the estate will benefit from continuing to have an

8

independent and knowledgeable CRO in place who is charged with the task of maximizing the value of this estate and coordinating the ongoing efforts of the Debtor's subsidiaries to sell their assets for the highest possible price.  The Debtor submits that the interests of all constituents will be well served by allowing the Debtor to continue in the path of independent and experienced governance that will maximize value for all concerned.

### Background

15.     The Debtor and its affiliates are a commercial real estate company with direct and indirect ownership interests in approximately twenty-seven (27) apartment complexes and other real property interests in Arizona, Georgia, Maryland, Nevada, South Carolina, Texas, and Virginia.  The Debtor is the ultimate parent within the organization.  An organizational chart for the Debtor and its affiliates is attached hereto as **Exhibit B**.

16.     The Debtor's principal secured creditors are the Beach Point Funds. Cortland Capital Market Services LLC ("Cortland") is the administrative agent for the Beach Point Funds.  On May 19, 2014, the Beach Point Funds commenced an action in California state court (the "State Court Action") to collect on a $73.5 million loan consummated in September and October 2013.  The loan is secured by pledges in certain specified membership interests owned by the Debtor and two non-debtor subsidiaries.  A significant portion of the Debtor's interests are unencumbered by the Beach Point Funds' debt.[4]  Despite having been paid approximately $18 million to date, the Beach Point Funds continue to assert "over" $73

---

[4]  The Beach Point Funds suggest in the Trustee Motion that they have security interests in all distributions realized by the Debtor from its non-Debtor subsidiaries.  *See* Trustee Motion at ¶ 17, n. 17.  However, the pledges executed by the Debtor in favor of Cortland are limited to certain specifically identified membership interests held by the Debtor, which exclude roughly half of the subsidiaries' real estate portfolio.

9

million in claims against the Debtor, which are overstated and disputed.  In addition to the Beach Point Funds' commencement of the State Court Action, Cortland (as administrative agent for the Beach Point Funds) noticed a foreclosure sale of the Debtor's pledged membership interests for August 29, 2014.

17.     This bankruptcy case was commenced in order to provide the Debtor with a breathing spell as a means to effectuate a reorganization, including the sale of the real estate portfolio owned by the Debtor's non-debtor subsidiaries.

18.     The Debtor's subsidiaries have already retained an investment bank and commercial real estate brokers who have begun a comprehensive process of marketing the entire subsidiary portfolio for sale.  Initial offers are expected from prospective buyers by the end of September 2014.  The Debtor expects to start consummating sales during the following months.

19.     Significantly, the Debtor believes that proceeds of subsidiary asset sales will generate sufficient value for the Debtor's estate to pay all claims of the Beach Point Funds (to the extent allowed) and other creditors, and to generate returns in favor of the Debtor's equity holders.  Even the Beach Point Funds suggest that they have created equity value for the Debtor's owners by having extended credit to the Debtor.  *See* Trustee Motion at ¶ 16.  Absent a continuance to allow the sale process to play out, the Debtor intends to present valuation evidence at the trial on the Trustee Motion in the form of expert testimony and/or actual offers as and when they are received.

## Independent Management for the Debtor

20.     Management of the Debtor is now in the hands of an independent and experienced CRO, Bradley D. Sharp of Development Specialists, Inc.  The CRO's engagement is broad-ranging.  The CRO has assumed control of the Debtor's direct and indirect assets, including day-to-day control of the ongoing efforts of the Debtor's affiliates to market and sell their respective real estate properties, among other duties.  The CRO commenced work for the Debtor prepetition and has devoted considerable time and resources familiarizing himself with the Debtor and addressing property issues.  Going forward, the CRO will report to a newly-created board of managers that will be comprised of independent and experienced professionals.  The Debtor expects that the new independent board of managers will be in place by Friday, September 19, 2014.

21.     The Debtor's principals, aside from executing an amended operating agreement that will implement the governance changes summarized below, will have no management role in the Debtor going forward.  The Debtor's revised operating agreement will provide, among other things, for:

- Creation of a new board of managers to be filled by independent and experienced third parties who have no prior relationship to the Debtor, its affiliates, or any of its principals.  The board of managers will have ultimate management control over the Debtor and its direct and indirect non-Debtor subsidiaries, including the sole right to approve or disapprove any sales of subsidiary assets or to amend or modify any subsidiary operating agreements to ensure that the board of managers exercises full dominion and control over such entities.

