## Exhibit 1

**Amended Operating Agreement**

**AMENDED AND RESTATED**

**OPERATING AGREEMENT**

**OF**

**VARIANT HOLDING COMPANY, LLC**
a Delaware limited liability company

Dated September 19, 2014

## AMENDED AND RESTATED
## OPERATING AGREEMENT
## OF VARIANT HOLDING COMPANY, LLC

a Delaware limited liability company

This Amended and Restated Operating Agreement (this "*Operating Agreement*") of **Variant Holding Company, LLC,** a limited liability company formed and existing under the laws of the State of Delaware, with its mailing address at c/o Development Specialists, Inc., 333 South Grand Avenue, Suite 4070, Los Angeles, CA 90071 (the "*Company*" or the "*LLC*") is made and entered into as of September 19, 2014 (the "*Effective Date*"), by and among the Members listed on Exhibit A hereto with their principal offices at 1200 North El Dorado Place, Suite G-700, Tucson, AZ 85715.

## RECITALS

The Members hereby acknowledge that:

A.    The Members of the Company and Variant Manager, LLC, a Delaware limited liability company ("*Variant Manager*"), are parties to an Operating Agreement dated July __, 2013 in respect of the Company (the "*Original Operating Agreement*"). Under the Original Operating Agreement, Variant Manager was the sole manager of the Company.

B.    On August 28, 2014 (the "*Petition Date*"), the Company commenced voluntary chapter 11 proceedings under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as now in effect or hereafter amended, the "*Bankruptcy Code*") before the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") in Case No. 14-12021 (BLS) (the "*Chapter 11 Case*").

C.    On August 28, 2014, the Company retained Bradley D. Sharp of Development Specialists, Inc. as its Chief Restructuring Officer. Mr. Sharp has been charged with the task of controlling the assets of the Company and its subsidiaries, including their portfolio of apartment and other real estate.

D.    The Members hereby remove Variant Manager as manager of the Company and desire to amend and restate the Original Operating Agreement to provide, *inter alia*, that during the Bankruptcy Period (as hereinafter defined) (A) management of the operations and business affairs of the Company will be under the control of Mr. Sharp as Chief Restructuring Officer, subject to the supervision of an independent board of managers and (B) neither Variant Manager, nor the Members, nor any of their Affiliates shall participate in the management or affairs of the Company.

E.    Accordingly, the Members now hereby amend and restate the Original Operating Agreement to read in full as set forth as follows.

ARTICLE 1
DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein):

1.1    *"Act"* means the Delaware Limited Liability Company Act, as amended from time to time.

1.2    *"Adjusted Capital Account Balance"* means, with respect to each Member, the balance of the Capital Account of such Member as of the end of the applicable Fiscal Year of the Company, adjusted for the following:

a.    Such Capital Account shall be credited for any amounts that such Member is obligated or treated as obligated to restore with respect to any deficit balance in his, her or its Capital Account pursuant to Regulation Sections 1.704-1(b)(2)(ii)(b)(3) and 1.704-1(b)(2)(ii)(c), respectively;

b.    Such Capital Account shall be credited for any amounts that such Member is deemed to be obligated to restore with respect to any deficit balance in his or its Capital Account pursuant to the next to last sentences of each of Regulation Section 1.704-2(g)(1) (that is, the Member's share of Minimum Gain) and Regulation Section 1.704-2(i)(5) (that is, the Member's share of partner nonrecourse debt minimum gain); and

c.    Such Capital Account shall be debited for any adjustment, allocation or distribution described in paragraph (4), (5) or (6) of Regulation Section 1.704-1(b)(2)(ii)(d).

1.3    *"Adjusted Capital Account Deficit"* means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

a.    The deficit shall be decreased by the amounts, if any, that such Member is obligated to restore under the terms of this Operating Agreement, or is deemed obligated to restore pursuant to Regulation Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5); and

b.    The deficit shall be increased by the items described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.4    *"Adjusted Invested Capital"* means, for each Member, the amount of any Capital Contributions contributed by such Member less the amount of any Distributions to such Member made pursuant to Section 10.5(b).

1.5    *"Affiliate"* means with respect to any Person, (i) any Person directly or indirectly controlling, controlled by, or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Person, (iii) any

2

officer, director, or general partner of such Person, (iv) any Person who is an officer, director, general partner, trustee, or holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence, or (v) any Person who is a parent, child, sibling, first-cousin, uncle, or aunt of a Person or Affiliate, or any spouse or child thereof. For purposes of this definition, the term *"controls," "is controlled by,"* or *"is under common control with"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

      1.6    *"Assignee"* means the owner of an Economic Interest who is not a Member.

      1.7    *"Bankruptcy Code"* has the meaning set forth in the Recitals hereto.

      1.8    *"Bankruptcy Court"* has the meaning set forth in the Recitals hereto.

      1.9    *"Bankruptcy Period"* means the period that begins on the Effective Date and ends on the first to occur of (a) the entry of an order of the Bankruptcy Court for a final decree in the Chapter 11 Case, (b) the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (c) the confirmation of a chapter 11 plan of reorganization in the Chapter 11 Case.

      1.10    *"Board of Managers"* means the Board of Managers of the Company as provided in Article V hereof.

      1.11    *"Capital Account"* means the capital account maintained by the Company for each Member in accordance with the following provisions:

          a.    A Member's Capital Account shall be credited with the Member's Capital Contributions, the amount of any Company liabilities assumed by the Member (or that are secured by Company property distributed to the Member), the Member's allocable share of profit and any share of income or gain specially allocated to such Member pursuant to the provisions of Section 10.3 (other than Section 10.3(c)); and

          b.    A Member's Capital Account shall be debited with the amount of money and the Fair Market Value of any Company property distributed to the Member, the amount of any liabilities of the Member assumed by the Company (or that are secured by property contributed by the Member to the Company), the Member's allocable share of Loss and any share of deductions or losses specially allocated to the Member pursuant to the provisions of Section 10.3 (other than Section 10.3(c)) hereof.

If any Membership Interest is transferred pursuant to the terms of this Operating Agreement, the Transferee shall succeed to the Capital Account of the transferor to the extent attributable to the transferred Membership Interest. It is intended that the Capital Accounts of all Members shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Operating Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with such Regulations.

1.12    *"Capital Contribution"* means any contribution to the capital of the Company in cash or property by a Member or Assignee whenever made.

1.13    *"Capital Contribution Date"* means the date upon which a Capital Contribution is made by a Member or Assignee to the Company for purposes of calculating the Priority Return.

1.14    *"Certificate"* means the Certificate of Formation of the Company as filed with the Secretary of State on or about April 18, 2013, as the same may be amended from time to time.

