IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VARIANT HOLDING COMPANY, LLC, | Case No. 14-12021-BLS |
| Debtor. | Related to Docket No. 34, 65 |

**REPLY IN SUPPORT OF MOTION OF THE BEACH POINT FUNDS
AND CORTLAND CAPITAL MARKET SERVICES LLC FOR AN ORDER
(I) COMPELLING THE DEBTOR OR CHAPTER 11 TRUSTEE TO SEEK
BANKRUPTCY COURT APPROVAL FOR ALL SALES OF PROPERTY OWNED BY
NON-DEBTOR SUBSIDIARIES, (II) GRANTING THE BEACH POINT FUNDS AND
CORTLAND CAPITAL MARKET SERVICES LLC ADEQUATE PROTECTION FOR
THE USE OF THEIR COLLATERAL, AND (III) GRANTING RELATED RELIEF**

BPC VHI, L.P., Beach Point Total Return Master Fund, L.P., and Beach Point Distressed

Master Fund, L.P. (collectively, the "Beach Point Funds"), and Cortland Capital Market Services

LLC, as administrative agent for the Beach Point Funds (the "Administrative Agent", and

together with the Beach Point Funds, the "Beach Point Parties"), hereby reply to the objection

filed by the Debtor [D.I. 65] (the "Objection") to the *Motion of the Beach Point Funds and*

*Cortland Capital Market Services LLC for an Order (I) Compelling the Debtor or Chapter 11*

*Trustee to Seek Bankruptcy Court Approval for All Sales of Property Owned by Non-Debtor*

*Subsidiaries, (II) Granting the Beach Point Funds and Cortland Capital Market Services LLC*

*Adequate Protection for the Use of Their Collateral, and (III) Granting Related Relief* [D.I. 34]

(the "Sale Protocol Motion").[1]

---

[1] Capitalized terms not otherwise defined herein shall have the meanings afforded to them in the Sale Protocol Motion.

I.

## PRELIMINARY STATEMENT

1.      The Beach Point Parties proved in the Sale Protocol Motion that several forms of relief are necessary to protect their interests and those of other creditors in this case. First, the Beach Point Parties have established, and the Debtor did not contest, that this Court's approval is necessary for the Debtor to exercise its management rights to sell properties owned by the Debtor's Subsidiaries. The Debtor's proposed "Subsidiary Transaction Protocol," however, falls far short of the Debtor acting in the best interests of this estate or acting with the type of transparency the Debtor purports to be championing. Instead of providing for the proceeds of the sales to be repaid to the estate in connection with the Debtor's approval of such sales, the Debtor is proposing to keep the proceeds with non-debtor entities, contrary to the interests of this Debtor's creditors, in violation of at least one of its senior loan agreements, and until its recent amendment, its own operating agreement.

2.      Second, the Beach Point Parties demonstrated in the Sale Protocol Motion that their liens extend to all cash and sale proceeds of the Debtor, and that any use by the Debtor of such cash therefore requires the affirmative consent of the Beach Point Parties or an order of this Court, following notice and a hearing, that the Beach Point Parties' interests are adequately protected. Any adequate protection package for the Beach Point Parties should require, at a minimum, the current payment of the their postpetition interest and fees, which are indisputably owed based on the Debtor's estimated value of the estate. The Debtor does not contest these assertions, but rather claims that the Beach Point Parties are not entitled to adequate protection because it has unilaterally decided to keep all sale proceeds outside of this estate. As noted above, the Debtor's manipulation of its intercompany obligations should not be permitted and is

particularly offensive if the purpose is to evade this Court's review of its actions or to eliminate critical protections afforded to the Beach Point Parties under the Bankruptcy Code.

3.      Third, the Beach Point Parties proposed that, as a further condition for the use of their cash collateral, the Debtor must share certain basic information about the use of their cash and the financial performance of the Subsidiaries. This is information the Beach Point Parties were being provided under the Loan Agreement, and that debtors are routinely ordered to provide as a condition for cash collateral use. Further, it is information that could readily be obtained through requests under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 2004. In response, the Debtor proposes sharing nothing more than high-level financial information, arguing that the Beach Point Parties are not entitled to more because they are not creditors of the Subsidiaries. The Court should reject the Debtor's proposal, because it would unfairly shield from scrutiny the Debtor's activities precisely when it is needed most.

