**Exhibit B**

**LLC Agreement**

**ROYAL NUMERIC FX INVESTMENTS, LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

DATED AS OF FEBRUARY 28, 2013

2346925.7

TABLE OF CONTENTS

ARTICLE I       Definitions........................................................................................................1
    Section 1.1    Definitions........................................................................................................1
    Section 1.2    Terms Generally..............................................................................................22

ARTICLE II      General Provisions..........................................................................................22
    Section 2.1    Formation.........................................................................................................22
    Section 2.2    Name................................................................................................................23
    Section 2.3    Term.................................................................................................................23
    Section 2.4    Purpose; Powers..............................................................................................23
    Section 2.5    Place of Business; Registered Office and Registered Agent ..........................23

ARTICLE III     Members ..........................................................................................................24
    Section 3.1    Name and Address ...........................................................................................24
    Section 3.2    Limitation of Liability; Indemnification..........................................................24
    Section 3.3    Liability of a Member to the Company.............................................................25
    Section 3.4    Action by Members Without a Meeting ...........................................................25
    Section 3.5    Certain Duties and Obligations of the Members...............................................25
    Section 3.6    Preferred Membership Interest ........................................................................27

ARTICLE IV      Management and Operation of the Company ...................................................27
    Section 4.1    Appointment, Authority and Removal of Manager .........................................27
    Section 4.2    Affiliate Agreements........................................................................................28
    Section 4.3    Intentionally Omitted.......................................................................................28
    Section 4.4    Additional Specified Rights of the Members....................................................28
    Section 4.5    Intentionally Omitted.......................................................................................28
    Section 4.6    Amendment of Organizational Documents ......................................................29
    Section 4.7    Company Expenses...........................................................................................29
    Section 4.8    Subsidiaries......................................................................................................29
    Section 4.9    The Transaction ...............................................................................................30
    Section 4.10   Manager ...........................................................................................................31
    Section 4.11   Actions by Junior Common Member.................................................................33

ARTICLE V       Capital Contributions......................................................................................34
    Section 5.1    Capital Contributions.......................................................................................34
    Section 5.2    Priority and Return of Capital..........................................................................34
    Section 5.3    Withdrawal or Reduction of Capital Contributions..........................................34
    Section 5.4    Capital Accounts..............................................................................................34
    Section 5.5    Transfers ..........................................................................................................35
    Section 5.6    Deficit Capital Account ...................................................................................35
    Section 5.7    Capital Contribution Default............................................................................35
    Section 5.8    Conversions of Priming Advances....................................................................35

ARTICLE VI      Allocations; Distributions ..............................................................................36
    Section 6.1    Allocations of Profits and Losses ....................................................................36
    Section 6.2    Required Special Allocations............................................................................37

i

| Section 6.3 | Distributions Generally | 38 |
| Section 6.4 | Distributions of Cash from the FX3 Collection Account | 38 |
| Section 6.5 | Removal Adjustment. | 41 |
| Section 6.6 | Interest on and Return of Capital Contributions | 42 |
| Section 6.7 | Withholding | 42 |
| Section 6.8 | Redemption | 43 |
| Section 6.9 | Investment Fee | 43 |
| | | |
| ARTICLE VII | Taxes; Books and Records; Information | 43 |
| Section 7.1 | Tax Returns | 43 |
| Section 7.2 | Tax Elections; REIT Compliance | 44 |
| Section 7.3 | Tax Matters Member | 45 |
| Section 7.4 | General Accounting Matters | 45 |
| Section 7.5 | Information | 47 |
| Section 7.6 | Bank Accounts | 47 |
| Section 7.7 | Accounting Period | 47 |
| | | |
| ARTICLE VIII | Dissolution | 47 |
| Section 8.1 | Dissolution | 47 |
| Section 8.2 | Winding-up | 47 |
| Section 8.3 | Final Distribution | 48 |
| Section 8.4 | Termination | 48 |
| Section 8.5 | Claims of the Members | 48 |
| | | |
| ARTICLE IX | Transfer of Members' Interests | 48 |
| Section 9.1 | Restrictions on Transfer of Company Interests | 48 |
| Section 9.2 | Sponsor Members Transfer Rights | 50 |
| Section 9.3 | Preferred Member Transfer Rights | 51 |
| Section 9.4 | Other Transfer Provisions | 51 |
| Section 9.5 | Forced Sale Right | 52 |
| Section 9.6 | Buy/Sell Right | 54 |
| | | |
| ARTICLE X | Miscellaneous | 56 |
| Section 10.1 | Representations and Covenants by the Members | 56 |
| Section 10.2 | Equitable Relief | 58 |
| Section 10.3 | Governing Law | 58 |
| Section 10.4 | Successors and Assigns | 59 |
| Section 10.5 | Access; Confidentiality | 59 |
| Section 10.6 | Notices | 59 |
| Section 10.7 | Counterparts | 61 |
| Section 10.8 | Entire Agreement | 61 |
| Section 10.9 | Amendments | 61 |
| Section 10.10 | Waivers | 61 |
| Section 10.11 | Severability | 62 |
| Section 10.12 | No Partition | 62 |
| Section 10.13 | Exhibits and Schedules | 62 |
| Section 10.14 | Further Action | 62 |

Section 10.15  Cumulative Remedies; Prevailing Party ............................................................62
Section 10.16  Rules of Construction ....................................................................................62
Section 10.17  No Third Party Beneficiaries .........................................................................63
Section 10.18  Time of the Essence .......................................................................................63
Section 10.19  Control Party Representations and Warranties ..............................................63
Section 10.20  Brokerage ......................................................................................................63
Section 10.21  Preferred Member Right of First Offer ..........................................................64
Section 10.22  Recalculation of Interest ...............................................................................64

ARTICLE XI        Reserves and Cash Management ...................................................................65
Section 11.1   Reserves ........................................................................................................65
Section 11.2   Establishment of FX3 Collection Account ....................................................66
Section 11.3   Deposits into FX3 Collection Account ..........................................................66
Section 11.4   Eligible Account/Characterization of FX3 Collection Account/Pledge of
                Accounts ......................................................................................................67

SCHEDULES AND EXHIBITS

| | |
|---|---|
| Schedule A | Sources and Uses Statement |
| Schedule B | Property Owners and Properties |
| Schedule C | Sponsor Members' Organizational Structure |
| Schedule D | Mortgage Loan Documents |
| Schedule E | Approved Annual Budget |
| Schedule F | Mortgage Lender Direction Letter |
| Schedule G | Asset Management Duties |
| Schedule H | Accounts |
| Schedule I | McKinley Management Agreement |
| Schedule J | Form Sponsor Equity Note |
| Schedule 3.1 | Members; Initial Capital Contributions and Percentage Interests |
| Schedule 4.1(a) | Major Actions |
| Schedule 11.4(c) | Cash Management Agreement |

iii

THIS LIMITED LIABILITY COMPANY AGREEMENT OF ROYAL NUMERIC FX INVESTMENTS, LLC (the "Company"), dated as of February 28, 2013 (the "Closing Date"), by and among, ROYAL MULTIFAMILY VENTURES 2013-1, LLC, a Delaware limited liability company ("Preferred Member"), NUMERIC COMMERCIAL INVESTMENTS, LLC, a Delaware limited liability company ("Senior Common Member"), FX3 APARTMENTS INVESTORS, LLC, a Delaware limited liability company ("Junior Common Member" and together with Senior Common Member, collectively, "Sponsor Members" and each, a "Sponsor Member"), ROYAL MULTIFAMILY PROMOTE 2013-1, LLC, a Delaware limited liability company ("Guarantor Member" and, together with Preferred Member and the Sponsor Members, each a "Member" and, collectively, the "Members"), and such other persons as shall hereinafter become members of the Company as hereinafter provided.

### Preliminary Statement

WHEREAS, the Company was formed as a Delaware limited liability company pursuant to the filing of a Certificate of Formation in the office of the Secretary of State of the State of Delaware on February 13, 2013 (the "Certificate");

WHEREAS, on or about the date hereof, the Company's Subsidiaries are acquiring the Properties (as defined below) and are assuming the Mortgage Loan (as defined below);

WHEREAS, the Members desire to enter into this Agreement to provide for the regulation and establishment of the affairs of the Company, the conduct of the Company's business and the relations among them as Members of the Company;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

### Agreement

### ARTICLE I
### Definitions

Section 1.1   Definitions.   The following terms shall have the following meanings for purposes of this Agreement:

"Account" and "Accounts" has the meaning set forth in Section 11.3(a)(vi).

"Accrued Preferred Additional Amount" shall mean for each Distribution Period, an amount determined by multiplying the Monthly Share by the product determined by multiplying (x) the then outstanding Preferred Equity Investment by (y) the Preferred Additional Return from the date hereof through the Redemption Date or earlier Prepayment Date.

"Affiliate" means, with respect to any Person, (i) any other Person who Controls, is Controlled by or is under common Control with such Person, (ii) any director or officer of such Person or any Person specified in clause (i) above, or (iii) any other Person in which such Person has a ten percent (10%) or more beneficial interest or as to which such Person serves as a

1

managing member, manager general partner, trustee or in a similar fiduciary or management capacity.

"Affiliate Agreement" means any agreement between the Company or any Subsidiary on the one hand, and an Affiliate of a Member on the other hand.

"Agreement" means this Limited Liability Company Agreement, as it may be amended, supplemented, restated or otherwise modified from time to time.

"Anti-Money Laundering Laws" means any laws or regulations relating to money laundering or terrorist financing, including, without limitation, the Bank Secrecy Act, 31 U.S.C. sections 5301 *et seq.*; the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56 (a/k/a the USA Patriot Act); Laundering of Monetary Instruments, 18 U.S.C. section 1956; Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, 18 U.S.C. section 1957; the Financial Recordkeeping and Reporting of Currency and Foreign Transaction Regulations, 31 C.F.R. Part 103; and any similar laws or regulations currently in force or hereafter enacted.

"Approve," "Approved" or "Approval" shall refer to a proposed decision, action, report, budget, election, or any other matter that has been proposed by Manager or any Member and has received the written approval of the Members representing the majority of the Percentage Interests (except with respect to Major Actions for which the written approval of Preferred Member must be received and any other action, if any, that requires consent of all the Members pursuant to the express terms of this Agreement).

"Approved Annual Budget" shall have the meaning set forth in the Mortgage Loan Agreement, as approved by the Preferred Member in accordance with Section 4.10(b) hereof.

"Approved Accountant" shall mean BDO USA, LLP, any of the so called "Big Four" accounting firms or another firm of nationally recognized, certified public accountants which is Independent and which is selected by Preferred Member and approved by the Mortgage Lender.

"Asset Management Fee" means an asset management fee payable to (x) Manager so long as a Control Event has not occurred and (y) the Replacement Manager appointed by Preferred Member after a Control Event has occurred, in each case equal to one and ten one hundredths of one percent (1.10%) of gross collections per month; provided, however, so long as no Control Event has occurred, the property management fee shall not be greater than 3.15% of gross collections per month, together with any other amounts payable under the Management Agreement (it being understood that such other amounts shall only include (i) reimbursement of expenses as expressly set forth in the McKinley Management Agreement and (ii) additional fees for additional services, but only if such services are expressly requested and approved by the Company in accordance with the terms of the McKinley Management Agreement). In exchange for the Asset Management Fee, Manager or Replacement Manager, as applicable, shall perform the duties set forth on, in accordance with the performance standard set forth on, Schedule G, attached hereto.

2

"Assignment, Assumption and Loan Modification Agreement" shall have the meaning set forth in Section 4.9(a).

"Available Cash" means, for any period, any cash receipts of the Company, each Mortgage Borrower and any Subsidiaries during such period from all sources (other than Capital Contributions), including, without limitation, a sale of any Company Assets, any Reserves which are to be applied during such period pursuant to the terms of this Agreement, any proceeds received by the Company in connection with any refinancing of the Mortgage Loan or any other loan secured directly or indirectly by any Property; *less* the sum of all cash disbursements and expenses of the Company or any Subsidiary and debt service incurred during such fiscal period in accordance with an Approved Annual Budget, including disbursements for operating expenses, management fees, if any (so long as management fees are required to be paid by the Company), but excluding (x) cash disbursements paid out of Capital Contributions and (y) Distributions to the Members.

"Bankruptcy Event" means, with respect to any Person, (i) the voluntary or involuntary commencement of a case by or against such Person under Title 11 of the United States Code (the "Bankruptcy Code") or any other bankruptcy, insolvency, reorganization, debt arrangement, dissolution, liquidation or similar provision of state or federal law now or hereafter in effect; (ii) the consent by such Person to any such case; (iii) the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) for such Person; (iv) such Person makes an assignment for the benefit of creditors or agrees to a similar procedure under state or federal law; (v) such Person shall generally not be paying its debts as they become due; (vi) the imposition of a judicial or statutory lien on all or a substantial part of such Person's assets, unless the same is discharged or bonded over within sixty (60) days thereof; (vii) the entry of an order for relief under the Bankruptcy Code against such Person; and/or (viii) such Person or its board of directors, members, partners or managers shall vote to implement, or otherwise consent to, any of the foregoing. Notwithstanding the preceding sentence, the involuntary commencement of a bankruptcy case under the Bankruptcy Code shall not be deemed a "Bankruptcy Event" if such case was not directly or indirectly solicited by or on behalf such Person or was not directly or indirectly solicited or commenced by a Member or an Affiliate of a Member, and such case is dismissed ninety (90) days after the filing of the involuntary petition for relief.

"Book Basis" means, with respect to any asset of the Company, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Book Basis of any asset contributed by a Member to the Company shall be the gross fair market value of such asset.

(ii)    The Book Basis of the Company Assets shall be adjusted to equal their respective gross fair market values if the Preferred Member determines to restate Capital Accounts in accordance with the Treasury Regulations.

(iii)   The Book Basis of any item of Company Assets distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Preferred Member.

3

(iv)    The Book Basis of Company Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and subparagraphs (vi) of the definitions of "Net Profits" and "Net Losses" herein; provided, however, that Book Basis shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Book Basis of an asset has been determined or adjusted pursuant to subparagraph (i), (ii) or (iv), such Book Basis shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

"Broker" means American Heritage Realty & Finance, LLC.

"Business Day" means any day other than Saturday, Sunday or any other day on which commercial banks in Phoenix, Arizona are closed for commercial banking business.

"Buy/Sell Election Period" has the meaning set forth in Section 9.6(b).

"Capital Account" means, when used with respect to any Member, the capital account maintained for such Member in accordance with Section 5.4 hereof, as such capital account may be increased or decreased from time to time pursuant to the provisions of Section 5.4.

"Capital Call Notice" means a written notice to the Sponsor Members calling for Capital Contributions.

"Capital Contribution" means the following: amount of money contributed to the Company by a Member or its predecessor in interest on the date of contribution and shall include the contributions of such Member made pursuant to (x) Section 5.1 with respect to Capital Call Notices and (y) Section 5.8 with respect to Capital Contribution Default Capital Contributions and (z) any other amount expressly deemed in this Agreement to be a capital contribution.

"Capital Contribution Cure Failure" means a Capital Contribution Default that is not cured within five (5) Business Days from the date of such default (such failure to cure a Capital Contribution Default in full (which shall include, to the extent any Priming Advance was made in respect of such Capital Contribution Default, any such Priming Advance and the unpaid and accrued Priming Advance Return thereon pursuant to the terms of Section 5.7).

"Capital Contribution Default" has the meaning set forth in Section 5.7.

"Capital Contribution Default Capital Contribution" means one hundred thirty-five percent (135%) of the amount of money of any Priming Advance made to the Company by a Member or its predecessor(s) in interest on the date of contribution, together with (i) all costs and expenses incurred in connection with the enforcement of Sections 5.7 and 5.8, including

4

reasonable attorneys' fees and disbursements and witness fees, and (ii) all accrued but unpaid Priming Advance Return thereon.

"Capital Event" means any (i) sale, exchange, taking by eminent domain, damage, destruction or other disposition of all or any part of the Property or Properties or any of the Company's or Subsidiaries' assets, or (ii) financing or refinancing of any Company or Subsidiary indebtedness; provided, however, that the receipt by the Company of Capital Contributions shall not constitute Capital Events.

"Cash Management Agent" means U.S. Bank National Association, a national banking association, together with permitted successors and assigns as permitted under the Cash Management Agreement.

"Cash Management Agreement" means a Cash Management Agreement in the form attached as Schedule 11.4(c).

"Certificate" has the meaning set forth in the preliminary statement.

"Closing Date" means the date as set forth in the caption of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute. Any reference herein to a particular provision of the Code shall mean, where appropriate, the corresponding provision in any successor statute.

"Company" has the meaning set forth in the caption to this Agreement.

"Company Assets" means all right, title and interest of the Company in and to all or any portion of the Company's interest in the Subsidiaries, the Properties and each or any other assets of the Company.

"Company Nonrecourse Debt" has the meaning given the term "nonrecourse liability" in Regulation § 1.752-1(a)(2).

"Company Nonrecourse Deductions" has the meaning given the term "nonrecourse deductions" in Regulation § 1.704-2(b)(1) and Regulation § 1.704-2(b)(2). The amount of Company Nonrecourse Deductions for a Fiscal Year is determined in accordance with Regulation § 1.704-2(c).

"Conix Business Opportunities" (each a "Conix Business Opportunity") means collectively, all direct or indirect property interests or management rights held by (i) Courtland Gettel, (ii) any Sponsor Member, or (iii) any Restricted Party, including all Affiliates of the parties referenced in subsections (i) through (iii), in any multifamily property, whether currently held or hereinafter acquired.

"Conix Party" (each a "Conix Party") means collectively, (i) Courtland Gettel, (ii) any Sponsor Member, or (iii) any Restricted Party, including all Affiliates of the parties referenced in subsections (i) - (iii).

"Conix ROFO Notice" has the meaning set forth in Section 10.21.

"Conix ROFO Period" has the meaning set forth in Section 10.21.

"Conix ROFO Terms" has the meaning set forth in Section 10.21.

"Conix Guarantor" or "Conix Guarantors" means each of and collectively, Senior Common Member, Junior Common Member, Conix, Inc., Numeric Holding Company, LLC and Gettel Children's Trust 2.

"Contributing Member" has the meaning set forth in Section 5.7.

"Control" (including its correlative meanings, "Controlled by" and "under common Control with") means possession, directly or indirectly, of the power to direct or cause the direction of management or policies of the Person in question (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise), including, without limitation, in respect of FMCP, any Person that is managed or advised by FMCP and/or its Controlled Affiliates.

"Control Event" means the occurrence of any of the following: (i) a Material Event, (ii) a Payment Default, (iii) upon the death or Incapacitation of a Gettel Guarantor, the Sponsor Members do not replace such Gettel Guarantor with a Gettel Replacement Guarantor within sixty (60) days of such death or Incapacitation, as applicable, in accordance with the terms of Section 5.12 of the Preferred Recourse Guaranty, or (iv) a Key Man Event.

"Critical Decision" has the meaning set forth in Section 9.6(f).

"Debt Service" means debt service or mandatory amortization amounts under (A) the Mortgage Loan, or (B) any other secured or unsecured indebtedness incurred for money borrowed by the Company or any Subsidiary in accordance with the terms hereof.

