IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VARIANT HOLDING COMPANY, LLC, et al.,[1] | ) | Case No. 14-12021 (BLS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d); (B) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (C) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; (D) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361 AND 363; (E) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001; AND (F) AUTHORIZING SUBSIDIARY DEBTORS TO ASSUME BEACH POINT SETTLEMENT AGREEMENT PURSUANT TO 11 U.S.C. § 365**

The above-captioned debtors and debtors in possession (collectively, the

"Debtors") submit this motion (this "Motion"):  (i) for entry of an interim order on an

expedited basis (the "Interim Order") substantially in the form attached hereto as **Exhibit 1**,

and following a final hearing to be set by the Court (the "Final Hearing"), entry of a final order

(the "Final Order" and with the Interim Order, the "DIP Orders"), pursuant to sections 105,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Variant Holding Company, LLC (4044); Laser Focus Holding Company, LLC (9153); Laser Focus Commercial Investments, LLC (9326); Houston 2 Apartments, LLC (8886); 10400 Sandpiper Apartments, LLC (6556); 10301 Vista Apartments, LLC (8886); Houston 14 Apartments, LLC (7563); 12500 Plaza Apartments, LLC (7563); Pines of Westbury, Ltd (7563); 201 Ashton Oaks Apartments, LLC (7563); 13875 Cranbrook Forest Apartments, LLC (7563); 5900 Crystal Springs Apartments, LLC (7563); 7170 Las Palmas Apartments, LLC (7563); 11911 Park Texas Apartments, LLC (7563); 1201 Oaks of Brittany Apartments, LLC (7563); 3504 Mesa Ridge Apartments, LLC (7563); 667 Maxey Village Apartments, LLC (7563); 17103 Pine Forest Apartments, LLC (7563); 7600 Royal Oaks Apartments, LLC (7563); 4101 Pointe Apartments, LLC (7563); The Oaks at Stonecrest Apartments, LLC (5589); Numeric Commercial Investments, LLC (9443); FX3 Apartment Investors, LLC (4055); Royal Numeric FX Investments, LLC (6908); Broadmoor Apartments, LLC (7888); Chesapeake Apartments, LLC (5716); Holly Ridge Apartments, LLC (7117); Holly Tree Apartments, LLC (4288); Preston Valley Apartments, LLC (3356); Ravenwood Hills Apartments, LLC (8264); River Road Terrace Apartments, LLC (6396); Sandridge Apartments, LLC (3592); Majestic Heights Apartments, LLC (2174); Sonterra Apartments, LLC (6220); Toscana Villas Apartments, LLC (8873).  The Debtors' service address is: Variant Holding Company, LLC, c/o Development Specialists, Inc., 333 S. Grand Ave, Suite 4070, Los Angeles, CA 90071-1544.

361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"),

Rule 4001 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and

Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), and (ii) authorizing the Subsidiary Debtors (defined below)

pursuant to section 365(a) of title 11 of the Bankruptcy Code and Bankruptcy Rule 6006, to

assume the Settlement Agreement (as defined below).  In support of this Motion, the Debtors

rely on the *Declaration of Bradley D. Sharp in Support of First Day Motions*, and further

represent as follows:

## Overview

1.    By this Motion, the Debtors seek, among other things:

(i)    authorization to enter into the *Amended and Restated Debtor-in-*

*Possession Loan, Security and Guaranty Agreement* dated as of January 14, 2016 (as amended,

supplemented, or otherwise modified and in effect from time to time, the "DIP Agreement", a

true and correct copy of which is attached hereto as **Exhibit 2**, and together with any and all

other related documents and agreements entered into in connection with or related to the DIP

Loan (as defined below), the "DIP Loan Documents"),[2] by and among certain of the Debtors as

borrowers (the "DIP Borrowers")[3] and certain of the Debtors as guarantors (the "DIP

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the DIP Agreement.
[3] The "DIP Borrowers" consist of the following Debtors:  Variant Holding Company, LLC; 10400 Sandpiper Apartments, LLC; 10301 Vista Apartments, LLC; Pines of Westbury, Ltd; 201 Ashton Oaks Apartments, LLC; 13875 Cranbrook Forest Apartments, LLC; 5900 Crystal Springs Apartments, LLC; 7170 Las Palmas Apartments, LLC; 11911 Park Texas Apartments, LLC; 1201 Oaks of Brittany Apartments, LLC; 3504 Mesa Ridge Apartments, LLC; 667 Maxey Village Apartments, LLC; 17103 Pine Forest Apartments, LLC; 7600 Royal Oaks Apartments, LLC; 4101 Pointe Apartments, LLC; The Oaks at Stonecrest Apartments, LLC; Broadmoor Apartments, LLC; Chesapeake Apartments, LLC; Holly Ridge Apartments, LLC; Holly Tree Apartments, LLC; Preston Valley Apartments, LLC; Ravenwood Hills Apartments, LLC; River Road Terrace Apartments, LLC; Sandridge Apartments, LLC; Majestic Heights Apartments, LLC; Sonterra Apartments, LLC; and Toscana Villas Apartments, LLC.

Guarantors"),[4] BPC VHI, L.P., Beach Point Total Return Master Fund, L.P., and Beach Point

Distressed Master Fund, L.P., as the lenders (the "Beach Point Funds" or the "DIP Lenders"),

and Cortland Capital Market Services LLC as administrative agent for the DIP Lenders

("Cortland" and in such capacity, the "DIP Administrative Agent" and together with the DIP

Lenders, the "DIP Secured Parties"), and to obtain and be obligated in respect of postpetition

superpriority secured financing, subject, as to priority only, to the Carve-Out (as defined below),

the Liens granted pursuant to the Cash Collateral Orders (as defined below), the Senior Liens (as

defined in the DIP Orders), and any Existing Non-Affiliate Mechanic's Liens (as defined in the

DIP Agreement), as follows:

> a)       a "Tranche A Loan" in the principal amount of $3,321,601.50 plus

fees accrued through the Subsidiary Petition Date (as defined below), which amount has already

been advanced by the DIP Lenders to Variant to fund its operations under the *Debtor-in-*

*Possession Loan, Security and Guaranty Agreement* dated as of October 31, 2014 (as amended,

supplemented, or otherwise modified and in effect from time to time, the "HoldCo DIP

Agreement"), by and among debtor Variant Holding Company, LLC ("Variant"), the Guarantors

(as defined therein) (the "HoldCo DIP Guarantors"),[5] the Beach Point Funds as lenders (the

"HoldCo DIP Lenders"), and Cortland as administrative agent (in such capacity, the "HoldCo

DIP Administrative Agent" and together with the HoldCo DIP Lenders, the "HoldCo DIP

Secured Parties").  Variant will be the only borrower of the Tranche A Loan;

---

[4] The "DIP Guarantors" consist of the following Debtors:  Laser Focus Holding Company, LLC; Laser Focus
Commercial Investments, LLC; Houston 2 Apartments, LLC; Houston 14 Apartments, LLC; 12500 Plaza
Apartments, LLC; Numeric Commercial Investments, LLC; FX3 Apartment Investors, LLC; and Royal Numeric FX
Investments, LLC.
[5] The "HoldCo DIP Guarantors" are Laser Focus Holding Company, LLC; Laser Focus Commercial Investments,
LLC; Houston 14 Apartments, LLC; Houston 2 Apartments, LLC; Numeric Commercial Investments, LLC; and
Royal Numeric FX Investments, LLC.

b)        a "Tranche B1 Loan" in the principal amount of $19,075,507.95,

which amount has already been advanced by the DIP Lenders under the HoldCo DIP Agreement

and loaned by Variant to the other DIP Borrowers to fund their operations and preserve their

properties in the period leading up to the commencement of their chapter 11 cases.  All DIP

Borrowers will be deemed borrowers of the Tranche B1 Loan upon entry of the Interim Order;

and

c)        a "Tranche B2 Loan" (together with the Tranche B1 Loan, the

"Tranche B Loan," and the Tranche A Loan and the Tranche B Loan are collectively the "DIP

Loan") in an aggregate principal amount of $20,000,000 of additional postpetition financing to

be used to fund the operating expenses incurred by the Property-Owning Debtors (as defined

below) and certain of Variant's overhead expenses (excluding chapter 11 professional fees),

subject to increase for any Permitted Cure Advances (as defined below) up to $2,000,000, with

all of the DIP Borrowers as borrowers of the Tranche B2 Loan;

(ii)        authorization for the DIP Guarantors to guaranty all of the DIP Borrowers'

obligations under the DIP Loan, including the Tranche A Loan and the Tranche B Loan;

(iii)        authorization for the Debtors to enter into and perform the DIP Agreement

and the DIP Loan Documents and to perform such other and further acts as may be necessary or

appropriate in connection with the DIP Loan Documents;

(iv)        authorization for the Subsidiary Debtors to assume, pursuant to Section

365 of the Bankruptcy Code, the *Settlement Agreement* dated as of October 17, 2014 (the

"Settlement Agreement"), by and among Variant, the Prepetition Guarantors (as defined below),

those direct and indirect subsidiaries of Variant listed in Exhibit A thereto, and those individuals

and entities listed on Exhibit B thereto on the one hand, and the Beach Point Funds as lenders

under the Prepetition Loan Agreement (as defined below) (the "Prepetition Lenders"), Cortland

in its capacity as the administrative agent under the Prepetition Loan Agreement (in such

capacity, the "Prepetition Administrative Agent" and together with the Prepetition Lenders, the

"Prepetition Secured Parties"), and those individuals and entities listed on Exhibit C thereto on

the other hand, to the extent such Settlement Agreement constitutes an executory contract;

    (v)  authorization for the DIP Borrowers' use of "cash collateral" (as that term

is defined in section 363(a) of the Bankruptcy Code) constituting Prepetition Collateral (as

defined below) (including, without limitation, all cash and other amounts from time to time on

deposit or maintained by the Debtors and any cash proceeds of the disposition of the Prepetition

Collateral, the "Cash Collateral") on the terms and conditions set forth in the Interim Order, the

Final Order (defined below, as applicable), and in the DIP Loan Documents;

