IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VARIANT HOLDING COMPANY, LLC, et al.,[1] | ) | Case No. 14-12021 (BLS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING CERTAIN BID PROCEDURES FOR THE SALE OF PROPERTIES, (II) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) APPROVING BID PROTECTIONS, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the

"Debtors"), submit this motion (this "Motion") pursuant to sections 105, 363, 365, 503 and 507

of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), for the

entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bid Procedures

Order"), (i) authorizing and approving certain proposed Bid Procedures (collectively, the "Bid

Procedures," a copy of which is attached as Exhibit 1 to the Bid Procedures Order) for the

proposed sale of real property, improvements, and related personal property (collectively, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Variant Holding Company, LLC (4044); Laser Focus Holding Company, LLC (9153); Laser Focus Commercial Investments, LLC (9326); Houston 2 Apartments, LLC (8886); 10400 Sandpiper Apartments, LLC (6556); 10301 Vista Apartments, LLC (8886); Houston 14 Apartments, LLC (7563); 12500 Plaza Apartments, LLC (7563); Pines of Westbury, Ltd (7563); 201 Ashton Oaks Apartments, LLC (7563); 13875 Cranbrook Forest Apartments, LLC (7563); 5900 Crystal Springs Apartments, LLC (7563); 7170 Las Palmas Apartments, LLC (7563); 11911 Park Texas Apartments, LLC (7563); 1201 Oaks of Brittany Apartments, LLC (7563); 3504 Mesa Ridge Apartments, LLC (7563); 667 Maxey Village Apartments, LLC (7563); 17103 Pine Forest Apartments, LLC (7563); 7600 Royal Oaks Apartments, LLC (7563); 4101 Pointe Apartments, LLC (7563); The Oaks at Stonecrest Apartments, LLC (5589); Numeric Commercial Investments, LLC (9443); FX3 Apartment Investors, LLC (4055); Royal Numeric FX Investments, LLC (6908); Broadmoor Apartments, LLC (7888); Chesapeake Apartments, LLC (5716); Holly Ridge Apartments, LLC (7117); Holly Tree Apartments, LLC (4288); Preston Valley Apartments, LLC (3356); Ravenwood Hills Apartments, LLC (8264); River Road Terrace Apartments, LLC (6396); Sandridge Apartments, LLC (3592); Majestic Heights Apartments, LLC (2174); Sonterra Apartments, LLC (6220); and Toscana Villas Apartments, LLC (8873). The Debtors' service address is: Variant Holding Company, LLC, c/o Development Specialists, Inc., 333 S. Grand Ave, Suite 4070, Los Angeles, CA 90071-1544.

"Properties") owned by certain of the Debtors, as a portfolio of all of the Debtors' twenty-three

(23) Properties (the "Full Portfolio"), as identified on Exhibit A attached to the Bid Procedures,

and the assets related thereto (together with the Properties, the "Assets") free and clear of all

liens, claims, encumbrances, and other interests other than those permitted by the Stalking Horse

Agreement (as defined below) (collectively, the "Encumbrances") to BPC VHI, L.P., Beach

Point Total Return Master Fund, L.P., and Beach Point Distressed Master Fund, L.P. (the "Beach

Point Funds" or "Stalking Horse Purchaser"), pursuant to the *Portfolio Purchase and Sale*

*Agreement*, dated as of January 18, 2016 by and between the Property-Owning Debtors (as

defined below) and the Stalking Horse Purchaser (the "Stalking Horse Agreement") or, in the

event the Stalking Horse Purchaser is not the Successful Bidder (as defined below) for the Full

Portfolio or any individual Properties, then the Successful Bidder; (ii) authorizing certain

proposed assumption and assignment procedures for the Assumed Contracts (as defined below)

(collectively, the "Assumption and Assignment Procedures"); (iii) approving the form and

manner of notice thereof; (iv) approving the bid protections provided to the Stalking Horse

Purchaser under the Stalking Horse Agreement, including the requested two percent (2%) break-

up fee (the "Termination Payment") and an expense reimbursement up to a maximum amount of

$1,000,000 (the "Expense Reimbursement") (collectively, the "Bid Protections"); and (v)

granting related relief.

   As set forth in the Bid Procedures, Potential Bidders may submit bids as a cash

amount or credit bid for either (a) the Full Portfolio for a purchase price equal to not less

than$190,000,000 (which is the Purchase Price under the Stalking Horse Agreement) plus the

Termination Payment plus the Expense Reimbursement plus $250,000 (or a minimum bid of

$195.05 million), (b) a group of less than all of the twenty-three (23) Properties, or (c) individual

Properties (with a sale of the Full Portfolio or one or more Properties constituting a "Sale") for a purchase price equal to not less than the price set forth in Exhibit A to the Bid Procedures (the "Minimum Bid Prices")[2] for each Property being bid on; provided that any bid (including any credit bid) must provide for the payment of the Termination Payment and Expense Reimbursement (which amounts are accounted for in the Minimum Bid Prices), or any amount thereof allocated to any Property being bid (as set forth in Exhibit A to the Bid Procedures), in cash or by valid credit bid.

In support of this Motion, the Debtors rely on the *Declaration of Bradley D. Sharp in Support of First Day Motions*, and further respectfully represent as follows:

## Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] The Minimum Bid Prices account for the pro rata amount of the Termination Payment and Expense Reimbursement allocated to each Property.

3.      The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 6004-1.

### Background

4.      On August 28, 2014, Debtor Variant Holding Company, LLC ("Variant") filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing its chapter 11 case.  Variant's chapter 11 case is administered under Case No. 14-12021 (BLS).  Variant continues in the possession of its properties, and is operating and managing its affairs as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in Variant's chapter 11 case.

5.      On January 12, 2016 (the "Petition Date"), each of the Debtors other than Variant (the "Subsidiary Debtors") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Subsidiary Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in the Subsidiary Debtors' chapter 11 cases.

6.      Variant and its direct and indirect subsidiaries are a commercial real estate company with direct and indirect ownership interests in 23 real property interests in various states (the "Properties").  Variant is the ultimate parent within the organization.

7.      The property-owning subsidiaries of Variant that are now Subsidiary Debtors in this Court as of the Petition Date consist of the following entities: (1) Broadmoor Apartments, LLC, Chesapeake Apartments, LLC, Holly Ridge Apartments, LLC, Holly Tree Apartments, LLC, Preston Valley Apartments, LLC, Ravenwood Hills Apartments, LLC, River Road Terrace Apartments, LLC, and Sandridge Apartments, LLC (collectively, the "FX3

Portfolio Debtors"); (2) 10400 Sandpiper Apartments, LLC, 10301 Vista Apartments, LLC, Pines of Westbury, Ltd., 201 Ashton Oaks Apartments, LLC, 13875 Cranbrook Forest Apartments, LLC, 5900 Crystal Springs Apartments, LLC, 7107 Las Palmas Apartments, LLC, 11911 Park Texas Apartments, LLC, 1201 Oaks of Brittany Apartments, LLC, 3504 Mesa Ridge Apartments, LLC, 667 Maxey Village Apartments, LLC, 17103 Pine Forest Apartments, LLC, 7600 Royal Oaks Apartments, LLC, and 4101 Pointe Apartments, LLC (collectively, the "H14 Portfolio Debtors"); and (3) The Oaks at Stonecrest Apartments, LLC ("Oaks at Stonecrest") (the FX3 Portfolio Debtors, the H14 Portfolio Debtors, and Oaks at Stonecrest are collectively referred to herein as the "Property-Owning Debtors").

8.      The Property-Owning Debtors own the Properties, each of which is to be sold pursuant to the procedures set forth herein.

## The Debtors' Sale Process

### A.      The Original Sale.

9.      Variant commenced a process for the sale of its subsidiaries' real estate assets during the summer of 2014.  As previously presented to the Court, the marketing process was extensive.  In short, Variant's and the Property-Owning Debtors' brokers and professionals (i) distributed more than 40,000 teasers and marketing emails, (ii) executed confidentiality agreements with approximately 700 potential buyers that were provided financial information regarding the properties, (iii) provided property tours to approximately ninety (90) potential buyers, and (iv) considered ninety-one (91) non-binding bids for individual properties and combinations thereof.