- Prohibition on the members of the Debtor from taking any action to revise or revoke the Debtor's amended operating agreement, to remove the managers of the Debtor, or to appoint any replacement or additional managers;

- Confirmation that the CRO shall be the sole officer of the Debtor and shall report solely to the Debtor's board of managers.  The CRO cannot be removed except for good cause, which essentially means gross negligence or willful misconduct.  The CRO will have day-to-day control of cash flow and the sale process at non-Debtor subsidiary levels; and

- Removal of all current officers and/or managers of the Debtor other than the CRO and the new board of managers.  The Debtor's principals shall play no role in the governance of the Debtor going forward.

22.    As noted, the Debtor is in the process of marketing its subsidiaries' real estate portfolio for immediate sale.  The marketing effort is robust and spearheaded by an experienced investment banker and commercial real estate brokers.  The purpose of the sale process is to generate sufficient proceeds to repay the Beach Point Funds and other constituents in full as soon as reasonably possible and to maximize the value of this estate.

23.    As an additional safeguard and in the interests of full disclosure and complete transparency, the Debtor is prepared to seek Court approval authorizing the Debtor to cause its subsidiaries to consummate sale transactions as they arise.  Further, the Debtor will set aside any net proceeds of affiliates' asset sales (after payment of broker fees and creditor claims at subsidiary levels), once such proceeds have been distributed to the Debtor, pending further order of this Court.

24.    Finally, the CRO is currently in negotiations with Doral Bank, as lender at subsidiary levels, in order to obtain immediate financing to fund critical property maintenance needs.  It is anticipated that additional funding will be obtained in the near term.  The Debtor's subsidiaries are also working with an investment banker in an effort to refinance the existing indebtedness at the property level and to provide additional financing for repairs and upgrades at the properties.  However, there is no imminent threat to health or public safety

with respect to any of the properties owned by the Debtor's subsidiaries.  Sewage leaks have

either been fixed or apartments taken off market.  Air conditioning issues are either resolved or

in process.  Given that many of the properties are decades' old, these are issues that any trustee

would face and the CRO is focused on resolving them as they arise.

> 25.    The Beach Point Funds have not raised any substantive challenge to the

independence or qualifications of the CRO, except for the fact that the Beach Point Funds were

not involved in his selection.  The Debtor offered to meet with the Beach Point Funds shortly

after the filing of this case to address any concerns with management and to discuss sale

protocols.  That meeting did not take place.  Instead, the Beach Point Funds filed the Trustee

Motion.

### The Beach Point Funds' Allegations of Fraud are Unfounded and Fail to Take Into Account the Beach Point Funds' Own Misconduct

> 26.    The Beach Point Funds' allegations of fraud and misconduct in the

Trustee Motion are the subject of the pending State Court Action.  The Debtor, along with

certain affiliated parties, has filed the Cross-Complaint against the Beach Point Funds asserting

a variety of state law contract and tort claims, including breach of contract, fraud, breach of the

implied covenant of good faith and fair dealing, promissory estoppel, and extortion.  *See*

attached **Exhibit A**.  This litigation likely will take many months, if not years, to resolve and,

absent settlement, ultimately will go to a jury.  The Debtor submits that the allegations in the

State Court Action cannot (and should not) be resolved by this Court in the context of the

Trustee Motion.  The key point for purposes of the Trustee Motion is that none of these

allegations relate to *postpetition* conduct of the Debtor.

13

27.     Further, the Court should take notice of the fact that the Beach Point Funds' allegations are disputed and their own conduct must be closely scrutinized, as reflected by the Cross-Complaint.  As detailed in the Cross-Complaint, the wrongful acts and omissions of the Beach Point Funds revolve around a "loan to own" strategy implemented through a variety of means, including wrongfully demanding and receiving significant proceeds from property sales to which the Beach Point Funds were not entitled; intentionally thwarting the Debtor from achieving certain financial benchmarks, which triggered substantial punitive fees and charges payable to the Beach Point Funds; inducing and encouraging the Debtor to incur significant expense in connection with a refinance transaction that the Beach Point Funds agreed to approve, only to renege on that promise two days before closing for the purpose of creating capital shortages and financial distress for the Debtor; and intentionally interfering with the Debtor's efforts to refinance or sell its properties, which transactions would have generated proceeds more than sufficient to repay the Beach Point Funds' debt in full.  In a further effort to disrupt the Debtor's operations, the Cross-Complaint alleges that the Beach Point Funds have been communicating with one of the principal lenders on the Debtor's subsidiaries' real estate portfolio, Doral Bank, and are disseminating false information for the purpose of inducing Doral Bank to declare a default or otherwise defer making advances under a credit line.  By so doing, the Beach Point Funds have impeded the Debtor's ability to oversee and manage its properties and have created the property maintenance issues that the Beach Point Funds now assert as a basis for the appointment of a Trustee.