1.15    *"Chapter 11 Case"* has the meaning set forth in the Recitals hereto.

1.16    *"Code"* means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

1.17    *"Company"* means Variant Holding Company, LLC, a Delaware limited liability company.

1.18    *"Chief Restructuring Officer"* means Bradley D. Sharp, in his capacity as Chief Restructuring Officer of the Company, or any other Person that succeeds him in that capacity.

1.19    *"Covered Person"* means the Chief Restructuring Officer, the Managers, the Members and any employees or agents of the Company.

1.20    *"Distributable Cash"* means all cash, revenues and funds received by the Company, less such reserves as the Manager may reasonably deem necessary to the proper operation of the Company's business prior to any Distributions to Members and the maintenance of the liability protections afforded to the Manager and Members by the Act and other applicable laws and regulations.

1.21    *"Distribution"* means any money or other Property transferred by the Company to a Member or Assignee with respect to its Membership Interest in the Company.

1.22    *"Economic Interest"* means a Member's or Assignee's share of the Company's net profits, net losses and Distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members.

1.23    *"Fiscal Year"* means the calendar year.

1.24    *"For Cause"* means any of the following acts: (i) an intentional act of fraud, embezzlement, theft, self-dealing or any other material violation of law with respect to matters related to a Member or the conduct of Company business with third-parties; (ii) intentional damage to Company's assets, (iii) willful and continued failure to substantially perform the duties required by this Operating Agreement (other than as a result of incapacity due to physical or mental illness) by the Chief Restructuring Officer or any Manager or other willful misconduct, to the extent demonstrably and materially injurious to Company, monetarily or otherwise. For purposes of this definition, an act, or a failure to act, shall not be deemed willful or intentional,

4

unless it is done, or omitted to be done, in bad faith or without a reasonable belief that said action or omission was in the best interest of the Company.

    1.25    *"Gross Profit"* means the gross sale price of a Property, minus the gross purchase price of the Property and minus the actual costs expended for maintenance of the Property during the time of Company ownership.

    1.26    *"Independent Manager"* means a Manager that is not an Affiliate of, or other subject to the control or influence of, any Member of the Company or any Affiliate of the foregoing.

    1.27    *"Loss"* means any loss, claim, damages, liability, obligation, settlement, judgment, action, cause of action, litigation, mediation, arbitration, proceeding, investigation (whether civil or administrative and whether sounding in tort, contract, or otherwise), penalty, cost, or expense, including fees and disbursements.

    1.28    *"Manager"* individually means Manager 1 or Manager 2 and "Managers" collectively means Manager 1 and Manager 2, and in each case includes any other Person that succeeds a Manager in that capacity.

    1.29    *"Manager 1"* means M. Freddie Reiss, an individual.

    1.30    *"Manager 2"* means R. Todd Neilson, an individual.

    1.31    *"Member"* means each of the parties who execute a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Members. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

    1.32    *"Membership Interest"* means a Member's entire interest in the Company including such Member's Economic Interest and such other rights and privileges that the Member may enjoy by being a Member which shall only exist if represented by a Membership Certificate.

    1.33    *"Membership Percentage"* means, for each Member, the percentage set forth on Exhibit "A" to this Operating Agreement.

    1.34    *"Minimum Gain"* has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Member in a manner consistent with the Regulations under Code Section 704(b).

    1.35    *"Operating Agreement"* means this Amended and Restated Operating Agreement as may be amended from time to time.

    1.36    *"Original Operating Agreement"* has the meaning set forth in the Recitals hereto.

DOCS_LA:281620.1 89703-002

1.37    *"Person"* or *"Persons"* means any individual or entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" or "Persons".

1.38    *"Petition Date"* has the meaning set forth in the Recitals hereto.

1.39    *"Property"* means any ownership interest in any subsidiary or affiliate acquired by or contributed to the Company, together with any other asset acquired by the Company, whether held in its name or in the name of a nominee.

1.40    *"Priority Return"* means a twelve percent (12%) per annum cumulative return on each Member's Adjusted Invested Capital calculated from such Member's Capital Contribution Date(s).

1.41    *"Regulations"* means the final or temporary federal income tax regulations promulgated under the Code, as amended from time to time, and including corresponding provisions of succeeding regulations.

1.42    *"Secretary of State"* means the Secretary of State of the State of Delaware.

1.43    *"Transferee"* means a Person to whom a Membership Certificate is transferred in accordance with this Operating Agreement.

1.44    *"Variant Manager"* has the meaning set forth in the Recitals hereto.

## ARTICLE 2
## GENERAL PROVISIONS

2.1    Formation. On or about April 18, 2013, the Company was organized and formed as a Delaware limited liability company by causing the Certificate of Formation of the Company to be filed with the Secretary of State in accordance with and pursuant to the Act.

2.2    Name. The name of the Company is Variant Holding Company, LLC.

2.3    Principal Place of Business. The principal mailing address of the Company shall be 1200 North El Dorado Place, Suite G-700, Tucson, AZ 85715. The Company also has a mailing address at c/o Development Specialists, Inc., 333 South Grand Avenue, Suite 4070, Los Angeles, CA 90071 or such other place as the Board may from time to time designate. The Company may maintain such additional offices as the Board may determine.

2.4    Registered Office and Registered Agent. The Company's registered office shall be at the office of its registered agent, Harvard Business Services, Inc., 16192 Coastal Highway, Lewes, Delaware 19958. The registered office and registered agent may be changed from time to time by the Manager, by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State pursuant to the Act. The Company shall maintain at its registered office the records required to be maintained under the Act, as amended from time to time.

2.5    Term.  The term of the Company shall be perpetual from the date of filing of the Certificate, or as amended, with the Secretary of State unless the Company is earlier dissolved in accordance with either the provisions of this Operating Agreement or the Act.

### ARTICLE 3
### BUSINESS OF COMPANY

3.1    Permitted Businesses.  The business of the Company shall be primarily to act as the Sole Member of entities owned by the Company; to engage in any other business deemed advisable by the Board; and to engage in all activities necessary, customary, convenient, or incident to the foregoing which may be legally exercised by limited liability companies under the Act.

3.2    Compliance With Law.  Notwithstanding any other provisions of this Operating Agreement, the Company, the Chief Restructuring Officer, the Board of Managers and the Members will comply at all times with all applicable federal, state, and local statutes, regulations, ordinances, and other legal requirements.