4.      It is worth noting that the very positions taken by the Debtor in its Objection to the Sale Protocol Motion evidence the need for the appointment of a chapter 11 trustee in this case. While paying lip service to court supervision, independence, and transparency in its application to appoint a Chief Restructuring Officer, the Debtor, in its Objection to the Sale Protocol Motion, proposes to operate outside of this Court's view and without providing creditors with basic information about the same types of transactions that gave rise to the fraud in this case.[2]

5.      For the reasons set forth in the Sale Protocol Motion and herein, the Beach Point Parties respectfully request the Court grant the relief requested in the Sale Protocol Motion, as modified herein.

---

[2] The Beach Point Parties expressly reserve all rights, claims, defenses and remedies in this case and in connection with the Debtor or any of its Subsidiaries or affiliates. The Beach Point Parties further reserve the right to supplement or modify the relief requested in the Sale Protocol Motion and this Reply.

## II.

## ARGUMENT

**A.    The Debtor's Proposed Subsidiary Transaction Protocol is Insufficient Because it Does Not Require That Sale Proceeds be Repaid to the Debtor.**

6.    As provided in the Sale Protocol Motion, any exercise of the Debtor's voting rights in connection with a sale of the Subsidiaries' assets is an out of the ordinary course use of property of the estate. *See, e.g.*, *In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130, 140–41 (Bankr. D. Me. 1991). The Debtor provides no authority refuting this conclusion, and proposes a "Subsidiary Transaction Protocol," whereby, among other things, no properties owned by the Subsidiaries may be sold absent approval of either the Court or the Beach Point Parties.[3]  The Beach Point Parties agree that a protocol for the sale of the Subsidiaries' properties is necessary and appropriate in this case.  However, given that any protocol would be implemented as part of the Debtor's use of its membership interests under Bankruptcy Code section 363(b), the Debtor must prove that it is in the best interests of the estate. *E.g.*, *Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346 (3d Cir. 1999) ("[A]n agreement within the scope of § 363 is effective on execution subject to conditions subsequent—notice, a hearing, and a court determination that the agreement is in the best interests of the estate."); *cf. In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) ("The sale of assets which is not in the debtor's ordinary course of business requires proof that:  (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith.").

7.    There is nothing in the Objection suggesting how or why it is in the best interests of the estate for the Debtor to approve the sale of the Debtor's Subsidiaries' properties, but then

---

[3] Objection, ¶ 12.

cause the Subsidiaries, borrowers of over $71 million from the Debtor, to refuse to repay the loans used to acquire their assets. The Debtor borrowed $73.5 million from the Beach Point Funds, almost all of which was then loaned to subsidiaries to acquire the properties, or in the case of the FX3 Portfolio, to buy out a senior investor in the properties. These loans are evidenced in the Debtor's schedules, which list intercompany payables owing from Laser Focus Commercial Investments, LLC ("Laser Commercial") and Royal Numeric FX Investments, LLC ("Royal Numeric") to the Debtor in the amounts of approximately $54.6 million and $16.2 million, respectively.[4] Laser Commercial and Royal Numeric are holding companies within the H14 Portfolio and FX3 Portfolio, respectively.

8.    Given that Royal Numeric and Laser Commercial are not operating businesses, but merely holding companies, the only means of generating cash to pay down their intercompany obligations to the Debtor is from cash flow from the underlying properties or proceeds from the properties' sales. If, as the properties are sold, proceeds are used to fund intercompany loans among the Subsidiaries, rather than used to repay Royal Numeric's and Laser Commercial's debts to the Debtor, the Debtor's estate is placed at substantial risk of the Subsidiaries not being able to satisfy their obligations to the Debtor. This risk could be ameliorated simply by requiring sale proceeds to satisfy the intercompany obligations owing to the Debtor. The cash would then be under the protection of the Debtor and the Court, and the Debtor would be in a position to assess how such cash can be used in the best interest of the estate. If the Debtor deems it in the best interests of the estate to loan funds back to the Subsidiaries for improvements, it should first demonstrate why taking that risk is a better exercise of its fiduciary duties and business judgment than stemming the accrual of interest on a secured claim encumbering substantially all of the Debtor's assets. Despite these obvious

---

[4] Schedule B(18) [D.I. 43].

concerns, the Objection is completely silent as to why it is in the Debtor's best interests, or even

a proper exercise of the Debtor's business judgment, to keep sale proceeds at the Subsidiary

level.