"Deficiency" has the meaning set forth in Section 5.7.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Book Basis of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Basis as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero, Depreciation shall be determined with reference to such beginning Book Basis using any reasonable method selected by the Preferred Member.

"Distribution" means any cash, securities, property or other assets distributed to a Member by the Company.

6

"Distribution Date" means the fifteenth (15th) calendar day of each calendar month, and if such day is not a Business Day, then the Business Day immediately preceding such day.

"Distribution Period" has the meaning set forth in Section 6.3.

"Electing Party" has the meaning set forth in Section 9.5.

"Election Notice" has the meaning set forth in Section 9.6(a).

"Eligible Account" means an identifiable account which is separate from all other funds held by the holding institution that is either (a) an account or accounts maintained with the corporate trust department of a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $1,000,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"Emergency Situation" means, with respect to the Company, any Subsidiary and/or any Property, any situation where the Preferred Member or Manager, in its reasonable business judgment, concludes that the expenditure of funds (whether to make an emergency repair or replacement or otherwise) is essential (i) to avoid imminent material damage to all or any material portion of such Property, or (ii) to protect the safety of any person from imminent harm, or (iii) to avoid the imminent suspension of any necessary material service in or to the Company, any Subsidiary and/or any Property, the failure of which service would be reasonably likely to have a material adverse effect on the Company, any Subsidiary and/or any Property (or any material portion thereof); provided, however, any such expenditure shall not exceed $25,000.00.

"Escrow Agent" has the meaning set forth in Section 9.6(d).

"Fair Market Rental Value" has the meaning set forth in Section 6.5(b).

"Financing" means any indebtedness for borrowed money which may be incurred or assumed by the Company or any Subsidiary from time to time and which is secured by any Property or interests therein, including, without limitation, the Mortgage Loan.

"Fiscal Year" means the calendar year ending on December 31 of each year, unless otherwise required by the Code.

"FMCP" means Five Mile Capital Partners LLC.

"Former Manager" has the meaning set forth in Section 4.10(a).

"Forced Sale Right" has the meaning set forth in Section 9.5(a).

7

"Forfeited Promote" has the meaning set forth in Section 6.5(a).

"FX3 Collection Account" has the meaning set forth in Section 11.2(a)(i).

"GAAP" means generally accepted accounting principles in effect from time to time in the United States of America, consistently applied.

"Gettel Guarantors" or Gettel Guarantor" shall means each of and collectively, Courtland Gettel and Kathryn Rose Gettel, each an individual.

"Gettel Replacement Guarantor" means the "Replacement Guarantor" determined in accordance with the Preferred Recourse Guaranty.

"Governmental Entity" means any court, tribunal, department, body, board, bureau, administrative agency, commission or other authority or instrumentality of any governmental unit, whether federal, state, local or foreign.

"Gross Appraised Value" means the then-current fair market value of the Company Assets or any Property, as applicable, as determined by an independent appraiser engaged by Preferred Member on behalf of, and at the expense of, the Company. Such value shall be binding on the Members absent manifest error.

"Guarantor" or "Guarantors" means each of and collectively, any Conix Guarantor and any Gettel Guarantor.

"Guarantor Member" has the meaning set forth in the caption to this Agreement.

"Guarantor Member Distributions" means collectively, the Distributions to which the Guarantor Member is entitled under Sections 6.4(b)(vi)(y), 6.4(b)(vii)(y) and 6.4(b)(viii)(y).

"Guarantor Obligor Release Date" means the date on which no member of IMHFC Group is a Mortgage Loan Guaranty Obligor under the Mortgage Loan Guaranty.

"IMHFC" means IMH Financial Corporation, a Delaware corporation.

"IMHFC Group" means, individually and collectively, (i) Guarantor Member; (ii) IMHFC; (iii) Preferred Member; (iv) any other Person that has the authority to manage, directly or indirectly, the affairs of IMHFC, Guarantor Member or Preferred Member; and (v) any Affiliates of the foregoing.

"Incapacitation" shall mean mental and/or physical disability as to render a Person unable to exercise Control as required pursuant to this Agreement.

"Independent" shall mean, when used with respect to any Person, a Person who (i) does not have any direct financial interest or any material indirect financial interest in any Member or in any Affiliate of any Member, respectively, (ii) is not connected with any Member or in any Affiliate of any Member, respectively, as an officer, employee, promoter, underwriter, trustee, partner, member, manager, director or person performing similar functions, (iii) is not a

8

creditor, supplier or customer of any Member or any Affiliate of any Member, respectively, and (iv) is not a member of the immediate family of a Person defined in (i), (ii) or (iii) above.

"Independent Contractor" has the meaning set forth in Section 7.2(b).

"Initiating Member" has the meaning set forth in Section 9.6(a).

"Interest" means the interest of a Member in the Company, including the right of such Member in the capital, profits and losses of, and Distributions from, the Company, and the right of such Member to any and all benefits to which such Member may be entitled under this Agreement.

"Interest Transfer" has the meaning set forth in Section 9.1(a).

"Investment Fee" means a fee equal to four percent (4%) of the initial Capital Contribution to be made by Preferred Member, which fee is $600,000.00.

"IRR" or "Internal Rate of Return" shall mean as of the date of a Distribution by the Company pursuant to the terms of this Agreement, the rate of return (calculated as provided below) that (i) all distributions then and previously made to each Member from and after the Closing Date represent on (ii) the sum of all of the Member's Capital Contributions made from and after the Closing Date as of the date of such contribution.

In determining the IRR, the following shall apply:

(a)     all distribution amounts shall be based on the amount of the distribution prior to the application of any federal, state or local taxation to the Member (including any withholding or deduction requirements);

(b)     IRR shall be calculated on an annual basis using the "XIRR" function in Microsoft Excel (or if Microsoft Excel shall no longer be manufactured, a program similar to Microsoft Excel and acceptable to Preferred Member in its reasonable discretion);

(c)     all receipts of Capital Contributions, other than the Member's initial Capital Contributions, by the Company and all distributions to the Members shall be deemed to occur as of the last day of the month in which such Capital Contribution is received or such distribution is made;

(d)     Each Member's initial Capital Contribution shall be deemed (i) to have been the Capital Contribution as set forth on Schedule 3.1 hereof and (ii) to have been made on the date of this Agreement; and

(e)     with respect to a determination as to whether a cumulative, compounded IRR of eighteen percent (18%) and twenty-five percent (25.0%) has been achieved, respectively, only such distributions then and previously made to each Member pursuant to Sections 6.4(b), 6.4(c), and 6.4(d) shall be included.

9

"Junior Common Equity Investment" means the Junior Common Member's Capital Contribution made on the date hereof as set forth on Schedule 3.1 hereof, *plus* any additional Capital Contributions made by the Junior Common Member.

"Junior Common Member" has the meaning set forth in the caption to this Agreement.

"Junior Common Membership Interest" shall mean the Interest in the Company issued to Junior Common Member in consideration of the Junior Common Equity Investment.

"Junior Common Return" means shall mean a return on the outstanding Junior Common Member's Equity Investment of twelve percent (12.0%) per annum, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Key Man Event" means the occurrence of any of the following: (i) Courtland Gettel becomes the subject of any pending Bankruptcy Event, (ii) Courtland Gettel is (x) indicted in a felony proceeding involving fraud or deceit, or theft of funds or (y) convicted in any other felony proceeding, (iii) the death or Incapacitation of Courtland Gettel, (iv) Courtland Gettel fails to maintain, directly or indirectly through Gettel Children's Trust 2, (x) at least a fifty percent (50%) direct ownership interest in and Control of Senior Common Member and (y) at least a thirty-three percent (33%) direct ownership interest in and Control of any other Sponsor Member or (v) Courtland Gettel fails to be actively engaged in the business of the Company.

"Liabilities" has the meaning set forth in Section 3.2.

"Liquidator" means Preferred Member or Senior Common Member upon the occurrence of both (x) the Guarantor Obligor Release Date and (y) the redemption of the Preferred Membership Interest pursuant to Section 6.8.

"LLC Act" means the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq., as it may be amended from time to time, and any successor to such statute.

"Major Actions" has the meaning set forth in Section 4.1(a).

"Manager" has the meaning set forth in Section 4.10(a).

"Material Control Event" means the occurrence of any of the following: (i) at anytime prior to the Redemption Date and the payment of the Redemption Price to Preferred Member, a Control Event; and (ii) at anytime after the Redemption Date and the payment of the Redemption Price to Preferred Member: (v) the failure of the Senior Common Member to timely make any payment due under the Sponsor Equity Note, including, but not limited to payment in full of the outstanding principal balance, together with all interest earned thereon on the Maturity Date, (w) upon the death or Incapacitation of a Gettel Guarantor, the Sponsor Members do not replace such Gettel Guarantor with a Gettel Replacement Guarantor within sixty (60) days of such death or Incapacitation, as applicable, in accordance with the terms of Section 5.12 of the Preferred Recourse Guaranty, (x) a Key Man Event, (y) any of the events set forth in items (i) thru (viii), (x) through (xii), (xiv) and (xvi) through (xviiii) in the definition of "Material Default", or (z) any of the events set forth in items (i), (ii) and (iv) of "Material Event."

10

"Material Default" means any of the following:

(i)     the commission of fraud;

(ii)    breach of fiduciary obligations to the Company, Preferred Member or Guarantor Member;

(iii)   the commission of theft, misapplication or misappropriation of funds relating to or affecting the Company, any Subsidiary, the Mortgage Loan or any Property or under any Affiliate Agreement;

(iv)    if any Guarantor or any officer of any other member of Sponsor Group is (x) indicted in a felony proceeding involving fraud or deceit, or theft of funds or (y) convicted in any other felony proceeding;

(v)     willful misconduct or gross negligence in connection with the performance of any Person's respective duties under this Agreement or any Affiliate Agreement;

(vi)    a Bankruptcy Event;

(vii)   any Transfer in or out by any direct or indirect owner of a Member in violation of the terms of this Agreement;

(viii)  any failure by Manager or Members (excluding Preferred Member and Guarantor Member) to comply with the terms of Section 4.10(c) and Sections 11.3 and 11.4;

(ix)    a Control Event or a material breach of any provision of this Agreement, the Mortgage Loan Documents or any other documents evidencing any other loan secured by direct or indirect interests in one or more of the Properties, including, without limitation, the failure to pay any Preferred Current Return when same is due and payable pursuant to the terms of this Agreement, and the failure to deposit any shortfall into the Preferred Current Return Reserve Account, as required by Section 6.4(a)(iii);

(x)     any representation or warranty of any member of the Sponsor Group in any Transaction Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Preferred Member or Guarantor Member is materially incorrect or misleading in any way;

(xi)    any conveyance, transfer, assignment, pledge, mortgage, encumbrance, hypothecation or sale, by operation of law or otherwise of any Property, or any part thereof or interest therein, in violation of the terms of this Agreement;

(xii)   the occurrence of any event which triggers any liability to any Guarantor under the Preferred Recourse Guaranty or the Payment Guaranty;

(xiii)  if any member of the Sponsor Group fails to pay when due any monetary obligation (other than pursuant to this Agreement) to any Person in excess of two hundred and

11

fifty thousand dollars ($250,000.00), and such failure continues beyond the expiration of any applicable cure or grace periods;

(xiv) if any member of the Sponsor Group attempts to assign its rights or obligations under this Agreement or any of the other Mortgage Loan Documents or any interest herein or therein in contravention of the Mortgage Loan Documents;

(xv) a final judgment or decree for monetary damages in excess of two hundred and fifty thousand dollars ($250,000.00), or a monetary fine or penalty (not subject to appeal or as to which the time for appeal has expired) is entered against any Conix Guarantor or Gettel Guarantor by any Governmental Entity or other governmental authority, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within sixty (60) days from the entry thereof;

(xvi) if any member of the Sponsor Group breaches in any material respect any of the covenants of any other Transaction Document beyond any applicable cure periods contained in such Transaction Document;

(xvii) if a default under the Mortgage Loan Documents shall occur and be continuing for thirty (30) days after the Mortgage Lender delivers written notice thereof to any Mortgage Borrower of such default (or, if no written notice is required to be delivered under the terms of the Mortgage Loan, then if such default shall occur and be continuing for thirty (30) days after the initial occurrence thereof); provided, however, to the extent that such default is cured under the Mortgage Loan, but such default continues to be a Material Default under this Agreement (other than as a result of this clause (xiv)), such default shall still constitute a Material Default hereunder and be subject to the same grace, cure and notice provisions hereunder, if any; or

(xviii) an action is commenced against the Company or any Member by Courtland Gettel in violation of Section 4.9(i).

A Material Default by any member of Sponsor Group shall be deemed a Material Default by the remaining members of Sponsor Group. A Material Default by any officer, director, employee, agent, limited partner or member of a Member shall be deemed a Material Default by such Member.

"Material Event" means any of:

(i) a Bankruptcy Event of a Subsidiary (other than as a result of a deliberate involuntary filing by Preferred Member or Guarantor Member, which is not consented to by any member of Sponsor Group);

(ii) a Default or Event of Default (as such terms are defined in the Mortgage Loan Documents) under the Mortgage Loan Documents which has occurred and is continuing after the expiration of any applicable cure period;

(iii) any Material Default; or

12

(iv)    any default by any Guarantor under the Preferred Recourse Guaranty beyond any applicable grace periods.

"Maturity Date" has the meaning set forth in the Sponsor Equity Note.  Senior Common Member acknowledges that under no circumstances may Senior Common Member extend the Maturity Date.

"McKinley Management Agreement" means that certain Real Estate Management Agreement dated as of the date hereof between each Property Owner and McKinley.  The form of McKinley Management Agreement is attached hereto as Schedule I.

"McKinley" means McKinley Realty, LLC, a Michigan limited liability company.

"Member" has the meaning set forth in the caption to this Agreement.

"Member Nonrecourse Debt" means a nonrecourse debt of the Company within the meaning of Section 1.704-2(b)(4) of the Regulations.

"Member Nonrecourse Deductions" means the items of loss, deduction, and expenditure attributable to Member Nonrecourse Debt within the meaning of Section 1.704-2(i)(2) of the Regulations.

"Membership Interest" shall mean the Interest in the Company issued to each Member.

"Member Transfer" has the meaning set forth in Section 9.1(a).

"Monthly Share" shall mean the percentage determined by dividing the number of days in the Distribution Period for which the Accrued Preferred Additional Amount is being calculated by 360.

"Mortgage Borrower" or "Mortgage Borrowers" means each Property Owner and collectively, Property Owners.

"Mortgage Lender" means Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2006-C-4.

"Mortgage Lender Direction Letter" has the meaning set forth in Section 11.3(a)(iii).

"Mortgage Loan" means that certain mortgage loan in the original principal amount of $195,095,563.00 made to Alliance PP2 FX3 Limited Partnership, a Delaware limited partnership, as original borrower, by Column Financial, Inc., a Delaware corporation, as original Lender, on or about March 16, 2006, and being assigned to and assumed by Mortgage Borrower on or about the date hereof, secured by, among other things, a mortgage lien on the Properties.

13

"Mortgage Loan Agreement" shall mean that certain Amended and Restated Loan Agreement originally between Alliance PP2 FX3 Limited Partnership and Column Financial, Inc. dated as of March 16, 2006, as assigned to Mortgage Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms thereof and this Agreement.

"Mortgage Loan Documents" means, collectively, all documents and instruments evidencing or securing the Mortgage Loan. The Mortgage Loan Documents to be executed in connection with the closing of the Mortgage Loan are set forth on Schedule D hereto.

"Mortgage Loan Guaranty" means collectively, (i) that certain Guaranty Agreement dated as of the date hereof by the Mortgage Loan Guaranty Obligors in favor of Mortgage Lender and (ii) that certain Environmental Indemnity Agreement dated as of the date hereof by the Mortgage Loan Guaranty Obligors in favor of Mortgage Lender.

"Mortgage Loan Guaranty Obligors" means (i) Courtland Gettel, an individual, (ii) IMHFC and (iii) the Company.

"Necessary Expenses" means any of the following: (i) any amounts payable for Debt Service, taxes, utilities, insurance, and pursuant to agreements previously executed pursuant to the terms of this Agreement, to the extent such amounts are not set forth in the then-current Approved Annual Budget, and (ii) any amounts set forth in the Approved Annual Budget (subject to any Permitted Overage) as approved by the Preferred Member in accordance with Section 4.10(b), to the extent, in all events, any such amounts are due.

"Net Losses" means, for each Fiscal Year or other period, an amount equal to the excess of (a) the Company's items of loss and deduction for such year or other period over (b) the Company's items of income and gain for such year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss and deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax, and not otherwise taken into account in computing Net Losses, will be considered an item of income.

(ii)     Gain or loss resulting from any disposition of any Company Asset with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Basis of such asset, notwithstanding that the adjusted tax basis of such asset may differ from its Book Basis.

(iii)     Any increase or decrease to Capital Accounts as a result of any adjustment to the Book Basis of Company Assets pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) shall constitute an item of income or loss, respectively.

(iv)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Losses, will be considered an item of deduction.

14

(v)     In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account the Depreciation for the taxable year or other period as determined hereunder.

(vi)     To the extent an adjustment to the adjusted tax basis of any of the Company Assets pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Losses.

(vii)     Notwithstanding any other provision of this definition, any items of income, gain, loss or deduction which are specially allocated pursuant to Section 6.2 shall not be taken into account in computing Net Losses.

The amounts of items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 6.2 shall be determined by applying rules comparable to those set forth in subparagraphs (i)-(vi) above.

"Net Profits" means, for each Fiscal Year or other period, an amount equal to the excess of (a) the Company's items of income and gain for such year or other period over (b) the Company's items of deduction and loss for such year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss and deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax, and not otherwise taken into account in computing Net Profits, will be considered an item of income.

(ii)     Gain or loss resulting from any disposition of any Company Asset with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Basis of such asset, notwithstanding that the adjusted tax basis of such asset may differ from its Book Basis.

(iii)     Any increase or decrease to Capital Accounts as a result of any adjustment to the Book Basis of Company Assets pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) shall constitute an item of income or loss, respectively.

(iv)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits, will be considered an item of deduction.

(v)     In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account the Depreciation for the taxable year or other period as determined hereunder.

15

(vi)    To the extent an adjustment to the adjusted tax basis of any of the Company Assets pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits.

(vii)    Notwithstanding any other provision of this Paragraph, any items of income, gain, loss or deduction which are specially allocated pursuant to Section 6.2 of this Agreement shall not be taken into account in computing Net Profits.

The amounts of items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 6.2 of this Agreement shall be determined by applying rules comparable to those set forth in subparagraphs (i)-(vi) above.

"Non-electing Party" has the meaning set forth in Section 9.5.

"Non-Material Control Event Deposit" has the meaning set forth in Section 9.5.

"Operating Account" has the meaning set forth in Section 11.2(a)(ii).