    (vi)  authorization for the Debtors to grant security interests, liens, and

superpriority claims (including superpriority claims pursuant to section 364(c)(1) of the

Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and

priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Secured Parties,

subject, as to priority only, to the Carve-Out, the Senior Liens, and any Existing Non-Affiliate

Mechanic's Liens, payable from, and having recourse to, all prepetition property, including, but

not limited to, all Prepetition Collateral, and postpetition property of the Debtors' respective

estates (collectively, the "Estates") and all proceeds thereof;

    (vii)  reaffirmation of (a) the findings, holdings, rights, liens, claims, interests,

and protections provided under the *Final Order (A) Authorizing Debtor to Obtain Postpetition*

*Financing and to Grant Security Interest and Superpriority Administrative Expense Status*

*Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (B) Authorizing Debtor to Use Cash*

*Collateral; (C) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (D) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (as amended, supplemented, or otherwise modified and in effect from time to time, the "HoldCo Final Borrowing Order") as set forth in the Interim Order and the Final Order; (b) the Court's granting of adequate protection liens and superpriority claims to the Prepetition Secured Parties in connection with the Prepetition Secured Obligations (as defined below); (c) the Court's granting of super-priority claims and liens to the HoldCo DIP Secured Parties in connection with the HoldCo DIP Agreement; and (d) the rights and obligations of the Prepetition Secured Parties and Adequate Protection Guarantors (as defined below) under that Adequate Protection Guaranty (as defined below);

(viii)    authorization for (x) the DIP Secured Parties to terminate the DIP Agreement, and (y) the DIP Secured Parties, the HoldCo DIP Secured Parties and the Prepetition Secured Parties to terminate the Debtors' use of Cash Collateral, each upon the occurrence and continuance of an Event of Default on terms specified in the DIP Agreement;

(ix)    subject only to and effective upon entry of the Final Order, authorization of the limitation of the Debtors' and their successors' and assigns' right to assert claims to surcharge against the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in the DIP Orders;

(x)    modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors, the DIP Secured Parties, the HoldCo DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the DIP Loan Documents, the Interim Order, and as later applicable, the Final Order;

(xi)    pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim

Hearing") on this Motion be held before this Court to consider entry of this Interim Order to

(a) authorize Variant to be deemed to have borrowed under Tranche A Loan under the DIP

Agreement (and the DIP Guarantors to have guaranteed such Tranche A Loan) upon the entry of

the Interim Order; (b) authorize the DIP Borrowers to be deemed to have borrowed under the

Tranche B1 Loan under the DIP Agreement upon the entry of the Interim Order; (c) authorize the

DIP Borrowers to borrow under the DIP Agreement, on an interim basis, the Initial Advance

under the Tranche B2 Loan in an amount up to $6,000,000, plus Permitted Cure Advances up to

an aggregate amount not to exceed $2,000,000, on or after the date of the entry of the Interim

Order and through the date of entry of the Final Order; (d) authorize the Debtors' use of Cash

Collateral; and (e) approve the assumption of the Settlement Agreement;

(xii)    the scheduling of the Final Hearing to be held on or before February 15,

2016 to consider entry of the Final Order granting the relief requested in this Motion on a final

basis, authorizing the borrowing of the balance of the DIP Loan on a final basis, and approving

the Debtors' notice procedures with respect thereto; and

(xiii)    waiver of any applicable stay (including Rule 6004 of the Bankruptcy

Rules) and the provision of immediate effectiveness of the Interim Order, and as later applicable,

the Final Order.

## Jurisdiction

2.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference from the United States District Court for the*

*District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the

meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule

9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent

that it is later determined that the Court, absent consent of the parties, cannot enter final orders or

judgments in connection herewith consistent with Article III of the United States Constitution.

      3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

      4.      The statutory predicates for the relief sought herein are sections 105, 361,

362, 363, 364, 365 and 507 of the Bankruptcy Code, Bankruptcy Rules 4001 and 6006, and

Local Rule 4001-2.

<p align="center">**Concise Statement of Relief Requested**</p>

      5.      In accordance with Bankruptcy Rules 4001(b), (c), and (d) and Local Rule

4001-(2), below is a summary of the principal terms of the proposed DIP Agreement and

DIP Orders:[6]

| | | |
|---|---|---|
| a. | Borrowers/ Guarantors: | Each of the Debtors, subject to the following: |
| | | Only Variant, as borrower, and Laser Focus Holding Company, LLC, Laser Focus Commercial Investments, LLC, Houston 14 Apartments, LLC, Houston 2 Apartments, LLC, Numeric Commercial Investments, LLC, FX3 Apartments Investors, LLC, Royal Numeric FX Investments, LLC, and 12500 Plaza Apartments, LLC, as guarantors, will be liable for the Tranche A Loan, which represents $3,321,601.50 of outstanding principal obligations previously advanced under the HoldCo DIP Agreement to fund administrative and overhead costs of Variant during its chapter 11 case. |
| | | Each of the Debtors, jointly and severally, will be liable for the Tranche B1 Loan, which represents the amount borrowed by Variant under the HoldCo DIP Agreement and subsequently distributed to the Property-Owning Debtors to fund their operating costs and preserve their assets pending the commencement of their chapter 11 cases. The total amount of these obligations is |

---

[6] The summary of the terms and conditions of the DIP Agreement and the DIP Orders set forth in this Motion are intended solely for informational purposes and are qualified in their entirety by the DIP Agreement and the DIP Orders. In the event there is any conflict between this Motion and the DIP Orders, the DIP Orders will control in all respects.

$19,075,507.95.

Each of the Debtors, jointly and severally, will be liable for the Tranche B2 Loan, which represents all of the new advances to be made under the DIP Agreement. Such new advances will not exceed $20,000,000 in principal amount, provided, however, that the Debtors are requesting authority to borrow up to an additional $2,000,000 (each, a "Permitted Cure Advance") under the DIP Agreement as a Tranche B2 Loan to cover any costs to cure defaults under the cash collateral stipulations with the Mortgage Lenders (the "Cash Collateral Orders").

| | | |
|---|---|---|
| b. | DIP Secured Parties: | BPC VHI, L.P., Beach Point Total Return Master Fund, L.P., and Beach Point Distressed Master Fund, L.P. The DIP Administrative Agent for the Beach Point Funds is Cortland Capital Market Services LLC. |
| c. | Advance Date: | There are certain conditions precedent for an Initial Advance under the DIP Agreement, including: (a) the Interim Order shall be entered; (b) the Settlement Agreement shall have been affirmed and assumed by the Debtors and approved by the Court pursuant to the Interim Order; (c) the Stalking Horse Purchase Agreement shall have been entered into; (d) an Initial Advance Request is made; (e) the representations and warranties are correct; (f) no Events of Default have occurred; (g) those Mortgage Lenders that have agreed to Cash Collateral Orders shall have entered into intercreditor agreements with the DIP Secured Parties; and (h) certain pleadings have not been filed with the Court. |
| | | There are certain conditions precedent for a Future Advance under the DIP Agreement, including: (a) the conditions for an Interim Advance are satisfied; (b) the Settlement Agreement shall have been affirmed and assumed by the Debtors and approved by the Court pursuant to the Interim Order; (c) the Final Order shall be entered; (d) a Future Advance Request is made; (e) the representations and warranties are correct; (f) no Events of Default have occurred; and (g) certain pleadings have not been filed with the Court. |
| | | *See* DIP Agreement at Sections 4.02, 4.03. |
| d. | Type and Amount of DIP Loan: | The DIP Loan consists of the following: the Tranche A Loan, which represents $3,321,601.50 of outstanding principal and interest obligations owing for |

advances under the existing HoldCo DIP Agreement used to fund administrative and operating costs of Variant, and unliquidated fees and expenses incurred thereon through the Subsidiary Petition Date;

the Tranche B1 Loan, which represents the portion of the proceeds of the loan made under the HoldCo DIP Agreement that have been loaned by Variant to the Property-Owning Debtors to fund their operating expenses and preserve their assets pending the commencement of their chapter 11 cases.  The principal and interest owing for these obligations is $19,075,507.95; and

the Tranche B2 Loan, which represents all of the new advances under the DIP Agreement.  Such new advances will not exceed $20,000,000 in principal amount, provided, however, that the Debtors are requesting authority to borrow up to an additional $2,000,000 under the DIP Agreement as a Tranche B2 Loan to cover Permitted Cure Advances.

Upon entry of the Interim Order, the DIP Borrowers seek authority to borrow under the DIP Agreement, on an interim basis, the Initial Advance under the Tranche B2 Loan in an amount up to $6,000,000, plus Permitted Cure Advances up to an aggregate amount not to exceed $2,000,000.  Further, under the Interim Order:  (i) Variant will be deemed to have borrowed the Tranche A Loan (and the DIP Guarantors to have guaranteed such Tranche A Loan); and (ii) the DIP Borrowers will be deemed to have borrowed the Tranche B1 Loan on an unsecured, non-priority basis.

|   |   |   |
|---|---|---|
| e. | Availability/ Purpose: | The proceeds of the DIP Loan will be used to pay the Debtors' expenses under an approved budget (the "Budget"), including for (i) payment of outstanding payables owing by the Property-Owning Debtors (as defined below), (ii) operating expenses relating to the Properties (as defined below), (iii) adequate protection payments for the Mortgage Lenders (as defined below) and payment of the DIP Secured Parties' fees and expenses, and (iv) capital expenditures to maintain and preserve the Properties in the ordinary course of business, in each case in accordance with, and limited by, those items set forth in the Budget. |

None of the proceeds of the proposed DIP Loan will be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other

litigation against the DIP Secured Parties (in any capacity), including in connection with the validity of the liens granted to the DIP Secured Parties.