10.      Variant and the Property-Owning Debtors ultimately agreed to a portfolio sale of substantially all of their properties, and on March 4, 2015, Variant filed a motion seeking authority to cause its subsidiaries to sell substantially all of their multi-family property assets (the

"Original Motion") to a third party buyer, LRP Property Company, LLC (or its designees, "Lynd"), for $275,000,000 in the aggregate.  *See* Docket No. 255.  The sale was to be effectuated through two portfolio purchase and sale agreements:  one for the sale of three properties in Las Vegas in the amount of $40,000,000, and one for the sale of the Full Portfolio (which Properties are also being sold pursuant to this Motion) in the amount of $235,000,000 (the "Original PSA").

11.     On March 11, 2015, the Court entered an order granting the Original Motion without objection.  *See* Docket No. 279.  The closing of the sale of the Las Vegas assets occurred on March 26, 2015 for $40,000,000.

12.     The sale of the Full Portfolio under the Original PSA did not close. Instead, Lynd required a $42,000,000 price reduction in order to move forward to closing.

**B.     The Supplemental Sale.**

13.     Following termination of the Original PSA and the buyer's demand for a price reduction, the Debtor began to evaluate other options, but ultimately agreed to a price reduction of $30,000,000.

14.     On May 14, 2015, the parties executed a fourth amendment to the Original PSA, which reinstated the Original PSA subject to certain revised terms (the "Reinstated PSA"), including a reduction of the purchase price payable by Lynd for the Full Portfolio from $235,000,000 under the Original PSA to $205,000,000 under the Reinstated PSA.

**C.     The Supplemental Sale Motion.**

15.     On May 15, 2015, only one day after the Reinstated PSA was executed, Variant filed the supplemental sale motion to seek court approval of the reduced sale price (the "Supplemental Sale Motion").  *See* Docket No. 322.

16.     Pursuant to the Supplemental Sale Motion, the Debtor sought to sell the Full Portfolio for the sum of $205,000,000 consistent with the terms of the Reinstated PSA.

17.     The Equity Holders objected to the Supplemental Sale Motion.   After a contested two-day evidentiary hearing on June 4-5, 2015, the Court approved the relief sought by the Debtor and entered an order granting the Supplemental Sale Motion (the "Supplemental Sale Order").  *See* Docket No. 381.

18.     On June 18, 2015, the Equity Holders filed their notice of appeal of the Supplemental Sale Order.   That appeal is pending before the Honorable Gregory M. Sleet in the United States District Court for the District of Delaware, Civ. Action No. 15-513 (GMS).

19.     In large part due to the pendency of this appeal, the Debtors were unable to obtain title insurance for the sale and Lynd did not close.

**D.      Consideration of Alternative Restructuring Alternatives and Sale Efforts.**

20.     After the sale of the Full Portfolio under the Reinstated PSA failed, the Debtors considered a number of potential alternatives to maximize the value of the Debtors' Assets.  Due to the fact that the Properties, on an aggregate basis, continue to operate at an operating loss of approximately $1 million per month, the Debtors concluded that the only feasible alternative to realize value for creditors was a sale of the Debtors' remaining properties.

21.     The Debtors re-approached Lynd with the opportunity to acquire the Properties through a bankruptcy sale process for the Property-Owning Debtors, but Lynd would have required a further reduction below the price contemplated in the Supplemental Sale Order. The Debtors also engaged in discussions with three other potential buyers of the Properties. Each such buyer required a period of exclusivity to conduct due diligence and would provide no

assurances to the Debtors as to whether a proposal for the Properties would be made or the range of values that would be offered.

22.     With the Debtors unable to identify any purchaser willing to pay a purchase price commensurate with the believed value for the Properties, the Debtors began arms' length negotiations with the Beach Point Funds regarding their willingness to acquire the Properties.  After weeks of negotiations, the Debtors and the Beach Point Funds agreed to the terms of the Stalking Horse Agreement, pursuant to which the Beach Point Funds have committed to purchasing the Full Portfolio of Properties and related Assets for a "Purchase Price" of $190,000,000 (the "Stalking Horse Purchase Price"), which Purchase Price shall be satisfied through (i) a credit bid of the Beach Point Funds' secured claim under that *Amended and Restated Debtor-in-Possession Loan, Security and Guaranty Agreement* (the "DIP Agreement"), dated as of January 14, 2016, (ii) the payment or assumption of the Property-Owning Debtors' senior mortgage debt, (iii) the payment or assumption of the Property-Owning Debtors' allowed unsecured and administrative expense claims,[3] and (iv) waiver of distributions on account of the Beach Point Funds' outstanding debt obligations required to be paid pursuant to that *Settlement Agreement* (the "Settlement Agreement"), dated as of October 17, 2014 and approved by the Court on November 3, 2014 [Docket No. 152].

23.     The Stalking Horse Agreement is subject to overbids on a portfolio and individual Property basis, and therefore the Debtors believe that the Stalking Horse Agreement provides the best mechanism to satisfy the Debtors' valid claims, while also ensuring that the Properties are subjected to the market and sold at the highest available price.

---

[3] Pursuant to the Stalking Horse Agreement, the Beach Point Funds are not assuming or satisfying any claims that are subordinate to the Beach Point Funds' claims, either under the Settlement Agreement or otherwise.  Further, the terms pursuant to which the Beach Point Funds shall be permitted to assume the debt of certain of the Property-Owning Debtors' senior secured debt is the subject of intercreditor agreements.  Nothing in this Motion is intended to interfere or impede on the parties' rights and obligations under such intercreditor agreements.

E.      **Filing of the Subsidiary Debtors' Bankruptcy Cases**.

24.     The Subsidiary Debtors filed these chapter 11 cases in order to effectuate a sale or restructuring of their assets.  As noted above, the Subsidiary Debtors were unable to obtain title insurance for a sale of the Properties authorized by this Court in Variant's case in June 2015.  After substantial discussions and negotiations with several title companies, the Debtors have obtained assurance that they will be able to obtain title insurance for a sale of the Full Portfolio to the Beach Point Funds or a third party buyer, even over any appeal, if the Debtors (i) sell the Properties through a sale under section 363 of the Bankruptcy Code, implemented through a Chapter 11 plan, and (ii) obtain an order approving such sale and confirming such plan from the district court, upon the report and recommendation of this Court. The Debtors have filed these chapter 11 cases, and are seeking approval of the Bid Procedures to achieve this result.

**Stalking Horse Purchaser**

25.     The Debtors have entered into the Stalking Horse Agreement with the Beach Point Funds (as the Stalking Horse Purchaser) for the purchase of the Full Portfolio for $190,000,000, subject to the terms of the Stalking Horse Agreement and the proposed Bid Procedures.

26.     The Stalking Horse Agreement provides for Bid Protections as follows: (a) a Termination Payment, from the cash proceeds of any sale of one or more of the Properties to a party other than the Stalking Horse Purchaser (a "Third-Party Sale"), equal to (A) (i) if all of the Properties are sold through a Third-Party Sale, two percent (2.0%) of the Stalking Horse Purchase Price (the "Termination Payment"), or (ii) if one or more of the Properties are sold

through a Third-Party Sale, two percent (2.0%) of the "Pro Rata Purchase Allocation"[4] of the Termination Payment; and (b) an Expense Reimbursement of the Stalking Horse Purchaser's reasonable, documented, actual out-of-pocket fees and expenses, including reasonable attorneys' fees and expenses of other consultants, incurred in connection with the transaction contemplated by the Stalking Horse Agreement, (i) up to a maximum amount of $1,000,000 (the "Expense Reimbursement"), or (ii) if one or more of the Properties are sold through a Third-Party Sale, the Pro Rata Purchase Allocation of the Expense Reimbursement.  The amount of the Termination Payment and Expense Reimbursement may be considered by the Debtors in determining the highest or otherwise best bid and the net value that the Debtors and their estate will realize at any Auction.  The Bid Protections will have administrative claim status in the Debtors' cases pursuant to section 503(b) of the Bankruptcy Code.