28.     The Debtor also disputes the allegations of fraud or misconduct set forth in the Trustee Motion.  For example:

- The Beach Point Funds focus on the allegation that the Debtor's principals forged documents and created fictitious accounts to convince the Beach Point Funds that $6.1 million of proceeds from a subsidiary's asset sale (NC Storage) were held in escrow.  The Beach Point Funds neglect to mention that they were not entitled to this money under their own loan documents, but nonetheless, were paid $6.1 million on account of the NC Storage proceeds in June 2014.  As a result, the Beach Point Funds have suffered no damages and have no basis to assert fraud.

- The Beach Point Funds allege that the Debtor's principals implemented a kick-back scheme with various affiliated entities and improperly disbursed sale proceeds that should have gone to Beach Point (San Marin is an example).  In fact, the Beach Point Funds' loan documents permit transactions with affiliates so long as the terms are intrinsically fair.  As to San Marin, approximately $1 million had been paid from closing to Cajun Capital, an affiliated entity, in order to repay an outstanding loan.  The Beach Point Funds demanded all of this money and they got it.  The Beach Point Funds have been paid over $2.5 million in the aggregate on account of debts, closing costs, and expenses that had been paid from sales proceeds that the Beach Point Funds labeled as excessive or improper.

- The Beach Point Funds assert that they have been defrauded and shorted by the Debtor.  Yet, the Beach Point Funds have been paid approximately $18 million by the Debtor to date on account of the original $73.5 million loan balance.  Notwithstanding such pay-down, the Beach Point Funds claim that they are still somehow owed "over" $73 million.

29.     From soon after the consummation of the loan, the Beach Point Funds have pursued a strategy that is designed to exert control over the Debtor and to capture the value of its assets at the expense of all other creditors and constituents.  The Trustee Motion is the latest incarnation of the Beach Point Funds "loan to own" strategy.

30.     Given the hotly contested nature of the Beach Point Funds' allegations in the Trustee Motion and the fact that these allegations have been effectively mooted by virtue

of the Debtor's independent management on a going forward basis, the Debtor submits that appointment of a trustee is unwarranted and contrary to the interests of this estate.

### Appointment of a Trustee is Not Warranted Where the Alleged Prepetition Misconduct Will Not to Recur in Chapter 11

31.    "[O]n a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct.  Speculation that a debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case or justify the additional costs of a trustee." *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (citations omitted); *Ad Hoc Committee of Bondholders v. Citicorp Venture Capital Ltd. (In re Fairwood Corp.)*, 2000 WL 264319, *14-15 (S.D.N.Y. Mar. 9, 2000), *aff'd*, 242 F.3d 364 (2d Cir. 2001).  Indeed, "one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11. . . ." *Midlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.)*, 4 B.R. 635, 645 (Bankr.E.D.N.Y.1980); *see also* 7 *Collier on Bankruptcy* ¶ 1104.02[c][i] (16th ed. 2014) (footnotes omitted) ("[T]he reference to 'gross mismanagement' represents tacit recognition that some degree of mismanagement exists in virtually every insolvency case and that mere mismanagement does not, by itself constitute cause."); *In re General Oil Distributors, Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984) (most companies in bankruptcy have at least some degree of incompetence or mismanagement, but appointment of a trustee is meant to be the extraordinary exception rather than the rule).

32.    Critically, where no ongoing danger to the estate persists, no justification for the burden and expense of the appointment of a trustee exists.  *See* Kenneth N. Klee & K.

John Shaffer, *Creditors' Committees Under Chapter 11 of the Bankruptcy Code*, 44 S.C. L. Rev.

995, 1045, 1049 (1993) (noting that "the incremental costs" of a chapter 11 trustee typically

"outweigh[] the benefits" and "maximization of value rarely lies down this path").