### ARTICLE 4
### NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are listed on Exhibit "A" hereto.

### ARTICLE 5
### BOARD OF MANAGERS

5.1    Management by Board.  Except as otherwise expressly provided by this Operating Agreement (including Section 6.5 hereof) and except as otherwise required by the Bankruptcy Code and non-waivable provisions of applicable law, the business and affairs of the Company shall be managed by or under the direction of, and all decisions regarding the management and administration of the Company shall be made by, the Board of Managers.

5.2    Number, Tenure and Qualifications.  The Board of Managers shall consist of at least two (2) members who shall at all times be Independent Managers.  As of the Effective Date, the number of members on the Board of Managers shall be two (2) and the initial Independent Managers are Manager 1 and Manager 2.  Subject to the first sentence of this Section 5.2, the number of Managers may be increased or decreased from time to time and shall be determined (A) during the Bankruptcy Period, by the Board of Managers and (B) at all other times, by the Members.  Managers need not be Members of the Company.

5.3    Term.  Each Manager shall hold office until his or her successor is elected or until his death, resignation or removal.

5.4    Resignation.  A Manager may resign by giving written notice to the Company.  A Manager's resignation is effective upon its receipt by the Company or a later time set forth in the notice of resignation.

5.5     Removal.  A Manager may be removed For Cause by the Members, *provided, however*, during the Bankruptcy Period, the Members shall take no such action, and no such action shall have any force or effect, except upon and subject to approval by the Bankruptcy Court.

5.6     Vacancies.  Any vacancy on the Board of Managers, whether resulting from the death, resignation, or removal of a Manager or by increase in the number of Managers, may be filled (a) during the Bankruptcy Period, by the affirmative vote of a majority of all the Managers remaining in office, regardless of whether such majority constitutes a quorum and (b) at all other times, by Members holding not less than sixty five percent (65%) of the Membership Interests.

5.7     Meetings and Quorum.

        a.      The Board of Managers may hold meetings at any location within or without the State of Delaware.

        b.      Regular meetings of the Board of Managers may be set by resolution of the Board of Managers from time to time, and such meetings may be held without further notice, at such places and times as the Board of Managers determines.

        c.      Special meetings of the Board of Managers may be called at the request of the Chief Restructuring Officer or any Manager, and shall be called by the Chief Restructuring Officer or Manager on not less than 24 hours' notice.  The notice shall specify the place, date and time of the special meeting, but need not specify the business to be transacted at, or the purpose of, the meeting.

        d.      At all meetings of the Board of Managers, a majority of the Managers then in office (including any sole remaining Manager), constitutes a quorum for the transaction of business, unless a higher number is otherwise required by the Certificate of Formation or this Operating Agreement. If a quorum is not present at any meetings of the Board of Managers, a majority of the Managers present at the meeting (including a single Manager) may adjourn the meeting to another place and time without notice other than announcement at the meeting.  Any business may be transacted at the adjourned meeting which might have been transacted at the original meeting, provided a quorum is present.

5.8     Voting.  The vote of a majority of the Managers present at any meeting of the Board of Managers at which a quorum is present constitutes the action of the Board of Managers, unless a higher vote is otherwise required by non-waivable provision of the Act, the Certificate of Formation, or this Operating Agreement.

5.9     Telephonic Participation.  Members of the Board of Managers may participate in meetings of the Board of Managers by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting as provided herein shall constitute presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

DOCS_LA:281620.1 89703-002

5.10    Action Without Meeting. Any action required by the Act to be taken at a meeting of the Board of Managers, or any action which may be taken at a meeting of the Board of Managers, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall have been signed, before or after the action, by Managers of the Board of Managers then in office holding not less than the minimum number of votes that would be necessary to authorize or take action at a meeting at which all Managers of the Board of Managers were present and voted. Such consent shall have the same force and effect as a unanimous vote of the Board of Managers. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section 5.10.

## ARTICLE 6
## MANAGEMENT DURING BANKRUPTCY; CHIEF RESTRUCTURING OFFICER

6.1    Office. At all times during the Bankruptcy Period, the Board of Managers shall cause the Company to have a Chief Restructuring Officer. Initially, Bradley D. Sharp shall be the Chief Restructuring Officer.

6.2    Term. The Chief Restructuring Officer shall serve until his death, resignation, or removal. No Person serving as Chief Restructuring Officer may be removed as Chief Restructuring Officer except For Cause by the Board of Managers and with the approval of the Bankruptcy Court.

6.3    Resignation. The Chief Restructuring Officer may resign at any time. In the event of a resignation, the resigning Chief Restructuring Officer shall render to the Board of Managers a full and complete accounting of monies and assets received, disbursed, and held during the term of office of that Chief Restructuring Officer. The resignation shall be effective on the later of (i) the date specified in the notice delivered to the Bankruptcy Court or (ii) the date that is thirty days (30) after the date such notice is delivered. In the event of any resignation or termination of the Chief Restructuring Officer, the Person serving as Chief Restructuring Officer shall be entitled to any compensation and payment or reimbursement of expenses due, in accordance with this Operating Agreement.

6.4    Appointment of Successor Chief Restructuring Officer. Upon the death, resignation, or removal of a Chief Restructuring Officer, the Board of Managers shall appoint a successor Chief Restructuring Officer.

6.5    Power and Authority. At all times at which the Company shall have a Chief Restructuring Officer, notwithstanding any contrary provision of this Operating Agreement (including Section 5.1 hereof), and subject to the Bankruptcy Code and otherwise applicable law, (i) the Chief Restructuring Officer shall have the exclusive right, power and authority to manage and direct the business and affairs of the Company subject to the oversight of the Board of Managers, and (ii) the power, authority and responsibilities of the Board of Managers shall consist of oversight of the Chief Restructuring Officer. Subject to the Bankruptcy Code and the non-waivable provisions of other applicable law, and to the oversight of the Board of Managers, the Chief Restructuring Officer shall have the power to do any and all acts on behalf of the

9

Company that are necessary or convenient to or in furtherance of any decisions within the scope of his authority and any and all actions that are related or incidental to the accomplishment of such actions, all without the consent of any other Person. The Chief Restructuring Officer shall report to the Board of Managers from time to time regarding the Chapter 11 Case and his activities on behalf of the Company, and the Board of Managers shall review the progress of the Chapter 11 Case and exercise such oversight and supervision of the Chief Restructuring Officer as it may consider appropriate. No approval by the Board of Managers shall be required for the validity of any action or decision taken by the Chief Restructuring Officer within the scope of his authority under this Operating Agreement. The Chief Restructuring Officer shall not take any action that is inconsistent with a directive issued by the Board of Managers.