9.      Ultimately, some protocol or notice requirements are necessary to ensure that the

Debtor's estate is protected as the Subsidiaries sell their properties.  As the Subsidiary

Transaction Protocol suggests, this will need to include some process whereby interested parties

are given the opportunity to vet the sale terms and proposed distribution of sale proceeds.[5]

Adoption of a satisfactory protocol for the sale of the Subsidiaries' properties is a necessary but

not sufficient step to ensuring the protection of this estate.  However, such protocol must be in

the best interests of this estate, and a protocol that contemplates keeping sale proceeds outside

the estate certainly does not satisfy this standard.

**B.      The Debtor is Impermissibly Keeping Cash Out of This Estate.**

      **1.      The Debtor's Decision to Refuse to Satisfy Intercompany Claims with Sale Proceeds is Improper.**

10.     The Debtor claims it does not have to make adequate protection payments to the

Beach Point Parties because it intends to retain sale proceeds at the non-debtor Subsidiary level,

putatively to "fund maintenance obligations, capital expenditures, or other ordinary course

expenses at the property level in order to maximize property values."[6]  The Debtor asserts that

this decision is an appropriate exercise of its business judgment.[7]  The Debtor is wrong for at

least three reasons.

---

[5] In a footnote in the Objection, the Debtor proposes "to agree upon a set release price," where the Beach Point Parties' approval of the sale will be assumed if such price is reached.  Objection, at 6 n.4.  The concept of a release price for per se approval of Subsidiary sales misses the point, as such concept does not remedy the need for interested parties to review proposed distributions from sales.
[6] Objection, ¶ 19.
[7] *Id.* at ¶ 15.

11.     First, where a debtor makes a corporate decision that is tainted by potential conflict, the appropriate standard of review is not business judgment, but the more enhanced entire fairness standard. *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011). Under the entire fairness standard, the Debtor has the burden of showing fair dealing and fair price. *Id.* In *L.A. Dodgers*, this Court evaluated the debtor's decision to borrow debtor-in-possession financing under the entire fairness standard because the debtor's principal was conflicted in that he faced increased liability to the DIP lender if the debtor borrowed from any other source. *Id.* The Court also noted that entire fairness review was appropriate because the debtor refused to even negotiate or meet with other potential DIP lenders. *Id.* at 313 & n.8.

12.     This case is no different. The Debtor has apparently decided to keep funds at the Subsidiary level to keep the cash out of the reach of this Court's jurisdiction and the Debtor's creditors. But that decision is rife with conflict. On the one hand, the Debtor owes fiduciary duties to this estate to maximize value and protect and conserve assets. *See In re Nw. Airlines Corp.*, 349 B.R. 338, 369 (S.D.N.Y. 2006). At the same time, the Debtor intends to use proceeds from sales to loan to other Subsidiaries, benefiting the Subsidiaries' creditors, and assuming undue risk for the creditors of this estate for the benefit of the Debtor's owners. It is disconcerting that the Debtor, through its proposed Chief Restructuring Officer, appears to be placing the interests of the Debtor's principals ahead of the creditors they are alleged to have defrauded. This approach places at risk of depletion cash that should be under the control of this Court and used to satisfy claims against this estate. This risk is only compounded by the fact that, by leaving cash at the Subsidiary level, the Debtor is cutting off its ability to stem the continued increase of the Beach Point Parties' oversecured claim, which accrues interest at a rate of almost $37,000 a day. Where, as here, the Debtor's decision is so clearly conflicted, the Court

should not simply defer to the Debtor's exercise of its business judgment; the Court should require the Debtor to show both that it acted fairly and that it received fair consideration for putting at risk the recovery on the estate's most valuable assets—something it has not done and cannot do.

13.     Second, regardless of the standard the Court chooses to apply, the Debtor's decision to cause its Subsidiaries to forego repayment of millions of dollars of intercompany obligations—for no consideration whatsoever—is inappropriate. The business judgment rule is not a blank check. The Debtor must show it has exercised its fiduciary duties to maximize the value of the estate and "protect and conserve the debtor's property." *Id.* The Debtor here has a fiduciary obligation to maximize the value of this estate for the benefit of these creditors. *In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D.N.J. 2000). Refusing to repay material intercompany claims (the very lifeblood of this holding company debtor) unquestionably jeopardizes this estate. By failing to satisfy these claims, the Debtor is depriving its creditors of the protections afforded under the Bankruptcy Code and eliminating any assurance that the assets of this estate (or in this case, assets that should be in the estate) are being used in the estate's best interests.