"Payment Default" shall mean (a) the failure of any Sponsor Member to pay and/or contribute any amount due under this Agreement on the date such amount is due pursuant to the terms hereof (including, without limitation, any Preferred Current Return Default), (b) the failure of the Preferred Member or Guarantor Member to be paid any amount due to it under Section 6.4 on a Distribution Date or otherwise under this Agreement (provided however, that it shall not be a Payment Default if any Sponsor Member shall make a Capital Contribution to allow the Company to pay such amounts, which Capital Contribution shall be from the monies of any Restricted Party (but not from monies of the Property, the Company or its Subsidiaries) in accordance with Section 6.4) and (c) the failure of the Senior Common Member to timely make any payment due under the Sponsor Equity Note, including, but not limited to payment in full of the outstanding principal balance, together with all interest earned thereon on the Maturity Date. The Members acknowledge that neither the making of a Priming Advance nor the conversion thereof shall cure a Payment Default.

"Payment Guaranty" means that certain Payment Guaranty by the Gettel Guarantors in favor of the Company.

"Percentage Interest" means, with respect to each Member as of any date, the percentage obtained by dividing the aggregate amount of Capital Contributions made by such Member by the aggregate amount of Capital Contributions made by all Members.

"Permitted Investments" means any one or more of the following obligations acquired at a purchase price of not greater than par, payable on demand and meeting one of the appropriate standards set forth below:

16

(i)    cash in an interest-bearing demand account in any bank with capital, surplus and undivided profits aggregating at least $100,000,000, the short-term securities of which are rated at least "A-1" by S&P and "P-1" by Moody's; or

(ii)    bankers' acceptances and certificates of deposit and other interest-bearing obligations denominated in dollars and issued by any bank with capital, surplus and undivided profits aggregating at least $100,000,000, the short-term securities of which are rated at least "A-1" by S&P and "P-1" by Moody's;

provided, however, that such instrument continues to qualify as a "cash flow investment" pursuant the Code Section 860G(a)(6) earning a passive return in the nature of interest and no obligation or security shall be a Permitted Investment if (A) such obligation or security evidences a right to receive only interest payments or (B) the right to receive principal and interest payments on such obligation or security are derived from an underlying investment that provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.

"Permitted Overage" means collectively, an amount not to exceed five (5%) percent of a line item of cost and expense in the budgeted expenditures set forth in the Approved Annual Budget (in the aggregate with all other expenditures incurred in such line item); provided, however, that the aggregate total of the Permitted Overage shall not exceed the greater of: (a) Three Percent (3.0%) of the overall budgeted expenditures set forth in the Approved Annual Budget; and (b) $10,000.

"Person" or "person" means an individual, corporation, association, partnership, limited liability company, trust, joint venture, business trust or unincorporated organization or other entity or organization, or a Governmental Entity.

"Pledge by Company" has the meaning set forth Section 4.9(e).

"Pledge by Members" has the meaning set forth in Section 4.9(h).

"Preferred Additional Return" shall mean a return on the outstanding Preferred Equity Investment of seven percent (7.0%) per annum, calculated on the basis of a 360-day year and the actual number of days elapsed, compounded monthly, provided that the Preferred Additional Return shall increase to a return of twelve percent (12.0%) per annum, calculated and compounded as noted above, if any amounts due and payable to Preferred Member are not paid when due, for so long as such amounts have not been paid in full.

"Preferred Current Return" shall mean a return on the outstanding Preferred Equity Investment of eight percent (8.0%) per annum, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Preferred Current Return Default" shall mean the failure of the Preferred Current Return due to be paid to Preferred Member on a Distribution Date.

"Preferred Current Return Reserve Account" has the meaning set forth in Section 11.1(a).

17

"Preferred Current Return Reserve Funds" has the meaning set forth in <u>Section 11.1(a)</u>.

"Preferred Equity Investment" shall mean Preferred Member's Capital Contribution as set forth on <u>Schedule 3.1</u> hereof and the Preferred Member Sponsor Equity Contribution as set forth in <u>Section 5.9</u>, *plus* each unreturned installment of the Accrued Preferred Additional Amount.

"Preferred Member" has the meaning set forth in the caption to this Agreement.

"Preferred Member Agreement" shall mean that certain Consent and Agreement Regarding Preferred Equity among Mortgage Lender, Situs, Company and Preferred Member, dated as of the Closing Date.

"Preferred Member Sponsor Equity Contribution" has the meaning set forth in <u>Section 5.9</u>.

"Preferred Membership Interest" shall mean the Interest in the Company issued to Preferred Member in consideration of its Preferred Equity Investment.

"Preferred Recourse Guarantors" means, collectively, Conix Guarantors and Gettel Guarantors.

"Preferred Recourse Guaranty" means that certain guaranty from Preferred Recourse Guarantors, dated as of even date herewith.

"Preferred Total Return" shall mean a return on the outstanding Preferred Equity Investment of fifteen percent (15%) per annum, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Prepayment Amount" has the meaning set forth in <u>Section 6.4(h)</u>.

"Prepayment Date" has the meaning set forth in <u>Section 6.4(h)</u>.

"Priming Advance" has the meaning set forth in <u>Section 5.7</u>.

"Priming Advance Return" shall mean a return on any outstanding Priming Advance of twenty-five percent (25.0%) per annum compounded monthly and calculated on the basis of a 360-day year and the actual number of days elapsed.

"Prohibited Transferee" means any Person (but shall not include IMHFC, FMCP, New World Realty Advisors, LLC, Juniper Capital Partners, LLC and/or their respective Affiliates):

(i)    listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

18

(ii)     that is owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(iv)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v)     that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list;

(vi)    that (a) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws; (b) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; and (c) has had any of its/his/her funds seized or forfeited in any action under any Anti-Money Laundering Laws;

(vii)   that is not and will not be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, and who's assets do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA;

(viii)  that is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with whom are not and will not be subject to state statutes applicable to such Person regulating investments of and fiduciary obligations with respect to governmental plans;

(ix)    that is not in compliance with ERISA (and regulations promulgated thereunder), all Anti-Money Laundering Laws, and the Patriot Act;

(x)     Mortgage Lender;

(xi)    who is subject to a pending Bankruptcy Event;

(xii)   who has been convicted of a felony or is indicted in a felony proceeding;

(xiii)  who is a minor;

(xiv)   who is Incapacitated or otherwise lacks legal capacity;

(xv)    who is an Affiliate of a Person listed in any of clauses (i) through (and including) (xii) above

(xvi)   who is a Person who, or has one or more Affiliates who, are or have been in a dispute, arbitration or litigation with (A) any non-Transferring Member or any Affiliate of

19

any non-Transferring Member, including, without limitation, any direct or indirect owner of any non-Transferring Member, or (B) any of IMHFC, FMCP, New World Realty Advisors, LLC, Juniper Capital Partners, LLC and/or their respective Affiliates; or

(xvii)  who is a Person who, or has one or more Affiliates who, is a competitor of (A) any non-Transferring Member or any Affiliate of any non-Transferring Member, including, without limitation, any direct or indirect owner of any non-Transferring Member, or (B) any of IMHFC, FMCP, New World Realty Advisors, LLC, Juniper Capital Partners, LLC and/or their respective Affiliates.

"Promote" means collectively, the Distributions to which the Manager is entitled under Sections 6.4(b)(vi)(x), 6.4(b)(vii)(x) and 6.4(b)(viii)(x).

"Property" or "Properties" means, each of and collectively, the real property listed on Schedule B attached hereto and referred to as each "Property" or the "Properties" in the Mortgage Loan Agreement, and the personal property appurtenant thereto.

"Property Owner" or "Property Owners" means the owner of each Property and collectively, the owners of the Properties set forth on Schedule B.

"Redemption Date" has the meaning set forth in Section 6.8.

"Redemption Price" has the meaning set forth in Section 6.8.

"Refinance" means the refinancing of the Company Assets or any Property, as applicable, or any interest therein, through any lender, including, but not limited to Mortgage Lender.

"Refinancing Proceeds" means the aggregate amount of proceeds received by the Company (including any Property Owner) in connection with the refinancing of any Property or any other Company Asset from the Closing Date through the date which falls one (1) day prior to the Redemption Date.

"Remaining Properties" shall mean the remaining Company Assets held by the Company on the Redemption Date.

"Regulations" means the regulations promulgated under the Code.

"REIT" means a "real estate investment trust" within the meaning of Sections 856 through 859 of the Code.

"Release Amount" means the amount allocated in the Mortgage Loan Agreement to the release of a Property from a Mortgage.

"Removal Adjustment" has the meaning set forth in Section 6.5(a).

"Removal Adjustment Control Event" has the meaning set forth in Section 6.5(a).

20

"Replacement Manager" has the meaning set forth in Section 4.10(a).

"Reserves" means the Preferred Current Return Reserve Funds, and any other reserve established pursuant to the terms of this Agreement.

"Responding Member" has the meaning set forth in Section 9.6(a).

"Restricted Party" means collectively, (a) any Guarantor and any spouse, descendant (by birth or adoption), sibling, mother-in-law, father-in-law, sister-in-law, brother-in-law, parent, step-parent or any other family member of any Gettel Guarantor and (b) any direct or indirect shareholder, partner, member, non-member manager, legal or beneficial owner of any Sponsor Member, including any Affiliated manager or any non-member manager of the foregoing.

"ROFO Notice" has the meaning set forth in Section 9.5.

"ROFO Price" has the meaning set forth in Section 9.5.

"ROFO Terms" has the meaning set forth in Section 9.5.

"Sale" means the sale of the Company Assets or any Property, as applicable, or any interest therein, to a third-party.

"Sale Price" has the meaning set forth in Section 9.6(a).

"Second Funding Date" means August 28, 2013.

"Senior Common Additional Return" shall mean a return on the outstanding Senior Common Equity Investment of two percent (2.0%) per annum, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Senior Common Current Return" shall mean a return on the outstanding Senior Common Equity Investment of ten percent (10.0%) per annum, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Senior Common Equity Investment" shall mean Senior Common Member's Capital Contribution as set forth on Schedule 3.1 hereof, *plus* any additional Capital Contributions made by Senior Common Member, including Capital Contribution Default Capital Contributions.

"Senior Common Member" has the meaning set forth in the caption to this Agreement.

"Situs" means Situs Holdings LLC, a Delaware limited liability company.

"Sources and Uses Statement" shall mean the statement of sources and uses attached hereto as Schedule A.

21

"Sponsor Group" means, individually and collectively, (i) Junior Common Member; (ii) Senior Common Member; (iii) Preferred Recourse Guarantors; (iv) any other Person that has the ability to manage, directly or indirectly, any Property (other than Preferred Member or Guarantor Member) under the direction of, in the name of or on behalf of any member of Sponsor Group; and (v) any Affiliates of the foregoing (other than Preferred Member or Guarantor Member).

"Sponsor Equity Note" means that certain Promissory Note dated as of the Closing Date in the amount of $7,228,192.00 made by Senior Common Member in favor of Company in the form attached hereto as Schedule J.

"Subsidiary" or "Subsidiaries" means each Property Owner and collectively, the Property Owners and each other entity or entities Controlled by the Company.

"Tax Authority" has the meaning set forth in Section 6.7.

"Transaction" has the meaning set forth in Section 4.9.

"Transaction Documents" means, collectively, this Agreement, the McKinley Management Agreement, any Affiliate Agreement, the Mortgage Loan Documents or any other agreement relating to the Company, any Subsidiary or any Property.

"Transfer" has the meaning set forth in Section 9.1(a).

"Transferee" has the meaning set forth in Section 9.4(c).

"UCC" means the Uniform Commercial Code as adopted and enacted by the State of Delaware.

"Withheld Member" has the meaning set forth in Section 6.7.

Section 1.2    Terms Generally.   The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless otherwise expressly specified, the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The terms "hereunder" "herein" and words of similar import shall mean this entire Agreement as a whole unless reference to a specific section of this Agreement is made.  All references in this Agreement to a section or article shall mean a section or article of this Agreement, unless otherwise expressly specified.

## ARTICLE II
### General Provisions

Section 2.1    Formation.   One or more Persons has acted as the organizer or organizers of the Company by preparing, executing and filing with the Delaware Secretary of State the Certificate pursuant to the LLC Act, as such Certificate may have been or may be amended from time to time.  The acts of such Persons are hereby authorized and ratified.  The Manager is hereby designated as an authorized person, within the meaning of the LLC Act, to

22

execute, deliver and file any amendments and/or restatements thereof if reasonably approved by Preferred Member, and any other certificates necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business. The execution by the Manager of any of the foregoing certificates (and any amendments and/or restatements thereof) shall be sufficient.

Section 2.2    Name. The Company shall conduct its activities under the name of "Royal Numeric FX Investments, LLC." The Company may use such other or additional names as the Members may deem necessary or desirable, provided that: (a) the Manager shall have determined, before use of any such name, that the Company is entitled to use such name and will not by reason of such use infringe upon any rights of any other Person or violate any applicable laws or governmental regulations, and (b) the Manager shall register such name under assumed or fictitious name law (or equivalent thereof) in the state in which the Property is located.

Section 2.3    Term. The Company's existence shall be dissolved, wound up and terminated no later than February 24, 2063, unless sooner dissolved, wound up or terminated in accordance with Article VIII of this Agreement or the LLC Act.

Section 2.4    Purpose; Powers

(a)    The purpose of the Company shall be to conduct and engage in the following activities (or to cause the Subsidiaries to conduct and engage in the following activities): (i) to own, acquire, hold, manage, service, encumber, finance, refinance, develop, administer, maintain, lease, repair, transfer, assign, sell, restructure or otherwise dispose of, and exercise remedies with respect to, the Mortgage Loan and/or the Properties, directly or indirectly through ownership of and acting as a member or partner of, any Subsidiaries, (ii) to conduct such other lawful business activities related or incidental thereto and (iii) to exercise all powers enumerated in the LLC Act necessary, incidental or related to the conduct, promotion or attainment of the purposes set forth herein and for the protection and benefit of the Company and its assets.

(b)    The Company is authorized and empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of its purposes and for the protection and benefit of the Company, including all acts and things permitted under the LLC Act and this Agreement.

(c)    All of the foregoing purposes and powers may be exercised, if at all, subject to the limitation, in each case, that if such action constitutes a Major Action, approval of Preferred Member must be obtained. Further, notwithstanding anything to the contrary contained herein, in no event shall the Company or any Subsidiary be permitted to hire any employees.

Section 2.5    Place of Business; Registered Office and Registered Agent. The Company shall maintain a registered office c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, or such other office as is approved by the Manager. The Company shall maintain an office and principal place of business at c/o Conix, Inc., 3915 E. Broadway Blvd., Suite 400, Tucson, Arizona 85711, or at such other place as may

23

from time to time be determined as its principal place of business by the Members.  The name and address of the Company's registered agent as of the date of this Agreement is: c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. The Manager shall promptly provide Guarantor Member copies of any and all notices received at the Company's registered office.

## ARTICLE III
### Members

Section 3.1    Name and Address.    The name, address and initial Capital Contributions and Percentage Interests of each of the Members as of the date of this Agreement are set forth on Schedule 3.1 hereto.  Such Schedule shall be amended from time to time by the Manager to reflect the admission or withdrawal of a Member or the transfer or assignment of Interests in accordance with the terms of this Agreement and other modifications to or changes in the information set forth therein.  The Manager shall promptly distribute such amendments in writing to each of the Members.

Section 3.2    Limitation of Liability; Indemnification.    Subject to Section 3.3, each Member's liability to the Company, to any other Member or to any other third party shall be limited to the maximum extent permitted by law.  No Member shall have any duty to the Company or any other Member except as expressly provided in this Agreement, provided that the foregoing shall not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.  A Member shall not be personally liable for any indebtedness, liability or obligation of the Company, except (i) that such Member shall remain obligated to make Capital Contributions in accordance with Articles IV and VI and liable for the payment of its Capital Contribution to the extent expressly set forth in Section 3.3(a) of this Agreement, the LLC Act and any other applicable law, (ii) that such Member to the extent a signatory to the Preferred Recourse Guaranty and/or the Payment Guaranty shall remain liable under the Preferred Recourse Guaranty and/or the Payment Guaranty, as applicable, or (iii) as otherwise expressly set forth in this Agreement.    The Company shall indemnify, defend and hold harmless each Member from and against any and all damages, losses, liabilities, claims, demands, and expenses, including reasonable attorneys' fees and disbursements and any costs incurred to enforce the provisions of this Agreement (collectively, "Liabilities"), to the maximum extent permitted under the LLC Act, except those resulting from such Member's material misrepresentation, gross negligence, malfeasance, fraud, theft, misappropriation, willful misconduct, bad faith or breach of the terms of this Agreement or the occurrence of a Material Default with respect to such Member or for liabilities related to the Preferred Recourse Guaranty and/or the Payment Guaranty.  The Company shall indemnify, defend and hold harmless the Manager from and against any and all Liabilities, to the maximum extent permitted under the LLC Act, except those resulting from such Manager's material misrepresentation, gross negligence, malfeasance, fraud, theft, misappropriation, willful misconduct, bad faith or breach of the terms of this Agreement or the occurrence of a Material Default with respect to the Manager or for liabilities related to the Preferred Recourse Guaranty and/or the Payment Guaranty.  Notwithstanding anything to the contrary in this Agreement, Sponsor Members shall, jointly and severally, indemnify, defend and hold harmless (i) the Company and all Members from and against all Liabilities resulting from an action or a claim brought by McKinley or any of its Affiliates against the Company and/or any of its Members for

24

any reason, other than a claimed breach of the Management Agreement (unless the claim is that Manager acted or failed to act, on behalf of itself, the Company or any Subsidiary, in a manner that breached the Management Agreement, without the consent or approval of Preferred Member or Guarantor Member), and (ii) the Company from and against all Liabilities resulting from an action or a claim brought by Mortgage Lender under the Mortgage Loan Guaranty, except, with respect to this subsection (ii), in the event the unilateral bad faith act of any member of the IMHFC Group forms the predominant basis for the action or claim.

Section 3.3    Liability of a Member to the Company.

(a)    A Member that rightfully receives the return of any portion of a Capital Contribution is liable to the Company only to the extent now or hereafter provided by the LLC Act. A Member who receives a Distribution in violation of subsection (a) of Article 18-607 of the LLC Act, and who knew at the time of the Distribution that the Distribution violated subsection (a) of Article 18-607 of the LLC Act, shall be liable to the Company for the amount of the Distribution. A Member who receives a Distribution in violation of subsection (a) of Article 18-607 of the LLC Act, and who did not know at the time of the Distribution that the Distribution violated subsection (a) of Article 18-607 of the LLC Act, shall not be liable for the amount of the Distribution.

(b)    No Member is an agent of the Company solely by virtue of being a Member, and no Member has (or shall hold itself out as having) authority to sign, act for or bind the Company solely by virtue of being a Member, all of such powers being vested in the Manager (subject to the rights and limitations as set forth in this Agreement). Any Member that executes any document or instrument or otherwise takes any action to bind the Company in violation of this Section 3.3 shall be solely responsible for, and shall indemnify, defend and hold harmless the Company, the Manager and each other Member, against any Liabilities, as and when incurred, that the Company, the Manager or such other Member, as the case may be, may at any time become subject to or liable for by reason of the actions specified above. The provisions of this Section 3.3 shall survive the termination of this Agreement.

Section 3.4    Action by Members Without a Meeting.    Whenever the Members of the Company are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing (including in electronic format), setting forth the action so taken, shall be signed by the Members who hold voting interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the Members entitled to vote thereon were present and voted and shall be delivered to the administrative office of the Company, or to an employee or agent of the Company. The Manager shall provide notice to the Members within a reasonable period of time after an action is taken by the Members.