*See* DIP Agreement at Section 3.01.

f.  <u>Priority</u>:

All obligations under the DIP Agreement (provided that the Tranche A Obligations shall not extend to the Property-Owning Debtors) shall be:

(i)  pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status, subject to the Carve-Out, the Senior Liens, and any Existing Non-Affiliate Mechanic's Liens;

(ii)  pursuant to sections 364(c)(2), secured by a perfected first priority lien on the DIP Collateral to the extent that the DIP Collateral is not subject to valid, perfected and non-avoidable liens as of the Subsidiary Petition Date (but in all cases subject to the Carve-Out, the Senior Liens, and any Existing Non-Affiliate Mechanic's Liens);

(iii)  pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected second priority lien on the Collateral, to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence as of the Subsidiary Petition Date or to valid liens in existence as of the Subsidiary Petition Date that are perfected subsequent to such date as permitted by section 546(b) of the Bankruptcy Code (but in all cases subject to the Carve-Out, the Senior Liens, and any Existing Non-Affiliate Mechanic's Liens); and

(iv)  pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first priority "priming" lien on the Collateral (but in all cases subject to the Carve-Out, the Senior Liens, and any Existing Non-Affiliate Mechanic's Liens) (items (ii), (iii), and (iv) above are together, the "<u>DIP Liens</u>"). *See* Interim Order at ¶¶ 3, 5, 6.

Notwithstanding the foregoing:  (i) the granting of allowed senior administrative expenses claims against the DIP Guarantors with respect to the Tranche A Obligations and against the Subsidiary Debtors with respect to the Tranche B1 Obligations is subject to entry of the Final Order, and (ii) the granting of liens of the same scope and priority as the Tranche B2 Liens to secure the Tranche B1 Obligations is subject to entry of the Final Order.  *See* Interim Order at ¶¶ 3(c) and 6(d).

The "Carve-Out" means the sum of (i) any fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930 of title 28 of the United States Code, and (ii) any Professional Fee Advances actually made by the Lenders, pursuant to the terms of the DIP Agreement and the Professional Fee Letter Agreement (as defined in the DIP Agreement).

*See* Interim Order at ¶ 4.

g. Superpriority Status:

As determined under the HoldCo Final Borrowing Order and reaffirmed under the Interim Order, all of the Tranche A Obligations shall constitute allowed senior administrative expense claims against Variant and the DIP Guarantors with priority over any and all other administrative expenses, adequate protection claims, diminution claims (including all Adequate Protection Obligations and all other claims against Variant and the DIP Guarantors), subject, as to priority only, to the Carve-Out, and which shall be payable from and have recourse to all pre- and post-petition property of Variant, the DIP Guarantors and their estates and all proceeds thereof, including, all Tranche A Avoidance Actions (as defined below) and Tranche A Avoidance Proceeds (as defined below).

Subject to the terms of any intercreditor agreements by and between the Mortgage Lenders and the DIP Lenders, all of the Tranche B Obligations shall constitute allowed senior administrative expense claims against the Debtors with priority over any and all other administrative expenses, adequate protection claims, diminution claims (including all Adequate Protection Obligations and all other claims against the Debtors), subject, as to priority only, to the Carve-Out and the super-priority claims of Mortgage Lenders under the Cash Collateral Orders, and which shall be payable from and have recourse to all pre- and post-

petition property of the Debtors and the Estates and all proceeds thereof, including, subject to entry of the Final Order, all Tranche B Avoidance Actions (as defined below) and Tranche B Avoidance Proceeds (as defined below).

*See* Interim Order at ¶ 3.

Notwithstanding the foregoing, the granting of allowed senior administrative expenses claims against the DIP Guarantors with respect to the Tranche A Obligations and against the Subsidiary Debtors with respect to the Tranche B1 Obligations is subject to entry of the Final Order. *See* Interim Order at ¶ 3(c).

| | | |
|---|---|---|
| h. | DIP Collateral: | The term "DIP Collateral" means: |

Tranche A Collateral (as determined under the HoldCo Final Borrowing Order and reaffirmed under the Interim Order): (a) all pre- and post-petition property of Variant and the DIP Guarantors, whether existing on the HoldCo Petition Date or thereafter acquired, that, on or as of the HoldCo Petition Date or the date acquired (if acquired after the HoldCo Petition Date) is not subject to valid, perfected and non-avoidable liens, if any (collectively, "Tranche A Unencumbered Property"), and any proceeds of all of the foregoing.  The Tranche A Unencumbered Property shall also include Variant's and the DIP Guarantors' avoidance actions under the Bankruptcy Code (the "Tranche A Avoidance Actions") and shall include any proceeds or property recovered, unencumbered or otherwise, that are the subject of successful Tranche A Avoidance Actions, whether by judgment, settlement or otherwise ("Tranche A Avoidance Proceeds"); (b) all pre- and post-petition property of Variant and the DIP Guarantors (including, without limitation, Cash Collateral), whether now existing or hereafter acquired.

*See* Interim Order at ¶ 5.

Tranche B Collateral: (a) all pre- and post-petition property of the Debtors, whether existing on the Subsidiary Petition Date or thereafter acquired, that, on or as of the Subsidiary Petition Date or the date acquired (if acquired after the Subsidiary Petition Date) is not subject to valid, perfected and non-avoidable liens, if any (collectively, "Tranche B Unencumbered Property"), and any proceeds of all of the foregoing.  Subject to entry of the Final Order, the Tranche B Unencumbered Property shall also include avoidance actions under the Bankruptcy Code (collectively, "Tranche

B Avoidance Actions", and together with the Tranche A Avoidance Actions, the "Avoidance Actions"), and shall include any proceeds or property recovered, unencumbered or otherwise, that are the subject of successful Tranche B Avoidance Actions, whether by judgment, settlement or otherwise ("Tranche B Avoidance Proceeds"); and (b) all pre- and post-petition property of the Debtors (including, without limitation, Cash Collateral), whether now existing or hereafter acquired, junior only to the Senior Liens and any Existing Non-Affiliate Mechanic's Liens.

*See* Interim Order at ¶ 6.

Notwithstanding the foregoing, the granting of liens of the same scope and priority as the Tranche B2 Liens to secure the Tranche B1 Obligations is subject to entry of the Final Order. *See* Interim Order at ¶ 6(d).

|   |   |   |
|---|---|---|
| i. | Agent Fees: | The DIP Administrative Agent will be paid certain Agent Fees under the Agent Fee Letter for its services as administrative agent under the DIP Loan Documents in an amount of $22,500 each year. |
| j. | Interest Rate: | The Tranche A Loan will bear interest on the unpaid principal amount thereof at a per annum rate equal to 14.2% simple interest calculated on the basis of a 360-day year for the actual days elapsed. |
|   |   | The Tranche B Loan will bear interest on the unpaid principal amount thereof at a per annum rate equal to 6% simple interest calculated on the basis of a 360-day year for the actual days elapsed. |
|   |   | All interest is payable on the first business day of each calendar month, and shall be paid-in-kind in arrears on each payment date by increasing the principal amount of the subject loan on such date by an amount equal to such accrued interest. |
|   |   | *See* DIP Agreement at Section 2.03(a). |
| k. | Maturity Date: | The DIP Loan will mature on the later of (i) October 31, 2016, or (ii) if the Court enters a report and recommendation in form and substance reasonably satisfactory to the Lenders by August 31, 2016 approving a winning bidder (or bidders) for the sale of substantially all of the assets of the Property-Owning Debtors, November 30, 2016; or, in case upon the earlier termination of the DIP Loan in accordance with the terms of the DIP Agreement. *See* DIP Agreement at Sections 1.01, 3.02. |

| l. | Representations and Warranties/ Covenants: | Customary for financings of this type. *See* DIP Agreement at Article 5. |
|---|---|---|
| m. | Conditions Precedent to Interim Lending: | The obligations of the DIP Lenders to make the interim financing available will be subject to satisfaction, or waiver by the DIP Lenders of the conditions precedent set forth in the DIP Agreement, which conditions include the Debtors' reaffirmation and assumption of the Settlement Agreement. *See* DIP Agreement at Section 4.02. |
| n. | Events of Default: | As specified in the DIP Agreement at Section 7.01. |
| o. | Remedies Upon Default: | Upon the occurrence and during the continuance of any Event of Default under the DIP Agreement, subject to the applicable cure period, the DIP Secured Parties may exercise their rights on default without further order of or application to the Bankruptcy Court, and may compel Variant's assignment of intercompany claims against the Subsidiary Debtors to the DIP Administrative Agent, notwithstanding the automatic stay; provided that the DIP Secured Parties will give the DIP Borrowers, counsel to the official committee of unsecured creditors and the United States Trustee 3 business days' prior written notice of an Event of Default and 7 business days' prior written notice of the exercise of certain remedies with respect to the DIP Collateral. *See* DIP Agreement at Section 7.01. |
| p. | Indemnification and Releases: | The DIP Agreement contains customary provisions releasing claims against the DIP Secured Parties and indemnifying and exculpating the DIP Secured Parties. *See* DIP Agreement at Sections 2.05, 2.06, 3.06, and 9.02. |
| q. | Lender Stipulations: | The Debtors in the Interim Order confirm the validity, perfection and amount of the Prepetition Secured Parties' liens and claims. *See* Interim Order at Recital D. |