27.     The Debtors have entered into the Stalking Horse Agreement with the Stalking Horse Purchaser in order to bring certainty to the sale process.  The Stalking Horse Agreement is the highest and best offer currently available, and the Stalking Horse Purchaser has refused to enter into the Stalking Horse Agreement without the Bid Protections.  The Debtors, however, intend to continue to market the Properties over the next sixty (60) days, and they will be looking for proposals for the Properties on either a portfolio or property-by-property basis, pursuant to the terms of the Bid Procedures.

---

[4] "Pro Rata Purchase Allocation" shall mean the percentage value obtained after dividing (i) as the numerator, the aggregate value of the purchase price for Propert(ies) for which a Third-Party is the Successful Bidder in a Third-Party Sale, and (ii) as the denominator, the Stalking Horse Purchase Price, as adjusted pursuant to the Stalking Horse Agreement, plus the actual purchase price for any Properties acquired in Third-Party Sales.

**Assets to Be Sold**

28.     The assets the Debtors intend to sell under the Stalking Horse Agreement or through a Third-Party Sale consist of all or substantially all of the Debtors' Properties, as identified on Exhibit A attached to the Bid Procedures.   The Properties include fourteen (14) real estate assets commonly referred to as the "H14 Portfolio," eight (8) real estate assets commonly referred to as the "FX3 Portfolio," and the Oaks at Stonecrest.

29.     The Debtors intend to offer the Assets for sale, provided that the Debtors determine that the aggregate consideration offered by any bid, or combination of bids for the Assets, satisfies the requirements set forth in the proposed Bid Procedures.  Potential Bidders may bid on all or any number or combination of the Assets, provided that the bid offers to acquire through a cash purchase or credit bid either (a) for the Full Portfolio for a purchase price equal to not less than the Stalking Horse Purchase Price plus the Termination Payment plus the Expense Reimbursement plus $250,000, or (b) for one or more of the Properties for a purchase price equal to not less than the Minimum Bid Prices for each Property being bid on (as set forth in Exhibit A to the Bid Procedures); provided that any bid (including any credit bid) must provide for the payment of the Termination Payment and Expense Reimbursement, or any amount thereof allocated to any Property being bid, in cash or through a valid credit bid.

**Bid Procedures**[5]

30.     Upon entry of the Bid Procedures Order, the Debtors intend to immediately begin the process of soliciting bids for all of the Assets, or any number or

---

[5] Any summary of the Bid Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bid Procedures as provided for in the Bid Procedures Order.  To the extent there is any conflict between any summary contained herein and the actual terms and conditions of the Bid Procedures as provided for in the Bid Procedures Order, the actual terms and conditions of the Bid Procedures as provided for in the Bid Procedures Order shall control.  Capitalized terms used but not defined in this summary of the Bid Procedures shall have the meanings ascribed to such terms in the Bid Procedures.

combination thereof, in accordance with the Bid Procedures.  The Bid Procedures describe, among other things, the assets available for sale, the manner in which bids become "qualified," the coordination of diligence efforts among the bidders and the Debtors, the receipt and negotiation of bids received, the conduct of any Auction, and the selection and approval of the Successful Bidder and the selection of any Back-Up Bidder.   The Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, fair, and open manner, while ensuring that the highest or best bid is generated for the Assets.

31.    At a hearing following the Auction (the "Sale Hearing"), the Debtors will seek the entry of a report and recommendation (the "Sale Recommendation") from the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), whereby the Bankruptcy Court shall recommend that the United States District Court for the District of Delaware (the "District Court") enter an order (the "Sale Order") authorizing and approving the transactions contemplated by one or more of the Sales.[6]  The Sale Hearing may be held contemporaneously with a hearing for confirmation of a chapter 11 plan to be proposed by the Debtors.

32.    Certain of the key terms of the Bid Procedures are included below:

a.    **Diligence**:  Any person or entity that wishes to participate in the bidding process for the Properties (each, a "Potential Bidder") must first become a "Qualified Bidder".  As a prerequisite to becoming a Qualified Bidder (and thus being able to conduct due diligence and gain access to the Debtors' confidential electronic data room concerning the Properties (the "Data Room")), a Potential Bidder must submit to the Debtors and their advisors: (i) documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction; (ii) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder; (iii) a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation

---

[6] If any Sale can close with entry of the Sale Order by the Bankruptcy Court, then the District Court will not be obligated to enter a Sale Order.

Parties,[7] that the interested party has a bona fide interest in consummating a sale transaction; and (iv) sufficient information, as determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties, to determine that the interested party (i) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion) and (ii) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bid Procedures: (i) the Stalking Horse Purchaser and the Mortgage Lenders[8] shall each be considered a Qualified Bidder; and (ii) in determining whether the Potential Bidders constitute Qualified Bidders, the Debtors may consider a combination of bids for the Properties.

None of the Debtors, their affiliates, or any of their respective representatives is obligated to furnish any information relating to the respective Debtors other than to a Potential Bidder and may refuse to provide or continue to provide any such information to a Potential Bidder or other entity for any reason whatsoever.  If the Debtors determine that a Potential Bidder does not constitute a Qualified Bidder (as defined below) or is not reasonably likely to be a Qualified Bidder, then such Potential Bidder shall not be entitled to receive due diligence access or additional non-public information.

Each Potential Bidder will be provided with a simplified form "<u>Asset Purchase Agreement</u>" (approved by the Debtors and the Consultation Parties) to be used in connection with any "Qualified Bid" submitted pursuant to the Bid Procedures.

b.    **<u>Bid Requirements</u>**:

      i.     <u>Qualified Bid</u>.  Other than in the case of the Stalking Horse Purchaser and the Mortgage Lenders, to participate in the bidding process and be deemed

---

[7] The term "Consultation Parties" as used in the Bid Procedures means: (i) counsel to any statutorily appointed committee of unsecured creditors in the Debtors' chapter 11 cases  (the  "<u>Creditors' Committee</u>"); (ii) the Stalking Horse Purchaser and DIP Lenders, and their counsel, (a) O'Melveny & Myers LLP, Two Embarcadero Center, 28th Floor, San Francisco, CA 94111, Attn: Suzzanne S. Uhland, and (b) O'Melveny & Myers LLP, 400 South Hope Street, Los Angeles, CA 90071, Attn: Michael S. Neumeister; (iii) counsel to C-III Asset Management LLC (a) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153-0119, Attn: W. Michael Bond and Debra Dandeneau, and (b) Weil, Gotshal & Manges LLP, 1395 Brickell Avenue, Suite 1200, Miami, FL 33131, Attn: Nellie Camerik; and (iv) counsel to the H14 Lender (as defined below), Herrick Feinstein LLP, 2 Park Ave, New York, NY 10016, Attn: Andrew C. Gold.