> The philosophy of chapter 11 is to give the debtor a "second
> chance" and, consistent with such philosophy, current management
> should be permitted to identify and correct its past mistakes.
> While a certain amount of mismanagement of the debtor's affairs
> prior to the filing date may not be sufficient grounds for the
> appointment of a trustee, continuing mismanagement of the affairs
> of a debtor after the filing date is evidence of the need for the
> appointment of a trustee.

*In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (citing H.R. Rep. No.

595, 95th Cong., 1st Sess. 220 (1977)).

33.    Although the Beach Point Funds' allegations of fraud and misconduct are

disputed and subject to pending cross-claims, what matters most for purposes of the Trustee

Motion is that such conduct (even if true) cannot recur *postpetition* given the numerous

safeguards that are now in place.  The Debtor's former principals and alleged wrongdoers will

have no role in the governance of the Debtor on a going forward basis.  The Debtor, and its

subsidiaries, will be controlled solely by the CRO and the new board of managers, and any

proposed dispositions of subsidiary assets by the Debtor will be subject to this Court's approval.

Hence, there is no more danger of misconduct here than there would be if a trustee were

appointed.

34.    Moreover, as things stand now, the Debtor's estate has the benefit of an

independent, knowledgeable, and fully engaged CRO who: (a) is familiar with the Debtor and its

subsidiaries' assets, (b) is involved in ongoing dialogue with lenders at subsidiary levels in order

to obtain immediate funding to address property maintenance needs, and (c) has the benefit of

counsel who is fully up to speed on the status of this case.

35.     As succinctly stated by the Third Circuit:

> [T]he basis for the strong presumption against appointing an
> outside trustee is that there is often no need for one: "The debtor-
> in-possession is a fiduciary of the creditors and, as a result, has an
> obligation to refrain from acting in a manner which could damage
> the estate, or hinder a successful reorganization." *Petit v. New
> England Mort. Servs.*, 182 B.R. 64, 69 (D. Me. 1995).

*In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998).  The instant case is a

perfect example.  Given the governance safeguards implemented by the Debtor, the Trustee

Motion should be denied because there is simply no need for a chapter 11 trustee.

## Given the Debtor's Governance Changes, There is No Cause to Appoint a Trustee

36.     Section 1104(a) of the Bankruptcy Code authorizes the appointment of a

trustee (1) "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the

affairs of the debtor," (2) "if such appointment is in the best interests of creditors, any equity

security holders, and other interests of the estate," or (3) if grounds exist for dismissal of the case

or conversion to chapter 7, but the court determines that the appointment of a trustee is in the

best interests of creditors and the estate.  11 U.S.C. § 1104(a).

37.     "It is settled that the appointment of a trustee should be the exception,

rather than the rule." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989); *Marvel*, 140

F.3d at 471.  The "standard for § 1104 appointment is very high . . . ." *Smart World Techs., LLC.

v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 176 (2d Cir. 2005).

The appointment of a chapter 11 trustee represents an "extraordinary remedy." *In re Ionosphere*

18

*Clubs*, 113 B.R. at 167; *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006).  Accordingly, the movant "must prove the need for a trustee by clear and convincing evidence."  *Sharon Steel*, 871 F.2d at 1226; *see also Marvel*, 140 F.3d at 471 (same); *Adelphia*, 336 B.R. at 656 (same); *Official Committee of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 317-318 (3d Cir. 2004) (same).

38.    Moreover, there is "a strong presumption" against the appointment of a trustee.  *Ionosphere*, 113 R.R. at 167; *Marvel*, 140 F.3d at 471.  This "strong presumption" is based on the fact that there is no need for a trustee in most cases because the debtor-in-possession is already a fiduciary for the estate and has an obligation to refrain from acting in a manner that could damage the estate.  *Marvel*, 140 F.3d at 471.  "The strong presumption also finds its basis in the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization."  *Id.*

39.    In the instant case, given the governance changes implemented by the Debtor, the Beach Point Funds cannot demonstrate by clear and convincing evidence that the extraordinary remedy of appointing a chapter 11 trustee is warranted.  Indeed, there is no need to appoint a trustee given that the Debtor already has the benefit of an independent and highly experienced CRO.  In such capacity, the CRO will control the Debtor's and its subsidiaries' cash flow and sale process.  The Debtor is also in the process of appointing a new board of managers not beholden to the Debtor's equity holders or principals.  The board will oversee the CRO and

19

ensure that the value of the estate is maximized for all constituents.  As a further level of protection, the Debtor will not cause any of its non-debtor subsidiaries to consummate any asset sales, and will not distribute any proceeds of such sales received by the Debtor (after payment of broker fees and creditor claims at subsidiary levels), without the approval of this Court.