      6.6    Officer of Company; Execution of Instruments.

      a.    In addition to the rights, powers, and privileges otherwise expressly provided for or granted under this Operating Agreement, the Chief Restructuring Officer shall be an officer of the Company with the power and authority to act in the name or on behalf of the Company as its authorized agent and representative under the title of "Chief Restructuring Officer." In such capacity, the Chief Restructuring Officer shall have, subject to the Bankruptcy Code and the non-waivable provisions of other applicable laws and the oversight of the Board of Managers, the general duties of supervision and management of the day to day operations of the Company customarily vested in the chief executive officer or chief restructuring officer of a Delaware limited liability company.

      b.    The Chief Restructuring Officer, acting alone, shall have the power and authority to sign, execute, deliver, acknowledge, and/or file, on behalf and in the name of the Company, all checks, drafts, demands for money, promissory notes, deeds, mortgages, bonds, stock certificates, contracts, leases, reports and all other documents or instruments he may deem necessary or proper to be executed in the course of the Company's regular business and he may authorize any other Person as agent of the Company to sign, execute, deliver, acknowledge, and/or file such documents or instruments in his place and stead. All funds of the Company not otherwise employed shall be deposited or used as the Chief Restructuring Officer from time to time designates. The Chief Restructuring Officer may also ratify or confirm the execution or delivery of any check, draft, demand for money, promissory note, deed, mortgage, bond, stock certificate, contract, lease, report or other document or instrument signed in the name of and on the Company's behalf. Any such documents or instruments so signed, executed, delivered, acknowledged, filed, ratified and/or confirmed, of any type or nature, shall be binding on the Company.

      c.    The Chief Restructuring Officer may certify and authenticate records of the Company to third parties, and any third party dealing with the Company, the Chief Restructuring Officer, or the Members may rely upon a certificate signed by the Chief Restructuring Officer as to (i) the identity of the Chief Restructuring Officer, the Managers, or the Members; (ii) the existence or non-existence of any fact or facts that constitute a condition precedent to acts by the Chief Restructuring Officer, the Managers, or the Members or are in any other manner germane to the affairs of the Company; (iii) the Persons that are authorized to execute and deliver any instrument or document of or on behalf of the Company; or (iv) any act

10

or failure to act by the Company or as to any other matter whatsoever involving the Company, the Managers, the Members, or the Chief Restructuring Officer.

   d. Any shares or other securities issued by any other corporation and owned or controlled by the Company may be voted at any meeting of security holders of such other corporation by the Chief Restructuring Officer or by proxy appointed by him. Such proxy or consent with respect to any shares or other securities issued by any other corporation and owned by the Company shall be executed in the name of the Company by the Chief Restructuring Officer without necessity of any authorization by the Board of Managers or the Member. Any Person or Persons designated in the manner above stated as the proxy or proxies of the Company shall have full right, power and authority to vote the shares or other securities issued by such other corporation and owned by the Company the same as such shares or other securities might be voted by the Company.

   6.7 <u>Certain Powers of Chief Restructuring Officer</u>. Subject to the Bankruptcy Code and non-waivable provisions of other applicable laws and the oversight of the Board of Managers, the Chief Restructuring Officer shall have the power and authority, on behalf of the Company, to undertake the following actions:

   a. Act as an authorized representative in any and all capacities, including, without limitation, as attorney-in-fact, on behalf of the Company;

   b. Enter into, make, and perform contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the business of the Company and make all decisions and waivers thereunder;

   c. Open and maintain bank and investment accounts and arrangements, draw checks and other orders for the payment of money, and designate individuals with authority to sign or give instructions with respect to those accounts and arrangements;

   d. Manage, conserve, protect, operate, and maintain Property, including where appropriate causing a direct or indirect subsidiary of the Company to commence a bankruptcy filing;

   e. Collect sums due to the Company;

   f. Subject to any required Bankruptcy Court approval, distribute, or cause or permit to be distributed, any operating income or proceeds from any sale of any Property in accordance with the provisions hereof;

   g. To the extent that funds of the Company are available therefor, pay debts and obligations of the Company;

   h. Select, remove, and change the authority and responsibility of lawyers, accountants, and other advisers and consultants;

   i. Institute, prosecute and defend any proceeding in the Company's name;

11

         j.      Sell, convey, mortgage, pledge, lease, exchange and otherwise dispose of any Property;

         k.      Engage or hire agents or contractors of the Company, define their duties, and establish their compensation;

         l.      Purchase liability and other insurance to protect the Company's property and business; and

         m.      File with the Secretary of State any annual reporting required under the Act.

Unless expressly authorized to do so by this Operating Agreement, or by the agreement of the Members, no attorney-in-fact, employee or other agent of the Company other than the Chief Restructuring Officer, if any, or other Person designated by the Board of Managers shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized to act as an agent of the Company in accordance with the previous sentence.

    6.8    Reserved.

    6.9    Required Effort. The Chief Restructuring Officer shall not be required to devote all or any specific amount of his time, effort or managerial resources to the affairs of the Company. The Chief Restructuring Officer shall be obligated to devote only such time, effort and resources as he deems appropriate for the operation of the Company.

    6.10    Outside Activities. The Managers and the Chief Restructuring Officer may engage or invest in any activity, including without limitation those that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other activities or to the income or proceeds derived therefrom. The Managers and the Chief Restructuring Officer shall not be obligated to present any investment opportunity to the Company. The Managers and the Chief Restructuring Officer shall have the right to hold any investment opportunity for their own account or to recommend such opportunity to Persons other than the Company. The Members acknowledges that the Managers and the Chief Restructuring Officer may own, operate, manage or provide services in respect of other businesses, including businesses that may compete with the Company or for such Person's time. Each Member hereby waives any and all rights and claims which he or she may otherwise have against the Managers or the Chief Restructuring Officer as a result of any of such activities.

    6.11    Limitation on Liability.

         a.      No Covered Person shall be liable to the Company or the Members for any Loss incurred by reason of any act or omission (whether or not constituting negligence) performed or omitted to be performed by the Covered Person in good faith and in a manner reasonably believed to be within the scope of authority conferred on the Covered Person by this Operating Agreement, except that a Covered Person shall be liable for any Loss incurred by reason of the Covered Person's gross negligence, willful misconduct or fraud.