14.     Finally, the Debtor's putative business justification—that sale proceeds may be needed to fund maintenance and capital expenditures—rings hollow. First, the Court should not take this assertion on faith. "Needed maintenance" and "capital expenditures" are the same labels the Debtor previously applied to its fraudulent conduct.[8] Second, the Debtor offers no reason why the Subsidiaries' intercompany debt could not be repaid to the Debtor, with the Debtor then lending the funds back to the Subsidiaries if expenditures are required and justified. This procedure would have the added benefit of subjecting any such intercompany loans to Court supervision and allowing the Debtor to charge interest for the use of its funds. Rather, by

---

[8] Trustee Motion, § II.D.I.

keeping sale proceeds at the Subsidiary level, to the extent the funds are loaned between portfolios that are secured by different lenders, the net effect of the Debtor's decision would be to overcollateralize lenders of the Subsidiaries at the expense of the creditors of the Debtor. There is no justification—whether under the entire fairness standard or the business judgment rule—for the Debtor to take steps that actively harm the creditors of its estate.

**2.    Failing to Repay Intercompany Debt Appears Designed to Avoid Provisions of the Bankruptcy Code and Prepetition Contracts.**

15.    The Debtor's decision to cause its Subsidiaries not to repay their obligations, in addition to being inconsistent with the "entire fairness" or even "business judgment" standard, appears designed to prevent the Subsidiaries from complying with contractual or Bankruptcy Code provisions, thereby eliminating critical creditor rights and protections.

16.    First, on information and belief, under the H14 SPEs' loan agreement with Doral Bank, in order for the H14 SPEs to obtain a release of Doral Bank's security interest under any sale, certain proceeds are specifically required to be paid toward amounts owing with respect to the Beach Point Parties' loan to the Debtor. If the Debtor intends to keep all sale proceeds at the Subsidiary level, then it will be forcing its Subsidiaries to default under their loan with Doral Bank. Not only does this default directly harm the Beach Point Parties, but it will also place the value of the H14 Portfolio in jeopardy.

17.    Second, with respect to Royal Numeric or Laser Commercial—the obligors of over $70.8 million in intercompany loans owing to the Debtor—the Debtor's conduct appears designed to prevent Royal Numeric's and Laser Commercial's compliance with Bankruptcy Code section 542(b). Section 542(b) requires "all entities that owe a debt to the debtor as of the petition date . . . to turn over or pay that debt to or on the order of the trustee or debtor in possession." 11 U.S.C. § 542(b); 5 COLLIER ON BANKRUPTCY ¶ 542.03 (16th rev. ed. 2014).

- 9 -

"Such debts commonly include accounts receivable, liquidated judgments or monies held in trust or escrow." 5 COLLIER ON BANKRUPTCY ¶ 542.03. While there is some debate about whether section 542 is self-executing, *compare id.* ¶ 542.02 *with In re Hall*, 502 B.R. 650, 663–64 (Bankr. D. Colo. 2014), there is no question that the Subsidiaries could be compelled to turn over the proceeds to the Debtor if they themselves sought to collect debts owed from the property-owning Subsidiaries.

18.     The Debtor should not be able to skirt the Bankruptcy Code's mandatory turnover provisions by simply causing the Subsidiaries to hold sale proceeds in a manner that would not trigger those obligations. Indeed, on information and belief, the FX3 Portfolio generates excess cash flow that, based on the Cash Management Agreement governing the senior debt for those assets, should be distributed to Royal Numeric. In addition to sale proceeds, pursuant to Bankruptcy Code section 542(b), the Debtor, as fiduciary of the estate, should compel Royal Numeric's satisfaction of its intercompany debt to the Debtor with any unrestricted cash.