Section 3.5    Certain Duties and Obligations of the Members.

(a)    If requested, the Members shall take all actions which may be reasonably necessary or appropriate (i) for the formation and continuation of the Company as a limited liability company under the laws of the State of Delaware and (ii) for the development, maintenance, preservation and operation of the business of the Company in accordance with the

25

provisions of this Agreement and applicable laws and regulations. If requested, the Members shall take all actions which are reasonably necessary and appropriate to form or qualify the Company to conduct the business in which the Company is engaged under the laws of any jurisdiction in which the Company is doing business and to continue in effect such formation or qualification.

(b)     No Member shall take any action so as to cause the Company to be classified for federal income tax purposes as an association taxable as a corporation and not as a partnership.

(c)     The provisions of this Agreement, to the extent that they restrict or reduce the duties and/or liabilities of a Member otherwise existing at law or in equity (including under the LLC Act), shall replace such other duties and liabilities of such Member.

(d)     Each Member shall defend and indemnify the Company and the other Members against, and shall hold it and them harmless from, any and all Liabilities, as and when incurred, in connection with or resulting from such indemnifying Member's (or its Affiliates') material misrepresentation, gross negligence, malfeasance, fraud, theft, misappropriation, willful misconduct, bad faith, breach of the terms of this Agreement or the occurrence of a Material Default with respect to such indemnifying Member or its Affiliate, and/or Liabilities related to the Preferred Recourse Guaranty and/or the Payment Guaranty. In addition, each Member that is an Affiliate of Manager shall defend and indemnify the other Members against, and shall hold it and them harmless from any Liabilities, as and when incurred, in connection with or resulting from such Manager's material misrepresentation, gross negligence, malfeasance, fraud, theft, misappropriation, willful misconduct, bad faith, breach of the terms of this Agreement or the occurrence of a Material Default with respect to such indemnifying Member or its Affiliate and/or Liabilities related to the Preferred Recourse Guaranty and/or the Payment Guaranty.

(e)     Notwithstanding anything to the contrary in this Agreement, to the fullest extent permitted by law, including, without limitation, Section 18-1101(c) and Section 18-1101(e) of the LLC Act, and notwithstanding any duty otherwise existing at law or in equity, neither the Preferred Member nor the Guarantor Member shall have any fiduciary duties to the Company, any other Member or any other Person that is a party to or is otherwise bound by this Agreement; provided, however, that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing or a bad faith violation thereof.

(f)     No Member shall take any action so as to cause any other Member to incur any liability pursuant to any guaranty or other indemnity provided in connection with this Agreement or the Mortgage Loan.

(g)     The Sponsor Members represent and warrant that the organizational structure of the Sponsor Members is truly, completely and accurately depicted by the schematic diagram attached hereto as Schedule C. No Sponsor Member shall, or shall permit Mortgage Borrower, any Subsidiary, any Sponsor Member and/or Guarantor to, change its name, identity, corporate structure or jurisdiction of organization, as applicable, without Preferred Member's prior written consent.

26

Section 3.6     Preferred Membership Interest and Guarantor Member's Interest.

(a)     Preferred Member shall have the rights and obligations set forth in this Agreement, and shall not have any obligation to contribute additional capital or property in excess of its Preferred Equity Investment to, or in respect of, debts, liabilities or other obligations of, the Company, or to make loans to the Company except as expressly provided in this Agreement, including, but not limited to, the right to make Priming Advances and the Preferred Member Sponsor Equity Contribution as provided in Sections 5.7 and 5.9, respectively.

(b)     Notwithstanding any provision of this Agreement to the contrary, upon the payment of the Redemption Price to Preferred Member, Preferred Member shall have no further Interest in the Company, other than as expressly provided in this Agreement (including, without limitation, pursuant to the last sentence of Section 6.8 and with respect to indemnity obligations and other rights and remedies in favor of Preferred Member that survive the redemption of the Preferred Membership Interest), and, without limiting the provisions of Sections 4.10(a) and 10.23, neither the approval nor consent of Preferred Member shall be necessary as to any action or inaction of or by the Company or the Manager.

(c)     Guarantor Member shall have the rights and obligations set forth in this Agreement, and shall not have any obligation to contribute any capital or property to, or in respect of, debts, liabilities or other obligations of, the Company, or to make loans to the Company except as expressly provided in this Agreement, including, but not limited to, the right to make Priming Advances as provided in Section 5.7.

ARTICLE IV
Management and Operation of the Company

Section 4.1     Appointment, Authority and Removal of Manager.

(a)     Subject to the proviso at the end of this sentence, the full right, power, authority and discretion to conduct the business and affairs of the Company and the Subsidiaries, and to do all things necessary or desirable to carry on the business of the Company and the Subsidiaries, shall be vested in Manager; provided, however, (i) the Manager may not take any of the actions or make any of the decisions listed on Schedule 4.1(a) annexed hereto (each, a "Major Action") without (in each instance) approval of Preferred Member, (ii) the Manager may not take any action or make any decision with respect to which, pursuant to the terms of this Agreement, Preferred Member or Guarantor Member has the sole authority and discretion to take or decide and (iii) each Member, on behalf of the Company, shall have the full right, power and authority to take the actions described in Section 4.4 below without the consent of the Manager or any other Member.

(b)     For any meeting of Members, the presence of Preferred Member or Guarantor Member and the then-current holder of the Membership Interest of at least one Sponsor Member are required to constitute a quorum for the transaction of any business. Unless expressly provided otherwise in this Agreement, whenever any Company action is to be taken by a vote of the Members, the acts and decisions of Preferred Member or Guarantor Member and

27

the then-current holder of the Membership Interest of at least one Sponsor Member shall be the acts and decisions of the Company.

(c)     Notwithstanding anything to the contrary contained in this Agreement, under no circumstances shall any of the following have any personal liability under this Agreement: (i) any member, partner, shareholder or other Person directly or indirectly holding an interest in any Member, in each case solely in its capacity as such, or (ii) any officer, director or employee of the foregoing or of any Member, in each case solely in its capacity as such; provided, however, the foregoing shall not affect any obligation of any Person pursuant to any guaranty or separate written agreement.

(d)     Notwithstanding anything to the contrary contained in this Agreement, Preferred Member or Guarantor Member shall have the right, at any time, and from time to time to take such actions as it shall deem reasonably necessary, in the event that there is a default or an event of default, or an event which could, upon the passage of time, become a default or event of default, under the Mortgage Loan. The Members acknowledge that neither Preferred Member nor Guarantor Member shall have any duty or obligation to take any such action.

Section 4.2     Affiliate Agreements. Preferred Member shall have the right, in its sole and absolute discretion, to approve all Affiliate Agreements where the counterparty is an Affiliate of any Sponsor Member. In addition, Preferred Member shall have the sole and exclusive right to (a) approve any amendment, modification or renewal of any such Affiliate Agreement, (b) enforce and, as desired, terminate any such Affiliate Agreement in accordance with the terms thereof, (c) enforce, on behalf of the Company, Manager's compliance with the terms of Schedule G and (d) if Manager commits a Material Default with respect to its obligations under Schedule G, Preferred Member shall have the right, on behalf of and at the expense of the Company, to engage an Affiliate or a third party to perform the services set forth on Schedule G, and shall have sole and absolute discretion over the terms and fees paid to such service provider. The Members acknowledge that all Affiliate Agreements are subject to approval of the Mortgage Lender. All Affiliate Agreements shall be on market terms and provide for market rate fees.

Section 4.3     Intentionally Omitted.

Section 4.4     Additional Specified Rights of the Members. Each Member and its agents and representatives shall have the right, at any time and from time to time, upon reasonable prior notice and during normal business hours to:

(i)     subject to the rights of any tenants, inspect the Property; and

(ii)     review (x) the books and records required to be maintained under Section 7.4 below, and (y) any information and reports relating to the management, servicing, operations or policies of the Mortgage Loan or any Property or assets of the Company or any Subsidiary maintained by the Manager.

Section 4.5     Intentionally Omitted.

28

Section 4.6     Amendment of Organizational Documents.  Neither any Sponsor Member nor any Conix Guarantor shall amend or modify any of their respective organizational documents without Preferred Member's written consent, in its sole and absolute discretion, other than to reflect the occurrence of any Transfer permitted pursuant to Section 9.2.

Section 4.7     Company Expenses.  The Company shall be responsible for the formation and organizational expenses of each of the Members (including Preferred Member and Guarantor Member).  Subject to Section 4.9(a), each Member shall be responsible for its costs (including legal expenses and disbursements) and those of its respective Affiliates incurred in connection with the negotiation of this Agreement.  All reasonable out-of-pocket expenses incurred by the Manager, Preferred Member and Guarantor Member in due diligence activities in connection with the Transaction, and incurred by the Manager in complying with its obligations under this Agreement (but excluding organizational expenses incurred after the Closing Date) shall be expenses of the Company to be reimbursed at Closing to the extent provided in Schedule A and not expenses of the Members (subject, if and to the extent applicable, to any applicable limitations set forth in this Agreement).  With the exception of Priming Advances and the Preferred Member Sponsor Equity Contribution (in each case Preferred Member or Guarantor Member, as applicable, shall be reimbursed for all costs and expenses, including reasonable attorneys' fees and disbursements in connection with the funding of such amounts or the enforcement of the provisions of this Agreement with respect to such fundings), unless and until such amounts are converted to a Capital Contribution, amounts expended or contributed by each Member (but not amounts expended or distributed by the Company or by any Subsidiary) to fund Necessary Expenses shall be treated as a Capital Contribution by such Member and will increase such Member's Capital Account.

Section 4.8     Subsidiaries.  All of the provisions of this Agreement regarding the management and governance of the Company shall apply to the management and governance of each Subsidiary, whether any such Subsidiary is Controlled directly or indirectly by the Company, as member, manager, partner, stockholder or otherwise.  Any action to be taken by any of the Subsidiaries shall for all purposes hereof be construed as an action taken by the Company and shall be subject to the same rights and limitations granted and imposed on the Members under this Agreement, subject to any additional rights and limitations granted or imposed in the governing documents of such Subsidiary.  Any and all references herein to the Company or the Manager or any Member causing or directing any action on behalf of a Subsidiary shall be deemed to refer to the Company causing (or the Manager or such Member causing the Company to cause), in its capacity as a member, manager, partner, stockholder or otherwise of such Subsidiary, such action to be taken for and on behalf of such Subsidiary.  The Manager shall perform, with no additional compensation (but with the same rights to reimbursement as set forth herein), the same or substantially identical services for each Subsidiary as the Manager performs for the Company, subject to the terms, conditions, limitations and restrictions set forth in this Agreement.  The Manager shall perform such duties, and in such circumstances and with regard to such duties, the Manager shall be subject to the same standards of conduct and shall have the same duties and obligations in performing or such services on behalf of each such Subsidiary as are set forth in this Agreement.  Without limiting the generality of the foregoing (and notwithstanding anything contained herein to the contrary), any action or decision to be taken or made by or on behalf of a Subsidiary that, if taken or made

29

by or on behalf of the Company would constitute a Major Action, requires Approval in accordance with this Agreement.

Section 4.9    The Transaction.

(a)    On the date hereof each Mortgage Borrower shall acquire its applicable Property and assume the Mortgage Loan (the foregoing, the "Transaction"). Subject to the terms of the following sentence, all costs and expenses incurred by the Company or its Subsidiaries in connection with the Transaction (including, without limitation, all transfer, stamp or similar taxes, and any costs, expenses or fees pursuant to, and connection with, that certain Assignment, Assumption and Loan Modification Agreement among Mortgage Borrower, Mortgage Lender and Mortgage Loan Guaranty Obligors, dated as of the Closing Date), and all fees which may from time to time become due and payable to any third party in respect of any services provided with respect to the Transaction, shall each be deemed to constitute costs and expenses of the Sponsor Members (and not of the Company, its Subsidiaries, Preferred Member or Guarantor Member); except that certain of these fees, costs and expenses together with the attorneys' and accounting fees of Sponsor Members will be included in the capitalization of the Company, to the extent mutually agreed to by Sponsor Members and Preferred Member.

(b)    In connection with the Transaction, (i) Sponsor Members shall cause Courtland Gettel and the Company to be guarantors under the Mortgage Loan Guaranty and (ii) Preferred Member shall cause IMHFC to be a guarantor under the Mortgage Loan Guaranty.

(c)    The Members hereby approve the Transaction.

(d)    The Manager shall have the authority to enter into, on behalf the Mortgage Borrower, the Mortgage Loan Documents set forth on Schedule D hereto.

(e)    To secure the obligations of the Company to Preferred Member and Guarantor Member under this Agreement, the Company shall (i) execute and deliver to, and for the benefit of, Preferred Member and Guarantor Member, a Pledge and Security Agreement ("Pledge by Company") pledging 100% of (x) the membership interests in each Property Owner and any other Subsidiary which holds title to any Property and (y) all right, title and interest in and to the Sponsor Equity Note, and (ii) cause the Property Owners to execute and deliver to, and for the benefit of, Preferred Member and Guarantor Member with respect to such Pledge and Security Agreement such certificates and acknowledgements as may be reasonably required by Preferred Member and Guarantor Member to perfect their interests under Article 8 of the UCC. Upon payment to Preferred Member of the Redemption Price, the foregoing security interest granted by the Company in favor of Preferred Member shall be released. Further, upon the Guarantor Obligor Release Date, the security interest granted by the Company in favor of Guarantor Member shall also be released.

(f)    Conix Guarantors and Gettel Guarantors shall each execute and deliver the Preferred Recourse Guaranty to, and for the benefit of, Preferred Member.

(g)    Gettel Guarantors shall each execute and deliver the Payment Guaranty to, and for the benefit of, the Company.

30

(h)     To secure the obligations of the Company to Preferred Member and Guarantor Member under this Agreement, Sponsor Members shall (i) execute and deliver to, and for the benefit of, Preferred Member and Guarantor Member, a Pledge and Security Agreement ("Pledge by Members") pledging 100% of the Sponsor Members' Membership Interests in the Company and (ii) execute and deliver to, and for the benefit of, Preferred Member and Guarantor Member with respect to such Pledge and Security Agreement such certificates and acknowledgements as may be reasonably required by Preferred Member and Guarantor Member to perfect their interests under Article 8 of the UCC. Upon payment to the Preferred Member of the Redemption Price, the foregoing security interest granted by Sponsor Members in favor of Preferred Member shall be released. Further, upon the Guarantor Obligor Release Date, the security interest granted by the Sponsor Members in favor of Guarantor Member shall also be released with respect to Sponsor Members' Membership Interests but shall remain in place as to Junior Common Member's pledge of its interest in the Promote to Guarantor Member, provided, however, with the consent of Guarantor Member, in each case, with respect to any financing that replaces the Mortgage Loan in whole or in part, the remaining security interest in the Promote may be subordinated to any such financing.

(i)     Until the Company has indefeasibly redeemed the Preferred Membership Interest pursuant to Section 6.8 and no member of IMHFC Group is a Mortgage Loan Guaranty Obligor, Courtland Gettel shall not have any right to (and shall not) take any action or make any claim against the Company and/or any of its Members in the event of any claim under the Mortgage Loan Guaranty.

Section 4.10   Manager.

(a)     The Members may designate a manager as the administrator of the Company (including any Replacement Manager, the "Manager"), who shall have the exclusive right to take and perform the day-to-day management functions of the Company. The Members hereby appoint Junior Common Member as the initial Manager. Except as provided below, Junior Common Member may not be removed and replaced as the Manager by Preferred Member, provided, however, upon a Control Event, Junior Common Member shall automatically be removed as, and shall no longer be deemed to be, the Manager (the "Former Manager"), and the rights and obligations of the Manager, and the right to subsequently remove and replace the Manager, shall thereafter vest in Preferred Member, or after the Redemption Date, Guarantor Member (or otherwise in a Person designated from time to time by Preferred Member, or after the Redemption Date, Guarantor Member), which Person may include, without limitation, an Affiliate of Preferred Member (such Person, the "Replacement Manager"). Preferred Member, or after the Redemption Date, Guarantor Member shall have the right, in its sole and absolute discretion, to cause the Company to engage any Replacement Manager on terms and conditions approved by Preferred Member, or after the Redemption Date, Guarantor Member, which shall in no event amend the terms of this Agreement to affect the Distributions set forth in Article 6. Upon a Control Event, no Sponsor Member shall have the right to approve decisions under this Agreement.

(b)     Manager shall prepare and deliver an Approved Annual Budget with respect to the Property for Preferred Member's approval at least sixty (60) days prior to the end of each Fiscal Year. Any expenditure exceeding the Permitted Overage shall be submitted to

31

Preferred Member for Preferred Member's approval, in each instance. Subject to the preceding sentence of this Section 4.10(b), (i) Manager shall not change or modify the Approved Annual Budget without first obtaining Preferred Member's approval, in Preferred Member's sole and absolute discretion; it being understood that Manager may submit a revised budget to Preferred Member for its approval, but the same shall not be effective until so approved by Preferred Member and (ii) subject to the Permitted Overage, all expenditures by Manager (on behalf of the Mortgage Borrower) shall be made strictly in accordance with the Approved Annual Budget. All expenditures under the Approved Annual Budget (and any Permitted Overage) shall be paid for by the Company, the Properties or the Company's Subsidiaries. The initial Approved Annual Budget, attached hereto as Schedule E, is hereby approved by Preferred Member. To the extent that there is insufficient Available Cash to pay expenditures set forth in the Approved Annual Budget together with any Permitted Overage, the Manager shall send Capital Call Notices to the Sponsor Members for the purpose of paying such expenditures.

(c)     The Manager shall, in good faith, (i) diligently manage the Properties on behalf of the Mortgage Borrower in accordance with the terms of the Mortgage Loan and this Agreement; provided that Manager shall not undertake any Major Action except as provided in Section 4.1(a), and (ii) keep Preferred Member and Guarantor Member apprised of the status of the Properties and the management and operation thereof. Subject to Section 4.10(d) and all limitations set forth in this Agreement, Junior Common Member (unless there has been a Control Event) and Preferred Member shall be the contact parties in connection with the management and operations of the Properties. If there exists a disagreement between Junior Common Member and Preferred Member with respect to the management and operations of the Properties, then, subject to Section 4.10(d) and all limitations set forth in this Agreement, (x) until the later to occur of (A) the payment to Preferred Member of the Redemption Price and (B) the Guarantor Obligor Release Date, the determination of Preferred Member shall govern, and (y) thereafter, the determination of Junior Common Member shall govern, provided that any such determination of Junior Common Member may not have any disproportionately adverse effect on Guarantor Member's rights or obligations. In connection with any action adopted or approved in accordance with this Section 4.10(c), Junior Member agrees and where applicable Preferred Member agrees to cause their respective designated representative under the McKinley Management Agreement to implement or cause McKinley to implement such action. Furthermore and notwithstanding the rights of the Members under Sections 4.1, 4.2, 4.6 and 4.10 and Manager under Sections 4.9 and 4.10 or the powers of the Manager in Section 5.1, without the prior consent of Guarantor Member, in each instance, the Manager and the Members hereby agree that they shall not:

(i)     Amend or otherwise modify this Agreement in a manner that would reduce the rights of or increase the obligations of Guarantor Member hereunder;

(ii)     Take any action or fail to perform any action which would have the effect of decreasing the amount of or delaying the payment of the amounts payable to Guarantor Member pursuant to Section 6.4;

(iii)     For so long as a member of IMHFC Group is a Mortgage Loan Guaranty Obligor, take any action to conserve, protect, operate, and maintain any environmental

32

aspects of any Property unless approved or directed by Guarantor Member or required by the Mortgage Lender;

        (iv)    For so long as a member of IMHFC Group is a Mortgage Loan Guaranty Obligor, amend or otherwise modify the Mortgage Loan Guaranty or otherwise take any action which Guarantor Member believes in its sole and absolute discretion could expose any member of IMHFC Group to liability under or increase its liabilities under the Mortgage Loan Guaranty; provided that this Section 4.10(c)(iv) shall not limit the provisions of Section 4.10(c)(v);

        (v)    Cause the Company or any Property Owner to enter into an agreement to sell all or any portion of any Property or consummate a sale of all or any portion of any Property; or

        (vi)    Cause the Company or any Property Owner to refinance a Property.