## Disclosures

6.      Pursuant to Bankruptcy Rule 4001(d) and Local Rule 4001-2, a debtor in possession seeking authority to use cash collateral or to obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing.  The debtor in possession must also justify the inclusion

of such provisions. Set forth below are the disclosures required in accordance with such rules:

a. Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to prepetition secured creditors in connection with the debtor's cash collateral usage or additional financing. **The proposed DIP Orders cross-collateralize a portion of the prepetition debt under the HoldCo DIP Agreement totaling $19,075,507.95, which is equal to the principal and interest owing on account of the loan proceeds that were borrowed by Variant and then distributed to the Property-Owning Debtors to fund their operating expenses and preserve their properties in the period leading up to their chapter 11 cases, as the Tranche B1 Loan through the grant of blanket security interests in the assets of the Property-Owning Debtors. Interim Order at ¶ 6.**

b. Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001(c)(1)(B)(iii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters. **The validity, perfection, priority, and amount of the Prepetition Secured Parties' liens and claims were determined with the Debtors through the Settlement Agreement and established in the HoldCo Final Borrowing Order, which liens and claims are ratified through the proposed DIP Orders. Interim Order at Recital D.**

c. Local Rule 4001-2(a)(i)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code. **The proposed Interim Order, at ¶ 8, provides for a waiver of rights under section 506(c) of the Bankruptcy Code only upon entry of the Final Order.**

d. Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. **The proposed Interim Order, at ¶¶ 5 & 6, provides for a grant of liens and superpriority claims that extend to the Debtors' claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code upon entry of the Final Order.**

e.  Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code). **The Tranche B1 Loan in the principal amount of $19,075,507.95 consists of principal and interest outstanding under the HoldCo DIP Agreement for advances that were loaned by Variant to the Property-Owning Debtors on a prepetition basis. Under the DIP Agreement, these prepetition obligations of Variant become postpetition obligations of all Debtors because these advances were in fact used by the Property-Owning Debtors to fund their operating costs pending the commencement of their chapter 11 cases, thereby preserving their assets for the benefit of all Debtors and their creditors. Interim Order at ¶¶ 2, 6.**

f.  Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee Carve-Out. **Not applicable because there is no Carve-Out for going-forward estate professional fees under the DIP Orders.**

g.  Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienholder. **The proposed DIP Orders provide for the priming of the Prepetition Secured Parties, which are the same parties as the DIP Secured Parties. Such priming is consensual. The proposed DIP Orders also prime the Texas Constitutional Liens (as defined below). Interim Order at ¶ 6. The holders of such liens are not entitled to adequate protection for the reasons discussed further below.**

h.  Local Rule 4001-2(a)(i)(H) requires the disclosure of provisions that affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code. **The proposed Interim Order, at ¶ 7, provides for a waiver of the Debtors' rights under section 552 of the Bankruptcy Code as to the secured claims of the Existing Lenders.**

i.  Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case. **The proposed Interim Order, at ¶¶ 3 & 11, describes the superpriority claims and adequate protection liens provided to the Prepetition Secured Parties.**

j.      Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay. **The proposed Interim Order, at ¶ 7, describes the modification of the automatic stay in the event of the occurrence of an Event of Default and to the extent necessary to implement the Interim Order.**

k.     Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate. **The proposed Interim Order, at ¶ 14, includes provisions that provide for the automatic perfection and validity of the DIP Liens without the necessity of any further filing or recording under the laws of any jurisdiction.**

## Background

7.     On August 28, 2014 (the "HoldCo Petition Date"), Variant filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Variant's chapter 11 case is administered under Case No. 14-12021 (BLS).  Variant continues in the possession of its properties and is operating and managing its affairs as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in Variant's chapter 11 case.

8.     On January 12, 2016 (the "Subsidiary Petition Date"), each of the Debtors other than Variant (the "Subsidiary Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Subsidiary Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in the Subsidiary Debtors' chapter 11 cases, and no committees have been appointed or designated.

9.     Variant and its direct and indirect subsidiaries are a commercial real estate business with direct and indirect ownership interests in 23 real property interests in various states (the "Properties").  Variant is the ultimate parent of the organization.

10.    The property-owning subsidiaries of Variant that are Subsidiary Debtors are: (1) Broadmoor Apartments, LLC, Chesapeake Apartments, LLC, Holly Ridge Apartments, LLC, Holly Tree Apartments, LLC, Preston Valley Apartments, LLC, Ravenwood Hills Apartments, LLC, River Road Terrace Apartments, LLC, and Sandridge Apartments, LLC (collectively, the "FX3 Portfolio Debtors"); (2) 10400 Sandpiper Apartments, LLC, 10301 Vista Apartments, LLC, Pines of Westbury, Ltd., 201 Ashton Oaks Apartments, LLC, 13875 Cranbrook Forest Apartments, LLC, 5900 Crystal Springs Apartments, LLC, 7107 Las Palmas Apartments, LLC, 11911 Park Texas Apartments, LLC, 1201 Oaks of Brittany Apartments, LLC, 3504 Mesa Ridge Apartments, LLC, 667 Maxey Village Apartments, LLC, 17103 Pine Forest Apartments, LLC, 7600 Royal Oaks Apartments, LLC, and 4101 Pointe Apartments, LLC (collectively, the "H14 Portfolio Debtors"); and (3) The Oaks at Stonecrest Apartments, LLC ("Oaks at Stonecrest") (the FX3 Portfolio Debtors, the H14 Portfolio Debtors, and Oaks at Stonecrest are collectively referred to herein as the "Property-Owning Debtors").

## Prepetition Secured Indebtedness

11.    Variant, the Beach Point Funds, as the Prepetition Lenders, and Cortland, as the Prepetition Administrative Agent, are parties to that *Amended and Restated Loan Agreement* dated as of October 11, 2013 (the "Prepetition Loan Agreement", and together with all other documents, agreements, and instruments delivered to the Prepetition Secured Parties in connection with the Prepetition Loan Agreement, the "Prepetition Loan Documents"). Pursuant to the terms of the Prepetition Loan Agreement, predecessors to the Beach Point Funds loaned Variant $73,500,000.

12.    Variant's obligations under the Prepetition Loan Agreement were guaranteed by (i) Conix Commercial Investments, LLC, Conpartments, LLC, Numeric Commercial

Investments, LLC, and Conix Commercial, LLC pursuant to the *Mezzanine Guaranty of Payment* dated as of September 13, 2013, and (ii) Courtland Gettel, Kathryn Nighswander (formerly, Kathryn Gettel), Conix, Inc., Walker's Dream Trust, Gettel Children's Trust, Gettel Children's Trust 2, and Gettel Children's Trust 3 pursuant to the *Mezzanine Limited Guaranty of Payment* dated as of September 13, 2013 (together, the "Prepetition Guarantors").

13.    As of September 1, 2014, the amount owing to the Beach Point Funds under the Prepetition Loan Agreement was $78,038,714, including, without limitation, (A) $2,750,000 for attorney's fees and expenses of the Beach Point Funds, (B) $75,250,000 for unpaid principal, interests, and all other fees, expenses and costs, and (c) $38,714 for the Prepetition Administrative Agent's attorney's fees, expenses, and other fees (collectively, the "Prepetition Secured Obligations"). Any reasonable attorneys' fees and expenses of the Beach Point Funds or the Prepetition Administrative Agent, and any fee owed or owing to the Prepetition Administrative Agent that are the obligation of Variant under the Prepetition Loan Documents, and that are incurred or accrue after September 1, 2014, are added to the Prepetition Secured Obligations as they are incurred or accrue.

14.    Variant's obligations under the Prepetition Loan Agreement were secured by substantially all assets of Variant and certain assets of the Prepetition Guarantors (the "Prepetition Liens"), which include the following property (collectively, the "Prepetition Collateral"):

   i.        Substantially all of Variant's real and personal property, including but not limited to all accounts, general intangibles, including without limitation, payment intangibles, and investment property related to the Properties (*see* Prepetition Loan Agreement, Section

3.01);

        ii.        Among other things, all of rights, title, and interests of Laser Focus

Holding Company, LLC ("Laser Holding") in and to Laser Holding's membership interests in

Laser Focus Commercial Investments, LLC (*see* the Pledge and Security Agreement dated as of

September 13, 2013 by and between Laser Holding and the Prepetition Administrative Agent);

        iii.        Among other things, all of the rights, title, and interests of Variant, Conix,

Inc., and Courtland Gettel (the "Laser Holding Pledgors")[7] in and to the Laser Holding Pledgors'

membership interests in Laser Holding (*see* the Pledge and Security Agreement dated as of

September 13, 2013 by and between Variant, the Laser Holding Pledgors and the Prepetition

Administrative Agent); and

        iv.        Among other things, all rights, title, and interests of Numeric Commercial

Investments, LLC ("Numeric Commercial") in and to Numeric Commercial's membership

interests in Tucson Mall Suites, LLC and Spencer Highway Self Storage, LLC (*see* the Pledge

and Security Agreement dated as of March 17, 2014 by and between Numeric Commercial and

the Prepetition Administrative Agent).

### The Beach Point Settlement Agreement

15.        Shortly after the HoldCo Petition Date, Variant, the Subsidiary Debtors, the

Beach Point Funds and certain other parties entered into a Settlement Agreement dated as of

October 17, 2014 (the "Settlement Agreement"). On November 3, 2014, the Court entered the

*Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019*

*Approving Settlement Agreement with the Beach Point Funds* [Docket No. 152] (the "Settlement

---

[7] The Debtors' professionals recently uncovered a previously unknown assignment of the membership interests in Laser Holding to Variant. The validity of these assignments has not been finally determined, but is assumed by the Debtors.

Order") approving the Settlement Agreement. A copy of the Settlement Order (with the Settlement Agreement as Exhibit 1 thereto) is attached to this Motion as **Exhibit 3**.

16.     Among other things, the Settlement Agreement (a) resolved certain claims among the parties, (b) affirmed that the Prepetition Secured Obligations constitute the legal, valid, and binding obligations of Variant and the Prepetition Guarantors, (c) required certain of the parties to enter into that certain *Guaranty of Adequate Protection Obligations* dated as of October 31, 2014 (the "Adequate Protection Guaranty"), by and among Laser Holding, Laser Focus Commercial Investments, LLC, Houston 14 Apartments, LLC, Houston 2 Apartments, LLC, and Royal Numeric FX Investments, LLC (the "Adequate Protection Guarantors"), and the Prepetition Secured Parties, and (d) committed the Beach Point Funds to provide debtor-in-possession financing to Variant pursuant to the terms of the HoldCo DIP Agreement. The transactions contemplated by the Settlement Agreement were consummated promptly after entry of the Settlement Order.

17.     The Settlement Agreement is executory in nature, particularly the waterfall provisions in section 5 thereof. Section 5 provides for a "Subsidiary Transaction Protocol" that includes a waterfall for the distribution of proceeds from a sale of the Subsidiary Debtors' assets.[8] Both the Debtors, on the one hand, and the Beach Point Funds, on the other hand, have agreed to abide by the provisions of the waterfall, and as a result, both groups have material obligations outstanding under the Settlement Agreement, rendering it executory. Further, as explained below, the Settlement Agreement includes releases that will only be triggered upon payment in full of the Prepetition Secured Obligations (section 11(c)), further demonstrating the executory nature of the Settlement Agreement.