[8] The "Mortgage Lenders" are the Wells Fargo Bank, N.A., as trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2006-C4, Centennial Bank (the "H14 Lender") and Arbor Realty SR, Inc.

a "<u>Qualified Bidder</u>," each Potential Bidder must submit a "<u>Qualified Bid</u>" to the Notice Parties[9] so as to be received by the Bid Deadline.  To constitute a Qualified Bid, a bid must satisfy each of the following requirements (each, a "<u>Bid Requirement</u>"):

a.  be in writing;

b.  offer a cash amount or credit bid either (a) for the Full Portfolio for a purchase price equal to not less than the Stalking Horse Purchase Price plus the Termination Payment plus the Expense Reimbursement plus $250,000, or (b) for one or more of the Properties for a purchase price equal to not less than the Minimum Bid Prices for each Property being bid on; provided that any bid (including any credit bid) must provide for the payment of the Termination Payment and Expense Reimbursement, or any amount thereof allocated to any Property being bid on;

c.  identify the Properties to be purchased, the liabilities, if any, to be assumed, and the cash purchase price or amount of credit bid, and the amount of the proposed purchase price to be allocated to each Property, if multiple Properties are being bid on by one Potential Bidder;

d.  fully disclose the legal identity of each entity that will be bidding for the  applicable Properties or otherwise participating in connection with such bid, and the complete terms of any such participation;

e.  fully disclose any current or former connections or agreements with the Debtors, any other known Potential Bidder or Qualified Bidder, and any current or former, officer, director, owner, or affiliate of the Debtors;

f.  provide an irrevocable offer in the form of the Asset Purchase Agreement (with any modifications, the "<u>Executed APA</u>"), including all exhibits and schedules contemplated thereby (other than exhibits and schedules that by their nature must be prepared by the Debtors); with a marked copy of the Executed APA to show any proposed amendments and modifications to the Asset Purchase Agreement;

---

[9] The term "Notice Parties" as used in the Bid Procedures means: (i) the Debtors, Variant Holding Company, LLC, c/o Development Specialists, Inc., 333 S. Grand Ave, Suite 4070, Los Angeles, CA 90071-1544, Attn: Bradley D. Sharp; (ii) counsel to the Debtors, (a) Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA  90067-4003, Attn: Richard M. Pachulski, and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE  19899, Attn: Peter J. Keane; and (iii) any investment banker or broker retained by the Debtors.

g.  include a marked copy of the Executed APA reflecting the differences between the Executed APA and the form Asset Purchase Agreement, as applicable;

h.  include a proposed list of the Debtors' executory contracts and unexpired leases that the Potential Bidder proposes be assumed, assigned, and sold to it in connection with the transaction (the "Assumed Contracts") and proposed adequate assurance of future performance, provided, however, that all tenant leases must be unimpaired and assumed by the Successful Bidder for any Property acquired;

i.  state that such bidder is financially capable of consummating the transactions contemplated by the Executed APA and detail the source(s) of funds that will be used to consummate the transactions;

j.  include satisfactory evidence of committed financing, equity, or other financial ability to consummate the transactions (which may include current audited financial statements, current bank account and marketable securities holdings or such other form of financial disclosure and credit-quality support information or enhancement acceptable to the Debtors) contemplated by the Executed APA in a timely manner;

k.  represent such bid does not violate laws, including The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-l, et seq., and other applicable foreign or domestic anti-corruption, anti-bribery, or anti-money laundering laws;

l.  represent that it has not engaged in any collusion with respect to its bid;

m.  disclose any other payments or agreements with any other person or entity relating to the bid and the potential purchase of any of the Properties;

n.  expressly acknowledge and represent that the bid is formal, binding, and not subject to any due diligence;

o.  not contain any financing contingencies of any kind;

p.  not contain any condition to closing of the transaction based on the receipt of any third party approvals (excluding required Bankruptcy Court or District Court approval and any required governmental and/or regulatory approval, if any);

q.  include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Executed APA;

r.  include a good faith deposit (the "Good Faith Deposit") in an amount equal to five percent (5%) of the purchase price offered to purchase the applicable Properties, which Good Faith Deposit must be submitted (i) in the case of any Potential Bidder other than a Mortgage Lender, in the form of a certified or bank check (or other form acceptable to the Debtors in their sole and absolute discretion) payable to the order of the Debtors, or (ii) in the case of any Mortgage Lender, in the form of either a certified or bank check (or other form acceptable to the Debtors in their sole and absolute discretion) payable to the order of the Debtors, or a binding "Debt Reduction Agreement".[10]  All Good Faith Deposits, not in the form of reduction and satisfaction of debt, will be held in a segregated account by the Debtors until no later than ten days after the Auction and thereafter returned to the respective bidders in accordance with these Bid Procedures, unless the bidder has been selected as the Successful Bidder; and

s.  provide for liquidated damages in the event of the Potential Bidder's breach of, or failure to perform under, the Executed APA equal to the amount of the Good Faith Deposit.

The Debtors may deem a bid that does not satisfy all of the above requirements a Qualified Bid if the Debtors, in consultation with the Consultation Parties, determine that deeming such bid a Qualified Bid is in the best interests of the Debtors' estates and creditors.  The Debtors shall make a determination, in consultation with the Consultation Parties, regarding whether a bid is a Qualified Bid and shall notify bidders, along with the Consultation Parties, whether their bids have been determined to be Qualified Bids by no later than April 6, 2016, at 5:00 p.m. (prevailing Eastern Time).  The Stalking Horse Purchaser is deemed a Qualified Bidder, and the Stalking Horse Agreement constitutes a Qualified Bid for all purposes; provided that the Stalking Horse Purchaser shall cease to be a Qualified Bidder (unless it independently satisfies the above requirements of sections (a)–(s)) if the Stalking Horse Agreement terminates pursuant to its terms.

---

[10] A "Debt Reduction Agreement" shall mean a binding agreement by the Mortgage Lender, in form and substance reasonably satisfactory to the Debtors and any other Consultation Party, to reduce and satisfy such Mortgage Lender's secured claim(s) against the Debtors in the amount of the Good Faith Deposit upon a failure by Mortgage Lender to, if selected as the Successful Bidder, close on the acquisition of a Property pursuant to these Bid Procedures and subject to the terms of any Executed APA.  Notwithstanding anything herein to the contrary, if a Mortgage Lender is the Successful Bidder and the Executed APA terminates for any reason other than a default by Mortgage Lender, the Debt Reduction Agreement shall be terminated and of no further force or effect.

Moreover, each of the Mortgage Lenders shall be deemed a Qualified Bidder and shall be permitted to exercise its right to credit bid at the Auction if, no later than the Bid Deadline, such Mortgage Lender (1) notifies the Debtors of its intention to credit bid and (2) delivers to the Debtors a bid that complies with clauses (a)–(g) and (j)–(s) herein.

Each Qualified Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bid Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bid Procedures, and any Sale Transaction.

ii.    <u>Bid Deadline</u>.   Any person or entity interested in participating in the Auction must submit, in writing, a Qualified Bid on or before <u>April 5, 2016, at 5:00 p.m.</u> (prevailing Eastern Time) (the "<u>Bid Deadline</u>") in writing, to the Notice Parties.  The Debtors may, upon written consent from the "DIP Lenders", adjourn the Auction, provided that they promptly notify the Stalking Horse Purchaser and all Potential Bidders of any such extension.  A copy of all Qualified Bids will be provided to the Consultation Parties within one (1) business day after receipt thereof.

iii.    <u>No Qualified Bids</u>.  If no timely Qualified Bids other than the Stalking Horse Purchaser's Qualified Bid are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at a sale hearing that the Bankruptcy Court approve the Stalking Horse Agreement and the transactions contemplated thereunder.

c.    **Auction**:  In the event that the Debtors receive one or more timely Qualified Bids for any Property (excluding the Stalking Horse Agreement), the Debtors shall conduct the Auction; <u>provided</u>, <u>however</u>, if the Debtors receive only one Qualified Bid (excluding the Stalking Horse Agreement) for the Full Portfolio, unless the Debtors have received Qualified Bids for any other separate Properties that exceed, in the aggregate, the amount of the Qualified Bid for the Full Portfolio, the Debtors shall not conduct the Auction and such Qualified Bid shall be deemed the Successful Bid.  The Auction, if required, will be conducted at the offices of the Debtors' counsel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles CA 90067, or such other location as designated by the Debtors in a notice to all Qualified Bidders and the Consultation Parties.  The Debtors shall have the right to conduct any number of Auctions on that date to accommodate Qualified Bids for any combination of the Debtors' Properties that the Debtors, in their business judgment, determine is in the best interest of the Debtors' estates, in consultation with the Consultation Parties.  The Debtors have the right, in consultation with the Consultation Parties, to adjourn or cancel the Auction at or prior to the Auction.

One (1) day prior to the Auction, the Debtors shall determine, in consultation with the Consultation Parties, which of the Qualified Bids, at such time, is the highest

or best bid for purposes of constituting the opening bid of the Auction (the "Initial Highest Bid"), and shall promptly notify the Stalking Horse Purchaser and all Qualified Bidders with Qualified Bids of the Initial Highest Bid.