40.    The CRO is also keenly focused on addressing any critical maintenance needs at the property level, none of which currently poses an imminent danger to health or safety.  These are the same concerns that any trustee would face and the CRO is already in the midst of obtaining funding from subsidiary-level lenders to cover any necessary expenses.  There is no need at this stage for a third party trustee to come into the mix.

### Appointing a Trustee is Decidedly Not in the Best Interests of the Estate

41.    Section 1104(a)(2) envisions a "flexible standard" for the appointment of a trustee when to do so would serve the "the interests of the creditors, equity security holders, and other interests of the estate."  *Sharon Steel*, 871 F.2d at 1226; *see also Marvel*, 140 F.3d at 474; *G-I Holdings*, 385 F.3d at 320 ("As *Sharon Steel* stated, the party asking for appointment of a trustee bears the burden of persuasion by clear and convincing evidence.  This burden does not shrink or shift.").

42.    In reconciling the "interests" standard with the "cause" standard, *Collier* notes:

> The "interests" standard may initially seem less stringent than the "cause" standard.  After all, no showing of wrongful behavior on the part of management is required, as long as interested parties can show a meaningful benefit from the appointment of a trustee. However, it is important to remember that the "interests" standard requires a finding that appointment of a trustee would be in the interest of essentially **all interested constituencies**."

7 *Collier on Bankruptcy* ¶ 1104.02[d][ii] (16th ed. 2014) (emphasis added).  One creditor cannot on its own obtain the appointment of a trustee under this provision in order to disenfranchise other interests.  Instead, appointment of a trustee must be in the interest of the estate generally in order to satisfy the statutory "interests" standard.

43.    Here, given that there is a real possibility that proceeds of subsidiary-level property sales will generate sufficient value to repay the Beach Point Funds in full (to the extent of their allowed claim), along with other creditor constituents, and leave additional proceeds for the Debtor's equity holders, the Court should be particularly circumspect of the Beach Point Funds' motives.  Rather than maximizing value for the benefit of all constituents, a trustee wholly unfamiliar with the Debtor, its assets, or the pending sale process at subsidiary levels would be ill-equipped to obtain the highest possible returns for the benefit of the estate or to consummate asset sales on the timetable currently contemplated by the Debtor.  As noted, the Debtor is intent on obtaining initial offers for its subsidiaries' real estate by the end of this month, and to start consummating sales during the following months, all with the ultimate goal of repaying the Beach Point Funds and other creditors in full.  It makes no sense to delay this process through the appointment of a trustee, particularly given that the grounds for the Trustee Motion have been addressed through the appointment of independent management.

44.    In short, the interests of the estate weigh heavily against the appointment of a chapter 11 trustee.

21

**Reservation of Rights**

45.     This is a preliminary objection only.  The Debtor reserves all of its rights to supplement this objection following the completion of discovery.

**Conclusion**

WHEREFORE, the Debtor respectfully requests that this Court (i) continue the hearing on the Trustee Motion by at least ninety (90) days, and (ii) following an evidentiary hearing, enter an order denying the Trustee Motion and granting such other and further relief as is just and proper under the circumstances.

Dated:  September 12, 2014              PACHULSKI STANG ZIEHL & JONES LLP


                                       */s/ Peter J. Keane*_____
                                       Richard M. Pachulski (CA Bar No. 90073)
                                       Alan J. Kornfeld (CA Bar No. 130063)
                                       Maxim B. Litvak (CA Bar No. 215852)
                                       Peter J. Keane (DE Bar No. 5503)
                                       919 North Market Street, 17th Floor
                                       P.O. Box 8705
                                       Wilmington, Delaware 19899-8705 (Courier 19801)
                                       Telephone:  (302) 652-4100
                                       Facsimile:  (302) 652-4400
                                       Email:  rpachulski@pszjlaw.com
                                               akornfeld@pszjlaw.com
                                               mlitvak@pszjlaw.com
                                               pkeane@pszjlaw.com

                                       [Proposed] Counsel for Debtor and Debtor in
                                       Possession, Variant Holding Company, LLC