12

b.    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within the professional or expert competence of that Covered Person, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or any other facts pertinent to the existence and amount of assets from which distributions might properly be paid. The foregoing provision shall in no way be deemed to reduce the limitation on liability of the Chief Restructuring Officer as provided in Section 6.11(a).

c.    The limitation on liability set forth in Section 6.11(a) hereof shall to apply (i) in any context, whether or not in connection with litigation in which any Covered Person is a party and whether or not in connection with the enforcement of this Operating Agreement (including the exculpation provisions hereof), (ii) to any act or omission in the performance or non-performance by any Covered Person of this Operating Agreement, and (iii) to any Loss in any way caused by, relating to, based upon, or arising out of (directly or indirectly) an act or omission by a Covered Person; provided, however, that the foregoing limitation on liability shall not apply to the extent that any Losses suffered or incurred by any Person are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence, willful misconduct or fraud of such Covered Person.

d.    None of the Covered Persons shall be presumed to be responsible for the acts or omissions of any other Covered Person. In no event shall any Covered Person be liable for indirect, punitive, special, incidental, or consequential damages or other Loss (including but not limited to lost profits) whatsoever, irrespective of whether the Covered Person has been informed of the likelihood of such damages or other Loss and regardless of the form of action.

e.    The provisions of this Operating Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person otherwise existing at law or in equity (including such fiduciary duties), are agreed by the Members to eliminate and replace any other such duties and liabilities (including such fiduciary duties) of the Covered Person, to the maximum extent permissible by law. To the extent that, at law or in equity, a Covered Person has duties and liabilities (including fiduciary duties) relating to the Company, such Covered Person acting under this Operating Agreement shall not be liable to the Company or the Members for actions or omissions in good faith reliance on the provisions hereof.

f.    All provisions of this Section shall apply to any former Covered Person for all actions or omissions taken while such Person was a Covered Person to the same extent as if that person were still a Covered Person.

6.12    Indemnification.

a.    To the fullest extent permitted by applicable law, each Covered Person shall be entitled to indemnification from the Company for any Loss incurred by that Covered Person by reason of any act or omission (whether or not constituting negligence) performed or omitted to be performed by that Covered Person in good faith and in a manner reasonably believed to be within the scope of authority conferred on that Covered Person by this Operating

13

Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any Loss finally determined by a court of competent jurisdiction to have resulted primarily and directly from the gross negligence, willful misconduct or fraud of such Covered Person with respect to those acts or omissions; but any indemnity under this <u>Section 6.12</u> shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof. This indemnification shall survive the death, dissolution, resignation or removal, as may be applicable, of the Chief Restructuring Officer, or the dissolution of the Company, and shall inure to the benefit of the Indemnified Parties' respective successors, heirs, and assigns.

        b.     To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company before the final disposition of the claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay that amount if it shall be determined that the Covered Person is not entitled to be indemnified under this <u>Section 6.12</u>.

        6.13   <u>Insurance</u>. The Chief Restructuring Officer, if any, and otherwise such other Person as may be designated by the Board of Managers may cause the Company to maintain, at Company expense, commercially reasonable and appropriate forms and amounts of insurance, including, without limitation, (i) where appropriate, commercial general liability and casualty and (ii) against claims brought by third-parties against the Company, any Manager, or the Chief Restructuring Officer, if any, in connection with the operation of the business.

## ARTICLE 7
## RIGHTS AND OBLIGATIONS OF MEMBERS

        7.1   <u>Limitation of Liability</u>. Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.

        7.2   <u>Company Debt Liability</u>. A Member will not be personally liable for any debts or losses of the Company beyond his, her or its respective Capital Contributions, and any obligation of the Members under <u>Section 9.2</u> of this Operating Agreement to make Capital Contributions, except as otherwise required by law.

        7.3   <u>Lack of Authority of Members</u>. No Member shall have any power or authority to act for or on behalf of the Company, execute or deliver any instruments in the name or on behalf of the Company or do any other act that would be binding on the Company, or to incur any debt or expenditures on behalf of the Company except as otherwise expressly stated herein.

        7.4   <u>Non-Participation in Management</u>. During the Bankruptcy Period, no Member or any Affiliate thereof shall, or shall have any right, power or authority to, make any decisions in the name of or on behalf of the Company or to vote upon, consent to, approve or ratify any act or transaction by the Company or otherwise participate in the management of the business or affairs of the Company.

14

7.5    No Right to Withdraw.    No Member, following the contribution of its Capital Contribution, shall have the right to withdraw as a Member from the Company unless first approved by the Manager and by all of the Members.

ARTICLE 8
MEETINGS OF MEMBERS

8.1    Meetings of Members.    The Company shall not hold regularly scheduled meetings of the Members.  Special meetings of the Members may be called (A) during the Bankruptcy Period, at any time by the Chief Restructuring Officer or the Board of Managers, and (B) at all other times, by any Member, who shall state the purpose or purposes of such meeting and the matters proposed to be acted on thereat.

8.2    Place and Manner of Meeting; Notice.    All meetings of the Members shall be held at such time and place, within or outside the State of Arizona, as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof.  Any business to be transacted at a meeting of the Members must be described in the notice of meeting.  Members may participate in such meetings by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting as provided herein shall constitute presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

8.3    Conduct of Meetings.    All meetings of the Members shall be presided over by (a) the Chief Restructuring Officer, if any or (b) such other Person as may be designated by the Board of Managers.  The Person presiding over a meeting in accordance with the previous sentence shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him, her or it in order.

8.4    Notice.    Written or printed notice stating the place, day, hour and purpose or purposes for which the meeting is called, shall be delivered not less than five (5) nor more than sixty (60) days before the date of the meeting either personally or by mail, by or at the direction of the Person calling the meeting, to each Member entitled to vote at the meeting, provided that such notice may be waived as provided in this Operating Agreement.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the Member at his, her or its address as it appears on the records of the Company, with postage thereon prepaid.

8.5    Quorum of Members.    The presence of sixty five percent (65%) of the Membership Interests shall be required to constitute a quorum at a meeting of Members.

8.6    Majority Vote; Withdrawal of Quorum; Deadlock Provision.    With respect to any matter when a quorum is present at any meeting, the affirmative vote of sixty five percent (65%) of the Membership Interests, present in person or represented by proxy, having voting power with respect to that matter, shall decide such matter brought before such meeting, unless the matter is one upon which, by express provision of the Certificate or this Operating Agreement, or by an express provision of the statutes which is applicable to such vote unless overridden by the

15

Certificate, a different vote is required, in which case such express provision shall govern and control the decision of such matter. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum.

8.7    Action Without Meeting. Any action required by the Act to be taken at a meeting of the Members, or any action which may be taken at a meeting of the Members, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall have been signed by the holder or holders of all the Membership Percentage entitled to vote with respect to the action that is the subject matter of the consent, and such consent shall have the same force and effect as a unanimous vote of the Members. Any action required by the Act to be taken at any annual or special meeting of Members, or any action which may be taken at any annual or special meeting of Members, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holder or holders of Membership Percentage having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all Membership Percentages entitled to vote on the action were present and voted. Every written consent pursuant to this Section 8.7 shall be signed, dated and delivered in the manner required by, and shall become effective at the time and remain effective for the period specified by, the Act. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section 8.7. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

8.8    Proxies. At all meetings of Members a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Chief Restructuring Officer, if any, or the Board of Managers before or at the time of the meeting. No proxy shall be valid after six (6) months from the date of its execution, unless otherwise provided in the proxy.