19.     Finally, the Debtor's proposal to keep sale proceeds at the Subsidiary level appears to be part of a global strategy to prevent any obligation on the part of current management to enforce rights against the Subsidiaries for the benefit of the Debtor's creditors. When the Debtor filed for bankruptcy, its operating agreement provided that management had the "responsibility" to "Collect sums due the Company . . . ."[9] The Debtor has now amended its operating agreement so that the proposed Chief Restructuring Officer, whose purpose is to provide transparency and act in the best interests of the Debtor's creditors, no longer has any "responsibility" to collect the Debtor's debts, but now merely has the power and authority to do

---

[9] *See Supplement to Motion of Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and Restructuring-Related Services, Nunc Pro Tunc as of the Petition Date* [D.I. 63], Ex. 2, at 11–12.

so.[10]  The Debtor should provide an explanation for an amendment to its operating agreement so contrary to the interests of its creditors.

**C.    The Debtor is Obligated to Pay the Beach Point Parties Postpetition Interest and Fees as Adequate Protection for the Use of Cash Collateral.**

20.    As explained in the Sale Protocol Motion, the Beach Point Parties have a valid and perfected security interest in, "at a minimum, all distributions from Laser Holding in the H14 Portfolio, and from Numeric Commercial on account of the FX3 Portfolio and the Other Properties Portfolio."[11]  Moreover, given that the Beach Point Parties have a perfected security interest in payment intangibles and accounts of the Debtor, the Beach Point Parties' security interest extends to the Royal Numeric and Laser Commercial intercompany debts, discussed above, as well.[12]  As a result, whether as distributions on equity interests or as payments in satisfaction of intercompany debt, any right of the Debtor to the proceeds from the sale of the FX3 or H14 Portfolio is covered by the Beach Point Parties' liens, and constitutes their cash collateral.

21.    The Debtor does not dispute in the Objection that any of its cash is subject to the Beach Point Parties' liens and thus is the Beach Point Parties' cash collateral.  Nor does the Debtor dispute that if it wants to use the cash collateral without the Beach Point Parties' consent, the Debtor needs to provide adequate protection to the Beach Point Parties.  The Debtor does not even dispute that the Beach Point Parties' proposed form of adequate protection—including payment of postpetition interests and fees, to which the Beach Point Parties are statutorily entitled under Bankruptcy Code section 506(b)—is proper.

---

[10] *Id.*
[11] Sale Protocol Motion, ¶ 18.
[12] *See* Loan Agreement, §§ 3.01(a)(vi), (b)(vi).

22.    Rather, the Debtor's Objection appears entirely premised on the contention that it will not be repaying the intercompany loans or otherwise distributing any sale proceeds to the Debtor and so adequate protection is not necessary because the Debtor will not be using any of the Beach Point Parties' cash collateral.[13] As discussed above, the Debtor's decision to refuse to use cash proceeds to repay its own intercompany receivable for no apparent reason other than to insulate cash proceeds from this Court's jurisdiction is contrary to the interests of the Debtor's creditors. Further, the Beach Point Parties are oversecured and their secured claim is therefore accruing postpetition interest and fees. See 11 U.S.C. § 506(b). Every day that sale proceeds remain at the Subsidiary level, the Beach Point Parties' claim grows by almost $37,000 from the accrual of interest with no assets or cash to satisfy the claim. If sale proceeds were paid into the Debtor and adequate protection payments made, then the Beach Point Parties' claim can be dealt with as the case proceeds. Or, at least creditors would have the opportunity to assess on their own whether such a use of estate assets is in their best interests.

23.    But more fundamentally, the Debtor's assertion that it somehow will not use any cash from its Subsidiaries in this case is a fiction. The Debtor's own cash flow projections show that in January 2015, the Debtor expects to receive over $3.8 million in "distributions to the Debtor from proceeds made available from asset sales of the [S]ubsidiaries."[14] This cash, which the Debtor proposes to use to pay its professionals, is the Beach Point Parties' cash collateral, and the Beach Point Parties are entitled to adequate protection for its use. See In re Blackwood Assocs. LP, 153 F.3d 61, 67 (2d Cir. 1998) (in the absence of consent, secured lender "would have had an absolute right to receive adequate protection payments before any use of the cash collateral by" the debtor). And this is a cash use the Beach Point Parties know about based only

---

[13] Objection, ¶¶ 19 ("Because the Debtor will not be receiving any of the proceeds of sale (at least initially), the Beach Point Parties are not entitled to adequate protection at this time.").

[14] See Initial Monthly Operating Report, "Cash Flow Projections" [D.I. 62].

on information currently available to them.  To the extent the Debtor has any other operational and support functions that require cash disbursements, the Debtor will further require the use of the Beach Point Parties' cash collateral.  Any such use must be conditioned on the provision of adequate protection to the Beach Point Parties, which, as explained in the Sale Protocol Motion, at a minimum requires the payment of postpetition interest and fees.