        (d)    Simultaneously with the execution and delivery of the Mortgage Loan Documents, Manager is authorized and directed by the Members to engage McKinley as the property manager of the Properties and to cause the Company to cause the Property Owners to enter into the McKinley Management Agreement.  Preferred Member shall have the sole and exclusive right to cause the Company (and the authority on behalf of the Company) to cause the Property Owners to (i) enforce the terms of the McKinley Management Agreement, (ii) approve any amendment, modification, extension or renewal of, or any other action with respect to, the McKinley Management Agreement, including, without limitation, (x) any waiver or granting or withholding of consent under the McKinley Management Agreement and (y) any request for, or agreement with respect to, additional services to be performed by McKinley pursuant to the Addendum attached to the McKinley Management Agreement, (iii) terminate the McKinley Management Agreement in accordance with the terms thereof and (iv) appoint a replacement manager pursuant to an agreement that is satisfactory to Preferred Member in its sole and absolute discretion.  Upon the execution of such replacement management agreement, all references in this Agreement to the McKinley Management Agreement shall instead refer to the replacement management agreement, and all references in this Agreement to McKinley shall instead refer to the replacement manager.

        Section 4.11   Actions by Junior Common Member.  Any notice, demand, request, delivery, statement, report, approval, election, consent or other item given or delivered, or action taken, by or on behalf of the Junior Common Member shall be deemed to be authorized by the Junior Common Member if taken by Courtland Gettel and any Person may rely and act upon the foregoing authorization without the need for any further investigation. Any notices or elections required to be given to Junior Common Member shall be given pursuant to Section 10.6.

ARTICLE V
Capital Contributions

Section 5.1    Capital Contributions

(a)    On the date hereof, (i) in exchange for 100% of the Junior Common Member Interest in the Company, Junior Common Member has made a cash payment to the Company in an amount equal to the amount of Junior Common Member's initial Capital Contribution as set forth on Schedule 3.1 hereof, (ii) Preferred Member has made a cash payment to the Company in an amount equal to the amount of Preferred Member's initial Capital Contribution as set forth on Schedule 3.1 hereof in exchange for a 100% Preferred Membership Interest in the Company and (iii) Senior Common Member has made a cash payment to the Company in an amount equal to the amount of Senior Common Member's initial Capital Contribution as set forth on Schedule 3.1 hereof in exchange for a 100% Senior Common Membership Interest in the Company, all of which transactions shall be deemed to constitute Capital Contributions by the Members in the amount of their respective initial Capital Contributions as set forth on Schedule 3.1 hereto as of the date of this Agreement.

(b)    If, at any time after the date hereof, the Company does not have sufficient funds to pay any Necessary Expenses, then either Sponsor Member or Manager may elect to send a Capital Call Notice to the Sponsor Members (but not Preferred Member or Guarantor Member) for the amounts necessary to pay such expenses.

(c)    Notwithstanding any other provision of this Agreement, neither Preferred Member nor Guarantor Member shall ever be required to make a Capital Contribution.  No Sponsor Member shall be required to make a Capital Contribution except as expressly provided in this Agreement.

(d)    Notwithstanding any other provision of this Agreement, no amount(s) contributed by the Junior Common Member shall increase any amount distributable to the Junior Common Member under this Agreement.

Section 5.2    Priority and Return of Capital.  Except for Preferred Member, no Member shall have priority over any other Member, whether for the return of a Capital Contribution or for Net Profits, Net Losses or a Distribution except as provided herein.

Section 5.3    Withdrawal or Reduction of Capital Contributions.    Except as otherwise expressly provided in this Agreement, no Member shall be entitled to demand or receive the return of its Capital Contribution.

Section 5.4    Capital Accounts.  A Capital Account shall be maintained for each Member.  Said Capital Account shall be kept in accordance with the provisions of Section 1.704-1(b)(2)(iv) of the Regulations.  Without limiting the foregoing, each Member's Capital Account shall be (a) increased by the net agreed value of each Capital Contribution made by such Member, allocations to such Member of the Net Profits and any other allocations to such Member of income pursuant to Section 6.2, and (b) decreased by the net agreed value of each Distribution made to such Member by the Company, allocations to such Member of Net Losses and other allocations to such Member pursuant to Section 6.2.  Preferred Member or Guarantor

34

Member may restate Capital Accounts upon any event for which such restatement is permitted pursuant to the Regulations promulgated under Code Section 704(b).

Section 5.5    Transfers.  Upon a permitted sale or other transfer of an Interest in the Company, the Capital Account of the Member transferring its Interest shall become the Capital Account of the Person to whom such Interest is sold or transferred in accordance with Section 1.704-1(b)(2)(iv) of the Regulations.

Section 5.6    Deficit Capital Account.  Notwithstanding anything to the contrary contained herein, no Member shall have any liability to restore all or any portion of a deficit balance in a Capital Account. A deficit balance in a Capital Account is not an asset of the Company.

Section 5.7    Capital Contribution Default.

Priming Advances.  If a Sponsor Member fails to fund its pro rata share, based on its Percentage Interest, of any additional Capital Contribution requested pursuant to a Capital Call Notice sent under Section 4.10(b), or Section 5.1(b), within five (5) Business Days of the date set forth in such Capital Call Notice or as required under Section 6.4(a)(iii), as applicable (such failure, a "Capital Contribution Default"), then the funding Member, Preferred Member or Guarantor Member, as the case may be (the "Contributing Member"), may, in its sole and absolute discretion but without any obligation to do so, contribute all or any portion of such non-funded, or non-deposited, amount (the "Deficiency"). If the Contributing Member elects to contribute all or any portion of the Deficiency (any contribution so made by the Contributing Member being herein referred to, together with all costs, expenses and (including, without limitation, reasonable attorneys' fees and disbursements) associated with enforcing such Deficiency as and when incurred, as a "Priming Advance"), then from and after the date of each such Priming Advance (or any portion thereof), the Contributing Member shall be entitled to a return on such Priming Advance equal to the Priming Advance Return in accordance with the terms and conditions of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, no Member shall have any obligation to make Priming Advances.

Section 5.8    Conversions of Priming Advances.  If any Priming Advance becomes a Capital Contribution Cure Failure, the Contributing Member which made such Priming Advance may elect to convert the unpaid portion of such Priming Advance (including any unpaid and accrued Priming Advance Return thereon through the date of such conversion) into a Capital Contribution Default Capital Contribution upon written notice to Manager, and the Capital Account of the Contributing Member shall be credited, and the Capital Account of the non-contributing Member shall be debited, with the amount of such Capital Contribution Default Capital Contribution.  The Members' Percentage Interests shall be adjusted to reflect the foregoing adjustments.

Section 5.9    Sponsor Equity Note.  On the date hereof Senior Common Member has delivered the Sponsor Equity Note to the Company in respect of Senior Common Member's obligation to make an additional Capital Contribution to the Company on or prior to the Second Funding Date. Any interest received by Company under the Sponsor Equity Note shall be deposited in the FX3 Collection Account and applied to the Distributions payable in

35

accordance with Section 6.4. Upon payment in full by Senior Common Member or the Gettel Guarantors of the Sponsor Equity Note in accordance with the terms thereof, such amount shall be recorded as a Capital Contribution to the Company by Senior Common Member. If Senior Common Member fails to timely make any payment due under the Sponsor Equity Note, including, but not limited to, payment in full of the outstanding principal balance, together with all interest earned thereon, on the Maturity Date, then in addition to having the rights under this Agreement in respect of such Payment Default, Preferred Member shall have the right, but shall be under no obligation, to contribute to the Company all or a portion of the amount due under the Sponsor Equity Note. In the event Preferred Member makes such a contribution, one hundred thirty-five percent (135%) of the amount of such contribution, plus an amount equal to all costs and expenses incurred in connection with the enforcement of the Company's rights under the Sponsor Equity Note, including, without limitation, reasonable attorneys' fees and disbursements and witness fees (collectively, the "Preferred Member Sponsor Equity Contribution"), shall be deemed to have been contributed to the Company by Preferred Member as an additional Preferred Equity Investment entitled to be repaid and to payment of the Preferred Current Return and Preferred Additional Return in accordance with Article VI in the same manner as the initial Preferred Equity Investment made on the Closing Date. The Members acknowledge that Preferred Member shall not be required to make a contribution pursuant to this Section 5.9 in lieu of declaring a Payment Default.

## ARTICLE VI
### Allocations; Distributions

Section 6.1    Allocations of Profits and Losses.

(a)    For each Fiscal Year or portion thereof during which cash from the FX3 Collection Account is distributable pursuant to Sections 6.4(a), 6.4(b), 6.4(c), or 6.4(d) the following shall apply:

(i)    The Preferred Current Return, the Preferred Additional Return and the Priming Advance Return shall be treated as "guaranteed payments" within the meaning of Section 707(c) of the Code as such amounts are accrued.

(ii)    Net Profits shall be allocated:

(A)    First, to the Preferred Member until the amount so allocated equals the Net Losses allocated to the Preferred Member under Section 6.1(a)(iii)(B); and

(B)    Second, to the Sponsor Members and the Guarantor Member.

(iii)    Net Losses shall be allocated:

(A)    First, to the Sponsor Members and Guarantor Member, until the Capital Accounts of the Sponsor Members and the Guarantor Member are reduced to zero; and

(B)    Second, to the Preferred Member.

36

(b)     For each Fiscal Year or portion thereof during which cash from the FX3 Collection Account is distributable pursuant to Sections 6.4(e), 6.4(f) or Section 8.3, Net Profits or Net Losses for any tax year (or portion thereof) shall be allocated among the Members, to the extent possible, in such a manner as to cause the balance in the Capital Account of each Member, as adjusted to reflect the allocations provided hereunder and the allocations under Section 6.2, to be equal to the aggregate amount of cash such Member would receive if the Company were liquidated and each asset of the Company were sold for an amount of cash equal to its respective Book Basis, all debt obligations were satisfied in accordance with their respective terms (limited with respect to each Company Nonrecourse Debt or Member Nonrecourse Debt to the Book Basis of the asset(s) securing such debt) and the remaining cash were distributed as provided in Section 8.3.

Section 6.2     Required Special Allocations. Notwithstanding Section 6.1:

(a)     Any Member Nonrecourse Deductions shall be specially allocated to the Member(s) that bear(s) the economic risk of loss with respect to the Member Nonrecourse Debt to which the Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Regulations in proportion to such Member's Capital Account.

(b)     Appropriate allocations of income, gain, loss or deduction shall be made to the extent required to comply with the "qualified income offset" provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations, the Company "minimum gain chargeback" provisions of Section 1.704-2(f) of the Regulations, and the Member "minimum gain chargeback" provisions of Section 1.704-2(i)(4) of the Regulations, all issued pursuant to Section 704(b) of the Code. To the extent permitted by such Regulations, the allocations in such year and subsequent years shall be further adjusted so that the cumulative effect of all the allocations shall be the same as if all such allocations were made pursuant to Section 6.1 hereof without regard to Section 6.2(a) and this Section 6.2(b).

(c)     In the event any Member has a deficit Capital Account balance at the end of a Fiscal Year that is in excess of the sum of (i) the amount (if any) such Member is obligated to restore pursuant to the Agreement, and (ii) the amount (if any) such member is deemed to be obligated to restore pursuant to the Regulations, taking into account all other allocations and adjustments under this Agreement (made as if this Section 6.2(c) were not in this Agreement), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible.

(d)     Any Company Nonrecourse Deductions for a Fiscal Year and Excess nonrecourse liability of the Company, as described in Regulation § 1.752-3(a)(3), shall be specially allocated to the Preferred Member.

(e)     In accordance with Code § 704(c) (and the principles thereof) and the Regulations issued with respect thereto, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, or after Company property has been revalued under Regulation § 1.704-1(b)(2)(iv), shall, solely for tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Basis.  Allocations pursuant to this

37

Section 6.2(e) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profit, Net Loss, other items, or distributions pursuant to any provision of this Agreement.

(f)     Net Profits, Net Losses, income, gain, deductions and credits allocated to a Company interest transferred, issued, or reissued during a Fiscal Year shall be allocated to the Persons who were the holders of such Company interest during such Fiscal Year, using any method selected by Preferred Member to the extent permitted by the Code.

(g)     On the Second Funding Date, provided that the Senior Common Member has repaid the Sponsor Equity Note in full on or before the Maturity Date and no Material Event or a Payment Default has occurred, an amount equal to $1,000,000.00 shall be paid to Senior Common Member as an acquisition fee (but shall not be deemed to be a part of Senior Common Member's initial Capital Contribution) as set forth on the Sources and Uses Statement.

Section 6.3     Distributions Generally.  The Manager shall promptly make any Distributions in accordance with Section 6.4 as soon as practicable, but in any event all cash from the FX3 Collection Account (except for Reserves that are not scheduled to be applied on any Distribution Date) shall be distributed on the fifteenth (15th) day of each calendar month.  At such times as the Manager makes Distributions, it shall provide the Members with a statement setting forth in reasonable detail the manner in which the Distributions were calculated and determined.  Notwithstanding any provisions to the contrary in this Agreement, the Company shall not, and the Manager shall not be required to, make a Distribution if such Distribution would violate the LLC Act or any Financing documents.  Without in any manner limiting the generality of the foregoing, notwithstanding anything to the contrary in this Agreement, the Manager shall not be required to make any Distribution if such Distribution would violate subsection (a) of Article 18-607 of the LLC Act.  Distributions on the Preferred Equity Investment shall be calculated based on the Preferred Total Return and on the basis of a fraction, the denominator of which shall be 360 and the numerator of which shall be the actual number of days elapsed in the relevant Distribution Period, except that distributions for a period less than a full month shall be calculated by multiplying the actual number of days elapsed in such period by a daily rate based on said three hundred sixty (360) day year.  Distributions shall accrue from, and including, the first (1st) day of the prior month and ending on the last day of the prior month (a "Distribution Period"); in each case without adjustment for any Business Day convention; provided that the first accrual period shall commence on the date hereof.

Section 6.4     Distributions of Cash from the FX3 Collection Account.

(a)     Until all amounts due and owing to Preferred Member pursuant to this Section 6.4(a) have been repaid in full, all cash from the FX3 Collection Account shall be Distributed on each Distribution Date as follows:

(i)     First, to the Preferred Member until the Preferred Member has received an amount equal to the Preferred Member Sponsor Equity Contribution;

(ii)     Second, to the Preferred Member to the extent of any accrued and unpaid Preferred Current Return;

(iii)    Third, after the date which is the earlier of (x) repayment in full of the Sponsor Equity Note and (y) the Second Funding Date, to the Preferred Current Return Reserve Account in the event that the Preferred Current Return Reserve Account is then in an amount less than $700,000, in an amount sufficient to cause the balance of the Preferred Current Return Reserve Account to equal $700,000 (provided, however, if at any time there is insufficient cash from the FX3 Collection Account to fund such amount in full, the Sponsor Members shall, within ninety (90) days after such Distribution Date, deposit any such shortfall into the Preferred Current Return Reserve Account so that it equals $700,000, which amount shall be funded from any Restricted Party, and not the Company or the Subsidiaries, and which shall be deemed a Capital Contribution by the Junior Common Member);

(iv)    Fourth, to Preferred Member to the extent of any accrued and unpaid Preferred Additional Return; and

(v)     Fifth, to the Preferred Member until its Preferred Equity Investment is fully repaid; in addition, simultaneously with any payment pursuant to this Section 6.4(a)(v), Preferred Member shall receive an amount equal to the sum of (w) a fifteen percent (15%) per annum (or after the occurrence and during the continuance of a Payment Default, twenty percent (20%) per annum) return on the amount of the Preferred Equity Investment distributed to Preferred Member pursuant to the initial clause of this Section 6.4(a)(v), calculated on the basis of a 360-day year for the number of days remaining before the first (1st) anniversary of the Closing Date, (x) the greater of (i) four percent (4%) of the amount of the Preferred Equity Investment distributed to Preferred Member pursuant to the initial clause of this Section 6.4(a)(v) and (ii) one and one-half percent (1.5%) of the greater of (A) the Gross Appraised Value and (B) the gross sales price or gross refinance proceeds received in exchange for a Sale or Refinance, respectively, it being understood that subsection (x)(ii) shall only be applicable if any amounts used to make a payment pursuant to this Section 6.4(a)(v) are derived from the Sale or Refinance of any Company Asset and (y) any unpaid portion of the Investment Fee.

(b)     Subject to the provisions of Sections 6.4(c), 6.4(d), 6.4(e), and 6.4(f) and 8.3, after Preferred Member has received all amounts payable to Preferred Member pursuant to Section 6.4(a), all Available Cash shall be Distributed on each Distribution Date to the Members as follows:

(i)     First, subject to Sections 5.7 and 11.1, to the Senior Common Member to the extent of the accrued and unpaid Senior Common Current Return;

(ii)    Second, to the Senior Common Member to the extent of the accrued and unpaid Senior Common Additional Return;

(iii)   Third, to the Senior Common Member until its Senior Common Equity Investment is fully repaid;

(iv)    Fourth, to the Junior Common Member to the extent of the accrued and unpaid Junior Common Return;

39

(v)     Fifth, to the Junior Common Member, until its Junior Common Equity Investment is fully repaid;

(vi)     Sixth, (x) 5% to the Manager (including any Replacement Manager), (y) 15% to Guarantor Member and (z) 80% to the Sponsor Members, pro rata in proportion to their respective Capital Contributions, to the extent that the respective Sponsor Member's Distributions when aggregated with such Distributions for all prior Distribution Periods pursuant to this Section 6.4 shall yield an Internal Rate of Return of eighteen percent (18%) per annum;

(vii)     Seventh, (x) 15% to the Manager (including any Replacement Manager), (y) 15% to Guarantor Member and (z) 70% to the Sponsor Members, pro rata in proportion to their respective Capital Contributions, to the extent that the respective Sponsor Member's Distributions when aggregated with such Distributions for all prior Distribution Periods pursuant to this Section 6.4 shall yield an Internal Rate of Return of twenty-five percent (25%) per annum; and

(viii)     Eighth, then (x) 25% to the Manager (including any Replacement Manager), (y) 15% to Guarantor Member and (z) 60% to the Sponsor Members, pro rata in proportion to their respective Capital Contributions.