---

[8] Notwithstanding the waterfall, any actual payment of prepetition claims against these estates would be subject to further order of this Court.

18.     All of the Debtors continue to benefit from the Settlement Agreement and its assumption.  The Settlement Agreement resolves further disputes and potentially costly, protracted litigation among the parties, including the Subsidiary Debtors, by the establishment of the waterfall mechanism for the distribution of sale proceeds.  Moreover, the Settlement Agreement provides for certain valuable future releases in favor of the Subsidiary Debtors in the event that the Prepetition Secured Obligations are repaid in full (section 11(c)).  Further, the Subsidiary Debtors' assumption of the Settlement Agreement is a condition to funding under the DIP Agreement and the consent of the Prepetition Secured Parties and HoldCo DIP Secured Parties to use of their cash collateral; absent assumption the Subsidiary Debtors would not have access to the funds necessary to administer their chapter 11 cases for the benefit of their creditors.

19.     There are no cure amounts payable under the Settlement Agreement.  Although the Prepetition Lenders were entitled to full payment of the Prepetition Secured Obligations by Variant on or before November 1, 2015, the Beach Point Funds have agreed to defer this date subject to the terms of that *Letter Agreement Regarding Forbearance Under Settlement Agreement*, dated as of January 14, 2016 (the "Beach Point Forbearance Agreement").  Under the Beach Point Forbearance Agreement, the Beach Point Funds and Cortland have agreed to forbear on their rights under the Settlement Agreement, including their right to foreclose on all of Variant's assets and interests in the Subsidiary Debtors, dependent on certain contingences provided therein.  A copy of the Beach Point Forbearance Agreement is attached to this Motion as **Exhibit 4**.

## Postpetition Secured Indebtedness Approved by the Court

20.    On November 17, 2014, this Court entered the HoldCo Final Borrowing

Order. The HoldCo Final Borrowing Order approved Variant's debtor-in-possession financing

facility under the terms of the HoldCo DIP Agreement, with the Beach Point Funds making a

loan in the amount of $10,000,000, which loan amount was later increased pursuant to separate

amendments to the HoldCo DIP Agreement and orders of this Court (the "HoldCo DIP Loan").

The HoldCo DIP Guarantors guaranteed the obligations under the HoldCo DIP Agreement.

21.    The HoldCo DIP Agreement was later amended with the approval of the Court as

follows:

     a.      by that First Amendment to Debtor-in-Possession Loan, Security and Guaranty Agreement dated as of March 5, 2015, approved by the Court on an interim basis by entry of an order dated March 11, 2015, and on a final basis by entry of an order dated March 31, 2015, pursuant to which the amount of the loan available under the HoldCo DIP Agreement increased to $10,750,000;

     b.      by that Second Amendment to Debtor-in-Possession Loan, Security and Guaranty Agreement dated as of May 29, 2015 (the "Second Amendment"), approved by the Court on an interim basis by entry of an order dated June 5, 2015, and on a final basis by entry of an order dated June 23, 2015, pursuant to which the amount of the loan available under the HoldCo DIP Agreement increased to $11,774,038.92;

     c.      by that Third Amendment to Debtor-in-Possession Loan, Security and Guaranty Agreement dated as of June 29, 2015, which increased the amount of the loan available under the HoldCo DIP Agreement to $13,874.038.92, as contemplated by the Court's order approving the Second Amendment;

     d.      by that Fourth Amendment to Debtor-in-Possession Loan, Security and Guaranty Agreement dated as of August 28, 2015 (the "Fourth Amendment"), approved by the Court on an interim basis by entry of an order dated September 4, 2015, and on a final basis by entry of an order dated September 24, 2015, pursuant to which the amount of the loan available under the HoldCo DIP Agreement increased to $20,574,038.92;

e.      by that Fifth Amendment to Debtor-in-Possession Loan, Security and Guaranty Agreement dated as of October 12, 2015, which increased the amount of the loan available under the HoldCo DIP Agreement to $22,089,322.81, as contemplated by the Court's order approving the Fourth Amendment;

f.      by that Sixth Amendment to Debtor-in-Possession Loan, Security and Guaranty Agreement dated as of November 5, 2015, which increased the amount of the loan available under the HoldCo DIP Agreement to $24,574,038.92, as contemplated by the Court's order approving the Fourth Amendment;

g.      by that Seventh Amendment to Debtor-in-Possession Loan, Security and Guaranty Agreement dated as of December 18, 2015, which extended the maturity date under the HoldCo DIP Agreement to December 21, 2015.

22.      As of the Subsidiary Petition Date, the outstanding principal amount due and owing by Variant and the HoldCo DIP Guarantors under the HoldCo DIP Agreement is $22,397,109.45.

23.      A portion of the advances under the HoldCo DIP Loan -- $3,321,601.50 (with principal and interest as of the Subsidiary Petition Date) -- was retained by Variant to fund its own overhead and the administrative expenses of its chapter 11 case. The remaining majority of the proceeds of the HoldCo DIP Loan borrowed by Variant -- $19,075,507.95 (with principal and interest as of the Subsidiary Petition Date) -- were loaned to the Property-Owning Debtors in order to fund their operating expenses and preserve the Properties pending a sale, which, as discussed further below, is the goal of their present chapter 11 cases. The intercompany claims of Variant against the Property-Owning Debtors resulting from the HoldCo DIP Loan proceeds are part of the collateral for the HoldCo DIP Loan that the HoldCo DIP Secured Parties would be entitled to collect.

### Capital Structure of the Subsidiary Debtors

24.     The FX3 Portfolio Debtors own eight apartment projects in Texas, Maryland,

Virginia, and South Carolina (together, the "FX3 Properties"). The FX3 Properties consist of

approximately 1,850 housing units. The Lynd Company ("Lynd") is the current property

manager for the FX3 Properties. The FX3 Properties are subject to the mortgage loan of Wells

Fargo Bank, N.A., as trustee for the registered holders of Credit Suisse First Boston Mortgage

Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2006-C4 (the "FX3

Noteholder") and C-III Asset Management LLC, in its capacity as special servicer (in such

capacity, the "Special Servicer") for the FX3 Noteholder. As of the Subsidiary Petition Date, the

amount of the debt owed to the FX3 Noteholder by the FX3 Portfolio Debtors is approximately

$51,684,385, plus fees and interest.

25.     The H14 Portfolio Debtors own fourteen apartment projects in Texas (together,

the "H14 Properties"). The H14 Properties consist of approximately 5,050 housing units. Lynd

is the current property manager for the H14 Properties. The H14 Properties are subject to the

mortgage loan of Centennial Bank (the "H14 Lender"). As of the Subsidiary Petition Date, the

amount of the debt owed to the H14 Lender by the H14 Portfolio Debtors is approximately

$55,271,546, plus fees and interest.

26.     Oaks at Stonecrest owns a single apartment project in Lithonia, Georgia (the

"Oaks Property"). The Oaks Property consists of approximately 280 housing units. Lynd is the

current property manager for the Oaks Property. The Oaks Property is subject to the mortgage

loan of Arbor Realty SR, Inc. (the "Oaks Lender" and together with the FX3 Noteholders and the

H14 Lender, the "Mortgage Lenders"). As of the Subsidiary Petition Date, the amount of the

debt owed to the Oaks Lender by Oaks at Stonecrest is $5,000,000, plus fees and interest.

27.     Aside from intercompany claims, unsecured debt at the Property-Owning Debtors is generally limited to ordinary course operating expenses associated with the Properties. However, as noted above, Variant also has intercompany claims against the Property-Owning Debtors for funds advanced to cover property-level expenses, including funds advanced from the proceeds of the HoldCo DIP Loan.  The intermediate holding company Debtors between Variant and the Property-Owning Debtors in the capital structure do not have significant liabilities, aside from certain guaranty obligations, including those under the Prepetition Loan Documents and the HoldCo DIP Agreement.

28.     In addition, putative liens have been filed against certain of the Properties by Conix, Inc. and Forward Progress Enterprises, LLC (the "Texas Constitutional Liens").  As found by this Court in Variant's chapter 11 case on June 1, 2015 pursuant to that *Order Denying Motion for Payment of Property Level Claims From Proceeds of Sale of Property of Non-Debtor Entities*, Conix, Inc. and Forward Progress Enterprises, LLC are precluded under the Settlement Agreement from being paid from any proceeds generated from a sale of the Properties until the Prepetition Secured Obligations, which are subordinated to the obligations under the DIP Agreement and HoldCo DIP Agreement, are paid in full.  There is also a bona fide dispute as to the validity of the Texas Constitutional Liens as they purport to assert mechanic's liens for which Conix, Inc. and Forward Progress Enterprises, LLC have no basis to assert.[9]

**Filing of Subsidiary Debtors' Cases**

29.     The Subsidiary Debtors filed their chapter 11 cases in order to effectuate a sale or restructuring of their assets that will maximize the value of their estates.  The Subsidiary Debtors endeavored to pursue such sales out-of-court.  However, the Subsidiary Debtors were unable to

---

[9] The Debtors' dispute regarding the Texas Constitutional Liens is set forth in the *Plaintiffs' Supplemental Reply in Support of Motion for Preliminary Injunction*, filed in *Variant Holding Company, LLC v. Gettel (In re Variant Holding Company, LLC)*, in Adversary No. 15-50931 (BLS) at Adv. Dkt. No. 95, at paragraphs 22 through 27.

obtain title insurance with respect to such sale, primarily due to an appeal filed by certain direct and indirect equity holders of Variant with respect to the Court's order prior authorizing such sale. The commencement of these chapter 11 cases by the Subsidiary Debtors was necessary to permit them to obtain title insurance, thereby facilitating an orderly sale of the Properties.