The Auction will be governed by the following procedures, subject to any non-material modification by the Debtors at the Auction:

i.    The Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative;

ii.    Only representatives of the Debtors, a representative of the Office of the United States Trustee, Qualified Bidders, the Consultation Parties, and their respective advisors will be entitled to attend the Auction.  Any and all other creditors interested in attending the Auction must, at least one (1) business day before the Auction, obtain Bankruptcy Court approval or consent of the Debtors, after consulting with the Consultation Parties, to attend the Auction.

iii.    Only the Qualified Bidders will be entitled to make any subsequent bids at the Auction.

iv.    Each Qualified Bidder will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.

v.    Bidding shall commence at the amount of Initial Highest Bid.

vi.    Qualified Bidders may then submit successive bids higher than the previous bid, based on and increased from the Initial Highest Bid(s), in increments of at least (i) with respect to bids for five (5) or more Properties, $100,000, or (ii) with respect to bids for less than five Properties, $25,000.

vii.    Each Qualified Bidder shall have the right to submit additional bids and make additional modifications to its Executed APA at the Auction to improve its bid.

viii.    The Auction may include individual negotiations with the Qualified Bidders and/or open bidding in the presence of all other Qualified Bidders.

ix.    The Debtors reserve the right to (x) determine, in their reasonable discretion and in consultation with the Consultation Parties, which bid for any particular Property or combination of Properties, is the highest or otherwise best and (y) reject at any time, without liability, any offer that the Debtors, in their discretion, deem to be (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or in

the Bid Procedures Order, or (3) contrary to the best interests of the Debtors and their estates.

x.       The Debtors, in their discretion and in consultation with the Consultation Parties, may conduct the Auction in stages.  In the first stage, the Debtors may auction individual or smaller portfolios of the Properties.  In the second stage, the Debtors may auction larger portfolios of the Properties, including the Full Portfolio.  The highest and otherwise best bid for a Property in the first stage of such Auction will be subject to overbid in the second stage of such Auction.

xi.      The Auction among Qualified Bidders shall continue according to these procedures until the Debtors determine, in consultation with the Consultation Parties and subject to Bankruptcy Court and District Court approval, as applicable, that the Debtors have received one or more successful bids (each a "Successful Bid").  In selecting a Successful Bid, the Debtors may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidders' ability to close a given transaction, the proposed timing thereof, and rights of such Qualified Bidder and the Debtors with respect to the termination thereof, the number, type and nature of any changes reflected in the Executed AP A provided by each Qualified Bidder, and the net benefit to the Debtors' estates.

xii.     At the completion of the Auction, the Debtors, in consultation with the Consultation Parties, shall determine which Qualified Bidder(s) have submitted the Successful Bid(s) for the Properties.  Such Qualified Bidder(s) will become the "Successful Bidder(s)" and shall have such rights and responsibilities of a purchaser, as set forth in the Executed APA(s), as it (or they) may have been modified during the Auction (the "Sale Transaction").

xiii.    The Auction shall be transcribed or videotaped.

Bids made after the close of the Auction shall not be considered by the Debtors. All Qualified Bidders at the Auction will be deemed to have consented to the exclusive jurisdiction of the Bankruptcy Court and District Court and waived any right to a jury trial in connection with any disputes relating to the Auction.  Within two (2) Business Days after the completion of the Auction, (i) the Debtors shall cause the results of the Auction, including a copy of the Successful Bid(s), to be filed with the Bankruptcy Court, and distributed as necessary pursuant to the Bid Procedures Order; and (ii) the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

d.    **Sale Hearing**:  The Successful Bid(s) and any Back-Up Bid (or if no Qualified Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse Agreement) will be subject to approval by the Court.   The sale hearing (the "Sale Hearing") will take place on or about <u>April 20, 2016, at 10:00 a.m.</u> (prevailing Eastern Time) before the Honorable Brendan L. Shannon, United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom 1, Wilmington, Delaware 19801. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court on the date scheduled for the Sale Hearing or on the Court's docket.  The Sale Hearing will be held contemporaneously with a hearing for confirmation of a chapter 11 plan to be proposed by the Debtors.  Upon entry of the Sale Recommendation by the Bankruptcy Court, the Debtors shall seek entry of the Sale Order by the District Court; <u>provided</u>, <u>however</u>, upon written confirmation from any Successful Bidder that it will close under any Third-Party Sale within 5 business days of the entry of the Sale Order by the Bankruptcy Court, such Third-Party Sale will be presented to and approved by the Bankruptcy Court, rather than the District Court.

e.    **Backup Bidder and Return of Good Faith Deposits**:  If an Auction is conducted, any Qualified Bidder that appears at the Auction may request to serve as the back-up bidder (the "Back-Up Bidder") for any Property such Qualified Bidder bid on; provided, that, (i) if multiple Qualified Bidders request to be the Back-Up Bidder for a Property, then the Back-Up Bidder shall be the Qualified Bidder that submitted the highest bid for such Property at the Auction, and (ii) notwithstanding subsection (i), if multiple Qualified Bidders bid on a Property, and any Qualified Bidder bid on multiple Properties as part of its bid, the Debtors, in consultation with the Consultation Parties, shall determine which Qualified Bidder shall be the Back-Up Bidder for such Properties. The Back-Up Bidder's highest bid at the Auction (the "Back-Up Bid") shall remain open and irrevocable until the first to occur of (i) September 30, 2016, (ii) consummation of a transaction with the Successful Bidder, or (iii) the Back-Up Bidder's receipt of notice from the Debtors of the release by the Debtors of the Back Up Bidder's obligations. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale Transaction because of a breach or failure to perform on its part or otherwise, the Back-Up Bidder will be deemed the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court. If the Successful Bidder or Back-Up Bidder, due to expiration or termination of the Successful Bid or the Back-Up Bid or otherwise, fails to consummate the transaction contemplated under their respective Executed APA, the Debtors and the Stalking Horse Purchaser will be authorized, but not required, to consummate the sale pursuant to the Stalking Horse Agreement, as modified during the Auction, without further order of the Bankruptcy Court or District Court.

Except as provided herein, (i) cash Good Faith Deposits (not including any Debt Reduction Agreement) will be returned without interest to each bidder not selected by the Debtors as the Successful Bidder or is not the Back-Up Bidder, and (ii) any Debt Reduction Agreement shall be deemed terminated and of no further force or effect for any bidder not selected by the Debtors as the Successful Bidder or that is not the Back-Up Bidder, in each case, by no later than the tenth (10th) Business Day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder will be held by the Debtors until ten (10) Business Days after the closing of the Sale Transaction with the Successful Bidder or termination of the Back-Up Bid as provided above.

f.    **Reservation of Rights**. The Debtors reserve the right, in their discretion and subject to the exercise of their business judgment and in consultation with the Consultation Parties, to make non-material alterations to these Bid Procedures, including the Auction, and/or terminate discussions with any and all prospective acquirers at any time and without specifying the reasons therefor, but only to the extent not materially inconsistent with the Bid Procedures or the Stalking Horse Agreement, but including changes so as to modify deposit amounts and to modify or eliminate the requirements with respect to Back-Up Bidders—but only to the extent not materially inconsistent with the Bid Procedures or the Stalking Horse Agreement. For the avoidance of any doubt, the Debtors reserve the right, in consultation with the Consultation Parties, to adopt "blind bidding," and to require any bidder to submit its highest or otherwise best bid, during the final round of bidding. The DIP Agent, DIP Lenders, and the "Existing Lenders"[11]  (as applicable) reserve, and nothing in these Bid Procedures should be construed to foreclose or preclude, (i) the right of (a) the DIP Lenders to credit bid all or any portion of their secured claims at the Auction, or (b) the Existing Lenders to bid on the Properties by waiving any distributions they are entitled to pursuant to the Beach Point Settlement Agreement (and the DIP Lenders and Existing Lenders shall be and shall be deemed to be Qualified Bidders for such purposes), or (ii) any and all rights of the DIP Agent and/or the DIP Lenders under the DIP Credit Agreement. Further, any other person or entity asserting a lien against the Properties (a "Lien Claimant") reserves, and nothing in these Bid Procedures should be construed or preclude, (i) the right of such Lien Claimant to credit bid all or any portion of their secured claims at the Auction, or (ii) any and all rights of the such Lien Claimant under its respective prepetition or postpetition agreements with the Debtors. Unless otherwise set forth in a separate order of the Bankruptcy Court, a Lien Claimant that asserts liens against multiple properties to secure a single debt may not credit bid against any single property in an amount that exceeds the dollar amount set forth in the Lien Claimants' applicable loan or credit documents pursuant to

---

[11] The Existing Lenders" consist of BPC VHI, L.P., Beach Point Total Return Master Fund, L.P., and Beach Point Distressed Master Fund, L.P., as lenders under that Amended and Restated Loan Agreement dated as of October 11, 2013.

which any property being bid on would be released of the subject lien(s) upon receipt of a cash payment.