ARTICLE 9
CONTRIBUTIONS TO THE COMPANY

9.1    Members' Capital Contributions.

a.    Member 1 shall be deemed to have made an initial capital contribution in the sum of Six Million Seven Hundred Fifty Seven Thousand One Hundred Ninety Six Dollars ($6,757,196.00) to the Company by its transfer of its one hundred percent (100%) Membership Interests in Conix Commercial Investments, LLC, and The Oaks at Stonecrest Apartments, LLC, to the Company.

b.    Member 2 shall be deemed to have made an initial capital contribution in the sum of Eight Hundred Fifty Thousand Dollars ($850,000.00) to the Company by its transfer of its one hundred percent (100%) Membership Interest in Third Maryland, LLC to the Company.

16

c.     Member 3 shall be deemed to have made an initial capital contribution in the sum of Twenty Eight Million Fifty Six Thousand Eight Hundred Sixty Six Dollars ($28,056,866.00) to the Company by its transfer of its one hundred percent (100%) Membership Interest in Numeric Commercial Investments, LLC to the Company.

d.     Member 4 shall be deemed to have made an initial capital contribution in the sum of Twenty Million Dollars ($20,000,000.00) to the Company by its transfer of its one hundred percent (100%) Membership Interest in Laser Focus Holding Company, LLC to the Company.

e.     Member 5 did not and is not required to make a capital contribution to the Company and is deemed vested in a one percent (1%) Membership Interest in the Company.

9.2    Return of Contributions.  Other than as provided in Section 10.5 or Section 12.2 of this Operating Agreement, a Member is not entitled to the return of any part of its Capital Contribution or to be paid interest in respect of either its Capital Account or its Capital Contribution.  An un-repaid Capital Contribution is not a liability of the Company or of the Manager or any Member.

9.3    Additional Contributions.  No Member shall be required to make additional Capital Contributions to the Company.

ARTICLE 10
ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

10.1    Allocations of Profits.  Except as provided in Sections 9.3 and 9.4, the net profits of the Company shall be allocated to each Member and Assignee as follows:

a.     First, to each Member or its Assignee, in proportion to and in the inverse order of the amounts by which cumulative net losses allocated to such Person pursuant to Sections 10.2.b-d exceed cumulative net profits allocated to such Member or Assignee under this Section 10.1.a, until cumulative net profits allocated to the Members and Assignees under this Section 10.1.a is equal to cumulative net losses allocated pursuant to Section 10.2.b-d to the Members and Assignees;

b.     Second, to each Member or its Assignee to the extent of any amounts distributed and/or accrued to such Member or Assignee pursuant to Section 10.5.a of this Operating Agreement;

c.     Third, to each Member or its Assignee to the extent of any amounts distributed and/or accrued to such Person pursuant to Section 10.5.c of this Operating Agreement;

d.     Thereafter, to each Member or its Assignee, to the extent of, and in proportion to, any amounts distributed and/or accrued to such Person pursuant to Section 10.5.e of this Operating Agreement.

17

10.2    <u>Allocation of Losses</u>. Except as provided in <u>Sections 10.3 and 10.4,</u> the net losses of the Company shall be allocated to each Member and Assignee as follows:

a.    First, to the extent any net profits have been previously allocated to a Member or its Assignee under <u>Section 10.1.d</u> with and have not been previously offset by allocations of net losses under this <u>Section 10.2.a,</u> net losses shall be allocated to such Person in the same percentage that the net profits were previously allocated with the most recent Fiscal Year's net profits being offset first.

b.    Second, to the extent any net profits have been previously allocated to a Member or its Assignee under <u>Section 10.1.c</u> with and have not been previously offset by allocations of net losses under this <u>Section 10.2.b,</u> net losses shall be allocated to such Persons in the same percentage that the net profits were previously allocated with the most recent Fiscal Year's profits being offset first.

c.    Third, to the extent any net profits have been previously allocated to a Member or its Assignee under <u>Section 10.1.b</u> and have not been previously offset by allocations of net losses under this <u>Section 10.2.c,</u> net losses shall be allocated to such Persons in the same percentage that the net profits were previously allocated with the most recent Fiscal Year's profits being offset first.

d.    Any additional net losses shall be allocated among the Members in accordance with their Membership Percentages.

10.3    <u>Regulatory Allocations</u>.

a.    <u>Qualified Income Offset</u>. No Member shall be allocated losses or deductions if the allocation: (i) causes a Member to have an Adjusted Capital Account Deficit, or (ii) increases a Member's Adjusted Capital Account Deficit. If, notwithstanding the provisions of the preceding sentence, a Member receives an allocation of loss or deduction (or item thereof), or any Distribution, which: (i) causes the Member to have an Adjusted Capital Account Deficit or (ii) increases a Member's Adjusted Capital Account Deficit, at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro-rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Member before any other allocation is made of Company items for that taxable year, in the amount and proportion required to eliminate the deficit as quickly as possible. This <u>Section 10.3.a</u> is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

b.    <u>Minimum Gain Chargeback</u>. Except as set forth in Regulation Section 1.704-2(f)(2) through (5), if, during any taxable year, there is a net decrease in Minimum Gain, each Member, prior to any other allocation pursuant to this Article 10, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Member's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this <u>Section 10.3.b</u> shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities to the extent of the Minimum Gain

18

attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 10.3.b shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

        c.      Contributed Property. In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for United States federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the fair market value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for United States federal income tax purposes and its fair market value in the manner required under Code Section 704(c) and the Regulations thereunder. In making allocations of Code Section 704(c) items, the Company shall exclusively use the "traditional method" within the meaning of Regulation Section 1.704-3(b).

        d.      Code Section 754 Adjustment. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and the gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to those sections of the Regulations.

        e.      Gross Income Allocations. To the extent that any Member has an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro-rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Member before any other allocation is made of Company items for that taxable year, in the amount and proportion required to eliminate the deficit as quickly as possible.