**D.    The Beach Point Parties' Demand for Reporting is Necessary in Light of the Debtor's New Intentions in This Case.**

      **1.    The Beach Point Parties Are Entitled to Reporting.**

    24.    The Beach Point Parties request in the Sale Protocol Motion that the Debtor and its Subsidiaries provide basic information regarding the status and performance of the Subsidiaries that is essential to ensure that the value of the properties is being preserved, and is typical where a debtor seeks to use a creditor's cash collateral. *E.g.*, *In re Penn Traffic Co.*, No. 09-14078 (PJW) (Bankr. D. Del. Jan. 25, 2010) (order requiring sharing of financial reports as a condition for cash collateral usage); *Fed. Nat'l Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship*, 153 B.R. 204, 215 (N.D. Ill. 1993) (finding that secured creditor had "cause for suspicion in light of the misappropriation of Parties by the Debtor's general partner," requiring debtor, as a condition for cash collateral use, to provide, among other things, weekly expense and income reports and monthly budget projections).

    25.    The Debtor's only response to the Beach Point Parties' reporting request is that the Beach Point Parties do not have liens or claims at the Subsidiary levels.[15]  While the Beach Point Parties are not creditors of the Subsidiaries, the Debtor is effectively using the Subsidiaries as a vehicle to use the Beach Point Parties' cash collateral without their consent.  The

---

[15] Objection, ¶ 22.

Subsidiaries should thus be subject to the exact same kind of information-sharing applying to any other debtor using cash collateral.

### 2. The Beach Point Parties' Reporting Requests are Reasonable.

26.     Notwithstanding the Beach Point Parties' entitlement to reporting, the Debtor offers only to "provide monthly financial statements to the Beach Point Parties . . . ."[16] While the Beach Point Parties have come to expect such cryptic promises from the Debtor, this does not mean that the reporting requested in the Sale Protocol Motion is not reasonable or appropriate under the circumstances.

27.     First, the reporting requested by the Beach Point Parties regarding the Subsidiaries and their properties is consistent with the Beach Point Parties' prepetition rights under its Loan Agreement with the Debtor.  Under section 6.02 of the Loan Agreement, the Debtor is obligated to provide to the Beach Point Parties "each of the financial statements, reports, certificates, budgets, notices and other items delivered or required to be delivered to the" the lenders under the FX3 and H14 Portfolios.  Accordingly, the Beach Point Parties are merely seeking reporting information they bargained for when they lent the Debtor over $73 million.

28.     Second, all of the reporting requested by the Beach Point Parties, if not provided pursuant to the relief requested in the Sale Protocol Motion, could similarly be the subject of Rule 2004 discovery.  "The scope of Rule 2004 examination is very broad," and "[a]ny third party who has a relationship with a debtor may be made subject to a Rule 2004 investigation." *E.g., In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. E.D.N.Y. 2004).  Given that the "purpose of a Rule 2004 examination is to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred," *id.*, the Beach Point Parties' reporting requests, designed to ensure

---

[16] *Id.*

the preservation of the only assets that might provide value to the Debtor's estate and that there is no wrongful diversion of such value, could similarly be obtained through continued Rule 2004 requests. As a result, any argument that the Beach Point Parties' reporting requests are "over-reaching" is inaccurate.

29.    Third, the Beach Point Parties' need for Subsidiary and property-level information is compounded by the Debtor's new apparent view of this case. When the Debtor first filed this case, its stated goal was to "proceed with its strategy of selling non-debtor subsidiary assets and thereby realizing the highest possible return for all constituents within a reasonably short time frame."[17]  This was reiterated at the status conference on September 15, where the Debtor's counsel stated in clear terms, "[t]he ultimate goal is to sell the assets as efficiently and as profitably as possible . . . ."[18]  The Debtor's position in this case has shifted, as it now apparently seeks to promptly sell only as many properties as are necessary to fund the capital expenditures that were not made prepetition because the Debtor's principals were skimming CapEx loan proceeds from the Subsidiaries. With this new goal now revealed, and with the Debtor's strategy constantly shifting (whether in connection with the sales, the proposed CRO's responsibilities, or otherwise), reporting is particularly important so that the Beach Point Parties can adequately respond to any request by the Debtor to use sale proceeds as part of any loan transactions. Without such reporting, the Debtor's offer to provide the Beach Point Parties with notice and an opportunity to object to proposed property sales is wholly illusory, as they would be left assessing proposed sales or loans without the benefit of current information regarding the Subsidiaries and the underlying property portfolio.