(c)     If a Capital Contribution Default by Senior Common Member has occurred and is continuing, and another Member has made a Priming Advance, then until the earlier of either (x) the date such Capital Contribution Default is cured in full by Senior Common Member (which shall include payment of all such unpaid Priming Advances and the unpaid and accrued Priming Advance Return thereon pursuant to the terms of Section 5.7) or (y) the occurrence of a Capital Contribution Cure Failure and conversion of the Priming Advance, related costs and Priming Advance Return into equity pursuant to Section 5.8, all Available Cash which Senior Common Member would be entitled to under Section 6.4(b) above shall be Distributed on each Distribution Date to the Member(s) that have made such Priming Advances (pro rata in accordance with the outstanding amounts owed by Senior Common Member to each such Member) until the same, together with related costs and Priming Advance Return thereon, are repaid in full.

(d)     If a Capital Contribution Default by Junior Common Member has occurred and is continuing, and another Member has made a Priming Advance, then until the earlier of either (x) the date such Capital Contribution Default is cured in full by Junior Common Member (which shall include payment of all such unpaid Priming Advances and the unpaid and accrued Primary Advance Return thereon pursuant to the terms of Section 5.7) or (y) the occurrence of a Capital Contribution Cure Failure and conversion of the Priming Advance, related costs and Priming Advance Return into equity pursuant to Section 5.8, all Available Cash which Junior Common Member would be entitled to under Section 6.4(b) above shall be Distributed on each Distribution Date to the Member(s) that have made such Priming Advances (pro rata in accordance with the outstanding amounts owed by Junior Common Member to each such Member) until the same, together with related costs and Priming Advance Return thereon, are repaid in full.

40

(e)     Upon a Capital Event that does not result in the winding up of the Company, the proceeds of such Capital Event shall be distributed in accordance with Sections 6.4(a), 6.4(b), 6.4(c), 6.4(d) and 8.3.

(f)     Upon a Capital Event that results in the winding up of the Company, the proceeds of such Capital Event shall be distributed (i) first, to pay all creditors of the Company, other than Members, either by the payment thereof or the making of reasonable provision therefore of all verified obligations, (ii) second, to the setting up of any reserves which the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company as provided in Section 18-804(b) of the LLC Act and, subject to such Section 18-804(b), at the expiration of such period as the aforesaid person or persons may deem advisable, for distribution in the manner hereinafter provided, and (iii) third, in accordance with Sections 6.4(a), 6.4(b), 6.4(c), 6.4(d) and 8.3.

(g)     If, on any Distribution Date, the cash then held in the FX3 Collection Account is insufficient to pay to the Preferred Member all accrued and unpaid Preferred Current Return, then the Sponsor Members shall be obligated, on a joint and several basis, to pay to Preferred Member on the Distribution Date an amount that, when aggregated with distributions on such Distribution Date from the FX3 Collection Account, equals the accrued and unpaid Preferred Current Return. Without limiting any other provision in this Agreement, the failure of Sponsor Members to make the foregoing payment shall be a Payment Default.

(h)     Subject to the following sentence, at any time, Senior Common Member may, on behalf of the Company, prepay all or any portion of the amounts due and owing to Preferred Member with respect to the Preferred Equity Investment. As a condition precedent to Senior Common Member's right to cause the Company to make any such prepayment, Senior Common Member shall send written notice to Preferred Member of its intention to cause the Company to make any such prepayment, the amount of the prepayment (the "Prepayment Amount"), and the date upon which the Prepayment Amount will be delivered to Preferred Member (the "Prepayment Date"). Such written notice shall be deemed irrevocable. On the specified payment date, the Company shall pay to Preferred Member the sum of (i) the Prepayment Amount, (ii) accrued and unpaid Preferred Current Return through and including the date of such prepayment, (iii) a fifteen percent (15%) per annum (or after the occurrence and during the continuance of a Payment Default, twenty percent (20%) per annum) return on the Prepayment Amount, calculated on the basis of a 360-day year for the number of days remaining before the first (1st) anniversary of the Closing Date, (iv) the greater of (x) four percent (4%) of the Prepayment Amount and (y) one and one-half percent (1.5%) of the greater of (A) the Gross Appraised Value and (B) the gross sales price or gross refinance proceeds received in exchange for a Sale or Refinance, respectively, it being understood that subsection (iv)(y) shall only be applicable if any amounts used to make a payment pursuant to this Section 6.4(h) are derived from the Sale or Refinance of any Company Asset, (v) any unpaid portion of the Investment Fee and (vi) the accrued and unpaid Preferred Additional Return.

Section 6.5     Removal Adjustment.

(a)     With the exception of a Control Event which is the result of a Key Man Event caused solely by the death or Incapacitation of Courtland Gettel (a "Removal Adjustment

41

Control Event"), upon the occurrence of a Control Event, Former Manager's Capital Account shall automatically be adjusted to remove the portion of the Promote which accrued to Manager from the Closing Date prior to and through the date of such Control Event (the "Forfeited Promote"). To the extent that the Former Manager shall have received any portion of the Forfeited Promote prior to the occurrence of the Control Event, the portion of the Forfeited Promote received by the Former Manager shall be repaid to the Company within three (3) Business Days of demand therefor by Replacement Manager. Absent manifest error, Replacement Manager's calculation of the Forfeited Promote shall be deemed final. Without limiting the foregoing, any portion of the Forfeited Promote repaid by the Former Manager shall not be deemed a Capital Contribution or increase Former Manager's Capital Account. At the option of Guarantor Member, all or a portion of the Forfeited Promote shall be credited (x) to Replacement Manager's Capital Account or (y) to the Capital Accounts of Guarantor Member and the Sponsor Members on a pro-rata basis in proportion to their respective interests in Distributions (i.e., for any Promote distributed pursuant to Section 6.4(b)(vi), 15/95ths to Guarantor Member and 80/95ths to the Sponsor Members; for any Promote distributed pursuant to Section 6.4(b)(vii), 15/85ths to Guarantor Member and 70/85ths to the Sponsor Members; and for any Promote distributed pursuant to Section 6.4(b)(viii), 15/75ths to Guarantor Member and 60/75ths to the Sponsor Members).

(b)     Upon the occurrence of a Removal Adjustment Control Event, Former Manager's Capital Account shall be adjusted by Preferred Member or Guarantor Member to reflect Distributions of the portion of the Promote to which the Former Manager would have been entitled to as Manager if the Company Assets were sold at Fair Market Value as of the date of such Removal Adjustment Control Event (the "Removal Adjustment"). Preferred Member's or Guarantor Member's determination of the fair market value of the Company Assets (the "Fair Market Value") shall be deemed final, absent manifest error.

(c)     Upon the occurrence of any Control Event, Former Manager shall not be entitled to receive any portion of the Promote other than as set forth in Section 6.5(b), and thereafter, Junior Common Member shall only receive Distributions in accordance with its respective Capital Contributions, at the option of Guarantor Member, from and after the occurrence of any Control Event, all or a portion of the Promote shall be paid to (x) Replacement Manager or (y) Guarantor Member and the Sponsor Members on a pro-rata basis in proportion to their respective interests in Distributions (i.e., for any Promote distributed pursuant to Section 6.4(b)(vi), 15/95ths to Guarantor Member and 80/95ths to the Sponsor Members; for any Promote distributed pursuant to Section 6.4(b)(vii), 15/85ths to Guarantor Member and 70/85ths to the Sponsor Members; and for any Promote distributed pursuant to Section 6.4(b)(viii), 15/75ths to Guarantor Member and 60/75ths to the Sponsor Members).

Section 6.6     Interest on and Return of Capital Contributions.  No Member shall be entitled to interest on its Capital Contribution or to a return of its Capital Contribution, except as specifically set forth in this Agreement.

Section 6.7     Withholding.  Notwithstanding any other provision contained in this Agreement, in the event that the Company is required to withhold and remit any taxes to the Internal Revenue Service or any other taxing authority (the "Tax Authority") with respect to any Member (the "Withheld Member"), then Company may treat any such remitted amounts as a

42

Distributions from the Company to Withheld Member at such times and in such amounts as determined by Preferred Member sufficient to fund, or reimburse the Company for, such obligations of the Company. Such withheld amounts shall not be deemed Capital Contributions for purposes of this Agreement. The amount of any such taxes remitted by the Company with respect to the Withheld Member for any year shall be a reduction of the Withheld Member's Capital Account balance as if such amount were Distributed to the Withheld Member. So long as any remitted amount of the Withheld Member remains unpaid, the Company shall make future Distributions due to the Withheld Member by applying the amount of any such Distribution first to the payment of such unpaid and/or withheld amounts.

Section 6.8    Redemption.    The Company shall redeem the Preferred Membership Interest for the Redemption Price on or before the second (2nd) anniversary of the Closing Date (the "Redemption Date"), provided that Sponsor Members may, upon payment of $300,000 to Preferred Member on or before the date that is thirty (30) days prior to the second (2nd) anniversary of the Closing Date, extend the Redemption Date to a date no later than the third (3rd) anniversary of the Closing Date. The "Redemption Price" shall equal the sum of (a) the accrued and unpaid Preferred Current Return, (b) the accrued and unpaid Preferred Additional Return, (c) the outstanding Preferred Equity Investment, (d) any unpaid portion of the Investment Fee, (e) if the Redemption Date occurs on or before the first (1st) anniversary of the Closing Date, a fifteen percent (15%) per annum return (or after the occurrence and during the continuance of a Payment Default, twenty percent (20%) per annum) on the outstanding Preferred Equity Investment, calculated on the basis of a 360-day year for the number of days remaining before the first (1st) anniversary of the Closing Date, and (f) the greater of (i) four percent (4%) of the outstanding Preferred Equity Investment and (ii) one and one-half percent (1.5%) of the Gross Appraised Value of the Remaining Properties as of the Redemption Date, less one and one-half percent (1.5%) of Refinancing Proceeds (but only as and to the extent previously paid to Preferred Member pursuant to Section 6.4(a)(v)(x)(ii)). Without limiting any other provision in this Agreement, the failure of the Company to redeem the Preferred Membership Interest on the Redemption Date for the Redemption Price shall be a Payment Default. The redemption of the Preferred Member's Membership Interest shall not vitiate or limit any obligation to pay to Preferred Member any amounts due to Preferred Member in addition to the Redemption Price (including, without limitation, any amounts due to Preferred Member in respect of any Priming Advance made by Preferred Member).

Section 6.9    Investment Fee.    On the Closing Date, the Company shall pay to Preferred Member an amount equal to $300,000. The remaining balance of the Investment Fee shall be paid on the date which is the earlier of (x) the Second Funding Date and (y) the date on which Senior Common Member repays the Sponsor Equity Note in full. Without limiting any other provision in this Agreement, the failure to pay such remaining portion of the Investment Fee shall be a Payment Default.

ARTICLE VII
Taxes; Books and Records; Information

Section 7.1    Tax Returns.    Subject to the prior review and approval of Preferred Member, Manager shall, at the sole cost and expense of the Company, cause to be prepared and filed, on behalf of the Company, all necessary federal, state and local income tax returns for the

43

Company (and each Subsidiary). Within a reasonable time period before filing any such tax return, Manager shall submit a draft thereof to Preferred Member, who shall have the right to consult with Manager and approve such draft before same is filed. Each Member shall furnish to Manager all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed. Manager shall use the Approved Accountant with respect to Manager's obligations pursuant to this Section 7.1.

Section 7.2    Tax Elections; REIT Compliance.

(a) The Company (and each Subsidiary's) tax returns shall include such elections, and shall otherwise be completed, as Manager shall determine and Preferred Member shall approve. Neither the Company nor any Member may make an election for the Company or any Subsidiary to be taxed as a corporation under the Code or any similar provisions of applicable state law, and no provisions of this Agreement shall be interpreted to authorize any such election. The other Members agree that in the event that Preferred Member shall propose to take or refrain from taking any action (or propose that the Company take or refrain from taking any action) to ensure that Preferred Member (or IMHFC or its respective Affiliates) would, taking into account its investment in the Company, qualify as a REIT or avoid the imposition of additional taxes on Preferred Member (or IMHFC or its respective Affiliates), the Company shall take or not take such action as directed by Preferred Member, provided however that if such action (or failure to take such action) would have an adverse effect on the Company or the Members, the Members shall cooperate in good faith to determine and implement a course of action which would, to the extent possible, preserve the REIT status of Preferred Member (or IMHFC or its respective Affiliates) and avoid the imposition of additional taxes on Preferred Member (or IMHFC or its respective Affiliates) (taking into account its investment in the Company) without causing an adverse effect on the Company or the Members.

(b)    Without limiting the foregoing, so long as Preferred Member or Guarantor Member owns, directly or indirectly, any interest in the Company, then notwithstanding any other provision of this Agreement:

(i)    any services that would otherwise cause any rents from a lease of any Property to be excluded from treatment as rents from real property pursuant to Section 856(d)(2)(C) of the Code shall be provided by either (x) an independent contractor (as described in Section 856(d)(3) of the Code) with respect to IMHFC and from whom neither the Company nor IMHFC derives or receives any income (an "Independent Contractor") or a (y) an entity that is a taxable REIT subsidiary with respect to IMHFC within the meaning of Section 856(l) of the Code (a "TRS");

(ii)    except for a TRS, the Company shall not own, directly or indirectly or by attribution (in accordance with attribution rules referred to in Section 856(d)(5) of the Code), in the aggregate more than 10% of the total value of all classes of stock or more than 10% of the total voting power (or, with respect to any such person which is not a corporation, an interest of 10% or more in the assets or net profits of such person) of a lessee or sublessee of all or any part of any Property or of any other assets of the Company except in each case with the specific written approval of Preferred Member or Guarantor Member, as the case may be;

44

(iii) except for securities of a TRS, the Company shall not own, directly or indirectly or by attribution, more than 10% of either the total value or the total voting power of the outstanding securities of any issuer or own any other asset (including a security), or engage in any activity, which would cause IMHFC to fail the asset test of Section 856(c)(4)(B) of the Code or one of the income tests set forth in Section 856(c) of the Code;

(iv) the Company shall not engage in any prohibited transaction within the meaning of Section 857(b)(6) of the Code;

(v) leases of any property owned by the Company shall provide for rents, which qualify as "rents from real property" within the meaning of Section 856(d) of the Code with respect to IMHFC; and

(vi) the aggregate amount of gross income that does not qualify for the 95% income test of Section 856(c) shall not exceed 5% of the Company's gross income.

(c) Notwithstanding the foregoing provisions of <u>Section 7.2</u>, the Company may enter into a transaction prohibited by this <u>Section 7.2</u> if it receives the prior written approval of Preferred Member and Guarantor Member specifically acknowledging that it is approving such transaction.

(d) IMHFC and its respective Affiliates shall be entitled to receive from the Company, as reasonably requested, such information as is reasonably necessary for IMHFC to determine its compliance with Sections 856-860 of the Code and the Treasury Regulations promulgated thereunder.

Section 7.3 <u>Tax Matters Member</u>. Preferred Member and, after the Redemption Date, at the option of Guarantor Member, Guarantor Member shall designate a Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code, and such Member so designated is hereby authorized and required to represent the Company (at the expense of the Company) in connection with all examinations of the affairs of the Company by tax authorities. Preferred Member is hereby designated as the initial "tax matters partner." The tax matters partner shall, at the Company's expense, keep the other Members reasonably informed about the status of any tax controversy or related proceeding involving the Company which could have a material adverse effect on another Member.

Section 7.4 <u>General Accounting Matters</u>. The Manager shall keep or cause to be kept books and records pertaining to the Company's (and each Subsidiary's) business showing all of its assets and liabilities, receipts and disbursements and all transactions entered into by the Company (or such Subsidiary). The books and records of the Company (and of each Subsidiary), and any reports required pursuant to this <u>Section 7.4</u>, are subject to the approval of Preferred Member and, after the Redemption Date, the Guarantor Member, each in its reasonable discretion. Such books and records, and all supporting data, of the Company (and each Subsidiary) shall be kept at the office of the Company and the Members and their representatives shall at all reasonable times have free access thereto for the purpose of inspecting or copying the same, provided, however, that upon a Control Event, Junior Common Member shall not have any right to access, inspect or copy any such books and records. The Company's (and each

45

Subsidiary's) books of account shall be prepared by the Approved Accountant and kept on an accrual basis or as otherwise determined by Preferred Member and otherwise in accordance with GAAP, except that for income tax purposes such books shall be kept in accordance with applicable tax accounting principles. The Manager shall engage the Approved Accountant to perform an annual audit of the Company, and the Approved Accountant to provide an audit report, and audited financial statements in accordance with GAAP, to Preferred Member and Guarantor Member within sixty (60) days after the Fiscal Year end. In furtherance of the Manager's obligations under this Section 7.4, the Manager shall furnish the following (which shall (x) be prepared in accordance with GAAP, where applicable, and (y) be in such form, and shall contain such detail, as is reasonably requested in good faith by Preferred Member and, after the Redemption Date, the Guarantor Member):

    (i)  With respect to the Company and the Subsidiaries:

      (A)  no later than forty-five (45) days after the end of each fiscal quarter, provide Preferred Member and Guarantor Member with the amount in each Member's Capital Account as of the last day of each fiscal quarter along with an unaudited balance sheet, income statement, cash flow statement and capital statement. Additionally, the Manager shall furnish to Preferred Member and Guarantor Member within fifteen (15) days of each month end an unaudited income statement, an unaudited balance statement and monthly bank reconciliations together with the so-called "soft" numbers within six (6) days of each month end;

      (B)  provide Preferred Member and Guarantor Member with (A) updates as to any material construction, renovation and/or leasing projects related to the Company or any Subsidiary following reasonable request therefor and (B) monthly reporting as to any withdrawals from the bank account of the Company for purposes of any capital expenditures relating to the Company or any Subsidiary;

      (C)  promptly, but no later than two (2) days after receipt, provide Preferred Member and Guarantor Member with copies of all written notices, written reports and material written correspondence relating to the Company, any Financing, any Subsidiary or the Property that was delivered to or received from the lenders under any Financing;

      (D)  promptly, but no later than two (2) days after receipt, provide Preferred Member and Guarantor Member with copies of any and all default and other material written notices received from franchisors, ground lessors, tenants and/or lenders promptly after receipt thereof;

      (E)  transmit to Preferred Member and Guarantor Member as soon as practicable following each Fiscal Year, but in any event within (i) sixty (60) days after the close of each Fiscal Year, a computation of the distributions to the Members and the allocation to such Members of the profits or losses, as the case may be, during such prior Fiscal Year and (ii) sixty (60) days after the close of each Fiscal Year, a Schedule K-1, as shall be necessary for the preparation by Preferred Member and Guarantor Member of a federal, state and local income tax return for the prior Fiscal Year, together with a true and complete copy of each federal, state and local tax return of the Company;

46

(F)     promptly, but no later than two (2) days after receipt, provide to Preferred Member and Guarantor Member a copy of any written notices received by the Manager which, in the good faith judgment of the Manager, disclose events which would be reasonably likely to materially impact the Company, any Subsidiary, the Preferred Membership Interest, Preferred Member, Guarantor Member or the Property; and

(G)     provide Preferred Member and the Guarantor Member with any other material information it shall from time to time reasonably request.