30.    In furtherance of that goal, the Property-Owning Debtors are finalizing documentation with respect to a stalking horse purchase agreement (the "Stalking Horse Purchase Agreement"), pursuant to which the Beach Point Funds or one or more affiliates will acquire the Properties for $190,000,000, subject to overbids. Under the Stalking Horse Purchase Agreement, if the Beach Point Funds acquire the Properties, they shall, up to an aggregate amount of $190,000,000, (i) assume or satisfy all claims allowed against the DIP Borrowers that are not prohibited from being paid prior to satisfaction of the Prepetition Secured Obligations, and (ii) waive distributions on account of their claims under the DIP Agreement and the Prepetition Secured Obligations. The total mortgage debt on the Properties is approximately $112 million. Hence, there is a substantial equity cushion in the assets of the Property-Owning Debtors. The Debtors believe that an orderly sale and plan confirmation process will preserve and maximize such value for the benefit of all constituents in these cases.

31.    Concurrently herewith, the Debtors filed motions seeking entry of Cash Collateral Orders authorizing the DIP Borrowers to, as applicable, (i) use certain cash collateral of the Mortgage Lenders and (ii) grant adequate protection and provide security and related relief in connection therewith.

**Need for DIP Financing and Continued Use of Cash Collateral**

32.    The Debtors have an urgent and immediate need to obtain postpetition financing in order to continue funding (a) Variant's overhead expenses, excluding chapter 11 professional

28

fees, (b) critical property-related expenses for the Property-Owning Debtors, and (c) adequate protection payments in the form of budgeted interest payments and expense reimbursements to the DIP Lenders and the Mortgage Lenders. Notably, the Debtors are not seeking to borrow any funds under the DIP Agreement for payment of estate chapter 11 professionals. The Debtors' principal bankruptcy professionals will be paid pursuant to the terms of the Professional Fee Letter approved by the Court in connection with the HoldCo DIP Agreement.

33.     As reflected in the Budget, the bulk of the new money under the DIP Agreement is allocated to the Property-Owning Debtors, which own 23 apartment complexes in various states.[10] The Properties are the Debtors' principal assets and the value thereof forms the basis for generating recoveries by the creditors of these estates.

34.     The Properties require immediate funding in order to ensure that the Property-Owning Debtors have sufficient capital to fund necessary repairs, maintenance, and other services in a timely manner. Such expenditures are necessary to preserve tenant health and safety. Further, without the postpetition financing and the use of cash collateral that will be provided under the DIP Agreement and the proposed DIP Orders, revenues from the Properties would be disrupted and the Property-Owning Debtors would lose value, which would severely prejudice recoveries to the estates.

35.     Specifically, the Property-Owning Debtors have various commitments to contractors and vendors who are performing basic functions such as air conditioning and building maintenance and repair that must be paid in order to meet health and safety requirements for the Properties. If the Properties cannot be maintained, they cannot be leased to renters and the flow of revenues at subsidiary levels will be interrupted. Under the DIP

---

[10] On March 11, 2015, Variant obtained court-approval to sell its Las Vegas assets owned by three of the Subsidiary Debtors (non-debtors at the time) to LRP Property Company, LLC, for $40 million. *See* Docket No. 279. That sale closed on March 26, 2015.

Agreement, the Debtors will have access to sufficient financing to satisfy their adequate

protection obligations to the Mortgage Lenders.

36.    The Debtors have sought and were unable to obtain financing from other sources

on terms preferable to the proposed DIP Loan.  Hence, the Debtors have determined, in the

exercise of their sound business judgment, that obtaining financing under the terms of the DIP

Agreement is in the bests interests of the Debtors and their estates and hereby request authority

to obtain such financing in compliance with the proposed DIP Orders.

**Basis for Relief**

**I.    DIP Financing**

**A.    The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Sections 364(c) and (d) of the Bankruptcy Code.**

37.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a

hearing, that the debtor seeking postpetition financing on a secured basis cannot "obtain

unsecured credit allowable under section, 503(b)(l) of [the Bankruptcy Code] as an

administrative expense." 11 U.S.C. § 364(c).

38.    In addition, section 364(d)(1) of the Bankruptcy Code, which governs the

incurrence of postpetition debt secured by "priming" liens, provides that the Court, after notice

and a hearing, may:

> authorize the obtaining of credit or the incurring of debt secured by
> a senior or equal lien on property of the estate that is subject to a
> lien only if --
>
> (A)    the [debtor] is unable to obtain credit otherwise; and
>
> (B)    there is adequate protection of the interest of the
> holder of the lien on the property of the estate on which
> such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(l).

39.    In evaluating proposed postpetition financing under section 364(c) and (d) of the

Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors,

including whether:

    a.    unencumbered credit or alternative financing without superpriority
          status is available to the debtor;

    b.    the credit transactions are necessary to preserve assets of the estate;

    c.    the terms of the credit agreement are fair, reasonable, and adequate;

    d.    the proposed financing agreement was negotiated in good faith and at
          arm's-length and entry thereto is an exercise of sound and reasonable
          business judgment and in the best interest of the debtors' estate and its
          creditors; and

    e.    the proposed financing agreement adequately protects prepetition
          secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors

in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr.

E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003)

(applying all factors in making a determination under section 364(d)).

40.    For the reasons discussed below, the Debtors satisfy the standards required to

obtain postpetition financing on a secured superpriority and priming lien basis under sections

364(c)(1), (2) and (3) and (d)(1) of the Bankruptcy Code.

**B.    The Debtors Are Unable to Obtain Financing on More Favorable Terms.**

41.    In demonstrating that credit was not available without the protections afforded by

section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort.

*See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving

financing facility and holding that debtor made reasonable efforts to satisfy the standards of

section 364(c) to obtain less onerous terms where debtor approached four lending institutions,

was rejected by two and selected the least onerous financing option from the remaining two

lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."). Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

42.     The economic terms of the DIP Loan are quite favorable to the Debtors—particularly given the relative priority of the DIP Liens. The proposed financing is at an interest rate of 6% per annum and contains no commitment or line fees of any kind. In fact, under the DIP Loan, interest on the sum of $19,075,507.95 owing with respect to the Tranche B1 Loan is reduced from 14.2% to 6%. In addition, the DIP Lenders are proposing to take a subordinate position to the liens and claims of the Mortgage Lenders and existing, non-subordinated mechanics' lien claimants of the Property-Owning Debtors. The Debtors considered whether alternative financing would be available from the Mortgage Lenders themselves and made inquiries of the Mortgage Lenders, but the Beach Point Funds made an effort to beat any alternative proposal with terms that were highly beneficial to the estates, as reflected in the DIP Agreement. Further, in agreeing to forbear on their remedies available under the Settlement Agreement, which forbearance is conditioned upon the Court's final approval of the DIP Agreement and transactions contemplated therein, the Beach Point Funds have provided unique

consideration that could not be provided by alternative lenders or financiers. It is the Debtors'

informed judgment that any further efforts to obtain even better terms would be fruitless.

43.    The Debtors respectfully submit that their efforts to obtain postpetition financing

satisfy the standard required under sections 364(c) and 364(d) of the Bankruptcy Code. *See, e.g.,*

*In re Simasko Production Co.*, 47 B.R. 444, 448–49 (D. Colo. 1985) (authorizing interim

financing stipulation where debtor's best business judgment indicated financing was necessary

and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y.

1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their

basic business judgment consistent with their fiduciary duties").

**C.    The Proposed Financing is Necessary to Preserve the Assets of the Debtors' Estates.**

44.    As debtors in possession, the Debtors have a fiduciary duty to protect and

maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325,

339 (3d Cir. 2004). The Debtors require postpetition financing and the use of cash collateral

under the terms of the DIP Agreement to maximize the value of the Property-Owning Debtors'

assets to benefit the estates. Specifically, the Debtors need the proposed financing in order to

maintain the Properties, which constitute the principal assets of the estates, as well as paying

Variant's ordinary course overhead expenses incurred in managing the enterprise. Cash is

necessary to fund maintenance and capital expenditures of the Property-Owning Debtors in order

to meet the basic needs of the Properties, particularly during an anticipated sale process. The

Debtors do not have sufficient sources of working capital, financing or cash collateral to carry on

the operation of their business or to maintain the Properties without the proposed DIP Loan. The

proposed funding thus is essential to the Debtors' ability to reorganize around the value to be

realized from the Property-Owning Debtors' assets or otherwise maximize value for their

creditors.

45.    The alternative in this case is "to force the [Property-Owning Debtors] to close

down their operations and thus doom any effort at reorganization which will hopefully extract

the maximum value of the assets involved to the benefit of *all* classes of creditors and other

constituencies involved in this case." *In re Dynaco Corp.,* 162 B.R. 389, 396 (Bankr. D.N.H.

1993).  Because this result would be at fundamental odds to the rehabilitative purposes of chapter

11, approval of this Motion is warranted.  *Id.* at 394 (noting that "it is apparent that the Congress

intended business under reorganization to proceed in as normal a fashion as possible") (*quoting*

*In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981)).

**D.    The Terms of the Proposed Financing are Fair and Reasonable.**

46.    In considering whether the terms of postpetition financing are fair and reasonable,

courts consider the terms in light of the relative circumstances of both the debtor and the

potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see*

*also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re*

*Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter

into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should

also be considered in light of current market conditions.  *See Transcript of Record*  at 740:4-6, *In*

*re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr S D N Y. Feb. 27, 2009) ("[B]y reason of

present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions

[of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

47.    The terms of the DIP Agreement and the proposed DIP Orders were negotiated in

good faith and at arm's-length between the Debtors and the DIP Lenders, resulting in an

agreement designed to permit the Debtors to maximize the value of the Property-Owning

Debtors' assets through an orderly sale process.  Further, the DIP Lenders are not requiring any

regular principal or interest payments on the DIP Loan, which if fully drawn will have an

outstanding principal amount of over $42,000,000, but are conditioning payment of their

principal and interest upon the completion of sales of the Properties, which event will benefit all

beneficiaries of the Debtors' estates.  The proposed terms are fair, reasonable and appropriate

under the circumstances, and should be approved.  *See, e.g.*, *Bray v. Shenandoah Fed. Sav. and

Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section

364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender,

particularly when "time is of the essence to preserve a vulnerable seasonal enterprise"); *In re

Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition

financing to preserve value of aircraft leaseholds where to hold otherwise would result in the

elimination of their value and the "immediate collapse of the Debtor as a going concern").