33.    The principal proposed deadlines under the Bid Procedures are set forth

below:

| April 5, 2016 at 5:00 p.m. (ET) | Bid Deadline |
|---|---|
| **April 8, 2016** | Auction<br><br>Time and Location:<br><br>Time to be announced.<br><br>Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Blvd., 13th Floor,<br>Los Angeles CA 90067 |
| April 12, 2016 at 5:00 p.m. (ET) | Deadline to File Notice of Successful Bidder |
| **April 13, 2016 at 5:00 p.m. (ET)** | Deadline to Serve Notice of Successful Bidder and Successful Bidder's Adequate Assurance Information |
| On or about April 20, 2016 | Sale Hearing |

34.    The Debtors respectfully submit that the timeline set forth in the Bid

Procedures are reasonable and necessary under the circumstances of these cases.  Such timeline

provides an 11-week period between the filing of this Motion and the Bid Deadline, which will

allow the Debtors to market the Properties and solicit interested buyers, and will provide parties

in interest sufficient time to formulate bids.  Moreover, relevant information regarding the

Debtors' businesses and the Properties has been made available in the Data Room during the sale

process, allowing potential bidders to conduct the diligence reasonably necessary for potential

bidders to assess the Properties and determine the amount of any bids.  To the extent that any

potential bidder has not previously conducted such diligence, such bidder, subject to satisfying

the requirements under the Bid Procedures, will have immediate access to, subject to the

execution of an appropriate confidentiality agreement, the information regarding the Debtors'

Assets contained in the Data Room.

**Notice Procedures for the Bid Procedures and Auction**

35.     The Debtors also request approval of the Bid Procedures notice (the "Bid Procedures Notice"), substantially in the form attached to the Bid Procedures Order as **Exhibit 2**. Within three (3) business days of entry of the Bid Procedures Order, the Debtors will serve the Bid Procedures Notice by email, mail, facsimile or overnight delivery on: (1) the U.S. Trustee; (2) counsel to the DIP Lender; (3) proposed counsel to any statutorily appointed committee of unsecured creditors; (4) all parties known by the Debtors to assert a lien on any of the Properties; (5) all persons known or reasonably believed to have asserted an interest in any of the Assets; (6) all non-Debtor parties to any of the Assumed Contracts; (7) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets; (8) the Office of the United States Attorney for the District of Delaware; (9) the Office of the Attorney General in each state in which the Debtors operate; (10) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (11) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (12) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (13) counsel to the Stalking Horse Purchaser; (14) all of the Debtors' known creditors  (for whom identifying information and addresses are available to the Debtors); and (15) all other parties that had filed a notice of appearance and demand for service of papers in these chapter 11 cases pursuant to Bankruptcy Rule 2002 as of the date of entry of the Bid Procedures Order.

36.     The Debtors shall also post the Bid Procedures Notice and the Bid Procedures Order on the website of the Debtors' claims and noticing agent, UpShot Services, LLC at www.upshotservices.com/variant.

**Assumption and Assignment Procedures**

37.     To facilitate the Sale, the Debtors seek authority to assume and assign to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, the Assumed Contracts in accordance with the Assumption and Assignment Procedures.

38.     The Assumption and Assignment Procedures are as follows:

a.      Within five (5) business days after the entry of the Bid Procedures Order (the "Assumption Notice Deadline"), the Debtors shall file with the Court and serve on each counterparty (each, a "Counterparty," and collectively, the "Counterparties") to an Assumed Contract a notice, substantially in the form attached to the Bid Procedures Order as **Exhibit 3** (the "Assumption Notice").

b.      The Assumption Notice shall include, without limitation, the following: (a) notice to each Counterparty recipient that its respective Contract may be designated by the Debtors as either assumed or rejected, and the timing and procedures relating to such designation, (b) to the extent applicable (i) the title of the Contract, (ii) the name of the counterparty to the Contract, (iii) the Debtors' good faith estimates of the cure amount (each, a "Cure Amount"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assumed Contracts, (iv) the identity of purchaser, (v) the deadline by which any such Contract counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto, and (vi) that such Contract counterparty's failure to object timely to the proposed assumption or cure amount will be deemed to be consent to such assumption to cure amount. If a Counterparty objects to (i) the Cure Amount for its Assumed Contract or (ii) the provision of adequate assurance of future performance, the Counterparty must file with the Court and serve on the Cure Objection Notice Parties (as defined below) a written objection (a "Contract Objection").

c.      Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, together with proof of service, on or before 4:00 p.m. (ET) on April 5, 2016 (the "Contract Objection Deadline"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Cure Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assumed

Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto. Any objections to adequate assurance of performance by the Stalking Horse Purchaser shall be filed by the Contract Objection Deadline. Any objections to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Purchaser shall be filed in accordance with paragraph 38(g) below.

d.    The "Cure Objection Notice Parties" are as follows: (i) counsel to the Debtors, (a) Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA 90067-4003, Attn: Richard M. Pachulski, and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899, Attn: Peter J. Keane; (ii) proposed counsel to any statutorily appointed creditors' committee; (iii) counsel to the DIP Lender, (a) O'Melveny & Meyers LLP, (i) Two Embarcadero Center, 28th Floor, San Francisco, CA 94111, Attn: Suzanne S. Uhland and (ii) 1999 Avenue of the Stars, Los Angeles, CA 90067, Attn: Michael S. Neumeister, and (b) Richards Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Mark D. Collins, and (iv) counsel to the Stalking Horse Purchaser, if any.

e.    If after the Assumption Notice Deadline additional executory contracts or unexpired leases of the Debtors are determined to be Assumed Contracts, as soon as practicable thereafter and in no event less than two (2) business days before the date of the Sale Hearing, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than: (i) the Contract Objection Deadline in the event that such Assumption Notice was filed and served within thirty (30) days of the Assumption Notice Deadline and (ii) three (3) days prior to the commencement of the Sale Hearing in the event that such Assumption Notice was filed and served more than thirty (30) days after the Assumption Notice Deadline.

f.    No later than two (2) business days after the date of the Auction, the Debtors shall file with the Court a notice identifying such Successful Bidder (a "Notice of Successful Bidder"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any), (ii) the Selected Assumed Contracts (as defined below); (iii) the proposed assignee(s) of such Selected Assumed Contracts; and (iv) that the Debtors have provided, or will provide, in coordination with the proposed assignee, the Successful Bidder's Adequate Assurance Information to each affected Counterparty on a confidential basis.

g.    No later than three (3) business days after the date of the Auction, the Debtors will cause to be served by overnight mail upon each affected Counterparty and its counsel (if known): (i) the Notice of Successful Bidder and (ii) the Successful Bidder's Adequate Assurance Information (to the extent not previously provided);

<u>provided</u>, <u>however,</u> that the Debtors shall provide the Adequate Assurance Information of a Qualified Bidder that submitted a Qualified Bid, as soon as practicable after receipt thereof, to such Counterparty that submits a written request to receive the Adequate Assurance Information by email that specifically identifies each property for which such Counterparty would like to receive Adequate Assurance Information. The Counterparties shall file any Contract Objections <u>solely</u> on the basis of adequate assurance of future performance not later than three (3) days prior to the commencement of a Sale Hearing.

h.     At a sale hearing, the Debtors will seek Court approval of their assumption and assignment to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, of only those Assumed Contracts that have been selected by the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then the Successful Bidder, to be assumed and assigned (each, an "<u>Assumed Contract</u>," and collectively, the "<u>Assumed Contracts</u>"). The Debtors and their estates reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Selected Assumed Contracts.

i.     If no Contract Objection is timely received with respect to a Selected Assumed Contract: (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then the Successful Bidder); (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Assumed Contract against the Debtors and their estates or the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then the Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

j.     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the sale hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "<u>Cure Dispute</u>"), such Contract Objection will be adjudicated at the sale hearing or at such other date and time as may be

determined by the Debtors or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

k.      Notwithstanding anything to the contrary herein, if after the sale hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtors are determined to be Assumed Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than five (5) days thereafter.  If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Assumed Contracts to any Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, without further notice to creditors or other parties in interest and without the need for further order of the Bankruptcy Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

39.     For the avoidance of doubt, the Assumption and Assignment Procedures shall not apply to any leases of tenants who lease apartments at the Properties (the "Tenants"). The Tenants' rights and any leases with the Tenants will "ride through" these chapter 11 cases and will remain unaffected.