    10.4    Other Allocation and Distribution Rules

        a.      Authority of Chief Restructuring Officer. The Chief Restructuring Officer is hereby authorized, upon the advice of the Company's tax counsel, to amend this Article 10 to comply with the Code and the Regulations promulgated under Code Section 704(b), and otherwise make necessary adjustments in allocations of net profits and net losses so that the Capital Accounts reflect the distributions made or to be made to each Member; provided, however, that no such amendment shall materially affect the timing or amount of any Distributions to a Member without such Member's prior written consent.

        b.      Transfer of Membership Interest. If any Membership Interest is issued, transferred or forfeited during any accounting period in compliance with the provisions of this

19

Operating Agreement, profits, losses, each item thereof and all other items attributable to such Membership Interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying Membership Interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Chief Restructuring Officer, if any, or by the Board of Managers.

        c.      Limitation on Distributions. Notwithstanding anything herein to the contrary, the Company shall not make any Distributions to the extent such Distributions are prohibited under the Act or other applicable law.

        d.      Guaranteed Payments. Any fees, salary, or similar compensation payable to a Member for services to or on behalf of the Company pursuant to this Operating Agreement shall be deemed a guaranteed payment pursuant to Section 707 of the Code for federal income tax purposes and not a distribution to such Member for such purposes. Such payments to a Member shall not reduce the Capital Account of such Member, except to the extent of its distributive share of any net losses or other downward capital adjustment resulting from such payment.

    10.5    Distributions. Except with respect to Distributions upon dissolution of the Company, which are governed by Section 12.2 hereof, from the Effective Date and throughout the Term of the Company, the Distributions of Distributable Cash, if any, by the Company shall be made to the Members in the following order of priority:

        a.      First, 100% of the Distributable Cash shall be distributed to the Members pro rata in accordance with their Adjusted Invested Capital until each Member has received an amount equal to the then undistributed Priority Return on the Adjusted Invested Capital of such Member as of the date of such Distribution;

        b.      Second, 100% of the Distributable Cash shall be distributed to the Members pro rata in accordance with their Adjusted Invested Capital until such Members have received an amount equal to the Adjusted Invested Capital of each such Member as of the date of such Distribution;

        c.      Third, 100% of the Distributable Cash shall be distributed to the Members pro rata in accordance with their respective Membership Percentages.

    10.6    Company Books.

        a.      The Chief Restructuring Officer, if any, and otherwise such other Person as may designated by the Board of Managers shall be responsible for maintaining proper and complete books of account of the Company's business at the Company's principal place of business with respect to all operations of the Company following the date of this Agreement. Accounting entries of all transactions shall be made within three (3) business days of such transaction. The books of account shall be maintained on a cash-based method and to the extent permitted for federal income tax purposes, shall show all items of income and expense.

        b.      Each Member at his, her or its sole cost and expense shall have the right at all times during usual business hours to audit, examine and make copies of or extracts from the

Company's books of account. Such right may be exercised through any agent or employee of such Member designated by that Member or by an independent certified public accountant designated by such Member. The Member exercising such right shall bear all expenses incurred in any such examination made on the Member's behalf.

        c.      The Chief Restructuring Officer, if any, and otherwise such other Person as may designated by the Board of Managers shall use his commercially reasonable efforts to prepare and deliver to the Members, within ninety (90) days of the end of each Fiscal Year ending after the date of this Agreement, the requisite tax return for the Company and "K-1" tax forms for the Members of the Company.

    10.7   Bank Accounts. Company funds shall be deposited in such bank account or accounts in the name of such entity as the Chief Restructuring Officer, if any, and otherwise the Board of Managers may designate.

ARTICLE 11

TRANSFERABILITY

    11.1   General. Neither a Member nor an Assignee shall have the right to sell, assign, transfer, exchange or otherwise transfer for consideration, (collectively, *"sell"* or *"sale"*), or gift, bequeath or otherwise transfer for no consideration whether or not by operation of law, except in the case of bankruptcy or estate planning purposes (collectively *"gift"* and together with *"sell"* or *"sale"*, *"transfer"*) all or any part of its Membership Interest or the interest in a Membership Certificate without the prior written consent of all other Members and the Chief Restructuring Officer. Each Member and Assignee hereby acknowledges the reasonableness of the restrictions on the transfer of Membership Interests imposed by this Operating Agreement in view of the Company purposes and the relationship of the Members and Assignees. Accordingly, the restrictions on transfer contained herein shall be specifically enforceable.

    11.2   Restriction Against Transfer. The Members hereby acknowledge and agree that the Membership Interests have not been registered with the Securities and Exchange Commission (or under the securities laws of any state), but have been issued pursuant to an exemption from registration under the Securities Act. Accordingly, notwithstanding anything contained herein to the contrary, the sale, transfer, pledge, hypothecation, or other disposition of any of said Membership Interests are restricted and may not be accomplished except in accordance with this Operating Agreement, and an appropriate registration or an opinion of counsel that registration is unnecessary.

ARTICLE 12

DISSOLUTION AND TERMINATION

    12.1   Liquidating Events. The Company shall dissolve and commence winding up and liquidating upon the first to occur of any of the following events (each a *"Liquidating Event"*):

        a.      At the election of the Chief Restructuring Officer; or

        b.      If required by the Act.

21

The Members agree that the Members may not take any action that would dissolve the Company or otherwise remove their interests from the Company without the express written consent of the Chief Restructuring Officer, if any, at his sole discretion, and otherwise the Board of Managers, at their sole discretion.

12.2    Winding Up, Liquidation and Distribution of Assets.    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Chief Restructuring Officer, if any, and otherwise such other Person as may be designated by the Board of Managers (the "*Wind Up Officer*") shall immediately proceed to wind up the affairs of the Company.

a.    If the Company is dissolved and its affairs are to be wound up, the Wind Up Officer shall:

(i)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable and as approved in advance, in writing, by sixty five percent (65%) of the Membership Interests and if agreed to by sixty five percent (65%) of the Membership Interests, to distribute any assets to the Members and Assignees in kind,

(ii)    Allocate any net profit or net loss resulting from such sales to the Members' and Assignees' Capital Accounts in accordance with Article 9 of this Operating Agreement,

(iii)    Discharge all liabilities of the Company, including liabilities to Members and Assignees who are also creditors, to the extent otherwise permitted by law, other than liabilities to Members and Assignees for Distributions and the return of capital, and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members and Assignees, the amounts of such reserves shall be deemed to be an expense of the Company), and

(iv)    Distribute to the Members and Assignees the remaining assets in accordance with the provisions of Section 10.5.

b.    Notwithstanding anything to the contrary in this Operating Agreement, if any Member or Assignee has a deficit balance in its Capital Account (after giving effect to all contributions, Distributions, allocations and other adjustments for all taxable years, including the year during which such liquidation occurs), such Member or Assignee shall have no obligation to make any Capital Contribution or to otherwise restore such deficit balance, and the negative balance of such Member's or Assignee's Capital Account shall not be considered a debt owed by such Member or Assignee to the Company or to any other Person for any purpose whatsoever.

c.    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be terminated upon the filing of an appropriate certificate with the Secretary of State.