---

[17] Gettel Declaration, ¶ 22.
[18] 9/5/14 Hr'g Tr., 16:18–20.

30.     Finally, even if the Beach Point Parties' reporting requests exceeded what is typical of an ordinary secured lender, they are justified in light of the Debtor's history of fraud, dishonesty, and diversion of assets. *Fed. Nat'l Mortg.*, 153 B.R. at 215.

31.     The Debtor's attempt to use the Bankruptcy Code and its layered corporate structure to deprive the Beach Point Parties of any of their bargained-for rights is evident in every line of the Debtor's Objection. However, the Court should not permit the Debtor to strip the Beach Point Parties' rights to adequate protection of their security interests, and then blind the Beach Point Parties so that they cannot ensure the value of their collateral is properly maintained. The Beach Point Parties are entitled to the reasonable reporting requested in the Motion.

## III.

## CONCLUSION

32.     Subject to the modifications discussed herein, the Beach Point Parties respectfully request the approval of a modified Subsidiary Transaction Protocol. However, the Court should not allow the Debtor to keep sale proceeds at the Subsidiary level, where the only apparent reason for doing so is to harm the Beach Point Parties. The Debtor's sole ground for denying the Beach Point Parties' request for adequate protection is that sale proceeds will not be distributed to the Debtor, and therefore do not constitute the Beach Point Parties' cash collateral. The Debtor's own projections demonstrate this is untrue. To protect the estate, sale proceeds should be held in a segregated account under the control of the Debtor and the jurisdiction of this Court. Anything else would be contrary to the Debtor's stated goal in its application to appoint a Chief Restructuring Officer, where the Debtor champions the transparency and fairness of process for this estate. Finally, to provide adequate protection for the Beach Point Parties' cash collateral, which the Debtor's own projections evidence intended use, the Beach Point Parties' postpetition

interest and fees should be paid on a current basis.  Failure to do so not only will harm the Beach

Point Parties; it will also allow the Debtor to shirk its fiduciary duties to creditors of this estate.

For the reasons stated herein, the Beach Point Parties respectfully request that the Court approve

the Sale Protocol Motion, as modified herein.

Dated:      September 25, 2014
            Wilmington, Delaware

                                  /s/ Robert J. Stearn, Jr.
                                  Mark D. Collins (No. 2981)
                                  Robert J. Stearn, Jr. (No. 2915)
                                  Christopher M. Samis (No. 4909)
                                  RICHARDS, LAYTON & FINGER, P.A.
                                  One Rodney Square
                                  920 North King Street
                                  Wilmington, Delaware 19801
                                  Telephone:  (302) 651-7700
                                  Facsimile:  (302) 651-7701

                                  - and -

                                  Daniel M. Petrocelli
                                  James M. Pearl
                                  Michael S. Neumeister
                                  O'MELVENY & MYERS LLP
                                  1999 Avenue of the Stars
                                  Los Angeles, California 90067
                                  Telephone:  (310) 553-6700
                                  Facsimile:  (310) 246-6779

                                  - and -

                                  Suzzanne S. Uhland
                                  O'MELVENY & MYERS LLP
                                  Two Embarcadero Center, 28th Floor
                                  San Francisco, California 94111
                                  Telephone:  (415) 984-8700
                                  Facsimile:  (415) 984-8701

                                  Attorneys for BPC VHI, L.P., Beach Point
                                  Total Return Master Fund, L.P., and Beach
                                  Point Distressed Master Fund, L.P.

                                  Secured Creditors

/s/ William D. Sullivan
William D. Sullivan (No. 2820)
SULLIVAN HAZELTINE ALLINSON, LLC
901 N. Market Street, Ste 1300
Wilmington, Delaware 19801
Telephone:  (302) 428-8191
Facsimile:  (302) 428-8195

- and -

Barbra R. Parlin
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone:  (212) 513-3210
Facsimile:  (212) 385-9010

Attorneys for Cortland Capital Market
Services LLC

Administrative Agent for Secured Creditors