(ii)     Without limiting the duties and obligations of Manager of Section 7.4 above, with respect to the Property, provide the Mortgage Lender, Preferred Member and the Guarantor Member with all reports, statements and/or summaries required pursuant to the Mortgage Loan Agreement no later than the applicable time periods provided for therein.

Section 7.5     Information.   A Member may inspect during ordinary business hours and at the principal place of business of the Company the Certificate, this Agreement, any tax returns of the Company for the immediately preceding three Fiscal Years, and all other business records in the possession or direct or indirect control of the Company.

Section 7.6     Bank Accounts.   All receipts, funds and income of the Company or any Subsidiary shall be deposited in accordance with Article XI.

Section 7.7     Accounting Period.   The accounting period of the Company shall be the Fiscal Year.

## ARTICLE VIII
### Dissolution

Section 8.1     Dissolution.   The Company shall be dissolved and subsequently terminated upon the occurrence of the first of the following events:

(a)     unanimous written agreement of the Members to dissolve and subsequently terminate the Company;

(b)     any other event that terminates the continued membership of any Member, but only if Preferred Member or Guarantor Member agrees in writing to dissolve the Company;

(c)     the entry of a decree of judicial dissolution under the LLC Act;

(d)     the occurrence of any other event of dissolution under the provisions of this Agreement or, subject to the provisions of this Agreement to the contrary, the LLC Act; and

(e)     if all or substantially all of the Company Assets are sold or otherwise disposed of and the proceeds thereof distributed.

Section 8.2     Winding-up.   When the Company is dissolved, the business and property of the Company shall be wound up and liquidated by the Liquidator. The Liquidator

47

shall use commercially reasonable efforts to reduce to cash and cash equivalent items such Company Assets as the Liquidator shall deem it advisable to sell, subject to obtaining fair value for such assets and any tax or other legal considerations. Notwithstanding anything to the contrary, if the Liquidator is not Preferred Member, then the Liquidator may not take any action that has any disproportionately adverse effect on Guarantor Member's rights or obligations.

Section 8.3   Final Distribution. Provided that Available Cash shall not have been previously distributed pursuant to Section 6.4(f), upon winding up of the Company, certain assets of the Company selected by the Liquidator may be sold, and the assets not sold, and the cash remaining after the payment of or provision for the debts of the Company, shall in all events be distributed as follows:

(a)   First, to pay all creditors of the Company, other than Members, either by the payment thereof or the making of reasonable provision therefor;

(b)   Second, to the setting up of any reserves which the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company as provided in Section 18-804(b) of the LLC Act and, subject to such Section 18-804(b), at the expiration of such period as the aforesaid person or persons may deem advisable, for distribution in the manner hereinafter provided; and

(c)   Third, in accordance with Section 6.4.

A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Liquidator to minimize the losses attendant upon a liquidation. The decision whether to distribute part or all of the assets of the Company in kind or in cash following dissolution shall be made by the Liquidator.

Section 8.4   Termination. The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in this Article VIII, and the existence of the Company shall have been terminated in the manner required by the LLC Act. The Liquidator (or Members if necessary) shall take all other actions as may be necessary to terminate the Company.

Section 8.5   Claims of the Members. Except as otherwise provided in this Agreement or any other Transaction Document, including, but not limited to, the Payment Guaranty, the Preferred Recourse Guaranty and the Sponsor Equity Note, current Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member or former Member, except if set forth in a separate guaranty.

ARTICLE IX
Transfer of Members' Interests

Section 9.1   Restrictions on Transfer of Company Interests.

48

(a) No Sponsor Member or Restricted Party (i) shall sell, assign, exchange, transfer, pledge, hypothecate or otherwise dispose of its Interest or any part thereof or retire or withdraw from the Company (an "Interest Transfer"), or (ii) shall, or shall permit any of its direct or indirect owners to, sell, assign, exchange, transfer, pledge, hypothecate or otherwise dispose of its direct or indirect interest in a Member (a "Member Transfer"; and together with an Interest Transfer, a "Transfer"), without the prior written approval of Preferred Member or Guarantor Member, each in its sole and absolute discretion, except as otherwise provided in this Article IX.

(b)    A Transfer shall include, but not be limited to, (i) if a person is a corporation, any merger, consolidation or sale or pledge of such corporation's stock or the creation or issuance of new stock; (ii) if a person is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the sale or pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the sale or pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests or the changing, granting or increasing of consent rights to any limited partner; (iii) if a person is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member, a non-member manager or any member exercising management or control rights (or if no managing member, non-member manager or member exercising management or control rights, any member) or the sale or pledge of the membership interest of a managing member or member exercising managing or control rights (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the sale or pledge of non-managing membership interests or the creation or issuance of new non managing membership interests, or the changing, granting or increasing of consent rights to any member or non-member; (iv) if a person is a trust or nominee trust, any merger, consolidation or the sale or pledge of the legal or beneficial interest in a person or the creation or issuance of new legal or beneficial interests; or (v) the death or Incapacitation of any person who shall be required to Control any Sponsor Member.

(c)    Notwithstanding the foregoing, no Transfer or substitution shall be recognized if Preferred Member or Guarantor Member reasonably believes that such Transfer or substitution would pose a material risk that the Company will be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the regulations promulgated thereunder.

(d)    Notwithstanding anything in this Agreement to the contrary, (i) in no event shall an Interest (or any portion thereof) be assigned, sold, exchanged, transferred, pledged, hypothecated or otherwise to a Prohibited Transferee, (ii) in no event shall any direct or indirect interest in any Member be Transferred to a Prohibited Transferee, (iii) in no event shall an Interest, or any direct or indirect interest in any Member (or any portion thereof), be Transferred in a manner prohibited under the Mortgage Loan Documents without first obtaining the written consent of the Mortgage Lender and approval of Preferred Member and Guarantor Member, it being understood that Manager shall not permit any amendment or modification of the Mortgage Loan Documents, and shall not permit any other agreement that binds the Company and/or its Subsidiaries, to have the effect of prohibiting any Transfer that is permitted pursuant to the terms of this Agreement, and (iv) in no event shall an Interest (or any portion

49

thereof) or any direct or indirect interest in any Member be directly or indirectly Transferred in the event such Transfer shall cause any Member to cease to be in compliance with all applicable anti-money laundering and anti-terrorist laws, regulations, rules, executive orders and government guidance, including the reporting, record keeping and compliance requirements of The International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, Title III of the USA PATRIOT Act, and other authorizing statutes, executive orders and regulations administered by the Office of Foreign Assets Control, Department of the Treasury; and any attempt to effect any such Transfer as is described in clauses (i), (ii), (iii) or (iv) of this sentence shall be void and of no effect and shall not bind any Company.

(e)     Notwithstanding anything in this Agreement to the contrary, in no event shall any Sponsor Member or any Restricted Party (or any Affiliate of any of the foregoing), or any Person acting at any such Person's request or direction, acquire or agree to acquire any interest in the Mortgage Loan or any portion thereof or any interest therein, or any direct or indirect ownership interest in any holder of any interest in the Mortgage Loan, by way of purchase, transfer, exchange or otherwise.

Section 9.2     Sponsor Members Transfer Rights.  Subject to Section 9.1(d) of this Agreement, provided that no Control Event shall have occurred, the following Transfers shall be permitted without Preferred Member's or Guarantor Member's consent: (i) the Member Transfer (but not the pledge), in one or a series of transactions, of the stock, partnership interests, membership interests or trust interests (as the case may be) in a Restricted Party; provided, that after giving effect to any such Member Transfer described in the preceding clause (i), (A) Courtland Gettel and/or the Gettel Children's Trust 2 Controls Manager (or in the event of Courtland Gettel's death or Incapacitation, any Gettel Replacement Guarantor Controls Manager); (B) as a condition to each such Member Transfer (except with respect to death), Preferred Member and Guarantor Member shall each receive not less than sixty (60) days prior written notice thereof; (C) each such Transfer is otherwise in compliance with this Section 9.2 (including, without limitation, the second to last sentence hereof); (D) after giving effect to each such Transfer there is no Material Default or Default or Event of Default (as defined in the Mortgage Loan Agreement) under the Mortgage Loan Documents and (E) all Transfer Taxes shall be paid by the Sponsor Members, as applicable (and not the Company, the Properties, Guarantor Member or Preferred Member).  In addition, at all times, (a) Courtland Gettel (or upon Courtland Gettel's death or Incapacitation, any Replacement Guarantor) or the Gettel Children's Trust 2 shall continue to own, directly or indirectly, (i) more than 50% of all legal, beneficial and economic interests in and Control Senior Common Member and (ii) at least 33% of all legal, beneficial and economic interests in and Control the remaining Sponsor Members, (b) Junior Common Member shall continue to own 100% of and Control the Junior Common Membership Interest in the Company, (c) Mortgage Borrower shall continue to own the Properties (other than those sold in accordance with the provisions of this Agreement), (d) the Company shall continue to own 100% of the membership interests in the Mortgage Borrower and (e) Courtland Gettel shall Control the Gettel Children's Trust 2 and the beneficiaries of the Gettel Children's Trust 2 shall be immediate family members (i.e., spouse, children, siblings and parents) of Courtland Gettel, and there shall be no modification of any documentation governing or relating to the Gettel Children's Trust 2 that would have the effect of directly or indirectly causing a breach of this Section 9.2(e).  For the avoidance of doubt, in no event shall this Section 9.2 or any other

50

term or provision of this Agreement be construed to permit an Interest Transfer by any Sponsor Member.

Section 9.3    Preferred Member and Guarantor Member Transfer Rights.

(a) Notwithstanding anything to the contrary provided herein, but subject to the restriction set forth in the Mortgage Loan Agreement (unless waived by Mortgage Lender), neither Preferred Member nor Guarantor Member shall be restricted from any Transfer whatsoever, provided, however, that except for (i) the Forced Sale Right, and (ii) subject to the Mortgage Loan Documents (unless waived by Mortgage Lender), the right to grant a security interest in all or any portion of Preferred Member's Interest, the Preferred Equity Investment or Guarantor Member's Interest, including without limitation any grant of a security interest or Transfer to NWRA Ventures I, LLC or its affiliates, successors or assigns, neither Preferred Member nor Guarantor Member shall cause the sale, assignment or other disposition of the Properties without the consent of Manager, which consent shall not be required after a Control Event. The Members acknowledge that (a) the beneficiary of any pledge by Preferred Member or Guarantor Member (whether such pledge is a pledge of Preferred Member's Interest, the Preferred Equity Investment, Guarantor Member's Interest, any Sponsor Member's Interest or any other asset) (the "Pledgee") shall not be obligated to comply with the requirements of Section 9.4 in order to succeed to the pledged collateral, (b) the Pledgee shall not be obligated to take any action of any kind or nature hereunder or otherwise in order to succeed to the pledged collateral and (c) the Manager shall execute documents, instruments and agreements on behalf of the Company, and the applicable Sponsor Member shall execute documents, instruments and agreements on its behalf, to perfect any such pledge, and/or execute an estoppel (or similar document) from the Company or the applicable Sponsor Member for the benefit of the Pledgee. Notwithstanding anything to the contrary in this Agreement, upon a Transfer of Preferred Member's or Guarantor Member's entire interest in the Company, the transferring Member shall (x) be released from all obligations under this Agreement and (y) be released from all obligations under the remaining Transaction Documents if Mortgage Lender grants such a release (it being understood that the transferring Member may seek Mortgage Lender's approval for a replacement guarantor); provided that if the Mortgage Lender does not grant such a release, then the Sponsor Members shall in addition to continuing to indemnify the transferring Member in respect of all obligations under the remaining Transaction Documents, use commercially reasonably efforts to cause a creditworthy party reasonably satisfactory to the transferring Member to indemnify the transferring Member in respect of all obligations under the remaining Transaction Documents.

(b)    At Preferred Member's expense, the Company and the Sponsor Members shall cooperate with Preferred Member to facilitate a secondary market transaction as reasonably requested. In connection therewith, Preferred Member may (i) amend or modify this Agreement, provided that the Sponsor Members' obligations are not materially increased nor their rights materially decreased, (ii) require the Company, its Subsidiaries, the Manager and/or the Sponsor Members to provide information regarding any of the foregoing parties and/or the Properties and (iii) require the Company, its Subsidiaries, the Manager and/or the Sponsor Members to provide customary securitization representations and indemnifications with respect to such information.

Section 9.4    Other Transfer Provisions.

51

(a) Any purported Transfer by a Member of all or any part of its Interest in violation of this Article IX shall be null and void and of no force or effect.

(b)     Except as expressly provided in this Article IX, no Member shall have the right to withdraw from the Company prior to its termination and no additional Member may be admitted to the Company unless approved by Preferred Member or Guarantor Member. In the event that a Member purports to resign as a Member, such Member shall not be entitled to receive any Distributions or fees and shall not otherwise be entitled to receive value for or in respect of its Interest except as otherwise expressly provided herein. Notwithstanding any provision of this Agreement to the contrary, a Member may not Transfer all or any part of its Interest if such Transfer would jeopardize the status of the Company as a partnership for federal income tax purposes, or would violate, or would cause the Company to violate, any applicable law or regulation, including any applicable federal or state securities laws or any document or instrument evidencing indebtedness of the Company (including the Indebtedness (as defined in the Mortgage Loan Agreement)) secured by the Company Assets.

(c)     Concurrently with the admission of any substitute or additional Member (such member, the "Transferee") as approved by Preferred Member or Guarantor Member, the Members shall forthwith cause any necessary papers to be filed and recorded and notice to be given wherever and to the extent required showing the substitution of a Transferee as a substitute Member in place of the Member transferring its Interest, or the admission of an additional Member, all at the expense, including payment of any professional and filing fees incurred, of such substituted or additional Member. The admission of any person as a substitute or additional Member shall be conditioned upon such person or entity's written acceptance and adoption of all the terms and provisions of this Agreement.

(d)     If any Interest of a Member is transferred during any accounting period in compliance with the provisions of this Article IX, each item of income, gain, loss, expense, deduction and credit and all other items attributable to such Interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying Interests during such period in accordance with Section 706(d) of the Code, using any conventions permitted by law and selected by Preferred Member or Guarantor Member. All Distributions on or before the date of such transfer of a Member's Interest shall be made to the transferor, and all Distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and Distributions, the Company shall recognize a transfer of a Member's Interest on the date that the Manager receives notice of the transfer and reasonable evidence of the consummation thereof which complies with this Article IX from the Member transferring its Interest.

Section 9.5     Forced Sale Right.     Subject to Section 9.6, at any time, any Member shall have the right to elect to solicit offers to purchase any Property from the Company; provided, however, (i) after a Control Event has occurred, no Sponsor Member shall be permitted to exercise such right or be the Electing Party and (ii) after a Material Control Event has occurred, no Sponsor Member shall be permitted to be the Non-electing Party pursuant to this Section 9.5. Prior to soliciting offers, the initiating Member (the "Electing Party") shall notify the other Members (collectively, the "Non-electing Party") in writing of such desire ("ROFO Notice") and the price (the "ROFO Price") and other terms at which the Electing Party

52

so desires to sell such Property (the "ROFO Terms"). If the Electing Party is the Preferred Member or Guarantor Member, then the Non-electing Party shall be, collectively, the Sponsor Members, who shall take whatever action Senior Common Member elects to take on their behalf (i.e., Junior Common Member shall be bound by the elections of Senior Common Member). Until the earlier of (x) the Redemption Date or (y) the Guarantor Obligor Release Date, at which time the Non-Electing Party shall be the Preferred Member or Guarantor Member, respectively, if the Electing Party is the Senior Common Member or Junior Common Member, then the Non-electing Party shall be, collectively, the Preferred Member and Guarantor Member, who shall take whatever action either the Preferred Member or Guarantor Member elects to take on their behalf (i.e., Guarantor Member or Preferred Member shall be bound by the elections of the other). The Non-electing Party shall advise the Electing Party within ten (10) Business Days after receiving such ROFO Notice if it is interested in purchasing such Property for the ROFO Price upon the ROFO Terms. If the Non-electing Party notifies the Electing Party within such time period that the Non-electing Party is interested in purchasing such Property at the ROFO Price and upon the ROFO Terms, then the Non-electing Party shall, within sixty (60) days following the Electing Party's receipt of such notice from the Non-electing Party (the "ROFO Election Period"), purchase such Property for the ROFO Price upon the ROFO Terms, in accordance with reasonable and customary practice where the ROFO Terms are silent. The Non-electing Party acknowledges and agrees that (x) such sale shall be in accordance with and subject to the terms and provisions of the Mortgage Loan and payment of the Release Amount with respect to the Property (including any applicable yield maintenance premiums, prepayment penalties, liquidation fees, special servicing fees and workout fees due thereunder) by the Company at closing shall be a condition to closing and (y) payment of all amounts due to Preferred Member under this Agreement shall be a condition to closing; provided, however, in the event that a Control Event has occurred which is not a Material Control Event, and Sponsor Members are the Non-electing Party, then the Non-electing Party shall in addition to satisfying any deposit requirements set forth in the ROFO Terms, not later than ten (10) days after the commencement of the ROFO Election Period deposit a sum equal to ("Non-Material Control Event Deposit") the greater of (x) ten (10%) percent of the total ROFO Price   and (y) $1,000,000.00 with Preferred Member which shall be held in escrow and treated as a credit to the ROFO Price and paid along with the balance of the ROFO Price to the Company at the closing of the sale under the ROFO Terms and distributed pursuant to Section 6.4.    Thereafter, in the event that Non-electing Party fails to close on the purchase in accordance with the ROFO Terms during the ROFO Election Period, Non-electing Party shall in addition to any deposits put up with Company under the ROFO Terms, forfeit the Non-Material Control Event Deposit, which shall be paid to Company not as a penalty but as liquidated damages and distributed pursuant to Section 6.4. The purchase price paid by the Non-electing Party shall be paid to the Company and distributed pursuant to Section 6.4. If the Electing Party fails to respond within such time period and/or if the Non-electing Party responds that it is not interested in purchasing such Property, then the Non-electing Party shall have no further right hereunder to purchase such Property under the terms set forth in the ROFO Notice or otherwise and the Electing Party shall have the right to cause a sale of such Property to an unaffiliated third party (the "Forced Sale Right") within one hundred twenty (120) days after the expiration of the ROFO Election Period; provided that the sale price for the Property may not be less than 95% of the ROFO Price and the sale must be conducted substantially on the ROFO Terms or reasonable and customary practice where the ROFO Terms are silent. If the foregoing conditions are not substantially met, then the

Electing Party must again comply with the provisions of this Section 9.5 if it desires to sell the Property. In all events, simultaneously with the closing of a sale of such Property, (i) the Release Amount with respect to such Property shall be paid or caused to be paid by Company to Mortgage Lender in full by prepayment or defeasance, as applicable, in accordance with the terms of the Mortgage Loan Agreement (including any applicable yield maintenance premiums, prepayment penalties, liquidation fees, special servicing fees and workout fees due thereunder), and (ii) in connection with a Forced Sale Right exercised by either Sponsor Member, Preferred Member shall receive written backup to its reasonable satisfaction evidencing payment of the foregoing. In the event that a party fails to fulfill its obligation to sell or purchase under this Section 9.5, then such party shall lose all rights under Sections 9.5 and 9.6 and the other party shall be entitled to exercise all rights and remedies provided by law or equity for such a default, including specific performance and the right to sue for damages.