**E.    Priming Liens as to the Prepetition Secured Obligations and the Texas
        Constitutional Liens are Appropriate.**

48.    Priming of the Prepetition Secured Obligations and the Texas Constitutional

Liens is appropriate.  To the extent a secured creditor's interests in the collateral constitute valid

and perfected security interests and liens as of the Subsidiary Petition Date, section 364(d)(1)(B)

of the Bankruptcy Code requires that adequate protection be provided where the liens of such

secured creditor are being primed to secure the obligations under a debtor in possession

financing facility.  The focus of the requirement is to protect a secured creditor from the

diminution in the value of its interest in the particular collateral during the period of use.  *See  In

re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of

adequate protection for a creditor is to insure that the creditor receives the value for which he

bargained prebankruptcy.") (internal citations omitted).  When priming of liens is sought under

section 364(d), the courts also examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens. *See In re Utah 7000, LLC*, No. 08-21869, 2008 WL 2654919, at *3 (Bankr. D. Utah July 3, 2008); *In re Beker Indus. Corp.*, 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986).

49.    First, as to the Prepetition Secured Obligations, the Prepetition Lenders consent to the priming proposed under the DIP Agreement.

50.    Second, the Texas Constitutional Liens are not entitled to adequate protection. As held by this Court in Variant's chapter 11 case on June 1, 2015 pursuant to that *Order Denying Motion for Payment of Property Level Claims From Proceeds of Sale of Property of Non-Debtor Entities*, Conix, Inc. and Forward Progress Enterprises, LLC are precluded under the Settlement Agreement from being paid from any proceeds generated from a sale of the Properties until the Prepetition Secured Obligations, which are subordinated to the obligations under the DIP Agreement, are paid in full. *See In re Levitt & Sons, LLC*, 384 B.R. 630, 642 (Bankr. S.D. Fla. 2008) ("junior lien holders are not entitled to adequate protection because they would receive nothing under non-bankruptcy law"); *see also In re Credit Indus. Corp.*, 366 F.2d 402, 410 (2d Cir. 1966) (junior creditors should be prevented from receiving funds where they have "explicitly agreed not to accept them").

51.    And even assuming *arguendo* that the Texas Constitutional Liens were entitled to adequate protection, they are more than covered by a substantial equity cushion approaching $78,000,000 at the Property-Owning Debtors (*i.e.*, $190,000,000 stalking horse purchase price minus approximately $112,000,000 in mortgage loan obligations). It is black letter law that a sufficient equity cushion in excess of 20% constitutes adequate protection of a secured lender. *See, e.g., Jay Vending Inc. v. McGowan (In re McGowan)*, 6 B.R. 241, 243 (Bankr. E.D.

Pa. 1980) (10% cushion is sufficient to be adequate protection); *Heritage Sav. & Loan Ass'n v. Rogers Dev. Corp. (In re Rogers Dev. Corp.)*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (approximately 15% to 20% was sufficient adequate protection to the creditor); *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir. 1984) (equity cushion of 20% is clear adequate protection of a secured creditor's interest in cash collateral, at least for some period of time). The Debtors are finalizing documentation with respect to the Stalking Horse Purchase Agreement, pursuant to which the Beach Point Funds, or an affiliate thereof, will acquire the Properties for $190,000,000, subject to overbids. The current mortgage debt at the Property-Owning Debtors is approximately $112,000,000. This difference of approximately $78,000,000 between the price a willing buyer would acquire the Properties and the mortgage debt creates a significant equity cushion for the Texas Constitutional Lien claimants.

52.     Moreover, there is a bona fide dispute as to the validity of the Texas Constitutional Liens. The Texas Constitutional Liens are not validly existing liens and, as a result, the purported lienholders do not actually have any interest in the DIP Collateral that would be subject to diminution in value. The Texas Constitutional Liens, therefore, are not entitled to any adequate protection in connection with the priming of such liens pursuant to the terms hereof.

53.     For the foregoing reasons, the proposed priming liens under the DIP Agreement as to the Prepetition Secured Obligations and the Texas Constitutional Liens are appropriate and should be approved as part of the DIP Loan Documents.

**F.      Cross-Collateralization of a Portion of the Holdco DIP Loan is Appropriate.**

54.     The Tranche B1 Loan under the DIP Agreement represents the portion of the loan under the HoldCo DIP Agreement that was borrowed by Variant and loaned downstream to its

subsidiaries—specifically the Property-Owning Debtors—in order to provide them with funds to pay their operating expenses and preserve the Properties in the period leading up to the commencement of their chapter 11 cases.  While the Property-Owning Debtors were not directly obligated and did not directly pledge their assets as collateral under the HoldCo DIP Agreement (because of restrictions in the Mortgage Lenders' loan documents), they will become directly obligated under the DIP Agreement and their assets will become DIP Collateral.

55.    Bankruptcy courts approve of cross-collateralized loans where (1) absent the proposed financing, the debtors' business operations will not survive; (2) the debtors are unable to obtain alternative financing on acceptable terms; (3) the proposed lender will not accede to less preferential terms; and (4) the proposed financing is in the best interests of the general creditor body. *In re Vanguard Diversified, Inc.*, 31 B.R. 364 (Bankr. E.D.N.Y. 1983).  The cross-collateralization of a portion of the obligations under the HoldCo DIP Agreement is justified in these cases on all of these grounds.

56.    The effectiveness of the DIP Agreement is expressly conditioned on the cross-collateralization—the DIP Lenders will not advance any new money to the Debtors without this provision. The Debtors would not have been able to secure the debtor-in-possession financing needed to stabilize their business without such condition, and as noted above, no other outside lender was willing to provide a debtor-in-possession financing arrangement that would be more favorable to the Debtors.  Importantly, this accommodation ultimately inures to the benefit of all of the Debtors' stakeholders because it gives the Debtors the liquidity they need to proceed under chapter 11 with a clear trajectory rather than under a free-fall scenario.  The Debtors will use the proceeds of the DIP Facility to continue to maintain the value of their Properties while they continue expeditiously towards the consummation of an organized sale process.

57.     These cases present several additional unique facts that weigh in favor of

approving the cross-collateralization.  First, the loan that is proposed to be cross-collateralized

was, in fact, used for the benefit of the Property-Owning Debtors and its creditors in the period

after the HoldCo Petition Date and leading up to the filing of the Property-Owning Debtors'

chapter 11 cases.  Second, the intercompany claims generated by the loaning of those funds to

the Property-Owning Debtors constituted accounts that were part of the HoldCo DIP Secured

Parties' collateral.  Under the HoldCo DIP Loan Documents, the HoldCo DIP Secured Parties

were granted the right (in certain circumstances) to proceed directly against the Property-Owning

Debtors to collect such intercompany claims.  As a result, the creditors of the Property-Owning

Debtors are not materially prejudiced by the cross-collateralization.  To the contrary, the added

liquidity benefits those creditors by preserving the value of the estates.

58.     Cross-collateralization and the securing or satisfaction of prepetition debt

with postpetition obligations and DIP liens is a common feature in debtor-in-possession

financings, and courts have approved such relief in a variety of cases, and in certain cases courts

have permitted cross-collateralization of prepetition debt on the first day of the case.  *See, e.g., In

re Orchard Supply Hardware Stores Corp.*, Case No. 13-11565 (Bankr. D. Del. Jul. 19, 2013)

(approving the debtors' granting of liens on significant unencumbered assets to secure roll up of

$188 million in prepetition debt under proposed DIP financing); *In re Source Interlink Cos. Inc.*,

Case No. 09-11424 (Bankr. D. Del. Apr. 29, 2009) (authorizing approximately $139 million DIP

that included roll-up of approximately $110 million prepetition debt pursuant to interim order

granted on first day of case); *In re Dayton Superior Corp.*, Case No. 09-11351 (Bankr. D. Del.

Apr. 19, 2009) (authorizing approximately $165 million DIP that included full roll-up of

approximately $102 million prepetition debt pursuant to interim order granted on first day of

case); *In re Pacific Energy Resources, Ltd.*, Case No. 09-10785 (Bankr. D. Del. Mar. 10, 2009)

(authorizing approximately $183 million DIP that included full roll-up of approximately $143

million prepetition debt pursuant to interim order granted on first day of case); *In re Foamex Int'l

Inc.*, Case No. 09-10560 (Bankr. D. Del. Feb. 20, 2009) (authorizing approximately $95 million

DIP that included full roll-up of approximately $39 million prepetition debt pursuant to interim

order granted on first day of case); *In re Hilex Poly Co. LLC*, Case No. 08-10890 (Bankr. D. Del.

May 7, 2008) (authorizing approximately $140 million DIP that included full roll-up of

approximately $51 million prepetition debt pursuant to interim order granted on first day of

case); *In re Holley Performance Products Inc.*, Case No. 08-10256 (Bankr. D. Del. Feb. 12,

2008) (authorizing approximately $60 million DIP that included full roll-up of approximately

$30 million prepetition debt pursuant to interim order granted on first day of case).  Moreover, in

this case, as consideration for the cross-collateralization of the DIP Loan, the over $17 million of

funds under the Tranche B1 Loan that was originally loaned under the HoldCo DIP Agreement

will accrue interest at 6%, rather than 14.2% under the HoldCo DIP Agreement.

**G.      Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.**

59.     A debtor's decision to enter into a postpetition lending facility under section 364

of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *Trans World

Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr.

D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and

prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y.

1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's

business judgment).

60.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

61.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.,* 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

62.     Here, for the reasons set forth above, the Debtors' sound business judgment clearly supports entry into the DIP Agreement in order to gain access to needed funding for the Property-Owning Debtors and thereby maximize value for all constituents.