## **Relief Requested**

40.     By this Motion, the Debtors seek entry of an order: (i) authorizing and approving the Bid Procedures, (ii) authorizing the Assumption and Assignment Procedures, (iii) approving the form and manner of notice thereof; (iv) approving the Stalking Horse Purchaser's status as the Stalking Horse, including, the Bid Protections; and (v) granting related relief.

## Basis for Relief

**A.    Sufficient Business Justification Exists for Consummation of a Sale or Sales Under Bankruptcy Code Sections 105(a) and 363(b).**

41.    Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Courts apply the "sound business judgment" test for a use, sale or lease of estate property under section 363(b).  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware &  Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

42.    The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

43.    The Debtors submit that their decision to proceed with a Sale or Sales of the Assets represents a reasonable exercise of the Debtors' business judgment and, accordingly,

should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors have already conducted an extensive, months'-long marketing process for the Properties, in which the Debtors marketed the Properties on an individual property and portfolio basis to thousands of market participants.  The marketing process proposed by the Debtors during these bankruptcy cases, which will be completed through the proposed Bid Procedures, will supplement the Debtors' previous marketing process, and will complete an extensive and fulsome marketing process for the Assets.  The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets by allowing the market to test the purchase price of the Assets, and will provide a greater recovery than would be provided by any other available alternative.  Furthermore, compliance with the Bid Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Purchaser or other Successful Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

44.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Stalking Horse Agreement, the Sale, Bid Procedures, and Auction to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

45.     The Sale conducted in accordance with the Bid Procedures will generate significant value for the Debtors' estates and represents the best path forward for maximizing

recoveries to such estates, the Debtors' creditors, and all parties in interest.  The Debtors submit

that ample business justification exists for seeking to sell the Assets.

**B.      A Proposed Sale of the Assets Free and Clear of All Encumbrances Pursuant to the Proposed Bid Procedures is Authorized Under Bankruptcy Code Section 363(f).**

46.      Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets

free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code,

which provides that "[t]he court may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

47.      Because section 363(f) of the Bankruptcy Code is drafted in the

disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the

Assets "free and clear" of liens and interests.  *See Citicorp Homeowners Servs., Inc. v. Elliot (In*

*re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the

disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also*

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132,

1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y.

1986) (same).  Furthermore, a debtor possesses broad authority to sell assets free and clear of

liens.  *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

48.      The Debtors submit that, in the interest of attracting the best offers for the

Assets, it is appropriate to sell their Assets on a final "as is" basis, free and clear of any

and  all Encumbrances (except as otherwise expressly set forth in the Sale Order and the Stalking

Horse Agreement or an Executed APA with a Successful Bidder, as applicable)  in accordance

with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are

satisfied with respect to such Sale.  In particular, the Debtors believe that section 363(f)(2) of the

Bankruptcy Code will be met because the Debtors' prepetition secured lenders and postpetition

lenders are secured by, among other things, the Assets and have consented to the Sale.

49.    Moreover, with respect to any other party asserting a lien, claim, or

encumbrance against the Assets, the Debtors anticipate that they will be able to satisfy one or

more of the conditions set forth in section 363(f).  In particular, known lienholders will receive

notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders

that do not object to a Sale should be deemed to have consented.  *See FutureSource LLC v.

Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course

there is notice) counts as consent.   It could not be otherwise; transaction costs would be

prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a

formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. Of

Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's

failure  to  object  to  sale  free  and  clear  of  liens,  claims  and  encumbrances  satisfies  section

363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).

50.    Furthermore, the Debtors propose that any Encumbrances asserted against

the Assets be transferred to and attach to the proceeds of such Sale, unless the Stalking Horse

Purchaser is the Successful Bidder, in which case the Stalking Horse Purchaser shall assume or

satisfy those Encumbrances set forth in the Stalking Horse Agreement.  Application of the

proceeds generated by the Sale(s) will be subject to any orders approving the use of the Property-

Owning Debtors' mortgage lenders' cash collateral, the provisions of the order approving the

Debtors' postpetition superpriority secured financing with the DIP Lenders (the "<u>DIP Order</u>"),

and the Settlement Agreement.

51.     For the avoidance of doubt, the Debtors do not intend to sell the Assets

free and clear of any Tenant leases, and such Tenant leases shall "ride through" the Debtors'

bankruptcy cases upon the effectiveness of a confirmed chapter 11 plan.

## C.    <u>The Court Should Approve the Bid Procedures</u>.

52.     The key objective in any sale of property of a debtor's estate is to

maximize the value received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339

(3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's

assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548,

573 (3d Cir. 2003) (same).  Procedures used to enhance competitive bidding support this

objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien*

*Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at

659 (stating that Bid Procedures encourage bidding and maximize the value of a debtor's assets).

53.     The Debtors have designed the Bid Procedures to promote a competitive

and fair bidding process and, thus, to maximize value for the Debtors' estates and creditors.  The

Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open

fashion that will encourage participation by financially capable bidders, thus increasing the

likelihood that the Debtors will receive the highest or best possible consideration for the Assets.

Furthermore, the Bid Procedures provide an appropriate framework for the Debtors to review,

analyze, and compare any bids received in order to determine which bids are in the best interests

of the Debtors' estates and their creditors.   Moreover, the DIP Facility and the Mortgage

Lenders' cash collateral orders were negotiated with outside termination or default dates, which if triggered, will result in the Property-Owning Debtors' lenders likely pursuing enforcement actions against the Properties thereafter, to the detriment of the Debtors' estates.  The proposed Bid Procedures have been designed to satisfy these outside dates so that the Debtors are able to maximize the value of their assets and creditor recoveries.

54.    The Debtors submit that the forgoing procedures are fair, transparent, and will derive the highest or best bids for the Debtors' Assets.  Therefore, the Debtors request that the Court approve of the Bid Procedures, including the dates established thereby for the Auction.

**D.    The Assumption and Assignment Procedures Should Be Approved.**

55.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'"  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quotation omitted).

56.    The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.  *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances.");  *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the

product of bad faith, whim, or caprice).  As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'"  *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872).   Indeed, "the sole issue is whether the rejection benefits the estate."  *In re HQ Global*, 290 B.R. at 511.

57.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing.  *See id.*; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").  Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease.  *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42-43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

58.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Assumed Contracts is in the best interests of the Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code.  *See, e.g.*, *In re Philadelphia*

*Newspapers, LLC*, 424 B.R. 178, 182-83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

59.    As set forth above, the Sale will provide significant benefits to the Debtors' estates.  To that end, the assumption, assignment and sale of the Assumed Contracts is necessary for the Debtors to obtain the benefits of the Stalking Horse Agreement or any Executed APA, as applicable.  In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k).  Thus, following an assignment to the Successful Bidder of any Assumed Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

60.    Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors propose to file with this Court and serve on each Counterparty to an Assumed Contract an Assumption Notice that indicates the proposed Cure Amount for each such contract.  As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the proposed Cure Amount, if applicable.  Moreover, the payment

or reserve of the applicable Cure Amount will be a condition to the Debtors' assumption and assignment of any Assumed Contract.