22

      d.    The Wind Up Officer shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

    12.3    <u>Return of Contribution Nonrecourse to Other Members</u>.  Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member and Assignee shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members and Assignees, such Members or Assignees shall have no recourse against any other Member or Assignee.

ARTICLE 13
<u>MISCELLANEOUS PROVISIONS</u>

    13.1    <u>Notices</u>.  Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's, Assignee's and/or Company's address, as appropriate, which is set forth in this Operating Agreement.  Except as otherwise provided herein, any such notice shall be deemed to be given three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

    13.2    <u>Amendments</u>.  This Operating Agreement may not be amended except by the affirmative unanimous written vote of Members; *provided, however,* that during the Bankruptcy Period, the Members shall not have the right, power or authority to amend this Operating Agreement except with the express prior written approval of the Chief Restructuring Officer, the Board of Managers, and the Bankruptcy Court.

    13.3    <u>Governing Law and Jurisdiction</u>.  This Operating Agreement is made pursuant to the Act and shall be governed, construed and interpreted in accordance with federal law, including the Bankruptcy Code, and the laws of the State of Delaware.

    13.4    <u>Captions</u>.  All captions contained in this Operating Agreement are for convenience only and shall not be deemed part of this Operating Agreement.

    13.5    <u>Entire Agreement</u>.  This Operating Agreement constitutes the Company's entire "limited liability company agreement" within the meaning of the Act.

    13.6    <u>Heirs, Successors and Assigns</u>.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and permitted assigns.

    13.7    <u>Third Party Beneficiaries</u>.  Except as otherwise contemplated in <u>Section 6.11</u> and <u>Section 6.12</u>, this Operating Agreement is intended for the benefit of the parties hereto, the

23

Managers and the Chief Restructuring Officer and is not intended to create any rights, powers or benefit in favor of any other Person.

13.8    _Counterparts._ This Operating Agreement may be executed in counterparts each of which shall be deemed an original but all of which shall constitute one and the same instrument.

13.9    _Severability._ If any part of this Operating Agreement, or the application thereof, is for any reason held invalid or unenforceable, it shall be deemed severable and the validity of the remainder of this Operating Agreement or the applications of such provisions to other persons or circumstances shall not be affected thereby.

13.10    _No Waiver._ The failure to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder, shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.

13.11    _Attorney's Fees._ The prevailing party shall be entitled to attorney's fees and costs in any action brought to enforce or interpret this Operating Agreement.

13.12    _Interpretation._ The words "hereof," "herein," and similar terms shall refer to this Operating Agreement and not to any particular Section or Article of this Operating Agreement. Words denoting the singular shall include the plural and words denoting the plural shall include the singular. Words denoting one gender shall include the other gender. "Including" shall mean "including without limitation" or "including but not limited to." References to approval, consent, discretion or judgment on the part of the Chief Restructuring Officer shall mean the Chief Restructuring Officer's sole consent, discretion or judgment, provided the exercise thereof does not constitute gross negligence or willful misconduct.

13.13    CONSENT TO JURISDICTION.    THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL BE THE EXCLUSIVE FORUM FOR ENFORCEMENT OF THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS AND (ONLY FOR THE LIMITED PURPOSE OF SUCH ENFORCEMENT) SUBMIT TO THE JURISDICTION THEREOF; PROVIDED THAT IF THE BANKRUPTCY COURT DETERMINES THAT IT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THEN EACH PARTY (A) AGREES THAT ALL SUCH ACTIONS OR PROCEEDINGS SHALL BE HEARD AND DETERMINED IN A FEDERAL COURT OF THE UNITED STATES SITTING IN THE CITY OF WILMINGTON, DELAWARE, (B) IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING, (C) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE VENUE OR JURISDICTION OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT, AND (D) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL

24

(OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS PROVIDED HEREIN (PROVIDED THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY DELAWARE LAW).

*[Signature page to follow]*

25

The undersigned hereby agree, acknowledge and certify that the foregoing Operating Agreement constitutes the Operating Agreement of Variant Holding Company, LLC adopted by the Members of the Company as of the date first set forth above.

**MEMBER 1:**

CONIX WH HOLDINGS, LLC,
a Delaware limited liability company,

By:    Worldwide Financial Investments, LLC,
        a Delaware limited liability company
Its:    Sole Member

        By:    Gettel Children's Trust
        Its:    Sole Member

            By: _____
               Court Gettel
            Its: Trustee

**MEMBER 2:**

CONIX, INC.,
an Arizona corporation

By: _____
    Court Gettel
Its: Chairman,

**MEMBER 3:**

NUMERIC HOLDING COMPANY, LLC
a Delaware limited liability company

By:    Gettel Children's Trust 2
Its:    Sole Member

        By: _____
          Court Gettel
        Its: Trustee

26

**MEMBER 4:**

WALKERS DREAM TRUST,

By: _____
    Court Gettel
Its: Trustee

**MEMBER 5:**

VARIANT ROYALTY GROUP, LP,
a Delaware limited partnership

By:     Variant Manager, LLC
Its:    General Partner

      By:     Gettel Children's Trust 3
      Its:    Sole Member

        By: _____
        Name: Court Gettel
        Its: Trustee

27

DOCS_LA:281620.1 89703-002

## EXHIBIT A

### LIST OF MEMBERS, ADDRESSES, CAPITAL CONTRIBUTIONS & MEMBERSHIP PERCENTAGES

| Member | Capital Contributed | Membership Percentage |
|---|---|---|
| Conix WH Holdings, LLC<br>3915 E. Broadway Blvd., Suite 400<br>Tucson, Arizona 85711 | $6,757,196.00 | 12.14% |
| Conix, Inc.<br>3915 E. Broadway Blvd., Suite 400<br>Tucson, Arizona 85711 | $850,000.00 | 1.53% |
| Numeric Holding Company, LLC<br>3915 E. Broadway Blvd., Suite 400<br>Tucson, Arizona 85711 | $28,056,866.00 | 49.40% |
| Walkers Dream Trust<br>3915 E. Broadway Blvd., Suite 400<br>Tucson, Arizona 85711 | $20,000,000.00 | 35.93% |
| Variant Royalty Group, LP<br>3915 E. Broadway Blvd., Suite 400<br>Tucson, Arizona 85711 | $0.00 | 1.00% |

28