Section 9.6    Buy/Sell Right.

(a)    Election. At any time, the Sponsor Members, on the one hand, or Preferred Member and Guarantor Member, on the other hand (the "Initiating Member"), shall have the right to implement the buy/sell procedures set forth in this Section 9.6 by giving written notice thereof (the "Election Notice") to the other parties (collectively, the "Responding Member"). Such Election Notice shall state that the Initiating Member is willing to buy the entire Membership Interest of the Responding Member or to have the Responding Member purchase the Membership Interest of the Initiating Member for a purchase price determined as set forth in this Section 9.6(a). The Initiating Member shall specify in the Election Notice a price at which it believes the Company would as of the date of the Election Notice be able to sell its Company Assets to an unrelated third party in a bona fide transaction. The purchase price for the Membership Interest of the Member that becomes a seller under this Section 9.6 will be the amount that such Member would receive in accordance with this Agreement from a sale of the Company Assets at such price (assuming that cash sale proceeds in the amount of such price, less the amount that would then be required to repay the indebtedness and other obligations of the Company (but without deduction for any brokerage commission or other selling costs) (the "Sale Price"), were distributed in accordance with Section 6.4(b), (c) and (d)). Notwithstanding anything to the contrary, if Preferred Member is a selling Member, payment of all amounts due to Preferred Member under this Agreement shall be a condition to closing under this Section 9.6.

(b)    Response. Within a period of 60 days after the Initiating Member gives the Election Notice (the "Buy/Sell Election Period"), the Responding Member shall be required to give written notice to the Initiating Member, electing either (i) to purchase, for cash, the Membership Interest of the Initiating Member for the Sale Price determined as provided in Section 9.6(a), or (ii) to sell, for cash, its Membership Interest to the Initiating Member for the Sale Price determined as provided in Section 9.6(a). If the Responding Member does not make such election by written notice to the Initiating Member within the Buy/Sell Election Period, then the Responding Member shall be deemed to have elected to sell its Membership Interest to the Initiating Member.

(c)    Closing. The closing of any purchase pursuant to this Section 9.6 shall be held at the principal office of the buying Member on or before the 60th day after the end of the

54

Buy/Sell Election Period (or on the next Business Day thereafter if such 60th day is not a business day). The selling Member shall transfer to the buyer the entire Membership Interest held by the selling Member free and clear of all liens, encumbrances and adverse claims. At the closing, (i) the selling Member shall (A) execute and deliver to the buyer an assignment of membership interest representing its Membership Interest and any other instruments that the buyer may reasonably require to give the buyer good and clear title to the selling Member's Membership Interest, and (B) pay one-half of any transfer or similar taxes arising out of or in connection with the sale and transfer of such Membership Interest to the buyer; and (ii) the buyer shall pay the Sale Price determined as provided in <u>Section 9.6(a)</u>, by delivery of immediately available funds to the selling Member in the amount of such Sale Price.

(d)     <u>Default</u>. In the event that a party fails to fulfill its obligation to sell or purchase under this <u>Section 9.6</u>, then (i) the other party shall be entitled to exercise all rights and remedies provided by law and equity for such a default, including specific performance and the right to sue for damages, and (ii) if the defaulting party is the buyer, then the seller shall have the right and option, by written notice to the buyer given within 30 days after such failure, to cancel the sale of its Membership Interest and, instead, purchase the Membership Interest of the buyer (A) for a price equal to 85% of the Sale Price that would have otherwise applied under <u>Section 9.6(a)</u> if the buyer(s) had originally been the seller, and (B) otherwise on the same terms and conditions that apply to a purchase under this <u>Section 9.6</u>. The Sponsor Members and the Guarantor Member acknowledge that such discount from 100% to 85% of the Sale Price in such circumstance represents a measurement of liquidated damages and is not a penalty. In addition, the defaulting party shall lose all rights under <u>Sections 9.5</u> and <u>9.6</u>.

(e)     <u>Third Party Matters</u>. The Member whose Membership Interest is being purchased pursuant to this <u>Section 9.6</u> shall be indemnified by the Member who is purchasing such Membership Interest against any loss, liability or damage incurred by such selling Member in accordance with this Agreement arising out of those obligations first incurred by the Company or Mortgage Borrower after such closing. The purchasing Member shall also, at the closing of such purchase, and as a condition to such closing, either (i) cause the selling Member to be released from all outstanding guaranties of or other liabilities of the selling Member with respect to Company or Mortgage Borrower or obligations that may have been given or assumed by any of them, including, but not limited to, the Mortgage Loan Documents, and such releases shall be reasonably satisfactory to the selling Member which is a party to the Mortgage Loan Documents or (ii) cause a creditworthy party reasonably satisfactory to the selling Member to indemnify the selling Member in respect of all obligations under any such guaranties or other liabilities that accrue after the closing. Unless otherwise agreed by the purchasing Member, if the sale of the selling Member's Membership Interest under this <u>Section 9.6</u> would violate any Mortgage Loan Documents to which the Company or Mortgage Borrower is a party, then the electing Member shall obtain the consent of the Mortgage Lender to such sale.

(f)     <u>Subordination</u>. Sponsor Members shall not be permitted to send the ROFO Notice or initiate the Force Sale Right set forth in <u>Section 9.6</u> above: (a) for a period of 120 days after delivery of an Election Notice to the Responding Member, or (b) at any time after the occurrence of a Control Event.

(g)     Sponsor Members. For the purposes of this Section 9.6, and notwithstanding anything to the contrary in this Section 9.6, Senior Common Member shall have the right to determine on behalf of both Sponsor Members whether to send an Election Notice to Guarantor Member, and any such Election Notice shall be binding on both Sponsor Members. In such event, both Sponsor Members shall collectively be referred to as the Initiating Member and the provisions of this Section 9.6 that apply to the Initiating Member shall apply to both Sponsor Members. Junior Common Member shall not have the right to send an Election Notice or to independently decide to be an Initiating Member. If the Sponsor Members receive an Election Notice from Guarantor Member, then both Sponsor Members shall collectively be referred to as the Responding Member, although only Senior Common Member shall have the right to deliver the written notice contemplated in Section 9.6(b), and Junior Common Member shall be bound by such notice. If Senior Common Member elects in such written notice to sell its Membership Interest to Guarantor Member, then Junior Common Member shall also be required to sell its Membership Interest to Guarantor Member. If either Sponsor Member defaults under Section 9.6, then Guarantor Member shall be entitled to purchase the Membership Interests of both Sponsor Members on the terms set forth in Section 9.6(d). If the Sponsor Members are purchasing Members, then they shall have the right to determine in what proportion they purchase the Membership Interests of Preferred Member and Guarantor Member.

(h)     Preferred Member and Guarantor Member. For the purposes of this Section 9.6, and notwithstanding anything to the contrary in this Section 9.6, Guarantor Member shall have the right to determine on behalf of Preferred Member and Guarantor Member whether to send an Election Notice to the Sponsor Members, and any such Election Notice shall be binding on both Preferred Member and Guarantor Member. In such event, Preferred Member and Guarantor Member shall collectively be referred to as the Initiating Member and the provisions of this Section 9.6 that apply to the Initiating Member shall apply to both Preferred Member and Guarantor Member. Preferred Member shall not have the right to send an Election Notice or to independently decide to be an Initiating Member. If Preferred Member and Guarantor Member receive an Election Notice from the Sponsor Members, then Preferred Member and Guarantor Member shall collectively be referred to as the Responding Member, although only Guarantor Member shall have the right to deliver the written notice contemplated in Section 9.6(b), and Preferred Member shall be bound by such notice.     If Guarantor Member elects in such written notice to sell its Membership Interest to the Sponsor Members, then Preferred Member shall also be required to sell its Membership Interest to the Sponsor Members. If either Preferred Member or Guarantor Member defaults under Section 9.6, then the Sponsor Members shall be entitled to purchase the Membership Interests of both Preferred Member and Guarantor Member on the terms set forth in Section 9.6(d). If Preferred Member and Guarantor Member are purchasing Members, then they shall have the right to determine in what proportion they purchase the Sponsor Members' Membership Interests.

## ARTICLE X
### Miscellaneous

Section 10.1    Representations and Covenants by the Members. Each Member represents, warrants, covenants, acknowledges and agrees that:

56

(a) It is a corporation, limited liability company or partnership, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite power and authority to enter into this Agreement, to acquire and hold its Interest and to perform its obligations hereunder; and the execution, delivery and performance of this Agreement has been duly authorized.

(b) This Agreement and all agreements, instruments and documents herein provided to be executed or caused to be executed by it are duly authorized, executed and delivered by and are and will be binding and enforceable against it.

(c) Neither (i) the execution and delivery of this Agreement and the performance of its obligations hereunder nor (ii) the Transaction will conflict with, result in a breach of or constitute a default (or any event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it (or any of its Affiliates) is a party or by which it (or any of its Affiliates) is bound or to which any of its (or any of its Affiliate's) property or assets are subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any Governmental Entity, that would materially and adversely affect the performance of its duties hereunder; such Member has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by such Member of its obligations hereunder.

(d) There is no action, suit or proceeding pending or, to its knowledge, threatened against it in any court or by or before any other Governmental Entity that would prohibit its entry into or performance of this Agreement.

(e) This Agreement is a binding agreement on the part of such Member enforceable in accordance with its terms against such Member.

(f) It has been advised to engage, and has engaged, its own counsel (whether in-house or external) and any other advisors it deems necessary and appropriate. By reason of its business or financial experience, or by reason of the business or financial experience of its own attorneys, accountants and financial advisors, it is capable of evaluating the risks and merits of an investment in the Interest and of protecting its own interests in connection with this investment. Nothing in this Agreement should or may be construed to allow any Member to rely upon the advice of counsel acting for another Member or to create an attorney-client relationship between a Member and counsel for another Member.

(g) It is familiar with the definition of "accredited investor" in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended, and it represents that it is an "accredited investor" within the meaning of that Rule.

(h) It is not required to register as an "investment company" within the meaning ascribed to such term by the Investment Company Act of 1940, as amended (the "40 Act"), and in the event the U.S. Securities and Exchange Commission determines that it is required to register as an "investment company" it shall promptly notify the other Member.

57

Each Member shall use commercially reasonable efforts to cooperate with the other Member to prevent either Member from being required to register as an "investment company".

(i)     each Person owning an interest in such Member (A) is not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury (or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation) and (B) is not a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of U.S. law, regulation, or executive order of the President of the United States, and (ii) such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times.

(j)     It acknowledges and agrees that Polsinelli Shughart PC serves as counsel to Preferred Member, and that Polsinelli Shughart PC does not serve as counsel to any other Member. Every Member, other than Preferred Member and Guarantor Member, acknowledges and agrees that it does not have an attorney-client relationship with Polsinelli Shughart PC, and that no such relationship will arise in the course of the Company's existence or dissolution by any means.

(k)     It acknowledges and agrees that JH Greenberg & Associates, PLLC serves as counsel to Sponsor Members, and that JH Greenberg & Associates, PLLC does not serve as counsel to any other Member. Every Member other than Sponsor Members acknowledge and agrees that it does not have an attorney-client relationship with JH Greenberg & Associates, PLLC, and that no such relationship will arise in the course of the Company's existence or dissolution by any means.

(l)     It shall comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect and shall immediately notify the other Members in writing if it becomes aware that any of the foregoing representations, warranties or covenants are no longer true or have been breached or if the Member has a reasonable basis to believe that they may no longer be true or have been breached.

Section 10.2    Equitable Relief.  The Members hereby confirm that damages at law may be an inadequate remedy for a breach or threatened breach of this Agreement and agree that each Member shall be entitled to seek specific performance if and to the extent specifically provided herein, or injunctive relief in the event of a breach (or written threat of a breach) of any provision hereof. The parties shall have the right to seek the relief set forth hereinabove in any Federal or State court in Wilmington, Delaware, but shall not have the right to seek monetary damages or declaratory relief in such court.

Section 10.3    Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware. In particular, the Company is formed pursuant to the LLC Act, and the rights and liabilities of the Members shall be as provided therein, except as herein otherwise expressly provided.

58

Section 10.4  <u>Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors and permitted assigns.

Section 10.5  <u>Access; Confidentiality</u>.  By executing this Agreement, Sponsor Members expressly agree, at all times during the term of the Company and thereafter and whether or not at the time a Member of the Company, (a) not to issue any press release or advertisement or take any similar action concerning the Company's business or affairs without first obtaining consent of Preferred Member and/or Guarantor Member, which shall not be unreasonably withheld, conditioned or delayed, (b) not to publicize detailed financial information concerning the Company and (c) not to disclose the Company's affairs generally; <u>provided</u> that none of the foregoing shall restrict any Member from disclosing information concerning such Member's investment in the Company to its officers, directors, employees, agents, legal counsel, accountants, other professional advisors, limited partners, members and Affiliates, in all events on a need-to-know basis, or to prospective or existing investors of such Member or its Affiliates or to prospective or existing lenders to such Member or its Affiliates. Nothing herein shall restrict any Member from disclosing information that: (i) is in the public domain; (ii) is required or would be reasonably prudent to be disclosed by applicable law; or (iii) is expressly approved in advance in writing by the Company. The provisions of this Section shall survive the termination of the Company. Notwithstanding anything in this Agreement to the contrary, any Member may disclose any information hereunder as the same may be required or advisable under all applicable laws, including, but not limited to, to comply with any disclosure requirements (whether voluntary or involuntary) under any applicable local, state and federal securities and banking laws.

Section 10.6  <u>Notices</u>.  Except as otherwise provided herein, any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, sent by nationally recognized overnight courier service, or delivered by hand to the respective party at the following address (or at such other addresses the party may have previously specified by notice to the other parties as the address to which notice shall be given to it):

> If to Preferred Member:
>
> IMH Financial Corporation
> 7001 North Scottsdale Road, Suite 2050
> Scottsdale, Arizona 85253
> Attention: Steve Darak, Chief Financial Officer
>
> with a copy to:
>
> McVey Law Firm PLLC
> 7001 North Scottsdale Road, Suite 2050
> Scottsdale, Arizona 85253
> Attention: John McVey, Esq.
>
> and

Polsinelli Shughart PC
One E. Washington Street, Suite 1200
Phoenix, Arizona 85004
Attention:  Jonathan Brohard, Esq.

and

NWRA Ventures I, LLC
10 Cuttermill Road, Suite 402
Great Neck, NY 11021
Attention:  Seth B. Lipsay and Ken Partlow

and

Paul Hastings LLP
75 East 55th Street
New York, NY 10022
Attention: Robert J. Wertheimer, Esq.

If to any Sponsor Members, including the Manager:

c/o Numeric Holding Company, LLC
3915 E. Broadway Blvd., Suite 400
Tucson, Arizona 85711
Attention: Court Gettel

with a copy to:

JH Greenberg & Associates, PLLC
3915 E. Broadway Blvd., Ste. 400
Tucson, Arizona 85711
Attention:  Jeffrey H. Greenberg, Esq.

If to Guarantor Member:

IMH Financial Corporation
7001 North Scottsdale Road, Suite 2050
Scottsdale, Arizona 85253
Attention: Steve Darak, Chief Financial Officer

with a copy to:

McVey Law Firm PLLC
7001 North Scottsdale Road, Suite 2050
Scottsdale, Arizona 85253
Attention: John McVey, Esq.

60

and:

Polsinelli Shughart PC
One E. Washington Street, Suite 1200
Phoenix, Arizona 85004
Attention: Jonathan Brohard, Esq.

and

NWRA Ventures I, LLC
10 Cuttermill Road, Suite 402
Great Neck, NY 11021
Attention: Seth B. Lipsay and Ken Partlow

and

Paul Hastings LLP
75 East 55th Street
New York, NY 10022
Attention: Robert J. Wertheimer, Esq.

Any such notice sent shall be deemed delivered upon receipt or refusal to accept delivery.

Section 10.7   Counterparts. This Agreement may be executed in any number of counterparts, all of which together shall constitute a single instrument. In addition, the parties may execute this Agreement by telecopy or other facsimile machine and such facsimile signature shall be deemed an original. Signatures may be communicated via electronic means (via facsimile or email PDF scan) and shall be considered an original signature and are binding against the party who executed and delivered such signature via electronic means.

Section 10.8   Entire Agreement. This Agreement embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter hereof.

Section 10.9   Amendments.   Any amendment to this Agreement shall be effective only if such amendment is evidenced by a written instrument duly executed and delivered by the Members.

Section 10.10 Waivers. No waiver of any breach of any term of this Agreement shall be effective unless made in writing signed by the party against whom enforcement of the waiver is sought, and no such waiver of any breach of that term or any other term of the same or different nature shall be construed as a waiver of any subsequent breach of that term of the same or different nature.

61

Section 10.11 Severability. It is the express intention of the parties that the agreements contained herein shall have the widest application possible. If any agreement contained herein is found by a court having jurisdiction to be unreasonable in scope or character, the agreement shall not be rendered unenforceable thereby, but rather the scope or character of such agreement shall be deemed reduced or modified with retroactive effect to render such agreement reasonable and such agreement shall be enforced as thus modified. If the court having jurisdiction will not review the agreement, then the parties shall mutually agree to revise the unenforceable provision to as close as permitted by law to the provision declared unenforceable. The parties further agree that in the event a court having jurisdiction determines, despite the express intent of the parties, that any portion of any covenant or agreement contained herein is not enforceable, the remaining provisions of this Agreement shall nonetheless remain valid and enforceable.

Section 10.12 No Partition. The Members hereby waive any right of partition they may have with respect to any assets of the Company, now existing or hereafter acquired.

Section 10.13 Exhibits and Schedules. The Schedules and Exhibits attached hereto are hereby incorporated herein and made a part of this Agreement.

Section 10.14 Further Action. The parties shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

Section 10.15 Cumulative Remedies; Prevailing Party. The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law or otherwise, provided, however, in no event shall any party be liable to the other for any indirect, special, or punitive damages of any kind or nature whatsoever, or for any lost profits, lost revenues or for other similar costs arising out of or in connection with this Agreement. If any Member seeks to enforce such Member's rights under this Agreement by legal proceedings or otherwise, the non-prevailing party shall be responsible for all costs and expenses in connection therewith, including, without limitation, reasonable attorneys' fees and disbursements and witness fees.

Section 10.16 Rules of Construction. Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text hereof. This Agreement is not subject to the principle of construing its meaning against the party that drafted it, and each Member acknowledges that it was represented by its own counsel in connection with its negotiation and drafting. Wherever in this Agreement any Member is permitted or required to make a decision or determination (including any direction, vote, election, action, consent or approval), (a) such Member may make that decision or determination in its sole and absolute discretion (except as otherwise expressly provided herein), and (b) without limiting the generality of the foregoing, in making such decision or determination, such Member is entitled to consider, favor and further only such interests and factors as it desires, including its own interests, and has no duty or obligation to consider, favor or further any other interest of the Company, any Subsidiary or any other Member.

62