**H.**  **Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral.**

63.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (A) each entity that has an interest in such cash collateral provides consent, or (B) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

64.    Here, aside from the Mortgage Lenders whose interests are addressed by separate motion, the only parties with an interest in the Debtors' cash collateral are the Prepetition Secured Parties, and their interests are adequately protected under Section 363(c)(2)(B) for the following reasons.  First, the Prepetition Secured Parties consent to the Debtors' use of cash collateral on the terms of the proposed DIP Orders.  Second, the Debtors intend to maximize value by maintaining the Properties and thereby maximize the value to be realized by the estates. Third, the Prepetition Secured Parties will be adequately protected through the provisions of the DIP Orders.  Section 361 of the Bankruptcy Code authorizes a debtor to provide adequate protection by granting replacement liens, making periodic cash payments, or granting such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property," *See* 11 U.S.C. § 361.  The Debtors believe that the proposed adequate protection described herein is fair and reasonable and will compensate the Prepetition Secured Parties for any possible diminution in value of the Debtors' assets.  Given the significant value that the Debtors stand to lose in the event that they are denied access to continued use of cash collateral, such protections are wholly appropriate and justified.

## II.    Assumption of Settlement Agreement by the Subsidiary Debtors

### A.    Applicable Law.

65.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); *see also Nat'l Labor Relations Bd. v. Bildisco & Bildisco*, 465 U.S. 513, 521–22 (1984); *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1075 (3d Cir. 1992); *Interface Group-Nevada v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 145 F.3d 124, 136 (3d Cir. Del. 1998); *Computer Sales Int'l, Inc. v. Federal Mogul (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003); *Med. Malpractice Ins. Assoc. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386 (2d Cir. 1997). This statutory provision permits a debtor to "maximize the value of the debtor's estate" by assuming executory contracts and unexpired leases that "benefit the estate" and by rejecting those that do not. *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) ("the purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and renounce title to and abandon burdensome property.").

66.    A court should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its "business judgment." *See In re Network Access Solutions Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *Decora Indus. Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *see also Bildisco & Bildisco*, 465 U.S. at 523 (describing the business judgment test as traditional).

67.     To determine if a debtor has satisfied the business judgment standard, a court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *vacated on other grounds by* 607 F.3d 957 (3d Cir. 2010). Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [i]s in the best interests of [the debtor] and the estate." *Network Access Solutions*, 330 B.R. at 75. Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. *See In re Fed. Mogul Global, Inc.*, 293 B.R. at 126.

**B.     The Settlement Agreement is Executory.**

68.     Section 365(a) allows debtors in possession to reject "any executory contract or unexpired lease of the debtor." 11 U.S.C. 365(a). The Bankruptcy Code does not define "executory contract," but the accepted definition is that of Professor Countryman: "An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 239 (3d Cir. 1995) (citing *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989)). In determining whether a contract is executory, the Third Circuit has emphasized whether the failure to perform an obligation under the contract would constitute a material breach. *Columbia Gas*, 50 F.3d at 244; *In re Access Beyond Techs., Inc.*, 237 B.R. 32, 43 (Bankr. D.Del. 1999). And the time for determining if a contract is executory is when the bankruptcy petition is filed. *Columbia Gas*, 50 F.3d at 240 (citations omitted).

69.    The Settlement Agreement is executory because there are material outstanding obligations on both sides. For instance, on the part of the Subsidiary Debtors, they have agreed to implement the "Subsidiary Transaction Protocol" in section 5 of the agreement that includes a waterfall for the distribution of proceeds from a sale of the Subsidiary Debtors' assets.[11] As to the bulk of the Subsidiary Debtors' assets, such sales have yet to occur. On the part of the Beach Point Funds, they have agreed to abide by the provisions of the waterfall in the Settlement Agreement and to accept payment consistent with the terms thereof. *See, e.g., In re HQ Global Holdings, Inc.*, 290 B.R. 507, 510-11 (Bankr. D. Del. 2003) (franchise agreements were executory because they required franchisees to keep one center open in their respective territories and pay monthly royalties while maintaining standards of operation). Further, the Settlement Agreement contemplates certain future releases in favor of the Subsidiary Debtors in the event that the Prepetition Secured Obligations are repaid in full. Because both the Subsidiary Debtors and Beach Point continue to have material outstanding obligations under the Settlement Agreement, it is executory in nature.

**C.    Assumption of the Settlement Agreement is in the Best Interests of the Subsidiary Debtors' Estates.**

70.    The Subsidiary Debtors submit that assumption of the Settlement Agreement is in the best interests of their estates and all parties in interest. The provisions of the Settlement Agreement continue to be highly beneficial to these estates by providing a fair and certain waterfall mechanism for the distribution of proceeds from the sale of the Properties (section 5). This waterfall takes into consideration the claims of various constituencies with interests in the Properties, including the secured claims of the Mortgage

---

[11] Any actual payment of prepetition claims against these estates would be subject to further order of this Court.

Lenders, thereby avoiding the need for the estates to become entangles in costly litigation resolving disputes among creditors.  The estates additional benefit from future releases in favor of the Subsidiary Debtors in the event that the Prepetition Secured Obligations are repaid in full (section 11(c)).  Further, the Subsidiary Debtors' affirmation of the Settlement Agreement is a condition to the DIP Lenders' agreement to provide millions of dollars in additional funding under the DIP Agreement.  The foregoing amounts to significant value to the Subsidiary Debtors' estates in exchange for the assumption of the Settlement Agreement.

71.     There are no current cure amounts payable by the Subsidiary Debtors under the Settlement Agreement.  Although the Beach Point Funds were entitled to full payment of the Prepetition Secured Obligations by Variant on or before November 1, 2015 under the terms of the Settlement Agreement, the Beach Point Funds have agreed, pursuant to the terms of the Beach Point Forbearance Agreement, to forbear on their rights under the Settlement Agreement to provide the Debtors with time to conduct a sale process for the Properties.  In any case, the Prepetition Secured Obligations are amounts owing by Variant and not the Subsidiary Debtors.

72.     For these reasons, the Subsidiary Debtors believe that assumption is an appropriate exercise of the Subsidiary Debtors' business judgment and should be approved.

**D.      The Requirements for Assumption of the Settlement Agreement Are Met**

73.     Section 365(b)(1) of the Bankruptcy Code requires that a debtor in possession meet certain requirements to assume an executory contract:

> (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

74.     As noted above, there are no cure amounts payable by the Subsidiary Debtors under the Settlement Agreement.  In addition, adequate assurance of future performance is not at issue because the outstanding obligations under the Settlement Agreement are not monetary in nature as to the Subsidiary Debtors.  The Subsidiary Debtors must only implement the Subsidiary Transaction Protocol, which they are fully prepared to do, subject only to this Court's separate approval of any actual payment of prepetition claims.

### E.     Satisfaction of Bankruptcy Rules 6004(a) and 6004(h)

75.     To implement assumption of the Settlement Agreement successfully, the Subsidiary Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Subsidiary Debtors have

established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Interim Order and Final Hearing

76.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to this Motion.

77.    The urgent need to preserve the Properties, and avoid immediate and irreparable harm to the Debtors' estate, makes it imperative that the Debtors be authorized to obtain postpetition financing and use cash collateral as of the Subsidiary Petition Date, pending the Final Hearing, in order to maintain and preserve the Properties.  Without the ability to obtain access to such funding, the Property-Owning Debtors would be unable to meet the basic needs of the Properties, which would disrupt revenues from rents and adversely impact the ongoing sale process, causing irreparable harm to the Debtors' estates.

78.    Accordingly, the Debtors respectfully request that, pending the hearing on a Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

### Notice

79.    Notice of this Motion will be provided to the following parties, or their counsel, if known:  (a) the Office of the United States Trustee; (b) the DIP Lenders; (c) the secured lenders of the Property-Owning Debtors, including the Mortgage Lenders; (d) all entities known or reasonably believed to have asserted a security interest or lien against the assets of the

Debtors; (e) the creditors holding the 20 largest unsecured claims against the Subsidiary Debtors

(as applicable, on a consolidated basis); (f) the creditors holding the 20 largest unsecured claims

against Variant; and (g) those persons who have previously requested notice pursuant to

Bankruptcy Rule 2002 in Variant's chapter 11 case. As this Motion is seeking "first day" relief,

within two business days of the hearing on this Motion, the Debtors will serve copies of this

Motion and any order entered in respect to this Motion as required by Local Rule 9013-l(m).

The Debtors submit that, in light of the nature of the relief requested, no other or further notice

need be given.

### Notice with Respect to Final Hearing

80.    Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they

be authorized to provide notice of the Final Hearing by serving a copy of this Motion,

together with the Interim Order, by hand or overnight mail or courier service (or for those

set up to receive electronic transmissions, by electronic transmission), upon the parties

referenced in the immediately above section. The Debtors respectfully request that such

notice is sufficient and requests that this Court find that no further notice of the Final

Hearing and Final Order is required.

### No Prior Request

81.    Except as otherwise indicated in this Motion, no prior motion for the relief

requested herein has been made to this or any other court.

[Remainder of page intentionally left blank]

WHEREFORE, based upon the foregoing, the Debtors request entry of the

Interim Order and the Final Order under sections 105, 361, 362, 363, and 507 of the Bankruptcy

Code, Bankruptcy Rule 4001 and Local Rule 4001-2, (i) authorizing the Debtors to (a) obtain

financing under the terms of the DIP Agreement and use cash collateral, and (b) provide

adequate protection to the Prepetition Secured Parties; and scheduling the final hearing, and (ii)

authorizing the Subsidiary Debtors (defined below) pursuant to section 365(a) of the

Bankruptcy Code and Bankruptcy Rule 6006, to assume the Settlement Agreement.


Dated: January 14, 2016                    PACHULSKI STANG ZIEHL & JONES LLP

                                           Richard M. Pachulski (CA Bar No. 90073)
                                           Maxim B. Litvak (CA Bar No. 215852)
                                           Peter J. Keane (DE Bar No. 5503)
                                           919 North Market Street, 17th Floor
                                           P.O. Box 8705
                                           Wilmington, Delaware 19899-8705 (Courier 19801)
                                           Telephone:  (302) 652-4100
                                           Facsimile:  (302) 652-4400
                                           Email:  rpachulski@pszjlaw.com
                                                   mlitvak@pszjlaw.com
                                                   pkeane@pszjlaw.com

                                           Proposed Counsel for the Debtors and Debtors in
                                           Possession