61.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."   11 U.S.C. § 365(f)(2).   The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

62.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

63.     Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract.  In order for its bid to be deemed a

Qualified Bid, each Qualified Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including: (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; (b) the name of the proposed entity that will act as the assignee; and (c) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance.  To the extent available, the Adequate Assurance Information may also include: (x) a corporate organization chart or similar disclosure identifying ownership and control of the proposed assignee; (y) the potential assignee's intended use; and (z) financial statements, tax returns and annual reports.  Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts at the sale hearing have been met, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.[12]

64.    Therefore, the Debtors respectfully request that the Court (a) approve the proposed assumption and assignment of the Assumed Contracts, and (b) find that all anti-assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[13]

---

[12] The Debtors will also provide the Adequate Assurance Information to any Counterparty that submits a written request to receive the Adequate Assurance Information by email that specifically identifies each property for which such Counterparty would like to receive Adequate Assurance Information in accordance with the terms of the Bidding Procedure Order.

[13] Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that

**E.**      **Approval of the Bid Protections is Appropriate.**

65.      As indicated above, the Debtors request that the Court approve the Bid Protections in their entirety.  To compensate the Stalking Horse Purchaser whose bid will be subject to higher or better offers, the Debtors seek approval of the Bid Protections in accordance with the terms of the Stalking Horse Agreement.

66.      The Debtors and the Stalking Horse Purchaser believe that the amount of the Bid Protections is reasonable, given the benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Stalking Horse Purchaser, the risk to the Stalking Horse Purchaser that a third-party offer may ultimately be accepted, and that approval of the Bid Protections under the terms of the Stalking Horse Agreement (including the administrative claim status thereof) is necessary to preserve and enhance the value of the Debtors' estates.  The Debtors believe that the agreement to pay the Bid Protections on the terms of the Stalking Horse is necessary to induce the Stalking Horse Purchaser to enter into the transactions encompassed by the Stalking Horse Agreement and thus to enable the Debtors to obtain the highest and best possible price for the Assets.  Furthermore, the Debtors believe that the Bid Protections are fair and reasonable provision under all the circumstances.

67.      The Bid Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The Bid Protections will encourage competitive bidding and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

---

terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

68.    Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives similar to the Bid Protections, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  *See, e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

69.    The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context.  *In Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates.  *See id.* at 533.

70.    The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to an estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id.* at 537.  Second, where the availability of bidding incentives induces a bidder to research the value a debtor's assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely,

"the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

71.    Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Bid Protections are appropriate.  The Debtors' agreement to pay the Bid Protections pursuant to the terms of the Stalking Horse Agreement is the product of good faith, arm's-length negotiations between the Debtors and the Stalking Horse Purchaser.  The Bid Protections are fair and reasonable in amount, and are reasonably intended to compensate for the risk to the Stalking Horse Purchaser of being used as a stalking-horse bidder. Similarly, the Stalking Horse Agreement provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Assets will be] sold will reflect [its] true worth." *Id.*

72.    Finally, the Bid Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and the Bid Protections will permit the Debtors to insist that competing bids for the Assets, made in accordance with the Bid Procedures, be materially higher or otherwise better than the Stalking Horse Agreement (or competing agreement), which is a clear benefit to the Debtors' estates.

73.    Furthermore, the Bid Protections consist of (a) a Termination Payment, from the proceeds of any sale of one or more of the Properties to a party other than the Stalking Horse Purchaser (a "Third-Party Sale"), an amount of cash equal to (A) (i) if all of the Properties are sold through a Third-Party Sale, two percent (2.0%) of the sum of the Stalking Horse Purchase Price (the "Termination Payment"), or (ii) if one or more of the Properties are sold through a Third-Party Sale, two percent (2%) of the "Pro Rata Purchase Allocation" of the Termination Payment; and (b) an Expense Reimbursement of the Stalking Horse Purchaser's

reasonable, documented, actual out-of-pocket fees and expenses, including reasonable attorneys' fees and expenses of other consultants, incurred in connection with the transaction contemplated by the Stalking Horse Agreement, (i) up to a maximum amount of $1,000,000, or (ii) if one or more of the Properties are sold through a Third-Party Sale, the Pro Rata Purchase Allocation of the Expense Reimbursement.

74.     The Bid Protections are within the spectrum of termination fees approved by bankruptcy courts in other chapter 11 cases in this district.  *See, e.g.*, *In re Point Blank Solutions, Inc.*, Case No. 10-11255 (PJW) (Bankr. D. Del, Oct. 5, 2011) (court approved break-up and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000); *In re Champion Enterprises, Inc.*, Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (court approved break-up fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Western Nonwovens, Inc.*, Case No. 08-11435 (PJW) (Bankr. D. Del., July 28, 2009) (court approved break-up fee and expense reimbursement of $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase price); *In re Filene's Basement, Inc.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (court approved break-up fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11, 2008) (court approved break-up fee of 3%, or $240,000.00 in connection with sale of debtor's assets for purchase price of $8,000,000); *In re Global Motorsport Group, Inc.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (court approved a break-up fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products LLC*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (court approved a

break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve Food Distribution,*

*Inc.*, Case No. 00-0358 (PJW) (Bankr. D. Del., Sept. 27, 2000) (court approved a break-up fee of

3.64%, or $4,000,000, in connection with $110,000,000 sale).

75.     Finally, the Bid Protections proposed to be provided to the Beach Point

Funds are relatively modest compared to the $20 million the Beach Point Funds are committing

to loan the Debtors under the DIP Agreement.  If a third party acquires the Full Portfolio by

overbidding only the minimum overbid amount ($5,050,000) and the Beach Point Funds

advance the full commitment amount under the DIP Loan, then the Beach Point Funds will not

have realized the benefit of almost $15 million in advanced funds.  Not only are the Beach Point

Funds incurring significant additional costs to act as the Stalking Horse Purchaser; they are also

incurring significant risk so that the Debtors may conduct another open and fair marketing

process.  Under these circumstances, the Bid Protections under the Stalking Horse Agreement are

well within the range of acceptable bid protections under Third Circuit precedent.

### Waiver of Stay Under Bankruptcy Rule 6004(h) and 6006(d)

76.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use,

sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after

entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P.  6004(h).  Furthermore,

Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory

contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry

of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

77.     As set forth throughout this Motion, any delay in the Debtors' ability to

proceed with the bidding process and the Auction would be detrimental to the Debtors, their

creditors and estates.  For this reason and those set forth above, the Debtors submit that ample

cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and

6006(d), to the extent applicable.

## **Notice of Motion**

78.     Notice of this Motion will be provided to the following parties, or their

counsel, if known: (a) the Office of the United States Trustee; (b) the Debtors' principal secured

lenders; (c) the creditors holding the 20 largest unsecured claims against the Subsidiary Debtors

(as applicable, on a consolidated basis); (d) the creditors holding the 20 largest unsecured claims

against Variant Holding Company, LLC; (e) all parties known or reasonably believed by the

Debtors to have asserted a lien on, or interest in, any of the Assets; and (f) those persons who

have previously requested notice pursuant to Bankruptcy Rule 2002 in the case of Variant

Holding Company, LLC.  The Debtors submit that, in light of the nature of the relief requested,

no other or further notice need be given.

## **No Prior Request**

79.     No prior motion for the relief requested herein has been made to this or

any other court.


[Remainder of page intentionally left blank]

WHEREFORE, the Debtors request entry of the Bidding Procedures Order granting the relief requested herein and such other and further relief as is just and proper.

Dated:  January 19, 2016                    PACHULSKI STANG ZIEHL & JONES LLP


*/s/ Peter J. Keane*_____
Richard M. Pachulski (CA Bar No. 90073)
Maxim B. Litvak (CA Bar No. 215852)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  rpachulski@pszjlaw.com
        mlitvak@pszjlaw.com
        pkeane@pszjlaw.com

Proposed Counsel for the Debtors and Debtors in Possession